UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
----------------------------------------------------------------------------x
STATE OF NEW YORK, STATE OF CALIFORNIA, STATE
OF CONNECTICUT, STATE OF ILLINOIS, STATE OF
IOWA, STATE OF MAINE, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS, STATE OF
NEW MEXICO, STATE OF OREGON, COMMONWEALTH
OF PENNSYLVANIA, STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF WASHINGTON,
DISTRICT OF COLUMBIA, CITY OF CHICAGO

                             Plaintiffs,

            – against –

E. SCOTT PRUITT, in his official capacity as Administrator
of the United States Environmental Protection Agency, and the
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                             Defendants.
----------------------------------------------------------------------------x

**COMPLAINT**

**Index No. 1:18-cv-773**

The States of New York, California, Connecticut, Illinois, Iowa, Maine, Maryland, New

Mexico, Oregon, Rhode Island, Vermont, Washington, the Commonwealths of Massachusetts

and Pennsylvania, the District of Columbia, and the City of Chicago (collectively "Plaintiffs" or

"States and Local Governments") bring this action to compel E. Scott Pruitt, in his official

capacity as Administrator of the United States Environmental Protection Agency, and the United

States Environmental Protection Agency (together, "EPA"), to comply with the nondiscretionary

duty under the Clean Air Act ("Act") to establish guidelines for limiting methane emissions from

existing sources in the oil and natural gas sector, thereby remedying EPA's unreasonable delay

in establishing such emission guidelines.

## JURISDICTION AND VENUE

    1.    This Court has jurisdiction over this action pursuant to section 304(a) of the Act,

42 U.S.C. § 7604(a), which authorizes any person, after duly giving notice, to commence an

action in district court to compel agency action unreasonably delayed. The Court also has

jurisdiction to hear this civil action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction)

and 28 U.S.C. § 1361 (action to compel officer or agency to perform a duty owed to plaintiffs).

2.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e), because this civil

action is brought against an agency of the United States and an officer of the United States,

acting in his official capacity, and a substantial part of the events or omissions giving rise to

Plaintiffs' claim occurred in this judicial district, as the Administrator's failure to perform his

nondiscretionary duty to establish guidelines for limiting methane emissions from existing

sources in the oil and natural gas sector occurred in this district, and EPA maintains an office in

this district.

3.    Since the action unreasonably delayed would be reviewable in the United States

Court of Appeals for the District of Columbia Circuit under section 307(b) of the Act, 42

U.S.C. § 7607(b), venue is also proper in this Court under section 304(a) of the Act, 42 U.S.C.

§ 7604(a) ("[A]n action to compel agency action referred to in section 7607(b) of this title

which is unreasonably delayed may only be filed in a United States District Court within the

circuit in which such action would be reviewable under section 7607(b) of this title.").

## NOTICE

4.    On June 29, 2017, Plaintiffs sent EPA notices of intent to sue for EPA's failure to

establish guidelines for standards of performance for methane emissions from existing oil and

natural gas sources. The letters provided 180-day notice for an action to compel agency action

unreasonably delayed under section 304(a).

5.    More than 180 days have passed since the Plaintiffs sent the notice letters, and

EPA still has not completed its mandatory obligation to issue guidelines for the control of

methane emissions from existing oil and natural gas sources to remedy its unreasonable delay in issuing such guidelines.

## PARTIES

6.    Plaintiff State of New York is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

7.    Plaintiff State of California is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

8.    Plaintiff State of Connecticut is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

9.    Plaintiff State of Illinois is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

10.    Plaintiff State of Iowa is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

11.    Plaintiff State of Maine is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

12.    Plaintiff State of Maryland is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

13.    Plaintiff Commonwealth of Massachusetts is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

14.    Plaintiff State of New Mexico is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

15.    Plaintiff State of Oregon is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

16.    Plaintiff Commonwealth of Pennsylvania is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

17.    Plaintiff State of Rhode Island is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

18.    Plaintiff State of Vermont is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

19.     Plaintiff State of Washington is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State.

20.     Plaintiff District of Columbia is a municipal entity that brings this action on its own behalf to protect city property and on behalf of its residents to protect their health and well-being.

21.     Plaintiff City of Chicago is a municipal entity that brings this action on its own behalf to protect city property and on behalf of its residents to protect their health and well-being.

22.     Each of the plaintiffs is a "person" as defined in the applicable provision of the Act, 42 U.S.C. § 7602(e).

23.     Defendant E. Scott Pruitt is Administrator of the EPA. The Administrator is charged with implementing and enforcing the Act, including the nondiscretionary requirement in section 111(d), 42 U.S.C. § 7411(d), to establish guidelines for limiting emissions of any non-criteria and non-hazardous air pollutants from existing sources in a source category when EPA establishes standards of performance for emissions of air pollutants from new sources in the source category under section 111(b).

24.     Defendant EPA is an executive agency of the federal government charged with implementing and enforcing the Act in coordination with the states.

## STATUTORY AND REGULATORY FRAMEWORK

25.     Section 111 of the Act requires EPA to develop air pollution control performance standards that apply to specific categories of stationary sources. Section 111(b) requires the Administrator to list categories of stationary sources that the Administrator finds "cause[], or

contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). The Administrator then must establish "standards of performance" for emissions of air pollutants from new and modified sources within each such category ("new source performance standards" or "NSPS"). *Id.* § 7411(b)(1)(B).

26.     Pursuant to section 111(b)(1)(B) of the Act, EPA must, "at least every eight years, review and, if appropriate, revise such standards" following the procedure required for promulgation of such standards. *Id.* § 7411(b)(1)(B).

27.     When EPA establishes performance standards for new sources in a particular source category, EPA is also required under section 111(d) and applicable regulations to publish guidelines for controlling emissions from existing sources in that source category, subject to two narrow exceptions not applicable here. EPA's regulations provide that such guidelines will be issued "[c]oncurrently upon or after proposal of [section 111(b)] standards of performance for the control of a designated pollutant from affected facilities." 40 C.F.R. § 60.22(a).

28.     After EPA issues final guidelines for existing sources for a designated pollutant, states have nine months to develop and submit state plans containing emission standards for control of that pollutant from designated facilities within the state. 40 C.F.R. § 60.23(a)(1). EPA must then take final action on the state plans within four months of the due date for those plans. *Id.* § 60.27(b). If EPA disapproves a state plan (or a portion thereof), it must promulgate a plan for the state within six months after the date required for submission of the plan. *Id.* § 60.27(d).

**FACTUAL BACKGROUND**

A.     **Methane Pollution**

29.     Methane is a potent greenhouse gas—pound for pound, it warms the climate twenty-eight to thirty-six times more over a one hundred-year time frame than carbon dioxide. According to the Intergovernmental Panel on Climate Change ("IPCC") 5th Assessment Report (2013), methane is the second leading climate-forcing agent after carbon dioxide globally. The IPCC has also found that, on a twenty-year timeframe, methane is about eighty-six times more potent than carbon dioxide.

30.     In December 2009, EPA determined that methane, along with other greenhouse gases, endangers public health and welfare because of its contribution to climate change. 74 Fed. Reg. 66,496 (Dec. 15, 2009).

31.     EPA has found that methane "contributes to warming of the atmosphere, which, over time, leads to increased air and ocean temperatures, changes in precipitation patterns, melting and thawing of global glaciers and ice, increasingly severe weather events, such as hurricanes of greater intensity and sea level rise." 77 Fed. Reg. 49,490, 49,535 (Aug. 23, 2011).

32.     According to EPA's 2015 "Inventory of U.S. Greenhouse Gas Emissions and Sinks," total methane emissions from the oil and gas industry account for about 31 percent of the total methane emissions from all U.S. sources and account for about 10 percent of all U.S. greenhouse gas emissions from human activities, with oil and natural gas systems being the single largest source of methane emissions in the U.S..

33.     Methane emissions from oil and natural gas sources harm plaintiffs and their citizens by significantly contributing to air pollution that causes climate change.

34.    Plaintiffs and their citizens have experienced and will continue to experience injuries from climate change, including, but not limited to:

   a.    increased heat deaths and illnesses due to intensified and prolonged heat waves;

   b.    increased ground-level ozone pollution, with concomitant increases in asthma, bronchitis, heart disease, and emphysema, as well as coughing, throat irritation, and lung tissue damage;

   c.    beach erosion, temporary and permanent inundation of portions of coastal state property, damage to publicly owned coastal facilities and infrastructure, and salinization of water supplies from accelerated sea level rise;

   d.    more frequent flooding from more severe rains and higher storm surges resulting in property damage and hazard to human safety;

   e.    diminished water supplies and adverse impacts to agriculture due to reduced snowpack and more frequent and severe droughts;

   f.    deaths, property damage, and impairment of air and water quality from increasingly more severe and damaging wildfires;

   g.    additional state emergency response costs caused by more frequent and intense storm surges, floods, and wildfires; and

   h.    widespread loss of species and biodiversity, including the disappearance of hardwood forests from the northern United States.

35.    The need for EPA to proceed promptly with the regulation of existing sources is especially pressing because the lion's share of methane emissions from the oil and natural gas

sector comes from existing sources. Indeed, sources in existence prior to 2012 are projected to

be responsible for up to 90 percent of the methane emissions in the oil and natural gas sector in

2018. ICF Int'l, Economic Analysis of Methane Emission Reduction Opportunities in the U.S.

Onshore Oil and Natural Gas Industries 1 (2014) (*available at*

http://www.edf.org/sites/default/files/methane_cost_curve_report.pdf).

36.    The same study found that industry could cut emissions forty percent below the

projected 2018 levels at an average annual cost of less than one cent per thousand cubic feet of

natural gas produced. Taking into account the total economic value of the natural gas that

would be recovered through the use of these additional emissions controls, this forty percent

reduction would yield savings of over $100 million dollars per year for the U.S. economy and

consumers.

**B.    EPA's Failure to Timely Issue Emissions Guidelines for Methane Pollution from Existing Oil and Natural Gas Operations**

37.    The oil and natural gas sector is listed as a category of stationary sources that the

Administrator has found causes or contributes significantly to air pollution that may reasonably

be anticipated to endanger public health or welfare. 44 Fed. Reg. 49,222 (Aug. 21, 1979).

38.    EPA originally promulgated standards of performance for sources in the oil and

natural gas sector in 1985. 50 Fed. Reg. 26,122 (June 24, 1985); 50 Fed. Reg. 40,158 (Oct. 1,

1985).

39.    EPA's failure to timely review the 1985 standards for sources in the oil and

natural gas sector led multiple groups to file suit in 2009 to compel such review. That case,

*Wild Earth Guardians v. EPA*, No. 1:09-CV-00089 (D.D.C.), resulted in the Court's entering a

consent decree setting forth a schedule for EPA to propose and finalize any revisions to the oil

and gas sector standards of performance. The consent decree, as modified, required EPA to propose standards by July 28, 2011, and to take final action by April 17, 2012.

40.     In August 2011, EPA proposed revisions to the oil and natural gas standards of performance. 76 Fed. Reg. 52,738 (Aug. 23, 2011). EPA acknowledged in the proposal that "processes in the Oil and Natural Gas source category emit significant amounts of methane," and that such emissions are equivalent to more than 328 million metric tons of carbon dioxide each year. *Id.* at 52,756. However, EPA did not propose any standards for methane emissions, despite having previously determined in 2009 that methane and other greenhouse gases endanger public health and welfare.

41.     EPA signed a final rule revising some aspects of the oil and natural gas standards in April 2012, which was published on August 16, 2012 ("2012 Final Rule"). 77 Fed. Reg. 49,490.

42.     In violation of its mandatory 8-year review obligation under section 111(b)(1)(B) of the Act, EPA failed to determine in the 2012 Final Rule whether it was appropriate to establish methane standards. Instead, EPA stated that "[i]n this rule, we are not taking final action with respect to regulation of methane. Rather, we intend to continue to evaluate the appropriateness of regulating methane with an eye toward taking additional steps if appropriate." *Id.* at 49,513. The agency stated that "over time," it would assess emissions data received pursuant to the recently implemented greenhouse gas emissions reporting program, which would help it evaluate whether to directly regulate methane and identify cost-effective ways to do so. *Id.* EPA set forth no timetable for taking final action to address methane emissions.

10

43.  EPA stated that the standards it adopted in the 2012 Final Rule for emissions of volatile organic compounds ("VOCs") and hazardous air pollutants would have the incidental benefit of also reducing annual methane emissions by about 19 million metric tons of carbon dioxide equivalent, *id.* at 49,535, which is only a small fraction of the 328 million metric tons of total carbon dioxide equivalent methane emissions from the oil and natural gas sector.

44.  Throughout this time, EPA had compelling data demonstrating that many measures to avoid (or reduce) methane leaks from new and existing oil and natural gas operations are available and cost-effective. For instance, through EPA's voluntary Natural Gas Star Program—a public-private partnership with the oil and natural gas industry launched in 1993—"many of [the] technologies and management practices" available to control methane emissions from the sector "have been well documented (including information on cost, benefits and reduction potential) and implemented in oil and gas systems throughout the U.S." EPA, Office of Air & Radiation, *Technical Support Document for the Advanced Notice of Proposed Rulemaking for Greenhouse Gases; Stationary Sources*, Sec. VII, at 30 (June 2008).

45.  On December 11, 2012, several of the Plaintiff States notified EPA of their intent to sue the agency for violating the Clean Air Act by failing to determine in the 2012 rulemaking whether standards limiting methane emissions from oil and natural gas operations under section 111 were appropriate and by failing to set performance standards for new sources and guidelines for existing sources that curb emissions of methane from the oil and natural gas sector. The letter notified EPA that such failures were both a violation of a nondiscretionary duty under section 111 of the Act and constituted unreasonable delay in taking agency action.

46.  In June 2013, President Obama issued a Climate Action Plan that, among other things, committed his administration to developing a comprehensive, interagency strategy to

reduce methane emissions. That strategy, released in March 2014, committed EPA to a number

of activities, including assessing significant sources of methane and other emissions from the

oil and natural gas sector, soliciting input from independent experts through a series of

technical white papers, and determining how best to pursue further methane reductions from

these sources. Because of EPA's actions demonstrating progress in addressing these sources,

the Plaintiff States that had previously notified EPA of their intent to sue held the filing of a

lawsuit in abeyance.

47.     On April 15, 2014, EPA released five technical white papers regarding sources of

and mitigation techniques to control methane and VOC emissions in the oil and natural gas

sector. EPA sought independent peer review of the white papers and received more than 43,000

comments from the public, including several of the Plaintiff States. EPA stated that it intended

to use the technical documents and public comments received to "solidify its understanding of

these potentially significant sources," enabling the agency "to fully evaluate the range of

options for cost-effectively cutting VOC and methane waste and emissions."

48.     In September 2015, EPA proposed overdue regulations to require new and

modified oil and natural gas facilities to meet standards to limit their methane emissions. 80

Fed. Reg. 56,593 (Sept. 18, 2015). Numerous Attorneys General submitted comments on the

proposed standards for new and modified sources, and further urged EPA to move forward

expeditiously with regulation of existing sources, which is mandated under the Act once a rule

on new and modified sources is finalized.

49.     On June 3, 2016, EPA finally promulgated much-delayed final performance

standards for methane emissions from new and modified oil and natural gas sources. *Oil and

Natural Gas Sector Emission Standards for New, Reconstructed and Modified Sources*, 81 Fed.

Reg. 35,824 (June 3, 2016) ("New Source Rule"). EPA's promulgation of those new source standards triggered its mandatory obligation under 42 U.S.C. § 7411(d) and 40 C.F.R. § 60.22(a) to issue existing source guidelines.

50.    In recognition of that obligation, on the same day that it issued the New Source Rule, EPA published notice that it would be issuing an information collection request ("ICR") to obtain "more specific information that would be of critical use in addressing existing source emissions pursuant to CAA section 111(d)." 81 Fed. Reg, 35,763, 35,764 (June 3, 2016). After two rounds of notice and comment, and review by the Office of Management and Budget, resulting in narrower requests for information and lower compliance costs, EPA issued the Final Methane ICR on November 10, 2016. The ICR had two parts: (1) an operator survey, designed to obtain basic information from onshore oil and natural gas facilities to better understand the number and types of equipment at production facilities; and (2) a facility survey, sent to select oil and natural gas facilities to obtain more detailed information on sources of methane emissions and emissions control devices or practices. EPA began receiving the requested information from oil and natural gas operators in January 2017.

51.    Nineteen months later, EPA has not yet fulfilled its mandatory obligation under the Act, outlined in 42 U.S.C. § 7411(d) and 40 C.F.R. § 60.22(a), to issue guidelines for the control of methane emissions from existing oil and natural gas sources once it promulgated the New Source Rule.

52.    Quite the contrary, on March 2, 2017, one day after eleven states, mostly oil and gas-producing states, wrote to Administrator Pruitt requesting that he suspend and withdraw the ICR. Without any notice or opportunity for comment, EPA withdrew the Final Methane ICR.

82 Fed. Reg. 12,817 (Mar. 7, 2017). On April 3, 2017, several of the Plaintiff States submitted

a letter to Administrator Pruitt objecting to the ICR withdrawal.

53.     Further indicating its disinterest in regulating air pollutant emissions from existing

oil and natural gas sources, on March 1, 2018, EPA proposed a complete withdrawal of its

2016 Control Techniques Guidelines ("CTGs") for the Oil and Natural Gas Industry. The CTGs

are technical recommendations critical to reducing emissions of VOCs from existing oil and

natural gas facilities, which would have the co-benefit of reducing some methane emissions.

*See Notice of Proposed Withdrawal of the Control Techniques Guidelines for the Oil and*

*Natural Gas Industry*, 83 Fed. Reg. 10,478 (Mar. 9, 2018).

## CLAIM FOR RELIEF

### Continuing Unreasonable Delay in Performing Mandatory Duty to
### Issue Emission Guidelines for Control of Methane Emissions from Existing Sources

54.     The allegations set forth in the foregoing paragraphs are incorporated herein by

reference.

55.     As set forth above, EPA has a nondiscretionary legal duty to propose guidelines

for methane emissions from existing facilities in the oil and natural gas sector when it issues

standards of performance for methane emissions from new oil and natural gas sources.

56.     After extensive agency delay, EPA finally promulgated standards of performance

for methane emissions from new oil and natural gas sources in the final New Source Rule on

June 3, 2016, but to date has failed to fulfill its corresponding obligation under section 111(d)

to publish emission guidelines covering methane emissions from existing oil and natural gas

sources.

57.     EPA's failure has harmed and continues to harm Plaintiffs by delaying the

adoption and implementation of methane standards for existing oil and natural gas operations

that would result in cleaner and healthier air in the States and that would reduce and delay the harmful impacts from climate change, to the benefit of Plaintiffs and the health and welfare of their citizens.

58.    EPA has known since at least 1997 that oil and natural gas operations are one of the nation's largest methane sources.

59.    EPA has known since at least 2009 that methane endangers public health and welfare because of its contribution to climate change.

60.    EPA has long had ample data on cost-effective measures for controlling methane emissions from oil and natural gas sources, for example, through the Natural Gas STAR Program, which started in 1993.

61.    Since at least 2011, EPA has been assessing the significant emissions of methane from oil and natural gas operations and evaluating actions to address those emissions. *See* 76 Fed. Reg. at 52,756 ("Although this proposed rule does not include standards for regulating [methane emissions], we continue to assess these significant emissions and evaluate appropriate actions for addressing these concerns.").

62.    EPA also has a vast amount of scientific and technical data on emissions and control strategies developed over the last several years, including from its white papers, the Greenhouse Gas Reporting Program, and its 2016 CTGs for the Oil and Natural Gas Industry.

63.    Notwithstanding the detailed information EPA already has in its possession, EPA has not established guidelines for controlling methane emissions from existing oil and natural gas sources.

64.    EPA's delay in failing to establish methane emissions guidelines covering existing oil and natural gas sources as required by section 111(d) of the Act and EPA's

implementing regulations, 40 C.F.R. § 60.22(a), constitutes unreasonable delay in the performance of an act or duty within the meaning of section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), which delay is ongoing as of the present time.

65.     EPA's unreasonable delay in issuing these guidelines in turn delays both the date by which states must submit plans for the control of methane from existing oil and natural gas operations, 40 C.F.R. § 60.23(a), and the date by which existing sources must comply with approved pollution control standards, *see id.* § 60.24(c).

66.     EPA's failure to issue required guidelines for states to develop plans to limit methane emissions from existing sources harms Plaintiffs and their citizens by delaying adoption of such plans, resulting in higher emissions of methane and other pollutants from existing sources in the oil and natural gas sector than would be permitted if EPA were to complete the required actions.

## REQUESTED RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment against defendants as follows:

A.     Declaring that EPA's failure to publish emission guidelines for the control of methane emissions from existing sources in the oil and natural gas sector, as required by section 111(d) of the Act, 42 U.S.C. § 7411(d), and EPA's implementing regulations, 40 C.F.R. § 60.22(a), constitutes agency action unreasonably delayed within the meaning of 42 U.S.C. § 7604(a), in violation of the Act;

B.     Ordering EPA to propose and subsequently promulgate emission guidelines for methane emissions from existing sources in the oil and gas sector, in accordance with 42 U.S.C.

§ 7411(d) and 40 C.F.R. § 60.22(a), pursuant to an expeditious deadline established by this

Court;

      C.      Retaining jurisdiction over this matter until such time as EPA has issued such

guidelines;

      D.      Awarding Plaintiffs the costs of litigation, including reasonable attorneys' fees;

and

      E.      Awarding such other relief as the Court deems just and proper.

Dated: April 5, 2018

                           FOR THE STATE OF NEW YORK

                           ERIC T. SCHNEIDERMAN
                           Attorney General
By:
                           /s/ Christopher C. Gore
                           MICHAEL J. MYERS
                           MORGAN A. COSTELLO
                           CHRISTOPHER C. GORE
                           Assistant Attorneys General
                           Environmental Protection Bureau
                           The Capitol
                           Albany, NY 12224
                           (518) 776-2392

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
Timothy E. Sullivan
Daniel M. Lucas
Kavita P. Lesser
Deputy Attorneys General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6605
*Attorneys for the State of California, by
and through the California Air
Resources Board and Attorney General
Xavier Becerra*

FOR THE STATE OF CONNECTICUT

GEORGE JEPSEN
Attorney General
MATTHEW LEVINE
JILL LACEDONIA
Assistant Attorneys General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141-0120
(860) 808-5250

FOR THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General
MATTHEW DUNN
GERALD KARR
DANIEL ROTTENBERG
Assistant Attorneys General
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-0660

FOR THE STATE OF IOWA

TOM MILLER
Attorney General
JACOB LARSON
Assistant Attorney General
Environmental Law Division
Hoover State Office Building
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
(515) 281-5341

FOR THE STATE OF MAINE

JANET T. MILLS
Attorney General
GERALD D. REID
Assistant Attorney General
Chief, Natural Resources Division
Maine Attorney General's Office
6 State House Station
Augusta, ME 04333-0006
(207) 626-8545

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General
LEAH J. TULIN
Assistant Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6962

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General
MELISSA HOFFER
Assistant Attorney General
Chief, Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

18

FOR THE STATE OF NEW MEXICO

HECTOR H. BALDERAS
Attorney General
WILLIAM GRANTHAM
BRIAN E. MCMATH
Consumer & Environmental Protection
Division
New Mexico Office of the Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 717-3500


FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General
PAUL GARRAHAN
Attorney-in-Charge, Natural Resources
Section
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 947-4593


FOR THE COMMONWEALTH OF
PENNSYLVANIA

JOSH SHAPIRO
Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
ROBERT A. REILEY
Assistant Director, Pennsylvania
Department of Environmental Protection
Environmental Protection Section
Pennsylvania Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171

FOR THE STATE OF RHODE ISLAND

PETER F. KILMARTIN
Attorney General
GREGORY S. SCHULTZ
Special Assistant Attorney General
Rhode Island Department of Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400


FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186


FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General
KATHARINE G. SHIREY
Assistant Attorney General
Washington State Attorney General's Office
PO Box 40117
Olympia, WA 98504
(360) 586-6769


FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General
DAVID S. HOFFMAN
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
441 Fourth St. NW Ste. 600-S
Washington, D.C. 20001
(202) 442-9889

FOR THE CITY OF CHICAGO

EDWARD N. SISKEL
Corporation Counsel
JARED POLICCHIO*
Supervising Assistant Corporation Counsel
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764

*motion to appear pro hac vice to be
submitted promptly