# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STATE OF NEW YORK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ENVIRONMENTAL DEFENSE FUND, | ) | Civil Action No. 18-773 (RBW) |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WHEELER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF RELEVANT STATUTORY AND FACTUAL
        BACKGROUND ..................................................................................................3

        A.  Methane Pollution from the Oil and Natural Gas Sector Harms Plaintiffs
            and the Public..............................................................................................3

        B.  In 2016, EPA Charted a Course to "Swiftly" Fulfill Its Clean Air Act
            Obligation to Issue an Existing Source Rule for Methane Emissions. .........4

        C.  In Early 2017, the New EPA Administrator Halted the Agency's
            Regulatory Process, and EPA Has Since Refused to Fulfill Its Statutory
            Obligation. ..................................................................................................6

            1.  EPA Abruptly Withdrew the ICR in March, Halting Its Ongoing Process to
                Develop an Existing Source Rule. ..........................................................6

            2.  After It Withdrew the ICR and Halted Work on an Existing Source Rule, EPA
                Embarked on Its Non-Statutory Policy Review of the 2016 New Source Rule. .....9

            3.  Over Two Years After Initiating the E.O. Review, EPA Proposed to Rescind Its
                New Source Methane Standards to Further Avoid Its Statutory Obligation to
                Regulate Methane Emissions from Existing Sources. ...........................10

III.    JURISDICTION AND VENUE ...................................................................12

IV.     LEGAL STANDARD ....................................................................................13

V.      ARGUMENT..................................................................................................14

        A.  EPA Has a Non-Discretionary Duty to Promulgate an Existing Source
            Rule...........................................................................................................15

        B.  EPA Has Unreasonably Delayed Promulgating an Existing Source Rule..................16

            1.  *TRAC* factors 1 and 2: EPA's four-year delay in promulgating an Existing Source
                Rule is unreasonable and contrary to Congress's expectation..............................17

                a.  The E.O. Review does not provide a lawful justification for EPA's
                    deliberate delay and EPA's delay is therefore unreasonable. .........................17

                b.  The undisputed facts show EPA's highly irregular decision to halt its
                    ongoing regulatory process was unreasoned and therefore
                    unreasonable. ...............................................................................21

2. *TRAC* factors 3 and 5: EPA's delay endangers human health and welfare and is deeply prejudicial. ............................................................................26

3. *TRAC* factor 4: no competing priority justifies EPA's inaction. ...........................31

4. *TRAC* factor 6: EPA's deliberate delay is a bad faith attempt to evade its statutory duty. ..............................................................................................32

C. This Court Should Order EPA to Promulgate an Existing Source Rule As Soon As Feasible to Remedy EPA's Unreasonable Delay. .........................................39

1. The Court Should Require EPA to File a Proposed Plan within 30 Days that Includes Date-Certain Deadlines for EPA's Proposal and Promulgation of an Existing Source Rule as Expeditiously as Possible. ...............................................40

2. Given EPA's Substantial Delay and the Ongoing Significant Harm to Human Health and Welfare, EPA's Estimated Timelines for Promulgating an Existing Source Rule Are Too Long. ..................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air All. Hous. v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) ............................................................................19

*Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*,
  365 F. Supp. 3d 118 (D.D.C. 2019) ...............................................................13, 39

*Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*,
  334 F.3d 93 (D.C. Cir. 2003) ...............................................................................15

*Am. Lung Ass'n v. Browner*,
  884 F. Supp. 345 (D. Ariz. 1994) ........................................................................44

*Am. Tel. & Tel. Co. v. FCC*,
  978 F.2d 727 (D.C. Cir. 1992) ..............................................................................38

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................13

*Bennett v. Spear*,
  520 U.S. 154 (1997)...............................................................................................15

*Biodiversity Legal Found. v. Norton*,
  285 F. Supp. 2d 1 (D.D.C. 2003) ....................................................................21, 26

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Solis*,
  600 F. Supp. 2d 25 (D.D.C. 2009) ........................................................................17

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)...............................................................................................33

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ................................................................10, 19, 37

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001) ............................................................................39

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ........................................................................ passim

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)..................................................................................... passim

*Dep't of Homeland Sec. v. Regents of Univ. of California*,
No. 18-587, __ S.Ct. __, slip. op. (2020)........................................................................25, 36

*Envtl. Def. Fund v. Thomas*,
627 F. Supp. 566 (D.D.C. 1986)........................................................................19

*Envtl. Integrity Project v. EPA*,
160 F. Supp. 3d 50 (D.D.C. 2015)........................................................................15

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006)........................................................................13

*In re A Cmty Voice*,
878 F.3d 779 (9th Cir. 2017) ........................................................................14, 27, 42

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004)........................................................................ 17-18, 21, 38

*In re Core Comm's, Inc.*,
531 F.3d 849 (D.C. Cir. 2008)........................................................................26

*In re Nat. Res. Def. Council, Inc.*,
956 F.3d 1134 (9th Cir. 2020) ........................................................................14

*In re Pesticide Action Network*,
798 F.3d 809 (9th Cir. 2015) ........................................................................27, 30

*In re Pub. Emps. for Envtl. Responsibility*,
957 F.3d 267 (D.C. Cir. 2020)........................................................................16, 18, 40

*In re United Mine Workers of Am. Int'l Union*,
190 F.3d 545 (D.C. Cir. 1999) ........................................................................ 16-17, 27

*Massachusetts v. EPA*,
549 U.S. 497 (2007)........................................................................3, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................13

*Mercy Gen. Hosp. v. Azar*,
410 F. Supp. 3d 63 (D.D.C. 2019)........................................................................40

*Muwekma Ohlone Tribe v. Kempthorne*,
452 F. Supp. 2d 105 (D.D.C. 2006)........................................................................39

*Muwekma Tribe v. Babbitt*,
133 F. Supp. 2d 30 (D.D.C. 2000)........................................................................17, 40

*Nat. Res. Def. Council, Inc. v. Train*,
    510 F.2d 692 (D.C. Cir. 1974) ..................................................................................... 14

*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992) ..................................................................................... 19

*Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*,
    768 F.2d 1480 (D.C. Cir. 1985) ................................................................................... 21

*Orion Reserves Ltd. P'ship v. Kempthorne*,
    516 F. Supp. 2d 8 (D.D.C. 2007), rev'd on other grounds, *Orion Reserves Ltd.*
    *P'ship v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009) .................................................... 14

*Pub. Citizen Health Research Grp. v. Auchter*,
    702 F.2d 1150 (D.C. Cir. 1983) ............................................................................ 17, 27

*Scott v. Harris*,
    550 U.S. 372 (2007) ..................................................................................................... 13

*Sierra Club v. Leavitt*,
    355 F. Supp. 2d 544 (D.D.C. 2005) ............................................................................. 12

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ........................................................................ 14-15, 27n9

*Solenex LLC v. Jewell*,
    156 F. Supp. 3d 83 (D.D.C. 2015) .......................................................................... 13, 39

*Telecommunications Research & Action Center v. Federal Communications*
    *Commission (TRAC)*,
    750 F.2d 70 (D.C. Cir. 1984) ............................................................................... passim

*Tummino v. Von Eschenbach*,
    427 F. Supp. 2d 212 (E.D.N.Y. 2006) ................................................................... passim

*U.S. Women's Chamber of Commerce*, No. 1:04-cv-01889 (RBW), 2005 WL
    3244182 (D.D.C. Nov. 30, 2005) ................................................................................ 40

## FEDERAL STATUTES

28 U.S.C.
    § 1331 .......................................................................................................................... 12
    § 1361 .......................................................................................................................... 12

42 U.S.C.
  § 7401(b)(1) ....................................................................................................20, 27
  § 7411 ....................................................................................................................15
  § 7411(b) ...........................................................................................................1, 4
  § 7411(b)(1)(A) ...................................................................................................20
  § 7411(d) ..........................................................................................................1, 4
  § 7411(d)(1) .........................................................................................................15
  § 7604(a) ......................................................................................................12, 14
  § 7607(b) ..............................................................................................................12
  § 7607(d)(7)(B) ...............................................................................................18-19

44 U.S.C.
  §§ 3501 *et seq.* ...................................................................................................5

**FEDERAL REGULATIONS**

40 C.F.R. § 60.22a(a) ...............................................................................4, 15, 21

40 Fed. Reg. 53,340 (Nov. 17, 1975) ...................................................................21

42 Fed. Reg. 12,022 (Mar. 1, 1977) ...................................................................21n4

58 Fed. Reg. 51,735 (Oct. 4, 1993) ......................................................................44

61 Fed. Reg. 9,905 (Mar. 12, 1996) ...................................................................21n4

74 Fed. Reg. 66,496 (Dec. 15, 2009) ....................................................................39

77 Fed. Reg. 49,490 (Aug. 16, 2012) ...................................................................39

80 Fed. Reg. 64,510 (Oct. 23, 2015) ..................................................................21n4

80 Fed. Reg. 64,661 (Oct. 23, 2015) ..................................................................21n4

81 Fed. Reg, 35,763 (June 3, 2016) ...................................................5, 15, 27, 30

81 Fed. Reg. 59,276 (Aug. 29, 2016) .................................................................21n4

81 Fed. Reg. 59,332 (Aug. 29, 2016) .................................................................21n4

81 Fed. Reg. 66,962 (Sept. 29, 2016) ....................................................................5

81 Fed. Reg. 74,798 (Oct. 27, 2016) .....................................................................42

82 Fed. Reg. 12,817 (Mar. 7, 2017) ............................................................... passim

82 Fed. Reg. 16,093 (Mar. 31, 2017) ....................................................9-10, 36, 38

82 Fed. Reg. 16,331 (Apr. 4, 2017) ......................................................................10

82 Fed. Reg. 25,730 (June 5, 2017) .................................................................................10

82 Fed. Reg. 27,641 (June 16, 2017) ...............................................................................10

82 Fed. Reg. 27,645 (June 16, 2017) ...............................................................................10

84 Fed. Reg. 50,244 (Sept. 24, 2019) ....................................................................... passim

**RULES**

Fed. R. Civ. P. 56(a) .......................................................................................................13

**MISCELLANEOUS AUTHORITIES**

2017 Promoting Energy Independence Executive Order 13,783 .......................................... passim

EPA, Control Techniques Guidelines for the Oil and Natural Gas Industry (Oct.
     2016), *available at* https://www.epa.gov/sites/production/files/2016-
     10/documents/2016-ctg-oil-and-gas.pdf .........................................................43n15

EPA, Regulatory Impact Analysis for the Proposed Oil and Natural Gas Sector:
     Emission Standards for New, Reconstructed, and Modified Sources Review
     (Aug. 2019) ...................................................................................................28n11

IPCC, Summary for Policymakers of IPCC Special Report on Global Warming of
     1.5 C Approved by Governments (Oct. 8, 2018), *available at*
     http://www.ipcc.ch ........................................................................................29n12

Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and
     Gas Supply Chain*, 361 Science 186 (2018), *available at*
     https://science.sciencemag.org/content/361/6398/186. ......................................28n10

Supplemental Notice of Potential Withdrawal of the Control Techniques
     Guidelines for the Oil and Natural Gas Industry (Spring 2020)
     https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202004&RIN=
     2060-AT76 ...................................................................................................43n15

U.S. Global Change Research Program, *Fourth National Climate Assessment*, vol.
     II, Chapters 18-27 (2018), a*vailable at* https://nca2018.globalchange.gov ....................29n13

## I.    INTRODUCTION

Existing oil and natural gas sources are the largest industrial emitter of methane, a powerful greenhouse gas that is responsible for a quarter of the warming we are experiencing today. Since at least 2016, when EPA began to regulate methane from new sources, the Clean Air Act has required the Environmental Protection Agency (EPA) to regulate methane from these existing sources. *See* 42 U.S.C. § 7411(b), (d). Recognizing that duty, and the urgency of reducing dangerous pollution, in 2016 EPA set a course to "swiftly" develop regulations for methane emissions from existing oil and gas sources (Existing Source Rule), beginning with an information collection request (ICR). Plaintiffs' Statement of Undisputed Material Facts (SUF) 22. Had the agency stayed on course, it would have already issued an Existing Source Rule.

Instead, in early 2017, EPA abruptly pulled the plug on the ICR, terminating all agency work to promulgate an Existing Source Rule. Extensive discovery in this case establishes that the newly appointed Administrator, Scott Pruitt, halted the agency's ongoing process to regulate existing sources at the behest of an oil-and-natural-gas industry representative, with no public process, analysis, or input from EPA career staff, and on the basis of a pretextual rationale. Since then, EPA admits, it has not taken *any* steps toward fulfilling its statutory obligation under the Clean Air Act to reduce this dangerous pollution. And not because it lacks the resources or has competing priorities or, indeed, because of any change in the need for or feasibility of health-protective regulation. EPA's *sole* stated basis for spurning its mandatory statutory duty is that, pursuant to the 2017 Promoting Energy Independence Executive Order, No. 13,783 (E.O. 13,783), it was engaged in a non-statutory policy review (E.O. Review) to determine whether it could eliminate EPA's regulation of methane from *new* oil and natural gas sources—in place since 2016 and the trigger for its duty to regulate *existing* sources—on the basis of purported burdens to industry. But that rationale is neither lawful nor reasonable, since nothing in E.O. 13,783 waived—

1

nor could it—EPA's statutory Clean Air Act obligations. And, as set forth in more detail below, EPA's proffered basis for delay is not plausible; the Executive Order EPA claims permitted it to avoid its mandatory duty was issued weeks *after* EPA had already halted all work on the Existing Source Rule by withdrawing the ICR.

The Clean Air Act authorizes states and citizens to enforce EPA's mandatory duties when EPA unreasonably delays them. EPA's now four-year delay in regulating existing sources is unreasonable under the factors courts weigh, set out in *Telecommunications Research & Action Center v. Federal Communications Commission* (*TRAC*), 750 F.2d 70, 79-80 (D.C. Cir. 1984). While plaintiffs need not demonstrate that they prevail under each factor, in this case they do. The undisputed facts here show that EPA has offered no legitimate reasons for its delay. EPA's decision to halt its active process to regulate existing sources just weeks into the new Administration was unreasoned and unreasonable, made without regard for the agency's statutory duty to protect public health and welfare or the expertise of its staff (*TRAC* factors 1 & 2). EPA's deliberate delay has severely harmed Plaintiffs and the public by significantly delaying critical protections against dangerous pollution (*TRAC* factors 3 & 5). And the agency readily concedes that it does not lack resources or time (*TRAC* factor 4). Finally, while Plaintiffs need not demonstrate that EPA's delay was in bad faith, the only reasonable inference that may be drawn from the undisputed facts is that it was (*TRAC* factor 6). EPA's claim that the E.O. Review is the basis for its delay is merely a post-hoc, pretextual attempt to supply *any* justification (however unlawful) for the decision EPA had already made to halt existing source methane regulation.

This Court should grant summary judgment in favor of Plaintiffs, declare EPA's four-year delay unreasonable, and order EPA to develop and issue an Existing Source Rule expeditiously.

## II.   STATEMENT OF RELEVANT STATUTORY AND FACTUAL BACKGROUND

### A.   Methane Pollution from the Oil and Natural Gas Sector Harms Plaintiffs and the Public.

Following the Supreme Court's 2007 landmark decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which directed EPA to fulfill its Clean Air Act mandate to determine whether greenhouse gases endanger public health and welfare, EPA found that methane, along with other greenhouse gases, contributes to climate change and thus endangers public health and welfare. SUF 1. Pound for pound, methane warms the earth eighty-four to eighty-six times more than carbon dioxide for the first two decades after release and twenty-eight to thirty-six times more over a one hundred-year time frame. SUF 2. The oil and natural gas sector is the largest industrial emitter of domestic methane emissions, SUF 3; and methane emissions from oil and gas sources in existence before 2012 constitute the majority of methane emissions from the sector in the United States, SUF 4. By 2014, EPA had identified available and technically feasible mitigation technologies and practices to reduce methane emissions from oil and gas operations. SUF 5. But because of EPA's unreasonable delay in regulating existing sources, those sources have not been required to employ these technologies and practices, leading to millions of tons of excess methane emissions. Ex. 23 (McVay/Hull Decl.), at ¶¶ 11-12 & Tbl. 1.

Methane emissions from oil and gas sources harm Plaintiffs and their residents and members by significantly contributing to air pollution that causes climate change. Plaintiffs have experienced and will continue to experience substantial injuries from climate change, including sea level rise and increased severity of storms and flooding resulting in property damage and hazard to human safety, increased heat deaths and illnesses due to intensified and prolonged heat waves, and increased frequency and duration of wildfires threatening lives and property and increasing local air pollution. SUF 6.

Oil and gas sources also emit large quantities of ozone-forming volatile organic compounds (VOCs) and hazardous air pollutants that an Existing Source Rule would reduce. SUF 8 & 21. These pollutants, which have significant local health effects, are emitted in large quantities by the more than 850,000 existing oil and gas wells that, among other sources, would be subject to an Existing Source Rule, many of which are near schools and homes. SUF 7 & 9 (estimating that approximately 9,300,000 people live within a half mile of an existing well, including approximately 600,000 children under the age of five and 1,400,000 people over the age of 65 years, who are especially sensitive to the health risks posed by ozone and other local air pollution).

### B. In 2016, EPA Charted a Course to "Swiftly" Fulfill Its Clean Air Act Obligation to Issue an Existing Source Rule for Methane Emissions.

In light of the danger posed by methane pollution from existing sources, the Clean Air Act requires EPA to regulate both new and existing sources of methane emissions under sections 111(b) and 111(d), respectively. 42 U.S.C. § 7411(b), (d) (EPA "shall" promulgate regulations under which each state will establish standards of performance for existing sources for air pollutants for which EPA has established new source standards under section 111(b) of the Act); *see also* 40 C.F.R. § 60.22a(a) (EPA "will" publish existing source standards "upon or after promulgation of" new source standards). In 2016, EPA promulgated new source performance standards regulating methane emissions from new oil and natural gas sources under section 111(b) of the Clean Air Act (New Source Rule), SUF 16, but it did not concurrently propose or finalize regulations to limit such emissions from existing sources, SUF 18.

However, in early 2016, recognizing its mandatory statutory obligation and the urgency of reducing emissions—which new data showed were "substantially higher than previously understood," SUF 23—EPA set a deliberate course toward establishing an Existing Source Rule. In March 2016, three months before issuing the New Source Rule, EPA announced it would

"immediately" begin developing existing source regulations. SUF 22 ("EPA will begin developing regulations for methane emissions from existing oil and gas sources. We will start this work immediately to address methane from existing sources. We intend to work swiftly, and will involve stakeholders in meaningful ways, as we have been doing all along."). EPA determined that the first step in developing an Existing Source Rule would be to issue an ICR under the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501 *et seq.*, to obtain "more specific information that would be of critical use in addressing [existing source emissions pursuant to] CAA section 111(d)." 81 Fed. Reg, 35,763, 35,764 (June 3, 2016). EPA initiated the ICR process on the same day that it issued the New Source Rule. *Id.*

EPA devoted significant resources to developing the ICR in 2016, including five full-time employees and over one million dollars in additional contractor expenses. SUF 30. Brenda Shine, an engineer in EPA's Office of Air Quality Planning and Standards, led the effort. SUF 31. Ms. Shine testified that in the course of developing the ICR "the outreach was pretty extensive," and included numerous communications with both the regulated industry and States. SUF 32. After two rounds of public notice and comment, and review by the Office of Management and Budget (OMB) as required by the PRA, *see* 81 Fed. Reg. 66,962 (Sept. 29, 2016), EPA issued the final methane ICR on November 10, 2016. SUF 28 & 29. EPA intended to use the ICR to gather information on methane emissions from existing sources, technologies to reduce those emissions, and the costs of those technologies. SUF 25. EPA began receiving the requested information from oil and gas operators in or before January 2017. SUF 33. By March 2017, EPA had received approximately 4,500 responses to the ICR. SUF 37. To assist the ICR recipients with completing and returning the requested information, EPA established a telephonic help line, an email account,

and an ICR help desk staffed by dozens of EPA employees—whose substantial efforts resulted in their nomination for the EPA Exemplary Customer Service Award. SUF 34.

Thus, in early 2017, EPA was progressing deliberately toward addressing methane emissions from existing sources. According to EPA's own projections, had it continued on its course, the agency would have had sufficient time to finalize its statutorily-required Existing Source Rule by now. SUF 38.

### C. In Early 2017, the New EPA Administrator Halted the Agency's Regulatory Process, and EPA Has Since Refused to Fulfill Its Statutory Obligation.

EPA's substantial progress, however, was cut short. Weeks after a new President was inaugurated, EPA's new Administrator abruptly halted the agency's active process, unilaterally withdrew the ICR, and refused to take any steps toward regulation while EPA embarked on a lengthy non-statutory policy review to determine if it could deregulate new source methane emissions and thus attempt to eliminate its statutory obligation to regulate existing sources.

#### 1. EPA Abruptly Withdrew the ICR in March, Halting Its Ongoing Process to Develop an Existing Source Rule.

On February 1, 2017, just twelve days into the new Administration, Kathleen Sgamma, the president of an oil and gas industry trade group, reached out to David Kreutzer, a politically-appointed member of EPA's beachhead team, requesting a meeting. SUF 40.[1] Ms. Sgamma followed up on February 10, 2017, urging the agency either to eliminate the ICR or to extend the response date because "it seems unlikely that the new EPA will approach this 'existing' source regulation in the same way." SUF 41. That same day, George Sugiyama, another member of EPA's

---

[1] "Beachhead team" is a term of art for the political appointees who come to run the agency after inauguration of a new Administration. Ex. 9 (30(b)(6) Dep.), at 87:15-88:2. Around the same time, House Majority Leader Kevin McCarthy's office reached out to Marcus Peacock, a political official in OMB, asking him to forward a request to suspend the ICR to the appropriate EPA official. That request stated: "My assumption is that the EPA team will likely rescind/modify this ICR once it gets up and running … Goal here would be to suspend this ICR until the new EPA gets up and running." SUF 39. Marcus Peacock forwarded that request to Charles Munoz, then EPA's White House liaison. *Id.* (no record of Mr. Munoz forwarding it or discussing it with anyone else at EPA).

political team jumped into action, immediately directing Mr. Kreutzer to instruct EPA staff to tell recipients of the ICR not to respond, SUF 42, (an order that Mr. Sugiyama did not have authority to make, SUF 43, and that EPA staff did not follow at that time, SUF 44). Mr. Kreutzer continued to push forward efforts to withdraw the ICR. SUF 45 & 46. When Administrator Pruitt was confirmed shortly thereafter on February 17, SUF 47, he picked up the baton: as one political appointee put it, "Administrator Pruitt wants to make a fast start . . . with regard to . . . the methane information demand." SUF 48. And he did: on March 2, less than two weeks after his confirmation, Administrator Pruitt formally withdrew the ICR. SUF 57; 82 Fed. Reg. 12,817 (Mar. 7, 2017) (signed Mar. 2, 2017).

Both EPA and senior EPA staff testified that there was no decision-making process leading to the withdrawal of the ICR, no "internal review by the EPA concerning whether it should withdraw" the ICR, and that EPA did not consult its career staff in deciding to withdraw the ICR. SUF 58 & 60. Despite the fact that the ICR had undergone two rounds of public notice and comment, there was no public process leading up to the withdrawal. SUF 61. Neither the agency nor its most knowledgeable staff are aware of Administrator Pruitt seeking any analysis or assessment specifically related to the decision to withdraw the ICR. SUF 62. Sarah Dunham, a career EPA official who was then the acting head of EPA's Office of Air and Radiation, testified that she was not part of any decision-making process leading up to and had no involvement in determining the rationale for the withdrawal. SUF 60. According to EPA, senior career staff directly involved in the ICR did not learn EPA's stated basis for the withdrawal until the day it was announced, SUF 63; a process that, a senior EPA official testified, was inconsistent with "EPA's typical practice and routine procedures," SUF 64. Indeed, the many volunteers staffing EPA's ICR phone bank continued to field regulated entities' queries regarding responding to the

ICR throughout February and up until March 1 or 2 even as EPA's political officials were rushing to rescind the ICR. SUF 36. A February 28, 2017, draft press release circulated just two days prior to announcing the decision to withdraw the ICR contained only a "[Placeholder for message language about why cancelling]." SUF 51.

Meanwhile, on March 1, after EPA had already decided to withdraw the ICR and directed EPA career staff to prepare the documents to implement that decision (SUF 50 & 53), a group of eleven oil-producing states sent Administrator Pruitt a letter asking that the ICR be "suspen[ded]" "pending internal review by EPA concerning whether it should be withdrawn," given their "hope that the burdensome Obama climate rules never see the light of day." SUF 54-55. The morning of March 2, the day the Administrator signed the ICR withdrawal, a political EPA official directed the agency's Office of General Counsel to draft a Federal Register notice to withdraw the ICR, explaining that "[i]t can literally be three sentences long." SUF 56. Later that day, EPA announced the withdrawal of the ICR with three sentences of reasoning, claiming as its basis that EPA "would like to assess the need for the information that the agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need" and also citing the state letter received just the day before the notice was signed. SUF 65; 82 Fed. Reg. at 12,817.

Despite its public-facing rationale, EPA's 30(b)(6) deponent, Paul Gunning, testified that EPA had no plans to "assess the need for the information" at the time of or after withdrawing the ICR, SUF 66, and neither the agency nor anyone now at EPA knows what then-Administrator Pruitt meant by wanting to "assess the need" for the information, SUF 68. According to Mr. Gunning, the agency did no analysis to reevaluate the ICR's potential burden on industry, which EPA already had considered during two rounds of public notice and comment and found justified in light of the need for the information. SUF 69 & 70. EPA senior staff also testified that they do

not recall the agency considering options other than immediate withdrawal of the ICR, such as suspension (as the States' letter had suggested), *see*, *e.g*., SUF 55 & 71, which would have enabled EPA to first assess the need for the information without risking having to redo the lengthy and resource-intensive ICR process, if the agency determined that it still needed the information. As late as October 2017, EPA was still claiming that it was assessing the need for the information, a statement that a senior EPA staffer testified was not correct. SUF 72.

With EPA's withdrawal of the ICR, EPA halted all efforts to develop an Existing Source Rule. SUF 73. As EPA admitted, EPA's withdrawal of the ICR delayed EPA's ability to issue an Existing Source Rule. SUF 74. But EPA neither assessed nor identified any scientific, technical, or economic basis for reversing its decision to issue an Existing Source Rule and failed to assess any impacts of that decision. SUF 75. EPA even admitted that technologies are available to reduce methane emissions from existing sources. SUF 76. Within hours of EPA's March 2 announcement withdrawing the ICR, Kathleen Sgamma, the industry representative who prompted the ICR withdrawal, and EPA's David Kreutzer exchanged mutual appreciation, with Ms. Sgamma thanking Mr. Kreutzer "[f]rom the bottom of [her] heart." SUF 77.

### 2. After It Withdrew the ICR and Halted Work on an Existing Source Rule, EPA Embarked on Its Non-Statutory Policy Review of the 2016 New Source Rule.

On March 28, 2017, several weeks *after* EPA halted all development of an Existing Source Rule by withdrawing the ICR, President Trump issued E.O. 13,783. SUF 78; 82 Fed. Reg. 16,093 (Mar. 31, 2017). E.O. 13,783 directed agencies to review existing regulations and "appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources *beyond the degree necessary to protect the public interest or otherwise comply with the law*." *Id.* (Sec. 1(c)) (emphasis added). The Executive Order does not direct EPA to ignore its mandatory

statutory obligations. *Id.* at 16,096 (Sec. 8(b)). EPA initiated its E.O. Review of the New Source Rule in April 2017. SUF 79; 82 Fed. Reg. 16,331 (Apr. 4, 2017).

Meanwhile, in June 2017, again without any notice or comment, then-Administrator Pruitt attempted to unlawfully stay the New Source Rule. SUF 80; 82 Fed. Reg. 25,730 (June 5, 2017). Less than a month later, the United States Court of Appeals for the District of Columbia Circuit summarily vacated EPA's stay as "arbitrary, capricious, [and] ... in excess of [its] ... statutory ... authority." *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017) (citation omitted). Also in June 2017, EPA proposed two additional stays of the requirements of the New Source Rule for notice and comment. 82 Fed. Reg. 27,641 (June 16, 2017); 82 Fed. Reg. 27,645 (June 16, 2017). EPA never finalized the proposed stays. SUF 82. Therefore, the New Source Rule, including its triggering statutory requirement to promulgate an Existing Source Rule, has continued to be in full force and effect during the entire period of EPA's delay.

Since it withdrew the ICR and abruptly reversed course halting the regulatory process, EPA "has not taken any action specifically toward developing or issuing the Existing Source Guidelines, nor does EPA intend to do so before completing" the E.O. Review. SUF 83. Instead, EPA spent the last several years "reviewing" the New Source Rule pursuant to the E.O. Even though EPA halted the existing source regulatory process *before* it initiated that review, and had not yet completed that review, EPA's sole stated rationale for its multi-year refusal to promulgate an Existing Source Rule is that its E.O. Review "was likely to eliminate [EPA's] obligation to issue the Methane Guidelines altogether." EPA Stay Mot. (ECF No. 59) at 10.

   **3.  Over Two Years After Initiating the E.O. Review, EPA Proposed to Rescind
        Its New Source Methane Standards to Further Avoid Its Statutory Obligation
        to Regulate Methane Emissions from Existing Sources.**

On September 24, 2019, EPA published a proposed rule to rescind methane standards for new and modified sources in the oil and natural gas sector (New Source Rescission Rule) on the

ground that "methane requirements are entirely redundant with" requirements for VOCs. 84 Fed. Reg. 50,244, 50,246 (Sept. 24, 2019). The proposal purports to respond to E.O. 13,783, which directed the agency to rescind regulations that "unduly burden" the production of energy, but states that "because the methane control options are redundant with VOC control options, there are no expected cost or emissions impacts from rescinding the methane requirement." *See id.* at 50,281 (proposed rescission will result in $0 of cost savings); *see also* SUF 87 (senior EPA staffer testified that proposed rule would not relieve any burden on regulated sources).

At the same time that it asserts that standards for methane and VOCs are unlawfully redundant, the proposal also concludes that rescinding methane regulation will "obviate the need for the development of emission guidelines under CAA section 111(d) . . . to address methane emissions from existing sources." 84 Fed. Reg. at 50,254.[2] In other words, EPA has stated that rescission of the New Source Rule would nullify the statutory trigger for regulating existing sources—by far, the largest oil and gas sector sources of dangerous methane pollution—ensuring that hundreds of thousands of existing sources will continue to emit millions of tons of methane pollution. Yet, EPA's proposal asserts this is a mere "legal consequence," and declines to analyze the significant emissions impact of foregoing existing source regulation. *Id.* at 50,272; *see also* SUF 88 (impacts on existing source emissions were "viewed as out of scope"). The proposal "recognizes that in proposing to rescind one set of standards in part for its redundancy with another set, the EPA is choosing to rescind" methane standards instead of VOC standards,[3] a move that will result in hundreds of thousands of sources being left unregulated.

---

[2] EPA's position is that VOC-only regulation of new sources does not trigger its obligation to promulgate existing source regulations for oil-and-gas-sector VOC emissions because EPA regulates VOCs under a different section of the Act, and thus those pollutants are excluded from regulation under section 111(d). *See* 84 Fed. Reg. at 50,272.

[3] EPA's claimed justification for choosing to retain the VOC standards is that "EPA regulated VOC first." 84 Fed. Reg. at 50,260.

EPA's intention to no longer directly regulate methane emissions from the oil and gas sector has been met with opposition and concern from a range of stakeholders. For example, some major oil companies like Royal Dutch Shell PLC and Exxon Mobil Corp. have indicated their support for EPA's direct regulation of methane from both new and existing sources. SUF 89.

## III.    JURISDICTION AND VENUE

Section 304(a) of the Act authorizes the states and citizens, after giving notice, to commence a citizen suit against EPA where the Administrator has unreasonably delayed in performing a nondiscretionary duty under the Act. 42 U.S.C. § 7604(a); *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 555 (D.D.C. 2005). Plaintiffs filed their complaints more than 180 days after sending notice letters, but EPA had not then, and still has not, performed its nondiscretionary duty to promulgate an Existing Source Rule. SUF 90. This Court has jurisdiction pursuant to 42 U.S.C. § 7604(a) to compel EPA's unreasonably delayed action, as well as 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1361 (action to compel officer or agency to perform a duty owed to plaintiffs). Because the unreasonably delayed action would be reviewable in the United States Court of Appeals for the District of Columbia Circuit under section 307(b) of the Act, 42 U.S.C. § 7607(b), venue is also proper in this Court. 42 U.S.C. § 7604(a).

Plaintiffs have standing to sue EPA concerning its failure timely to fulfill its nondiscretionary duty under the Clean Air Act to promulgate an Existing Source Rule. EPA's failure has caused Plaintiffs to suffer past and continuing harm from the delay in addressing methane emissions that contribute to climate change impacts being suffered by Plaintiffs and their residents and members. *See* SUF 6; *supra* pp. 3-4; *infra* pp. 26-31. Because Plaintiffs' requested relief would redress the harms to these interests, Plaintiffs have standing. *See Massachusetts*, 549 U.S. at 518, 520-521 & n. 17.

## IV.   LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). In making its determination, the Court must "view the evidence in the light most favorable to [the nonmovant], and draw all reasonable inferences in [its] favor." *Holcomb*, 433 F.3d at 895.

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citations omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

When an agency has unreasonably delayed in fulfilling a nondiscretionary agency action under the Clean Air Act, summary judgment is an appropriate mechanism to declare that failure and to determine when compliance is due. *Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 132 (D.D.C. 2019) (granting summary judgment for plaintiffs as a result of unreasonably delayed agency action, and ordering the agency to take final action within 12 months, despite the agency's request for additional time); *Solenex LLC v. Jewell*, 156 F. Supp. 3d 83, 85-86 (D.D.C. 2015) (granting summary judgment for plaintiff as a result of

unreasonably delayed agency action and ordering defendants to submit "an accelerated and fixed schedule" to complete the action). The Court has broad discretion to fashion an equitable remedy by setting enforceable deadlines. 42 U.S.C. § 7604(a); *Orion Reserves Ltd. P'ship v. Kempthorne*, 516 F. Supp. 2d 8, 12, 16 (D.D.C. 2007), *rev'd on other grounds*, *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009); *see also In re A Cmty Voice*, 878 F.3d 779, 788 (9th Cir. 2017) (finding that EPA unreasonably delayed promulgating lead standards and ordering EPA to issue a proposed rule within 90 days); *see also In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1142-43 (9th Cir. 2020) (finding EPA's "years-long delay" on a "critical matter of public health" to be "nothing short of egregious" and ordering EPA to take action within 90 days).

## V.    ARGUMENT

EPA's four-year delay in promulgating critical pollution safeguards that the Clean Air Act requires is unreasonable. Indeed, in this unusual case, EPA does not claim that it lacks resources to promulgate these important, statutorily mandated protections from dangerous pollution, or that it has competing priorities. SUF 92. EPA's delay here is not the "footdragging efforts of a delinquent agency," *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974), though that itself would be unreasonable in light of the dangers posed. Instead, EPA affirmatively *halted* its active process to comply with its mandatory duty, and, as EPA admits, "has not taken any action specifically toward developing or issuing the Methane Guidelines, nor does EPA intend to do so before completing" its non-statutory policy review of the new source standards. SUF 83. This "recalcitrance … in the face of a clear statutory duty" is "of such magnitude that it amounts to an abdication of statutory responsibility." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (*superseded by* statute affirming federal district court jurisdiction for unreasonable delay claims). This Court should order EPA to promulgate an Existing Source Rule expeditiously.

### A.      EPA Has a Non-Discretionary Duty to Promulgate an Existing Source Rule.

The Clean Air Act requires EPA to regulate new and existing stationary sources that emit pollutants that endanger human health and welfare. 42 U.S.C. § 7411. In 2016, EPA concluded that both new and existing oil and gas sources contribute significantly to endangerment of human health and welfare by virtue of their emissions of the powerful greenhouse gas methane, and established methane standards for new sources. 81 Fed. Reg. at 35,833. For existing sources, the Act provides that "[t]he Administrator *shall* prescribe regulations which *shall* establish a procedure … under which each State *shall* submit to the Administrator a plan which … establishes standards of performance for any existing source for any air pollutant … to which a standard of performance under this section would apply if such existing source were a new source." 42 U.S.C. § 7411(d)(1) (emphasis added). Congress spoke in mandatory language in establishing EPA's duty to regulate existing sources. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("[A]ny contention that the relevant provision … is discretionary would fly in the face of its text, which uses the imperative 'shall.'"); *Allied Pilots Ass'n v. Pension Benefit Guar. Corp*., 334 F.3d 93, 98 (D.C. Cir. 2003) ("the word 'shall' is ordinarily the language of command"). EPA's regulations implementing section 111 further provide that "[c]oncurrently upon or after proposal of" new source standards, "the Administrator *will* publish a draft guideline," and, after considering comments, "a final guideline document *will* be published." 40 C.F.R. § 60.22a(a) (emphasis added).

Accordingly, EPA has a non-discretionary duty to regulate methane emissions from existing oil and gas sources. *See Thomas*, 828 F.2d at 790-94 ("Examples of such clear duties to act include provisions that require an agency to take specific action when certain preconditions have been met."); *Envtl. Integrity Project v. EPA*, 160 F. Supp. 3d 50, 59 (D.D.C. 2015) (duty mandatory although it had no "specific timetables"); *see also* Ex. 9 (30(b)(6) Dep.), at 26:17-21

(EPA's representative testifying that once the New Source Rule issued, "we knew that there was an obligation to look at existing source standards").

**B.**   **EPA Has Unreasonably Delayed Promulgating an Existing Source Rule.**

EPA's four-year delay in promulgating an Existing Source Rule is unreasonable. Courts weigh the following six *TRAC* factors in determining whether a delay is unreasonable:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80). In that inquiry, the court "should scrutinize [EPA's] justifications for delay" and "balance them against the consequences ensuing" and "must examine the delay in the context of the [Clean Air Act]," bearing in mind that promulgating an Existing Source Rule "is not a voluntary program for these purposes." *Cutler v. Hayes*, 818 F.2d 879, 898-99 (D.C. Cir. 1987). "No one factor is determinative, and each case must be analyzed according to its own unique circumstances." *In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d 267, 273 (D.C. Cir. 2020).

EPA has now delayed fulfilling its mandatory obligation for four years; indeed, had EPA not halted its active process to develop an Existing Source Rule, that Rule would be in place today, leading to the reduction of dangerous methane emissions from hundreds of thousands of existing sources. Four years ago, EPA concluded that methane is a "potent" greenhouse gas driving dangerous climate change and that the need to reduce methane emissions was "urgen[t]." 81 Fed. Reg. at 35,830, 35,833-37. A four-year delay, when health and welfare are endangered, is too long.

*See Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) ("Three years from announced intent to regulate to final rule is simply too long given the significant risk of grave danger…."); *see also In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) ("[A] reasonable time for agency action is typically counted in weeks or months, not years."). In this case, each of the *TRAC* factors supports the conclusion that EPA has unreasonably delayed issuing an Existing Source Rule for dangerous methane pollution.

### 1. *TRAC* factors 1 and 2: EPA's four-year delay in promulgating an Existing Source Rule is unreasonable and contrary to Congress's expectation.

EPA's four-year delay is wholly unreasonable and contrary to the statutory scheme under *TRAC* factors 1 and 2. *TRAC* factor 1 requires the Court to "consider the agency's justification for the pace of its decision." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 36 (D.D.C. 2000). The agency's purported justification for its prolonged delay here—the E.O. Review of the New Source Rule—is not a lawful or reasonable justification for EPA's deliberate delay under the Clean Air Act, and "is completely contrary to the statutory scheme," which demonstrates Congress intended EPA to move swiftly to protect human health and welfare. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Solis*, 600 F. Supp. 2d 25, 33 (D.D.C. 2009); *In re United Mine Workers*, 190 F.3d at 549 (second *TRAC* factor "gives content to the first"). And EPA's highly irregular, rushed decision, at the behest of an industry representative, to halt its ongoing process to regulate existing sources in the face of its mandatory duty represents an unreasoned and unreasonable "breakdown of regulatory processes." *Cutler*, 818 F.2d at 897 n.156.

### a. The E.O. Review does not provide a lawful justification for EPA's deliberate delay and EPA's delay is therefore unreasonable.

The undisputed facts show that EPA has no lawful or reasoned explanation for its four-year delay in developing an Existing Source Rule, as section 111(d) of the Clean Air Act mandates, and its delay is therefore unreasonable. While EPA "attempts to rationalize its delay, none of its

reasons comports with the specific considerations outlined in *TRAC*." *In re Am. Rivers*, 372 F.3d at 419; *see In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d at 274 (finding an unreasonable delay where "an interagency turf war" was not a valid basis for delay). EPA offers no "plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *In re Am. Rivers*, 372 F.3d at 420 (quoting *Cutler*, 818 F.2d at 898). EPA's *only* justification for its deliberate four-year delay in regulating dangerous methane pollution is that it "initiated the E.O. Review," and "[b]ecause the E.O. Review could result in the suspension, revision, or rescission of the methane standards in the 2016 NSPS," it could "potentially affect[] the substance of potential future guidelines for existing oil and natural gas sources, and/or eliminat[e] or curtail[] EPA's authority to issue such guidelines." SUF 83. That justification is unreasonable (in addition to being implausible, *infra* pp. 36-37), because it does not constitute a lawful basis for EPA's egregious multi-year disregard of its mandatory duty under the Clean Air Act. To the contrary, the text of the Clean Air Act demonstrates that Congress did not intend agency reconsideration to result in long delays in promulgating critical safeguards and that Congress expected EPA to promptly regulate existing sources once endangerment is found and new sources are regulated.

*First*, the text of the Clean Air Act demonstrates that EPA's justification for delay is contrary to the statute. Congress indicated its expectation in the Act that agency reconsideration of regulations would *not* halt critical health protections. Indeed, under the Act, Congress explicitly limited to three months the time in which an agency could stall the effectiveness of a rule for the purposes of reconsidering it; otherwise, reconsideration "shall not postpone the effectiveness of [a] rule." 42 U.S.C. § 7607(d)(7)(B). As the D.C. Circuit explained in summarily vacating EPA's attempt to stay the New Source Rule pending reconsideration, while an agency may reconsider its

regulations, it is "itself bound by the rule until that rule is amended or revoked." *Clean Air Council*, 862 F.3d at 9 (quoting *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992)); *see also Air All. Hous. v. EPA*, 906 F.3d 1049, 1060-61 (D.C. Cir. 2018) (EPA could not delay implementation of rule for the purpose of reconsidering it).

EPA's additional delay for the purpose of its E.O. Review has unlawfully "postpone[d] the effectiveness" of the New Source Rule, insofar as that Rule requires the agency to develop an Existing Source Rule, contrary to Congress's intent that protections should not be delayed through reconsideration. 42 U.S.C. § 7607(d)(7)(B). Accordingly, the agency's reconsideration of the New Source Rule cannot be a valid justification for the agency's delay of the Existing Source Rule. EPA may not ignore or delay its mandatory statutory or regulatory duties simply because it wishes to reconsider them. Nor may it "use the excuse of" an Executive Order to "refrain from"—or in this case, halt—carrying out its mandatory statutory duties. *Envtl. Def. Fund v. Thomas*, 627 F. Supp. 566, 570-71 (D.D.C. 1986) (Executive Orders cannot trump statutory duties).

Moreover, discovery here has revealed that there was no need for EPA to stop its work on developing existing source regulations in order to undertake the E.O. Review. There was no reason why EPA could not have furthered that effort in parallel with its reconsideration. Indeed, in response to an interrogatory asking how EPA's "ongoing review impacts or relates to its ability to develop and issue Existing Source Guidelines or affects the substance of those Guidelines," EPA stated that "[n]o formal analysis of those impacts or effects has been performed." Ex. 6 (Interrog. Resp.) at No. 22. It is arbitrary and unreasonable for an agency to halt an ongoing statutorily mandated regulatory process in favor of a review sought by the Executive without at least considering whether it could simultaneously do both. *See Air All. Hous. v. EPA*, 906 F.3d at 1066-67 ("EPA repeatedly justifies the 20-month delay as providing time for taking and considering

public comment on the [rule] and any potential revisions or rescission thereof. But EPA nowhere explains how the effectiveness of the rule would prevent EPA from undertaking notice and comment or other tasks for reconsideration, why a delay is necessary to EPA's process, or how the [rule] becoming effective on schedule would otherwise impede its ability to reconsider that rule."). If EPA decides at the end of its review to retain the current New Source Rule (or a court vacates any attempt to deregulate) EPA will have lost years during which it could have been developing these critical safeguards. Indeed, EPA's 30(b)(6) deponent agreed that EPA's withdrawal of the ICR would delay the time in which the agency could issue an Existing Source Rule. SUF 74.

*Second*, the text of the statute further demonstrates that Congress expected EPA to act promptly to regulate existing sources once it finds endangerment and regulates new sources, an expectation EPA has met in the past. Existing source regulation under section 111(d) is triggered by a finding of "endanger[ment]" to "public health or welfare," which EPA determines by looking at both new and existing sources. 42 U.S.C. § 7411(b)(1)(A) (source category listing is based on the significant contribution of that "category of sources," including both new and existing, to harmful pollution). Congress, whose primary purpose in the Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," *id.* § 7401(b)(1), would not expect multi-year delays to promulgate safeguards against pollution EPA had already found to be dangerous.

As EPA explained in promulgating its initial regulations implementing section 111(d), "[e]ven a cursory examination of the legislative history of the 1970 amendments," including section 111(d), "reveals that Congress was dissatisfied with air pollution control efforts … and was convinced that relatively drastic measures were necessary to protect public health and welfare. The result was a series of far-reaching amendments which … required EPA and the States to take

*swift and aggressive action*" to reduce pollution. 40 Fed. Reg. 53,340, 53,342-43 (Nov. 17, 1975) (emphasis added); *see Oil, Chem. & Atomic Workers Int'l Union v. Zeeger*, 768 F.2d 1480, 1488 (D.C. Cir. 1985) (legislative history indicates "that Congress did not expect [EPA] to tarry for years over its health and safety rulemakings."). Such "congressional policy concerns carry substantial weight in judging the reasonableness" of a delay. *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 15 (D.D.C. 2003). Here, EPA's four-year delay is "undermining the statutory scheme" by "frustrating the statutory goal." *Id.* at 14.

Consistent with Congress's expectation, EPA's regulations require publication of draft existing source regulations "[c]oncurrently upon or after proposal of" new source standards, and publication of final existing source regulations after promulgation of the new source standards. 40 C.F.R. § 60.22a(a). EPA has demonstrated that it understands its obligations when, in the past, it has issued existing source regulations concurrently with or very soon after publishing new source standards.[4] *See In re Am. Rivers*, 372 F.3d at 420 (noting that the agency's "dilatoriness is apparently—it offers nothing to the contrary—uncharacteristic of the relatively swift treatment it routinely gives similar petitions"). EPA's delay in developing an Existing Source Rule in this case runs contrary to Congress's expectation in the Clean Air Act.

### b.  *The undisputed facts show EPA's highly irregular decision to halt its ongoing regulatory process was unreasoned and therefore unreasonable.*

EPA's decision to initiate the ICR as part of its process to regulate existing sources followed a lengthy process in which EPA took its statutory mandate seriously, collected and

---

[4] For example, EPA issued existing source regulations for municipal solid waste landfills simultaneously with new source standards in March 1996, 61 Fed. Reg. 9,905 (Mar. 12, 1996), and again issued revised standards simultaneously in August 2016, 81 Fed. Reg. 59,276 (Aug. 29, 2016); 81 Fed. Reg. 59,332 (Aug. 29, 2016). *See* Ex. 12 (Cozzie Dep.), at 23:20-22 (senior agency staff acknowledging same). Likewise, EPA issued existing source regulations for existing power plants under section 111(d) of the Clean Air Act at the same time that it issued standards for new power plants under section 111(b). 80 Fed. Reg. 64,510 (Oct. 23, 2015); 80 Fed. Reg. 64,661 (Oct. 23, 2015). And EPA proposed existing source regulations for pollution from phosphate fertilizer plants less than one year after finalizing new source standards. 42 Fed. Reg. 12,022 (Mar. 1, 1977).

analyzed the relevant facts, and extensively engaged all of the stakeholders and the public, including through two rounds of notice and comment. *Supra* pp. 4-6. But EPA brought that active regulatory process to a screeching halt when Administrator Pruitt suddenly withdrew the ICR in support of that rule, and the discovery in this case reveals that the process leading to the withdrawal was unreasoned, further demonstrating that EPA's delay is unreasonable under *TRAC* factor 1.

The Administrator's decision-making process was highly irregular. In marked contrast to the process for adopting the ICR, EPA followed no public process whatsoever. *Supra* pp. 6-9; SUF 61; Ex. 9 (30(b)(6) Dep.), at 95:8-11 (Q "Was there any public process undertaken by the Agency before the decision to withdraw the ICR was made?" A "No."). Administrator Pruitt did not consult with any career staff, including Sarah Dunham, the career official who then led EPA's Office of Air and Radiation in making the decision. SUF 60; Ex. 9 (30(b)(6) Dep.), at 90:13-19 ("Again, it was a decision made by the Administrator. The career staff weren't involved in making that decision."); Ex. 11 (Dunham Dep.), at 67:5-68:5 (not recalling any career staff involvement); Ex. 7 (Amended Interrog. Resp.), at No. 4 (responding to an interrogatory that the EPA current officials "who are most familiar with the circumstances surrounding the ICR withdrawal" "are not aware of any persons either inside or outside of the Agency that former Administrator Pruitt consulted in the decision-making process that led to the withdrawal"); *id.* at No. 6 (same EPA officials only became aware of the basis for the withdrawal on March 2, the day it was signed). This is not the usual process. SUF 64 (senior career staff testifying that it is "not typical" for senior career staff "not to be aware of the basis for the pending reversal of a significant agency action until a few days before that action is finalized.").[5]

---

[5] Indeed, Ms. Shine, who led the ICR process, agreed that up until March 1 or 2 the ICR team was "just doing what [they] would have been doing to implement the ICR," Ex. 13 (Shine Dep.), at 174:9-12, and that it was not "typical for [her] to hear about a final agency action related directly to the work that [she] do[es] on … they day of or the day before it's finalized," *id.* at 180:22-25.

Nor—again in contrast to its process for adopting the ICR—did EPA conduct any review or assessment of the costs and benefits of withdrawing the ICR. SUF 58; Ex. 9 (30(b)(6) Dep.), at 171:6-9 (Q "So is there an internal review by the EPA concerning whether it should withdraw the request?" A "No."); SUF 62 (to EPA's knowledge, "career staff" did not "undertake or present to the administrator any analysis or assessment specific to the withdrawal of the ICR prior to its withdrawal")[6]; SUF 70 (no reanalysis of the potential burden on industry of the ICR was conducted between its issuance and withdrawal). This too was unusual. Ex. 12 (Cozzie Dep.), at 163:3-13 (senior EPA staff agreeing that "the typical procedure at EPA [is] for staff to prepare analysis to inform decision-makers in advance of a decision being made").

And there is no indication that the Administrator sought any information, or had come to any different conclusion, about the dangers posed by methane pollution from existing oil and gas sources. *See* Ex. 9 (30(b)(6) Dep.), at 191:9-13 (Q "So there had been, at this point in time of March 2nd, 2017, no changes in EPA's policy as it related to methane emissions from the oil and gas sector?" A "That's correct."). EPA neither assessed nor identified any scientific, technical, or economic basis for reversing its decision to issue an Existing Source Rule. SUF 75.[7] Certainly,

---

[6] EPA denied that "EPA's career staff did not undertake or present to the Administrator any analysis or assessment specific to the withdrawal of the ICR prior to its withdrawal." Ex. 5 (RFA Resp.), at 16. But the EPA later explained that the basis for that denial was that "EPA's career staff Derek Mill, Esq., an attorney in the Agency's Office of General Counsel," had "reviewed a draft of the Federal Register notice that announced the withdrawal of the ICR and provided legal comments." Ex. 16 (Feb. 12, 2020 Email from Heather Gange, DOJ). EPA clarified that "[w]hen responding to Request for Admission No. 16, EPA considered that review and comments to fall within the ambit of an 'analysis … specific to the withdrawal of the ICR prior to its withdrawal.'" *Id.* This explanation only serves to highlight the virtually complete lack of career staff participation or analysis that preceded the withdrawal of the ICR.

[7] Indeed, EPA still has identified no scientific, technical, or economic basis for reversing its decision to issue an Existing Source Rule. Nor could it. As EPA admitted, there are technologies available to reduce methane emissions from existing sources, and "EPA has not made any finding or otherwise demonstrated that the cost of implementing methane emissions-control technologies has increased" at any time since 2016. Ex. 5 (RFA Resp.), at 28. As one senior staff member testified, there was no change in the cost or availability of technology for reducing existing source methane emissions that could have influenced EPA's decision to issue the Existing Source Rule. *See* Ex. 12 (Cozzie Dep.), at 79:15-80:2; *id.* at 87:8-88:7. An Existing Source Rule, he confirmed, would help mitigate oil and gas sector methane emissions, *see id.* at 250:18-251:2, and, accordingly, the harmful health and welfare impacts associated with those emissions, *see supra* pp. 3-4.

those current EPA officials who were most familiar with the circumstances surrounding the ICR withdrawal, were not aware of any such information or analysis being provided to the Administrator. *See* SUF 62.

Instead, the undisputed facts demonstrate that EPA rushed to dismantle its process to regulate existing oil and gas sources only weeks into the new Administration, when an oil-and-gas industry representative, Kathleen Sgamma, emailed a politically appointed member of the EPA transition team, David Kreutzer, urging "several key rationales for … eliminating the ICR or at least extending the response date," including that "it seems unlikely that the new EPA will approach this 'existing' source regulation in the same way." SUF 41. That same day, another EPA political appointee ordered EPA staff to "e-mail the recipients of the ICR and to not respond." SUF 42. Kreutzer then forwarded Ms. Sgamma's email to another political appointee, David Schnare, noting, after internal discussions: "Looks like this will be easier than we thought." SUF 45. A couple minutes later, Kreutzer sent an email to senior career staff Sarah Dunham "Re: Quashing the ICR" asking her to "draft whatever request [she] would need." SUF 46. On February 22, five days after the new Administrator was appointed, Schnare sent an email stating "Administrator Pruitt wants to make a fast start and we are developing federal register notices with regard to . . . the methane information demand. Mr. Pruitt wants to launch all these on this Friday." SUF 48.

EPA's development of its stated rationale for withdrawing the ICR was also irregular. On February 28, two days before the withdrawal was signed, the press office sent an email to senior career staffers with a draft press release announcing the withdrawal that left a "[Placeholder for message language about why cancelling]…." SUF 51. A senior EPA career staffer testified that this was not typical. SUF 52. The morning the withdrawal was signed, an email from a political

24

staffer directed the Office of General Counsel to draft a Federal Register notice, explaining that "[i]t can literally be three sentences long." SUF 56.

That office complied, drafting a three-sentence rationale claiming that "the withdrawal is occurring because EPA would like to assess the need for the information that the agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need." SUF 65; 82 Fed. Reg. at 12,817. EPA has admitted it never had a plan to do that assessment at the time of the withdrawal or after. SUF 66 (EPA's representative testifying that "there was no plan.").[8] Moreover, the agency's official position via its 30(b)(6) witness, as well as the testimony of career staff most familiar with the circumstances surrounding the withdrawal, demonstrates that the agency does not even understand what that stated rationale means. SUF 68 (EPA's representative testifying that no one at EPA knows what was meant by assessing the need to collect the ICR data). And, in fact, EPA never asked senior career staff whether an assessment of the need for the information sought in the ICR was warranted or their assessment of the need for the information before withdrawing the ICR. SUF 67.

Nor are those same officials recall whether the Administrator considered merely suspending the ICR, an action that would be far more consonant with assessing the need for the data. SUF 71; *see Dep't of Homeland Sec. v. Regents of Univ. of California*, No. 18-587, __ S.Ct. __, slip. op. at 22 (2020) (holding that an agency acts arbitrarily when it does not consider alternatives that are "within the ambit of existing policy"). Indeed, the second and third sentences of the three-sentence rationale invoke as further basis for withdrawing the ICR a letter to EPA from a group oil-producing states—sent just *the day before*—that had requested just such a

---

[8] EPA's 30(b)(6) witness admitted that the agency has not even looked at the ICR responses it received, and does not know if they would be useful for the purposes of developing an Existing Source Rule. Ex. 9 (30(b)(6) Dep.), at 63:11-64:3; *see also* Ex. 13 (Shine Dep.), at 152:6-9 (Ms. Shine didn't look at any of the ICR responses "[o]ther than … compiling them into boxes for the hard copies.").

suspension of the ICR "pending internal review by the EPA as to *whether* it should withdraw the Request." SUF 55 (emphasis added). Instead, EPA summarily and arbitrarily withdrew the ICR and halted the ongoing, active process to issue existing source standards following the request of an industry representative and without any career staff input, any assessment, and apparently without a rationale that the agency even understands.

With little to no thought and the stroke of a pen (and three sentences hastily drafted by the General Counsel's office), EPA halted its ongoing process, hindering the agency's "ability to effectively regulate at all," despite its mandatory statutory duty. *See Biodiversity Legal Found.*, 285 F. Supp. at 14. Accordingly, the law and the undisputed facts demonstrate that, in sharp contrast to its decision to issue the ICR, EPA's decision to withdraw it, and thus indefinitely delay its efforts to develop an Existing Source Rule, was "anything but reasonable, and that fact is decisive here." *In re Core Comm's, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008). Because EPA's four-year delay is a "breakdown of regulatory processes" and fails the rule of reason, *TRAC* factors 1 and 2 weigh heavily in favor of finding an unreasonable delay. *Cutler*, 818 F.2d at 897 n.156.

### 2. *TRAC* factors 3 and 5: EPA's delay endangers human health and welfare and is deeply prejudicial.

"[P]erhaps most critically, the court must examine the consequences of the agency's delay." *Id.* at 898. Here, the staggering public health and welfare consequences of EPA's failure to regulate existing sources of methane emissions render EPA's delay plainly unreasonable under both *TRAC* factor 3, considering human health and welfare impacts, and *TRAC* factor 5, evaluating the nature and extent of interests prejudiced by the delay. *TRAC*, 750 F.2d at 80. "Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake …. This is particularly true when the very purpose of the governing Act is to

26

protect those lives." *Auchter*, 702 F.2d at 1157-58.[9] When considering delays that impact human health, analysis of the third and fifth *TRAC* factors may overlap. *In re United Mine Workers*, 190 F.3d 545, 552 n. 6 (D.C. Cir. 1999); *see also In re A Cmty Voice*, 878 F.3d at 787 (children exposed to health harm "due to the failure of EPA to act are severely prejudiced by EPA's delay, and the fifth factor thus favors issuance of the writ" of mandamus).

The third *TRAC* factor weighs heavily towards a finding of unreasonable delay when, as in this case, the agency's "own assessment" shows "dangers to human health." *In re Pesticide Action Network*, 798 F.3d 809, 814 (9th Cir. 2015); *see also In re A Cmty Voice*, 878 F.3d at 786 (holding EPA unreasonably delayed regulation when "there is a clear threat to human welfare" that "EPA itself has acknowledged"). As EPA itself has found, oil and gas sector methane emissions substantially contribute to climate change, endangering human health and welfare. 81 Fed. Reg. 35,843. EPA's delay in fulfilling its duty to promulgate an Existing Source Rule endangers human health on an ongoing basis.

EPA has recognized for over ten years that methane, along with five other greenhouse gases, endangers the public health and welfare of current and future generations through its contribution to climate change. SUF 1. EPA acknowledges that methane is a potent greenhouse gas that, pound for pound, warms the earth eighty-four to eighty-six times more than carbon dioxide for the first two decades after release. SUF 2. EPA admits that methane emissions contribute to warming of the atmosphere, leading to increased air and ocean temperatures, changes in precipitation patterns, melting and thawing of global glaciers and ice, increasingly severe weather events, such as hurricanes of greater intensity, and sea level rise. SUF 1. EPA further

---

[9] While EPA has a broad mandate under the Clean Air Act "to promote the public health and welfare," 42 U.S.C. § 7401(b)(1), because EPA has explicitly disavowed any intent to cite competing agency priorities as a justification for its delay, *see infra* Section V.B.3, action on an Existing Source Rule will not "come at the expense of delay of EPA action elsewhere." *See Thomas*, 828 F.2d at 798.

acknowledges that the oil and gas sector is the largest industrial emitter of methane in the United States, SUF 3, and that methane emissions from oil and gas sources in existence before 2012 constitute the majority of methane emissions from the sector in the United States. SUF 4.

In addition to EPA's own assessment of the threat to human health and welfare posed by methane emissions from the oil and gas industry, new data and studies further underscore the climate harm caused by EPA's delay in promulgating an Existing Source Rule. EPA recognized in March 2016, when it announced it would begin developing such rule, that "there was new data showing that emissions are higher than previously understood. And so it was believed to take time for us to take a close look at regulating [existing] sources." SUF 23. Indeed, a 2018 synthesis of published studies shows EPA underestimates methane emissions from the oil and natural gas sector by approximately sixty percent.[10]

Based on the latest data, over the at-least-four-year period of EPA's unreasonable delay in promulgating an Existing Source Rule, existing oil and natural gas sources have emitted a massive amount of methane:[11] over 38 million metric tons of methane, equivalent to the climate impact of over 600 million passenger vehicles driven for one year. Ex. 23 (McVay/Hull Decl.), at ¶ 11, Ex. 21 (Ocko Decl.), at ¶ 12. Substantial pollution will continue to occur if EPA continues to delay the adoption of an Existing Source Rule—potentially allowing well over 3 million metric tons of methane pollution that could otherwise be eliminated, for example, with an Existing Source Rule

---

[10] Ramón A. Alvarez, et al., *Assessment of Methane Emissions from the U.S. Oil and Gas Supply Chain*, 361 Science 186, 186 (2018), *available at* https://science.sciencemag.org/content/361/6398/186.

[11] Since 2017, EPA has attempted to ignore the pollution consequences of delaying an Existing Source Rule. *See* Ex. 9 (30(b)(6) Dep.), at 212:18-213:3 (EPA did not look at climate impacts of methane emissions that could be prevented with existing source methane regulations before withdrawing ICR). Indeed, despite its assertion in the E.O. Review proposal that an Existing Source Rule will be precluded as a "legal consequence" of removing methane requirements from the New Source Rule, 84 Fed. Reg. 50,272, EPA viewed assessing the scale of emissions from existing sources and potential emissions reductions under an Existing Source Rule as "outside of the scope" of analysis in the proposal. Ex. 9 (30(b)(6) Dep.) at 261:11-21; EPA, Regulatory Impact Analysis for the Proposed Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review 1-3 (Aug. 2019).

identical to the New Source Rule each year that the delay continues. Ex. 23 (McVay/Hull Decl.), at ¶ 12 & Tbl. 1.

Advances in the scientific understanding of climate change caused by methane further confirm and accentuate the need to cut methane emissions from existing oil and gas facilities. A year and a half ago, the Intergovernmental Panel on Climate Change underscored the immediate need to cut pollutants like methane, which warms the climate powerfully in the near term, to avoid catastrophic climate change.[12] Methane is responsible for a quarter of the warming—and associated climate harms—the world is experiencing today, and globally a quarter of human-emitted methane comes from the oil and gas sector. Ex. 21 (Ocko Decl.), at ¶ 3. As the federal government recognized in 2018 in the Fourth National Climate Assessment, an assessment in which EPA participated, climate change is already impacting health and welfare, through longer and more frequent extreme heat waves, more severe storms, sea level rise and coastal flooding, wildfires, and loss of snow pack and drought. U.S. Global Change Research Program, *Fourth National Climate Assessment*, Vol. II, Chapters 18-27 (2018).[13] Rapid reductions in methane emissions are critical to slowing the rate of warming and reducing the risk of the worst climate change impacts. Ex. 21 (Ocko Decl.), at ¶¶ 6-9.

Finally, because the same practices and technologies that reduce methane emissions from the oil and gas sector also cut harmful local air pollution, including VOCs and hazardous air pollutants, *see, e.g.*, Ex. 12 (Cozzie Dep.), at 31:15-18, EPA's failure to adopt an Existing Source Rule especially endangers the health of communities living in close proximity to existing oil and

---

[12] IPCC, Summary for Policymakers of IPCC Special Report on Global Warming of 1.5 C Approved by Governments (Oct. 8, 2018), *available at* http://www.ipcc.ch; *see also* Ex. 18 (Snyder Decl.), at ¶¶ 8-19; Ex. 19 (Basu Decl.), at ¶¶ 9-11 & Attach. 1& 2; Ex. 20 (Chamberlin Decl.), at ¶¶ 5-13; Ex. 22 (Engler Decl.), at ¶¶ 7-26; Ex. 21 (Ocko Decl.), at ¶¶ 7-8.

[13] *Available at* https://nca2018.globalchange.gov.

gas sources. As EPA has recognized, VOCs from the oil and gas sector contribute to ground-level ozone, or smog, which can cause immediate respiratory distress leading to hospitalization and is linked to long-term issues including the development of asthma and premature death from respiratory and heart disease, with exposure being particularly risky for children, older adults, and minority communities. 81 Fed. Reg. 35,837; *see also* Ex. 24 (Roy/Thompson Decl.), at ¶¶ 5-23. EPA further has acknowledged that hazardous air pollutants emitted by oil and gas activities can lead to cancer and other respiratory and neurological illnesses. 81 Fed. Reg. 35,837; *see* Ex. 12 (Cozzie Dep.), at 21:14-22:20 (EPA senior staff testifying that he is aware of studies and articles documenting adverse health effects in people living near oil and gas facilities and in industry workers); *see also* Ex. 24 (Roy/Thompson Decl.), at ¶¶ 24-31. Roughly 9.3 million people in the United States, including 600,000 children under the age of five years and 1.4 million people over the age of 65 years, live within half a mile of an existing well and are exposed to harmful local air pollution in the absence of an Existing Source Rule. Ex. 23 (McVay/Hull Decl.), at ¶ 20. EPA's delay in promulgating an Existing Source Rule deeply prejudices these frontline communities, along with all who suffer the harms of ongoing and worsening climate change. *TRAC* factor 3 weighs strongly in favor of finding that EPA has unreasonably delayed here.

 *TRAC* factor 5 similarly supports a conclusion that EPA has unreasonably delayed. EPA can provide "no acceptable justification for the considerable human health interests prejudiced by the delay." *In re Pesticide Action Network*, 798 F.3d 809, 814 (9th Cir. 2015). Control technologies and practices that could be implemented at existing sources have long been available. SUF 5 ("In or before 2014, EPA identified available mitigation technologies and practices to reduce emissions of methane from leaks, hydraulically fractured oil and natural gas wells and completions, compressors, pneumatic devices, and liquids unloading in the oil and natural gas sector."). These

control technologies are available at reasonable costs. Ex. 5 (RFA Resp.), at No. 28 (EPA has not made any finding or otherwise demonstrated that the cost of implementing methane emissions-control technologies has increased since 2014); *see also* Ex. 12 (Cozzie Dep.), at 79:15-80:2.

Nor are there other countervailing interests in support of EPA's delay. Indeed, companies within the oil and gas industry, including major producers such as BP, Shell, and ExxonMobil, have called on EPA to move forward with an Existing Source Rule, and suggested that operators are prejudiced by EPA's failure to do so. SUF 89. *See Cutler*, 818 F. Supp. 2d at 896-97 ("excessive delay … creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans"). For example, BP has argued that EPA existing source methane regulation is needed to "protect natural gas' license to operate" as the world works to lower greenhouse gas emissions. SUF 89 (BP Comments at 3).

EPA's delay in promulgating an Existing Source Rule endangers human health and welfare by allowing emissions of millions of tons of methane as well as other harmful air pollution each year and is deeply prejudicial to communities who must live with the health and climate impacts of EPA's inaction. *TRAC* factors 3 and 5 weigh heavily in favor of a finding of unreasonable delay.

### 3.   *TRAC* factor 4: no competing priority justifies EPA's inaction.

Under *TRAC* factor 4, "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. Here, EPA has "expressly committed not to defend this unreasonable delay suit on the customary grounds of competing priorities, other agency actions, or lack of time or other resources." EPA Reply in Support of Mot. to Stay (ECF No. 63) at 8. It has stated: "The United States … does not now, and will not in the future, argue that the E.O. Review and other actions described in [its Rule 26(a)] disclosures are higher or competing priorities in the sense that they are or were competing for time and other resources that otherwise could be devoted to developing the guidelines at issue." SUF

92. Indeed, rather than delay while pursuing any competing obligation, EPA has simply ignored its mandatory duty to promulgate an Existing Source Rule, instead opting to undertake a non-statutory policy review, and has disclaimed any argument that it did not have the resources to pursue both concurrently. *TRAC* factor 4 thus supports a finding of unreasonable delay in this case.

### 4. *TRAC* factor 6: EPA's deliberate delay is a bad faith attempt to evade its statutory duty.

Although "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed," *TRAC*, 750 F.2d at 80 (internal quotation marks omitted), where an "agency delays in bad faith," the court "should conclude that the delay is unreasonable," *Cutler*, 818 F.2d at 898. And "[b]ecause a delay that is a result of bad faith—that is, a delay for improper reasons—is a delay that is *per se* unreasonable," *TRAC* factor 6 demands "inquiry into whether the reasons offered by the agency are the actual reasons for the delay" or whether "improper influences" infected its delay. *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 231, 235 (E.D.N.Y. 2006).

EPA's proffered justification for its delay here—the non-statutory E.O. Review—is not only an unlawful and thus unreasonable basis for its egregious delay in regulating existing sources, *see supra* Section B.1.a., it is also not the agency's "actual reason" for inaction. *Id.* Contrary to EPA's claims to this Court, the only reasonable inferences from the undisputed facts instead "tell[] a story that does not match the explanation [EPA] gave for [its] decision": a tale of an agency determined to prevent regulation of existing sources for improper reasons in conflict with its statutory mission, and bent on achieving that goal regardless of the law or the facts. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). At every step the new Administration took office, EPA has sought to delay and eventually eliminate its duty to regulate existing sources, hiding its tracks under a thin veneer of pretext. Its bad faith delay is *per se* unreasonable.

As the Supreme Court recently explained in *New York*, although "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy," agencies must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 2574-75. Indeed, "[a]ccepting contrived reasons would defeat the purpose of" judicial review. *Id.* at 2576. Thus, in *New York* the Court rejected the Secretary of Commerce's "sole stated reason" for adding a citizenship question to the census where the evidence demonstrated that, rather than effecting a considered policy choice as he had belatedly claimed, the Secretary had been "determined to reinstate a citizen question from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the [stated] rationale late in the process." *Id.* at 2574-75.

Likewise, in an unreasonable delay challenge to the Food and Drug Administration's (FDA) inaction on petitions to allow over-the-counter use of contraceptives, the U.S. District Court for the Eastern District of New York found a "strong preliminary showing of 'bad faith or improper behavior'" relevant to *TRAC* factor 6 where, like the Secretary of Commerce in *New York*, and the EPA here, the FDA "had long since decided not to" take its delayed action, "but needed to find acceptable rationales for the decision." *Tummino*, 427 F. Supp. 2d at 231-33 (allowing extra-record investigation in light apparent bad faith) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). While FDA's five-year delay "alone raise[d] questions about the good faith of the FDA," the agency's record of inaction provided ample additional support to conclude that, contrary to FDA's stated basis, "the agency's senior decisionmakers were resting on improper

concerns" and seeking to evade judicial review. *Id.* at 232-33. Though FDA publicly claimed that it needed more time to review the matter, it "did little if anything to advance toward decision" in the meantime; career staff "overwhelming[ly] support[ed]" approval of the petition; available data "demonstrated [the contraceptive] to be safe for [over-the-counter] use;" those involved in the process stated that the decision not to approve the petition "had already been made" years prior; the FDA repeatedly deviated from its traditional decision making practices, including its "last-minute" search for any scientific support for its position; and the FDA announced "without any warning" that it wished to consider whether a rulemaking proceeding was necessary, "a course that will inevitably forestall decision for months if not years." *Id.* at 231-34.

EPA followed those ill-fated playbooks here. EPA's stated rationale for halting its ongoing process to regulate existing sources, its stated justification for delay in this case, and, indeed, its rationale for seeking to rescind the New Source Rule are all pretextual. Rather than being the "genuine justifications" for EPA's actions, *New York*, 139 S. Ct. at 2574, they are all aimed instead at eliminating altogether EPA's duty to regulate existing sources—a decision that was made long ago for "improper" reasons. *Tummino*, 427 F. Supp. 2d at 231.

*First*, the undisputed facts show that EPA's stated reasons for withdrawing the ICR and halting its regulatory process to develop an Existing Source Rule were not the agency's real reasons; instead, "improper considerations, unrelated to science or the mandate of the [EPA], had prompted [EPA's] decision[]" to withdraw the ICR. *Tummino*, 427 F. Supp. 2d at 232. As explained, *supra* pp. 21-26, EPA "deviated from its traditional practices in reaching the decision," betraying its true aim to evade its mandatory duty altogether. *Tummino*, 427 F. Supp. 2d at 233-34. The political beachhead team jumped into action at the behest of an industry representative. SUF 41-42, 45-46. There was no internal or public process leading up to the withdrawal. SUF 58

34

& 61. Administrator Pruitt never consulted the career staff knowledgeable about the ICR or existing source regulation nor sought any analysis or assessment of the withdrawal. SUF 60 & 62. And the withdrawal's rationale was crafted at the eleventh hour. SUF 51; *see New York*, 139 S. Ct. at 2574-75 (Secretary "adopted [stated] rationale late in the process" and his policy director "did not know why the Secretary wished to reinstate the question, but saw it as his task to 'find the best rationale'"). As a senior career staffer testified, this was not the agency's "typical" process. SUF 59 & 64.

The three-sentence rationale EPA landed on was, unsurprisingly, a farce. 82 Fed. Reg. 12,817. The agency had no plans "to assess the need for the information" sought in the ICR either before or after withdrawing it, SUF 66, and neither the agency nor its staff even understand what the agency meant, SUF 68. Had EPA truly wanted to assess the need, it would have suspended, not withdrawn, the ICR. And while EPA has argued that it never assessed this need because the Executive Order was signed soon after the withdrawal, Ex. 6 (Interrog. Resp.), at No. 10, as late as October 2017 the agency said the exact opposite, claiming that it was assessing the need for the information, something a senior staffer testified was not true. SUF 72; *see Tummino*, 427 F. Supp. 2d at 232 (despite public claim that it "needed more time to review matters," FDA "did little if anything to advance toward decision"). Moreover, rather than justify the withdrawal, EPA's "last-minute" reliance on a letter from certain oil-producing states—sent just the day before EPA withdrew the ICR and after EPA had decided to do so—only confirms the agency's deception. *Tummino*, 427 F. Supp. 2d at 233. EPA thus actively covered up that it had withdrawn the ICR, as a senior career staffer put it, "[b]ecause of the incoming administration's interest in promoting the development of fossil fuels," Ex. 12 (Cozzie Dep.), at 143:20-24, following the request of an industry representative.

35

*Second*, EPA's stated justification for its delay in this case—to pursue its E.O. review—is likewise pretextual. *See Regents of Univ. of California*, No. 18-587, __ S.Ct. __, slip. op. at 16 (2020) ("Permitting agencies to invoke belated justifications . . . can upset the orderly functioning of the process of review, forcing both litigants and courts to chase a moving target." (internal quotation marks and citation omitted)). Far from providing a justification for halting the agency's active process to regulate existing sources, the E.O. Review was merely a post-hoc effort to justify—and, indeed, to further—a decision EPA had already made. *Tummino*, 427 F. Supp. 2d at 233. (FDA "had long since decided not to" take its delayed action, "but needed to find acceptable rationales for the decision."). As described *supra* pp. 21-26, EPA halted its active regulatory process weeks *before* the Executive Order initiating that review was even signed. *Compare* 82 Fed. Reg. 12,817 (ICR Withdrawal, signed Mar. 2, 2017), *with* 82 Fed. Reg. at 16,093 (E.O. 13,783, issued Mar. 28, 2017)). And EPA never formally examined, much less explained, why it could not pursue its review and existing source regulation at the same time. *Supra* pp. 19-20. Indeed, EPA political appointees attempted to halt the agency's ongoing work to regulate existing sources even earlier, in February 2017, when, a political official gave the unauthorized order to tell ICR recipients not to respond to the ICR, SUF 42-43, and began laying the groundwork for Administrator Pruitt's requested "fast start" regarding the methane ICR, SUF 48; *cf. New York*, 139 S. Ct. at 2575 (Secretary "determined to reinstate a citizenship question from the time he entered office" and "instructed his staff to make it happen"). When, within hours of EPA's March 2 announcement withdrawing the ICR, Ms. Sgamma offered gratitude "from the bottom of [her] heart," Kreutzer quickly replied, noting that "there was nobody here (political or career) who thought the ICR made sense *given the changes in associated policy*," and bestowing "Kudos" on the industry representative "for being alert!" SUF 77 (emphasis added). In other words, EPA had

already decided not to regulate existing sources and acted to indefinitely delay any efforts to do so *before* the E.O. Review even began and without first undertaking any internal or public decision-making process to support such a change in policy.

The undisputed facts thus reveal that EPA's "actual reason" for abruptly halting development of an Existing Source Rule was not to engage in the post-hoc E.O. Review, as it claims to this Court. *Tummino*, 427 F. Supp. 2d at 233. Instead, EPA's E.O. Review was a course chosen to "inevitably forestall [existing source regulation] for months if not years," pending the next step in the agency's concerted plan to eliminate its duty completely. *Id.* at 232. Following on the heels of EPA's termination of work in support of an Existing Source Rule were EPA's effort to stall its New Source Rule through an unlawful administrative stay, *Clean Air Council*, 862 F.3d at 14 (summarily vacating EPA's stay as "arbitrary, capricious, [and] ... in excess of [EPA's] ... statutory ... authority"), and two proposed rules to further suspend EPA's New Source Rule. *See supra,* p. 10; *see also* Ex. 14 (Burden Report) (outlining new Administration's plans for halting oil and gas regulation).

*Finally*, the product of the E.O. Review—the proposed New Source Rescission Rule, 84 Fed. Reg. 50,244—upon which EPA has premised its bid to stop this case and thus "evade[] judicial review" of its delay, reflects yet another pretextual effort to eliminate its existing source authority. EPA purports to justify the New Source Rescission Rule by claiming that new source methane standards are unlawfully redundant of the VOC standards. 84 Fed. Reg. at 50,246. But in this Court, EPA has claimed that regulation of methane and VOCs are plainly *not* redundant—because, if EPA rescinds its methane standards, it will no longer be obligated to regulate many hundreds of thousands of existing sources. Ex. 17 (Tsirigotis Decl.), at ¶ 12 ("If EPA finalizes either of the two proposed amendments, the final rule would repeal the methane standards in the

2016 NSPS, and EPA would have no authority … to issue" an Existing Source Rule). This Court should not countenance EPA's "administrative law shell game." *Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 731-33 (D.C. Cir. 1992) (agency sought to "avoid judicial review" of a current violation via a future rulemaking—"a sort of administrative law shell game"); *see In re Am Rivers*, 372 F.3d at 420 ("[P]etitioners are entitled to an end to [the agency's] marathon round of administrative keep-away and soon.").

In any event, EPA's flimsy rationale for its proposed New Source Rescission Rule supports an inference that the agency was grasping "to find acceptable rationales" for a decision already made. *Tummino*, 427 F. Supp. 2d at 233. Even if the standards were redundant, the Clean Air Act does not *forbid* redundant standards, and, even if it did, it would not justify EPA's decision to remove methane standards as opposed to VOC standards, which would not affect the agency's duty to regulate existing sources of methane emissions. EPA did not even analyze the pollution implications of its proposal to rescind the New Source Rule's methane standards, and thus leave unregulated hundreds of thousands of existing sources. SUF 88. Further, although the proposed New Source Rescission Rule purports to be the result of EPA's review under E.O. 13,783, which directs agencies to "avoid[] regulatory burdens that unnecessarily encumber energy production," *see* 82 Fed. Reg. 16,093, EPA has asserted that rescinding methane standards would not, in fact, relieve *any* regulatory burdens.[14] Indeed, according to EPA, the *only* impacts that removing methane regulations would have are on EPA's obligation to regulate existing sources and industry's obligation to comply with such regulations. 84 Fed. Reg. at 50,254 (New Source

---

[14] *See* 84 Fed. Reg. at 50,254; *id.* at 50,281 (proposed rescission of methane requirements would result in $0 in cost savings and would not relieve any regulatory requirements on industry because of "redundant" new source VOC standards). One high-level career official even testified he was "[n]ot aware of" any additional burden on industry resulting from direct methane regulation under the New Source Rule EPA seeks to rescind. Ex. 12 (Cozzie Dep.), at 30:2-13, 31:15-34:11, 35:15-20. Nor was he aware that New Source Rule has "any adverse [economic] effect on the U.S. domestic oil and gas production." *Id.* at 86:24-87:3.

Rescission Rule "will ... obviate the need" to regulate existing sources). But EPA could not—and does not—rely on those impacts given EPA's undisturbed finding that methane from oil and gas sources (including the existing sources that generate the vast majority of emissions) endangers human health and welfare. SUF 1; 74 Fed. Reg. 66,496 (Dec. 15, 2009); *see also* 77 Fed. Reg. 49,490, 49,535 (Aug. 16, 2012). EPA's actions here—the withdrawal of the ICR, termination of an active effort to develop existing source regulations, unlawful administrative stay of the New Source Rule (summarily vacated by the D.C. Circuit), subsequent rulemaking proposals to pause the New Source Rule, and finally, the proposal to rescind the New Source Rule's methane requirements—demonstrate that EPA, from early in 2017, set a course to delay and ultimately eliminate EPA's authority to regulate existing oil and gas sources. As in *New York* and *Tummino*, at every turn EPA has contrived purportedly lawful bases to obfuscate its real, improper reason for its harmful delay: its long-ago "change in ... policy" to no longer regulate methane emissions from existing sources in the oil and gas sector. SUF 77. EPA's bad faith delay is *per se* unreasonable under *TRAC* factor 6. *See Cutler*, 818 F.2d at 898.

### C. This Court Should Order EPA to Promulgate an Existing Source Rule As Soon As Feasible to Remedy EPA's Unreasonable Delay.

Because EPA has unreasonably delayed promulgating an Existing Source Rule, this Court should require the agency to establish an "accelerated and fixed schedule" to fulfil its legal duty. *Solenex LLC*, 156 F. Supp. 3d at 85 (observing the D.C. Circuit "frequently orders recalcitrant agencies to establish schedules, subject to court approval, to finish their reviews and reach final agency decisions"); *see Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 122 (D.D.C. 2006) (similar). The Court has a "substantial ability to order that relief which is necessary to cure" an agency's unreasonable delay. *Air All. Hous.*, 365 F. Supp. 3d at 132 (quoting *Cobell v. Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) (internal quotations omitted)). Here, to remedy EPA's

unreasonable delay, Plaintiffs request that the Court retain jurisdiction over this matter to direct EPA to expeditiously propose and finalize an Existing Source Rule by date-certain deadlines, and to ensure EPA acts expeditiously in fulfilling its duties under the Clean Air Act by requiring the agency to submit progress reports to the Court. *See Mercy Gen. Hosp. v. Azar*, 410 F. Supp. 3d 63, 82 (D.D.C. 2019) (explaining "discretion to retain jurisdiction over a case pending completion of a remand and to order the filing of progress reports" is "typically reserved for cases alleging unreasonable delay of agency action" or other agency noncompliance).

> **1.   The Court Should Require EPA to File a Proposed Plan within 30 Days that Includes Date-Certain Deadlines for EPA's Proposal and Promulgation of an Existing Source Rule as Expeditiously as Possible.**

The Court should direct EPA to file, within 30 days, a proposed plan to expeditiously fulfil the agency's obligations to propose and promulgate an Existing Source Rule by date-certain deadlines. *See U.S. Women's Chamber of Commerce*, No. 1:04-cv-01889 (RBW), 2005 WL 3244182, at *16 (D.D.C. Nov. 30, 2005) (finding that a "'deadline is in order and the agency is directed to propose one consistent with this opinion'" within 45 days) (quoting *Muwekma Tribe*, 133 F. Supp. 2d at 41). The Court should further direct EPA to provide subsequent reports to the Court on the agency's progress toward promulgating an Existing Source Rule. *See In re Pub. Emps.*, 957 F.3d 267, 275 (D.C. Cir. 2020) (holding agency unreasonably delayed in issuing management plans, ordering agency to produce schedule for issuing plans and to submit regular progress updates, and retaining jurisdiction to approve plans and monitor agency progress).

While EPA has produced two alternative estimates of the time the agency asserts it may need to promulgate an Existing Source Rule, *see* Ex. 9 (30(b)(6) Dep.), at Exs. 49 & 50, the estimates do not provide date-certain deadlines for remedial action. The first timeline—which estimates 27.5 months until promulgation of an Existing Source Rule—assumes the agency will not need to undertake a new ICR. *Id.* at Ex. 49. The second timeline—which estimates 44.5

months—assumes the agency will need to first issue a new ICR before moving forward. *Id.* at Ex. 50. Given the significant further delay—according to EPA, nearly a year and a half—associated with undertaking a new ICR, EPA should first be required to determine whether the agency believes a new ICR is necessary and demonstrate that necessity to the Court to enable the Court to set interim and final deadlines for promulgating an Existing Source Rule.

Thirty days—not three months EPA claims to need, *id.* at Exs. 49 & 50—is ample time for EPA to determine whether it believes another ICR (or different information collection exercise) is necessary, and to propose date-certain deadlines for proposing and promulgating the Existing Source Rule based on that determination. The agency asserted long ago—in March 2017 that it was planning to assess the need for the ICR, although it never did. *See* SUF 66. EPA should not be permitted to further delay action on an Existing Source Rule by taking three months now to do something it represented it planned to start more than three years ago. It instead must expeditiously evaluate the need for additional information gathering. Indeed, in the context of the E.O. Review, EPA has recently evaluated data on several of the precise matters that the original ICR was intended to shine light on, including "examining the rate of turnover of existing facilities." 84 Fed. Reg. at 50,273; *see also* Ex. 9 (30(b)(6) Dep.), at 36:1-4 (ICR intended to obtain information "to better characterize the nature of the equipment that's out there in the existing source, how old is it, what's the turnover of that equipment"). Given the lengthy time that has already elapsed from when EPA first sought to assess the need for the ICR along with its recent evaluation of relevant data, EPA should be able to propose a date-certain schedule—that does or does not include an ICR—within 30 days. At that time, the Court would then be able to evaluate whether EPA's proposed plan is reasonable, and could set a schedule for EPA to propose and finalize an Existing Source Rule. Plaintiffs would request an opportunity to provide input to the Court on the

reasonableness of EPA's proposed date-certain deadlines because, as explained *infra*, EPA's two currently proposed alternative schedules are both unreasonable and over-long.

### 2. Given EPA's Substantial Delay and the Ongoing Significant Harm to Human Health and Welfare, EPA's Estimated Timelines for Promulgating an Existing Source Rule Are Too Long.

EPA's proffered timelines—up to more than three and a half years if EPA conducts a new ICR, Ex. 9 (30(b)(6) Dep.), at Ex. 50, to promulgate an Existing Source Rule that EPA would likely have already promulgated had it not halted its regulatory process to embark on its unreasonable delay—would deeply exacerbate the impacts of EPA's already-lengthy delay by allowing continued pollution and corresponding health and welfare risks. *See In re A Cmty Voice*, 878 F.3d at 788 (rejecting EPA's six-year timeline for promulgating a lead-based paint standard as "unreasonable" and directing EPA to instead finalize a rule within a year and a half, based on EPA's extensive prior delay and the health risks of further postponement of the standard). EPA's estimated timelines are particularly unreasonable given that that for years the agency has recommended, and States have required, emission reductions from *existing sources* using well-known control technologies and practices, and because EPA has estimated unnecessarily lengthy times for several steps on its timelines.

Fundamentally, EPA would not be breaking new ground in adopting an Existing Source Rule. As EPA admits, by 2014, it had identified technologies and practices for reducing methane emissions from many oil and gas sources. SUF 5. Indeed, EPA itself recognized a number of techniques for reducing emissions from *existing sources specifically* in the Control Technique Guidelines for the Oil and Natural Gas Industry that the agency released in 2016, which trigger a requirement for States with areas not in attainment with the national ambient air quality standards for ozone to update their regulations to incorporate control measures for oil and gas emissions. 81

Fed. Reg. 74,798 (Oct. 27, 2016).[15] These control measures represent reasonably available control technology—techniques that EPA determined to be available and technically feasible—for reducing emissions from a suite of existing oil and gas sources. CTGs, *infra* n.15.[16] Furthermore, several states have been successfully regulating existing sources for years. For example, Colorado adopted methane regulations for new and existing oil and gas sources in 2014, and has strengthened the standards in subsequent rulemakings, most recently in December 2019. Ex. 23 (McVay/Hull Decl.), at app. 1, p. 15. Similarly, California promulgated comprehensive methane standards for new and existing sources in 2017. Ex. 25 (CARB Decl.), at ¶ 8. These state regulations provide templates and analysis that can support EPA's promulgation of an Existing Source Rule. For instance, all facilities covered by California's regulations have now met requirements to report facility and equipment information, and hundreds of facilities are now submitting quarterly data on leak monitoring and repair. *Id.* at ¶ 10. Given that these States are *already* regulating existing sources, and have been for many years, it defies reason that EPA needs over three-and-a-half years to do the same.

Finally, specific steps in EPA's estimated timelines can be shortened, in addition to the time for deciding whether an ICR is necessary. Notably, EPA includes a total of *six months* in both estimates for review of the proposed and final Existing Source Rule by OMB. Ex. 9 (30(b)(6) Dep.), at Ex. 49 (90 days for proposal, 90 days for final rule); *id.* at Ex. 50 (same). In light of EPA's significant delay in promulgating an Existing Source Rule, OMB review can be waived or shortened if the Court imposes a deadline for EPA action. Exec. Order No. 12,866 § 6(a)(3)(D),

---

[15] EPA, Control Techniques Guidelines for the Oil and Natural Gas Industry (Oct. 2016), *available at* https://www.epa.gov/sites/production/files/2016-10/documents/2016-ctg-oil-and-gas.pdf (CTGs). The agency recently withdrew a proposal to rescind the CTGs, noting that "the CTG will remain in place as published on October 27, 2016." https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202004&RIN=2060-AT76.

[16] While the CTGs specifically targeted VOC emissions from existing source, according to EPA, "identical" control technologies reduce VOC *and methane* emissions from oil and gas sources. 84 Fed. Reg. at 50,246.

58 Fed. Reg. 51,735, 51,741 (Oct. 4, 1993) (interagency review can be shortened or waived "for those regulatory actions that are governed by a statutory or court-imposed deadline"); *see also Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 349 (D. Ariz. 1994) ("Review by of [OMB] serves no congressional purpose and is wholly discretionary. Therefore, it is not required, and the schedule [for agency to take action to remedy violation of a statutory deadline] shall exclude such review."). Indeed, EPA's representations in this very case underscore that the agency may seek expedited OMB review of its actions—even when a rulemaking is not required by statute or court order. *See, e.g.*, Decl. of Karl Moor (ECF No. 80-1), ¶ 14 (EPA requested that OMB conduct 30-day expedited review of final New Source Rescission Rule).

Similarly, if EPA determines (and the Court agrees) that additional information collection is needed, EPA's estimated time to conduct the ICR process is overlong. EPA claims it needs 16 additional months for a new ICR, however that timeline may be significantly streamlined, given that EPA has already promulgated an ICR on this topic. EPA's provision of nine months before it even mails the ICR to operators, *see* Ex. 9 (30(b)(6) Dep.), at Ex. 50, is *longer* than the eight months it took the agency to develop and send the original ICR, even though EPA already laid much of the groundwork for developing and tailoring questions in the initial ICR (including determining how to identify operators and developing testing protocols). And any additional information that might be needed is almost certainly less than reflected in the original ICR given that EPA has already received thousands of responses to the ICR, SUF 37, and other data is now available to the agency from implementation of the new source standards and CTGs, and from state programs that are currently regulating existing sources.

In the four years that have passed since EPA issued regulations governing methane emissions from new sources—the critical first step to issuing existing source regulations—

44

methane pollution for the sector has only increased, and new data show the problem is much worse than scientists understood even as of 2016. Each day that passes without existing source regulation, the oil and gas sector emits tons of methane pollution into the atmosphere—threatening communities across the nation. EPA's delay is not only unreasonable, it is unconscionable. The Court must ensure EPA performs its obligations under the Act.

Plaintiffs respectfully request that, to remedy EPA's unreasonable delay, the Court require EPA to submit a proposed schedule with date-certain deadlines for proposal and promulgation of an Existing Source Rule, including whether the agency believes it needs a new ICR, within 30 days of the Court's order. Plaintiffs further request that the Court set expeditious deadlines for EPA's action to propose and promulgate an Existing Source Rule and require EPA to submit periodic progress reports.

Respectfully Submitted,

Dated:  July 3, 2020

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General

  /s/ Morgan A. Costello
Morgan A. Costello
Christopher C. Gore
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2392

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General

  /s/ Kavita P. Lesser
Kavita P. Lesser
Daniel M. Lucas
Deputy Attorneys General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6605
*Attorneys for the State of California, by
and through the California Air
Resources Board and Attorney General
Xavier Becerra*

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

  /s/ Melissa Hoffer
Melissa Hoffer
Chief, Energy and Environment Bureau
Turner Smith
Assistant Attorney General
Megan Herzog
Special Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General

  /s/ Jill Lacedonia
Jill Lacedonia
Assistant Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141-0120
(860) 808-5250

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

  /s/ Gerald Karr
Gerald Karr
Assistant Attorney General
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-3369

FOR THE STATE OF IOWA

THOMAS J. MILLER
Attorney General

  /s/ Jacob Larson
Jacob Larson
Assistant Attorney General
Environmental Law Division
Hoover State Office Building
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
(515) 281-5341

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

  /s/ Laura Jensen
Laura Jensen
Assistant Attorney General
Maine Attorney General's Office
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

  /s/ Leah J. Tulin
Leah J. Tulin
Assistant Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6962

FOR THE STATE OF NEW MEXICO

HECTOR H. BALDERAS
Attorney General

  /s/ William Grantham
William Grantham
Consumer & Environmental Protection
Division
New Mexico Office of the Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 717-3500

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

  /s/ Paul Garrahan
Paul Garrahan
Attorney-in-Charge, Natural Resources
Section
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 947-4593

FOR THE COMMONWEALTH OF
PENNSYLVANIA

JOSH SHAPIRO
Attorney General

  /s/ Michael J. Fischer
Michael J. Fischer
Chief Deputy Attorney General
Ann Johnston
Senior Deputy Attorney General
Pennsylvania Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 705-6938
Robert A. Reiley
Assistant Director, Pennsylvania
Department of Environmental Protection
Rachel Carson Building
400 Market Street
Harrisburg, PA 17120

47

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General


  /s/ Gregory S. Schultz
Gregory S. Schultz
Special Assistant Attorney General
Rhode Island Department of Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400


FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General


  /s/ Nicholas F. Persampieri
Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186


FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General


  /s/ Emily C. Nelson
Emily C. Nelson
Assistant Attorney General
Washington State Attorney General's Office
PO Box 40117
Olympia, WA 98504
(360) 586-4607

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General


Catherine A. Jackson
Chief, Public Integrity Section


  /s/ David S. Hoffmann
David S. Hoffmann
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
441 Fourth St. NW Ste. 600-S
Washington, D.C. 20001
(202) 442-9889


FOR THE CITY OF CHICAGO

EDWARD N. SISKEL
Corporation Counsel


  /s/ Jared Policicchio
Jared Policicchio
Supervising Assistant Corporation Counsel
Admitted *Pro Hac Vice*
30 N. LaSalle Street, Suite 1400
Chicago, IL 60602
(312) 744-1438

DATED: July 3, 2020                    /s/ Susannah L. Weaver

Susannah L. Weaver, D.C. Bar # 1023021
Sean H. Donahue, D.C. Bar # 940450
Donahue, Goldberg & Weaver, LLP
1008 Pennsylvania Ave. SE
Washington, DC 20003
Phone: (202) 569-3818 (Ms. Weaver)
Phone: (202) 277-7085 (Mr. Donahue)
susannah@donahuegoldberg.com
sean@donahuegoldberg.com


Peter Zalzal, CO Bar # 42164
Rosalie Winn, CA Bar # 305616
Rachel Fullmer, CO Bar # 49868
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
Phone: (303) 447-7214 (Mr. Zalzal)
Phone: (303) 447-7212 (Ms. Winn)
Phone: (303) 447-7208 (Ms. Fullmer)
pzalzal@edf.org
rwinn@edf.org
rfullmer@edf.org


*Counsel for Plaintiff-Intervenor Environmental Defense Fund*