## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK, et al., | ) |
| Plaintiffs, | ) |
| and | ) |
| ENVIRONMENTAL DEFENSE FUND, | )          Civil Action No. 18-773 (RBW) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| ANDREW WHEELER, et al., | ) |
| Defendants. | ) |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs the States of New York, California, Connecticut, Illinois, Iowa, Maine, Maryland, New Mexico, Oregon, Rhode Island, Vermont, Washington, the Commonwealths of Massachusetts and Pennsylvania, the District of Columbia, and the City of Chicago and Plaintiff-Intervenor Environmental Defense Fund (collectively Plaintiffs), by and through the undersigned counsel, respectfully submit the following Statement of Undisputed Material Facts pursuant to Local Civil Rule 7(h) in support of their Motion for Summary Judgment.

| Undisputed Fact | Supporting Evidence |
|---|---|
| 1. EPA found, over ten years ago—and has not revised such finding—that methane, along with other greenhouse gases, endangers public health and welfare because | • **Ex. 5** (EPA's Responses to Plaintiffs' First Set of Requests for Admission (RFA Resp.)), at Nos. 5 & 6;<br>• 74 Fed. Reg. 66,496 (Dec. 15, 2009); |

| Undisputed Fact | Supporting Evidence |
|---|---|
| of its contribution to climate change. | • 77 Fed. Reg. 49,490, 49,535 (Aug. 16, 2012) (identifying changes including "increased air and ocean temperatures, changes in precipitation patterns, melting and thawing of global glaciers and ice, increasingly severe weather events, such as hurricanes of greater intensity and sea level rise."). |
| 2. Pound for pound, methane warms the earth eighty-four to eighty-six times more than carbon dioxide for the first two decades after release and twenty-eight to thirty-six times more over a one hundred-year time frame. | • **Ex. 5** (RFA Resp.), at Nos. 1 & 2. |
| 3. The oil and natural gas sector is the largest industrial emitter of methane emissions in the United States. | • **Ex. 5** (RFA Resp.), at No. 7;<br>• 81 Fed. Reg. 35,824, 35,842 (June 3, 2016). |
| 4. Methane emissions from oil and natural gas sources in existence before 2012 constitute the majority of methane emissions from the oil and natural gas sector in the United States. | • **Ex. 5** (RFA Resp.), at No. 8;<br>• EPA Omnibus Answer (ECF No. 29), at Answer to Initial Compl. ¶ 35 & Answer to Intervenor's Compl. ¶ 20. |
| 5. In or before 2014, EPA identified available and technically feasible mitigation technologies and practices to reduce methane | • **Ex. 5** (RFA Resp.), at Nos. 9-10, 20-25;<br>• EPA Omnibus Answer (ECF No. 29), at Answer to Initial Compl. ¶ 44 & Answer to Intervenor's Compl. ¶ 31; |

| Undisputed Fact | Supporting Evidence |
|---|---|
| emissions from oil and natural gas operations. | • Control Techniques Guidelines for the Oil and Natural Gas Industry (Oct. 2016), *available at* https://www.epa.gov/sites/production/files/2016-10/documents/2016-ctg-oil-and-gas.pdf; <br><br> • **Ex. 12** (Deposition of David Cozzie (Feb. 25, 2020) (Cozzie Dep.)), at 79:15-80:2; <br><br> • U.S. EPA Office of Air Quality Planning and Standards, Report for Oil and Natural Gas Sector Compressors (Apr. 2014), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-0505-5109; <br><br> • U.S. EPA Office of Air Quality Planning and Standards, Report for Oil and Natural Gas Sector Oil Well Completions and Associated Gas during Ongoing Production (Apr. 2014), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-0505-5108; <br><br> • U.S. EPA Office of Air Quality Planning and Standards, Report for Oil and Natural Gas Sector Leaks (Apr. 2014), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-0505-5110; <br><br> • U.S. EPA Office of Air Quality Planning and Standards, Report for Oil and Natural Gas Sector Liquids Unloading Processes (Apr. 2014), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-0505-5032; |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | • U.S. EPA Office of Air Quality Planning and Standards, Report for Oil and Natural Gas Sector Pneumatic Devices (Apr. 2014), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-0505-5030. |
| 6.  Plaintiffs, and their residents and members, have experienced and will continue to experience substantial injuries from climate change, including, but not limited to, sea level rise and increased severity of storms and flooding resulting in property damage and hazard to human safety, increased heat deaths and illnesses due to intensified and prolonged heat waves, and increased frequency and duration of wildfires threatening lives and property and increasing local air pollution. | • **Ex. 18** (Declaration of Jared Snyder (Oct. 18, 2019, ECF No. 62-1) (Snyder Decl.), at ¶¶ 8-19; <br> • **Ex. 19** (Declaration of Dr. Rupa Basu (Oct. 16, 2019, ECF No. 62-2) (Basu Decl.)), at ¶¶ 9-11 & Attach. 1 & 2; <br> • **Ex. 20** (Declaration of Jay Chamberlin (Oct. 18, 2019, ECF No. 62-3) (Chamberlin Decl.)), at ¶¶ 5-13; <br> • **Ex. 22** (Declaration of Lisa Berry Engler (July 2, 2020) (Engler Decl.)), at ¶¶ 7-26; <br> • **Ex. 21** (Declaration of Ilissa B. Ocko (Oct. 18, 2019, ECF No. 62-7) (Ocko Decl.)), at ¶¶ 7-8; <br> • Declaration of John Stith, Environmental Defense Fund (May 17, 2018, ECF No. 18-2, Attach.14); <br> • Declaration of Denise Fort, Environmental Defense Fund Member (May 21, 2018, ECF No. 18-2, Attach.15); <br> • Declaration of Arthur Cooley, Environmental Defense Fund Member (May 18, 2018, ECF No. 18-2, Attach.16); <br> • Declaration of Francis Don Schreiber, Environmental Defense Fund Member (May 18, 2018, ECF No. 18-2, Attach.17); |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | • Declaration of Hugh Fitzsimons, Environmental Defense Fund Member (May 25, 2018, ECF No. 18-2, Attach.18). |
| 7. There are more than 850,000 existing oil and gas wells in the United States. | • **Ex. 23** (Declaration of Dr. Renee McVay and Hillary Hull (July 3, 2020) (McVay/Hull Decl.)), at ¶ 8. |
| 8. Oil and gas sources also emit large quantities of ozone-forming volatile organic compounds (VOCs) and hazardous air pollutants. | • **Ex. 23** (McVay/Hull Decl.), at Table 1; <br> • **Ex. 24** (Declaration of Dr. Ananya Roy and Dr. Tammy Thompson (July 2, 2020) (Roy/Thompson Decl.)), at ¶¶ 17, 19, 24. |
| 9. Approximately 9,300,000 people live within a half mile of an existing well, including approximately 600,000 children under the age of five and 1,400,000 people over the age of 65 years, who are especially sensitive to the health risks posed by ozone and other local air pollution. | • **Ex. 23** (McVay/Hull Decl.), at ¶ 20; <br> • **Ex. 12** (Cozzie Dep.), at 21:15-22:20 (acknowledging studies indicating that people living in close proximity to oil and gas sources have become ill as a result of exposure to pollutants from those sources). |
| 10. In 1979, EPA listed Crude Oil and Natural Gas Production on its "priority list" as a category of stationary sources that may reasonably be anticipated to endanger public health and welfare under section 111 of the Clean Air Act. | • 44 Fed. Reg. 49,222 (Aug. 21, 1979). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 11. In 1985, EPA first promulgated new source performance standards for some of the air pollutants emitted by oil and gas sources, including VOCs emitted by a subset of sources included in the Crude Oil and Natural Gas Production source category. | • 50 Fed. Reg. 26,122 (June 24, 1985);<br>• 50 Fed. Reg. 40,158 (Oct. 1, 1985). |
| 12. In August 2011, EPA proposed revisions to the oil and natural gas standards of performance, but did not propose any standards for methane emissions. | • 76 Fed. Reg. 52,738, 52,756 (Aug. 23, 2011) (acknowledging in the proposal that "processes in the Oil and Natural Gas source category emit significant amounts of methane," and that such emissions are equivalent to more than 328 million metric tons of carbon dioxide each year);<br>• EPA Omnibus Answer (ECF No. 29), at Answer to Initial Compl. ¶ 40. |
| 13. In April 2012, EPA signed a final rule revising some aspects of the oil and natural gas standards, but declining to regulate methane. | • 77 Fed. Reg. 49,490, 49,513 (Aug. 16, 2012) (noting "inten[t] to continue to evaluate the appropriateness of regulating methane with an eye toward taking additional steps if appropriate"). |
| 14. Between 2014 and 2016, EPA continued to evaluate available emissions and mitigation technologies and practices to reduce emissions of methane from the oil and natural gas sector. | • **Ex. 5** (RFA Resp.), at No. 10. |
| 15. On September 18, 2015, EPA proposed new source performance | • 80 Fed. Reg. 56,593 (Sept. 18, 2015); |

| Undisputed Fact | Supporting Evidence |
|---|---|
| standards for methane emissions from the oil and natural gas sector. | • **Ex. 6** (EPA's Responses to Plaintiffs' First Set of Interrogatories (Feb. 28, 2019) (Interrog. Resp.)), at No. 1. |
| 16. On May 12, 2016, EPA promulgated new source performance standards regulating methane emissions from new oil and natural gas sources under section 111(b) of the Clean Air Act, 42 U.S.C. § 7411(b) (New Source Rule). | • 81 Fed. Reg. 35,824 (June 3, 2016);<br>• **Ex. 17** (Declaration of Peter E. Tsirigotis (Sept. 27, 2019, ECF No. 59-1) (Tsirigotis Decl.)), at ¶ 8. |
| 17. When EPA started developing standards for regulation of methane emissions from new oil and natural gas sources in August 2015 and when it finalized those standards in May 2016, EPA knew it was obligated to also look at developing and issuing existing source guidelines. | • **Ex. 9** (30(b)(6) Deposition of Paul Gunning (Feb. 11, 2020) (30(b)(6) Dep.)), at 26:17-21;<br>• *See also* **Ex. 10** (Deposition of Peter Tsirigotis (Feb. 13, 2020) (Tsirigotis Dep.)), at 132:11-15 (Q "[D]id you understand that the Agency was under a legal obligation to issue existing source regulations after it had issued the 2016 NSPS for methane?" A "Yes."). |
| 18. EPA did not concurrently propose or finalize guidelines for limiting methane emissions from existing sources at the same time it proposed and finalized standards for methane emissions from new oil and natural gas sources or at any time thereafter. | • **Ex. 5** (RFA Resp.), at No. 18. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 19. EPA has in the past concurrently proposed and finalized guidelines for limiting emissions of a pollutant from existing sources at the same time it has proposed and finalized new source performance standards for emissions of that pollutant from new sources. | <ul><li>*E.g.*, 81 Fed. Reg. 59,276 & 81 Fed. Reg. 59,332 (Aug. 29, 2016) (simultaneous revised new source standards and existing source guidelines for emissions from municipal solid waste landfills);</li><li>80 Fed. Reg. 64,510 & 80 Fed. Reg. 64,662 (Oct. 23, 2015) (simultaneous new source standards and existing source guidelines for power plant carbon dioxide emissions);</li><li>61 Fed. Reg. 9,905 (Mar. 12, 1996) (simultaneous new source standards and existing source guidelines for emissions from municipal solid waste landfills).</li></ul> |
| 20.  EPA's promulgation of an Existing Source Rule for controlling methane emissions from existing oil and natural gas sources would require States to develop plans to establish performance standards for controlling such emissions. | <ul><li>**Ex. 17** (Tsirigotis Decl.), at ¶ 7.</li></ul> |
| 21. An Existing Source Rule for controlling methane emissions from existing oil and natural gas sources would also reduce emissions of ozone-forming VOCs and hazardous air pollutants from these sources. | <ul><li>**Ex. 23** (McVay/Hull Decl.), at ¶ 8.</li></ul> |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 22. In March 2016, three months before EPA issued the New Source Rule, EPA announced it would "immediately" begin developing existing source regulations and intended to work "swiftly." | • **Ex. 9** (30(b)(6) Dep.), at 20:15-21:20;<br>• *Id.* at Ex. 3, *EPA Taking Steps to Cut Methane Emissions from Existing Oil and Gas Sources* (Mar. 10, 2016);<br>• **Ex. 6** (Interrog. Resp.), at No. 1;<br>• **Ex. 10** (Tsirigotis Dep.), at 102:13-16 ("We were moving expeditiously to do an ICR concurrently with finalizing a new source rule."). |
| 23. EPA stated in March 2016 that it would move forward with regulation of methane emissions from existing sources based in part on new research and analysis from industry organizations, academic and industry researchers, and non-governmental organizations showing "that methane emissions are substantially higher than [EPA] previously understood." | • **Ex. 9** (30(b)(6) Dep.), at 22:2-6;<br>• *Id.* at Ex. 3, *EPA Taking Steps to Cut Methane Emissions from Existing Oil and Gas Sources* (Mar. 10, 2016). |
| 24. EPA announced in March 2016 that it would initiate "a formal process to require companies operating existing oil and gas sources to provide information to assist in the development of comprehensive regulations to reduce methane emissions," which | • **Ex. 6** (Interrog. Resp.), at No. 1. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| EPA referred to as an "information collection request" or "ICR." | |
| 25. EPA intended to use the ICR to gather information on existing sources of methane emissions, technologies to reduce those emissions, and the costs of those technologies. | • **Ex. 9** (30(b)(6) Dep.), at Ex. 3, *EPA Taking Steps to Cut Methane Emissions from Existing Oil and Gas Sources* (Mar. 10, 2016);<br>• **Ex. 13** (Deposition of Brenda Shine (Feb. 27, 2020) (Shine Dep.)), at 81:11-25; 98:16-18; 100:9-101:13; 154:19-156:7; 165:22-166:11 (describing information the ICR would have collected and how it could have been used).<br>• *See generally* Information Collection Request Supporting Statement, EPA ICR No. 2548.01 (Nov. 9, 2016), *available at* https://www.epa.gov/sites/production/files/2016-11/documents/oil-natural-gas-icr-supporting-statement-epa-icr-2548-01.pdf. |
| 26. On May 12, 2016, EPA promulgated new source performance standards regulating methane emissions from new oil and natural gas sources under section 111(b) of the Clean Air Act. | • 81 Fed. Reg. 35,824, 35,895 (June 3, 2016). |
| 27. Also on May 12, 2016, EPA published the first draft of the ICR for public comment to obtain "more specific information that would be of critical use in addressing [existing source | • **Ex. 9** (30(b)(6) Dep.), at Ex. 4, *Proposed Information Collection Request; Information Collection Effort for Oil and Gas Facilities*, 81 Fed. Reg, 35,763, 35,764 (June 3, 2016);<br>• **Ex. 6** (Interrog. Resp.), at No. 1. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| emissions pursuant to] CAA section 111(d)." | |
| 28. On September 29, 2016, EPA published notice that it had submitted the ICR to the Office of Management and Budget (OMB) for review and approval and was soliciting public comment on a second draft of the ICR for an additional 30 days. | • 81 Fed. Reg. 66,962 (Sept. 29, 2016);<br>• **Ex. 6** (Interrog. Resp.), at No. 1. |
| 29. In November 2016, EPA issued the final ICR to support development of Existing Source Guidelines. | • **Ex. 6** (Interrog. Resp.), at No. 1;<br>• **Ex. 5** (RFA Resp.), at No 13. |
| 30. The resources EPA spent on development and issuance of the ICR in 2016 included five full-time employees and over one million dollars in additional contractor expenses. | • **Ex. 9** (30(b)(6) Dep.), at Ex. 6, *Resources Spent on Development and Issuance of the 2016 Information Collection Request*;<br>• *See also* **Ex. 10** (Tsirigotis Dep.), at 113:17-19 (EPA staff "took quite a bit of time putting [the ICR] together");<br>• **Ex. 13** (Shine Dep.), at 30:16-32:24 (describing staff who worked on the ICR), 66:15-67:22 (describing process for identifying ICR recipients); 67:23-70:14 (describing process for considering public comments); 131:10-132:24 (describing implementation of the ICR as a "big work effort"); 139:5-21 (similar).<br>• **Ex. 5** (RFA Resp.) at No. 12. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 31. Brenda Shine, then an engineer in the Refining and Chemicals Group in the Sector Programs and Policies Division of EPA's Office of Air Quality Planning and Standards, played a leadership role in the ICR process. | • **Ex. 9** (30(b)(6) Dep.), at 73:6-7, 76:17-21;<br>• **Ex. 13** (Shine Dep.), at 20:9-10, 30:13-15;<br>• **Ex. 10** (Tsirigotis Dep.), at 82:18-21. |
| 32. Ms. Shine testified that, in the course of developing the ICR "the outreach was pretty extensive," and included numerous communications with both the regulated industry and States. | • **Ex. 13** (Shine Dep.), at 54:8-10; *see generally id.* at 53:3-55:19 (describing outreach efforts). |
| 33. EPA began receiving the information requested in the ICR from oil and natural gas operators in or before January 2017. | • EPA Omnibus Answer (ECF No. 29), at Answer to Initial Comp. ¶ 50;<br>• **Ex. 5** (RFA Resp.), at 14;<br>• **Ex. 12** (Cozzie Dep.), at 134:4-10 (recalling EPA began receiving ICR responses in mid-December). |
| 34. To assist the ICR recipients with completing and returning the requested information, EPA established a telephonic help line, an email account, and an ICR help desk staffed by over a dozen EPA employee volunteers. | • **Ex. 6** (Interrog. Resp.), at No. 1;<br>• *See generally* **Ex. 12** (Cozzie Dep.), at 147:9-148:19, 135:6-15;<br>• *See also id.* at Ex. DC-30, *Draft Exemplary Customer Service Award Nomination*, USEPA-0037871-72;<br>• **Ex. 13** (Shine Dep.), at 136:1-24, 139:5-21 (describing work and staffing of help desk); |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | • **Ex. 15** (*People Helping with the Oil and Gas ICR Hotline, Emails & Correspondence*, USEPA-0283849). |
| 35. EPA received numerous requests for an extension of the deadline for responding to the ICR, many of which EPA granted. | • **Ex. 6** (Interrog. Resp.), at No. 1;<br>• **Ex. 13** (Shine Dep.), at 139:5-18. |
| 36. EPA's efforts to implement the ICR, including its phone bank to answer ICR recipients' questions about responding, continued throughout February 2017 and up until March 1 or 2. | • **Ex. 13** (Shine Dep.), at 174:9-12 (Q "So up until March 1st or 2nd … you were just doing what you would have been doing to implement the ICR?" A "Yeah.").<br>• *See id.* at 180:22-25 (Q "Was it typical for you to hear about a final agency action related directly to the work that you do on … the day of or the day before it's finalized?" A "No."). |
| 37. By March 2017, EPA had received approximately 4,500 responses to the ICR. | • **Ex. 9** (30(b)(6) Dep.), at 63:7-10. |
| 38. Based on EPA's own projected timelines, if the ICR had not been withdrawn and EPA had continued to work on existing source guidelines, EPA would have had sufficient time to issue an Existing Source Rule by now. | • **Ex. 9** (30(b)(6) Dep.), at Ex. 49, *Estimate of Time needed to promulgate EG without ICR* (Feb. 3, 2020) & Ex. 50, *Estimate of Time needed to promulgate EG with ICR* (Feb. 3, 2020);<br>• **Ex. 12** (Cozzie Dep.), at 231:18-232:11. |
| 39. On January 30, 2017, House Majority Leader Kevin McCarthy's office asked Marcus Peacock, a political official in | • **Ex. 9** (30(b)(6) Dep.), at Ex. 10, *Jan. 30, 2017, email chain*, USEPA-2023975-76 ("My assumption is that the EPA team will likely rescind/modify this ICR once it gets up and |

| Undisputed Fact | Supporting Evidence |
|---|---|
| OMB, to forward a request to "suspend this ICR until the new EPA gets up and running" to the appropriate EPA official; Marcus Peacock forwarded that request to Charles Munoz, then EPA's White House liaison. | running … Goal here would be to suspend this ICR until the new EPA gets up and running."). <br>• *Id.* at 114:4-6 (Q "What did [Mr. Munoz] do with this email?" A "I have no idea. There's no other record of him forwarding this."); *see also id.* at 114:21-115:1 (testifying the Mr. Munoz does not recall speaking to anyone at EPA about the letter). |
| 40. On February 1, 2017, Kathleen Sgamma, President of the Western Energy Alliance, contacted David Kreutzer, a politically appointed member of the EPA beachhead team, requesting "time to talk about the ICR that is ongoing for O&G companies." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 11, *Feb. 1-2, 2017, email chain*, USEPA-2021524; <br>• *Id.* at 85:15-20, 86:10-13, 87:15-88:2 (explaining that David Kreutzer was a member of the "beachhead team," which is a term of art for the political appointees who come to run the agency after inauguration of a new Administration). |
| 41. Ms. Sgamma sent another email to David Kreutzer on February 10, 2017, setting forth "several key rationales for either eliminating the ICR or at least extending the response date nationwide for every operator right now," including that "it seems unlikely that the new EPA will approach this 'existing' source regulation in the same way." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 17, *Feb. 10, 2017, email*, USEPA-2021161. |
| 42. On February 10, 2017, another member of the EPA's political beachhead team, George | • **Ex. 9** (30(b)(6) Dep.), at Ex. 16, *Feb. 9-10, 2017, email chain*, USEPA-2021162 ("CALL peter Zaragotis [sic] in OAQPS, Durham, NC he's the |

| Undisputed Fact | Supporting Evidence |
|---|---|
| Sugiyama, emailed David Kreutzer directing him to call Peter Tsirigotis, an EPA career official who at that time was director of the division that had issued the ICR, to tell Mr. Tsirigotis to email recipients of the ICR not to respond. | division director of the unit that put out the ICR and the rule. Tell him to e-mail the recipients of the ICR and to not respond.");<br>• *Id.* at 127:5-128:3. |
| 43. Mr. Sugiyama did not have authority to make that request. | • **Ex. 9** (30(b)(6) Dep.), at 128:2-6 (Q "Did George Sugiyama have the authority to make that request?" A "No. He did not.") |
| 44. EPA staff did not carry out Mr. Sugiyama's request at that time. | • **Ex. 9** (30(b)(6) Dep.), at 128:7-17 (Q "Was anything done in response to this email?" A "Not that I'm aware of, no." Q "Did anyone call Peter Tsirigotis and direct him to tell the recipients of the ICR not to respond?" A "He did not do that. And I spoke to Peter." Q "Peter did not email the recipients of the ICR?" A "That's correct.") |
| 45. Later on February 10, 2017, Mr. Kreutzer forwarded Ms. Sgamma's February 10 email to another political appointee, David Schnare, and stated: "Looks like this will be easier than we thought." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 18, *Feb. 10, 2017, email chain*, USEPA-2023043. |
| 46. Also on February 10, 2017, Mr. Kreutzer also emailed Sarah Dunham "Re: Quashing the ICR" and asked her to "draft whatever request you would need from | • **Ex. 9** (30(b)(6) Dep.), at Ex. 19, *Feb. 10, 2017, email*, USEPA-2023042. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| Catharine [sic] McCabe, then Acting EPA Administrator] and send it to her, Schnare, and me?" | |
| 47. Scott Pruitt was confirmed as EPA Administrator on February 17, 2017. | • **Ex. 9** (30(b)(6) Dep.), at 118:3-4. |
| 48. On February 22, 2017, David Schnare emailed a contact in the White House and stated: "Administrator Pruitt wants to make a fast start and we are developing federal register notices with regard to . . . the methane information collection demand. Mr. Pruitt wants to launch . . . on this Friday." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 20, *Feb. 22, 2017, email chain*, USEPA-2026536. |
| 49. On February 27, Ryan Jackson, Administrator Pruitt's newly-appointed Chief of Staff, emailed David Schnare: "I've been meaning to ask this all day and we have time tomorrow morning some, but what can be done on the ICR presently?" | • **Ex. 9** (30(b)(6) Dep.), at Ex. 22, *Feb. 27, 2017, email*, USEPA-2025753. |
| 50. On February 28, 2017, David Schnare emailed Sarah Dunham asking that she work with Nancy Grantham in EPA's Office of Public Affairs "to prepare a press | • **Ex. 9** (30(b)(6) Dep.), at Ex. 25, *Feb. 28, 2017, email*, USEPA-2028168. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| release to the appropriate trade press to announce that we are withdrawing our request for information on methane releases that we made under CAA Sec. 114, and that we are preparing letters to the 15,000 persons who originally received that request." | |
| 51. A February 28, 2017, draft press release drafted two days prior to announcing the decision to withdraw the ICR left a "[Placeholder for message language about why cancelling]." | • **Ex. 12** (Cozzie Dep.), at Ex. DC-32, *Feb. 28 email and attached press release*, USEPA-0055400-01. |
| 52. David Cozzie, a senior career official in the division of EPA's Office of Air Quality Planning and Standards that was responsible for developing the ICR and an Existing Source Rule, testified that in his experience it was not typical for a draft press release to have a placeholder for the rationale for the agency's action. | • **Ex. 12** (Cozzie Dep.), at 157:2-5 (Q "In your experience, is it typical for a draft press release to have a placeholder for the rationale for EPA's action?" A "Typically, no."); <br> • *Id.* at 14:22-16:13 (describing Mr. Cozzie's position and responsibilities). |
| 53. On the morning of March 1, 2017, an EPA political employee in the Office of Policy emailed another employee regarding the status of the ICR withdrawal: "Confirmed | • **Ex. 9** (30(b)(6) Dep.), at Ex. 29, *Mar. 1, 2017, email chain*, USEPA-2019876. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| that this decision has been made and OAR [EPA's air office] is working on the withdrawal. They have comms materials and are putting the notice together." | |
| 54. Later in the afternoon on March 1, 2017, various EPA employees received and forwarded an email from Politico Pro Energy with an article titled "AGs ask EPA to drop methane information request," with a link to a letter dated March 1, 2017, from several State Attorneys General and Governors to Administrator Pruitt. | • **Ex. 9** (30(b)(6) Dep.), at Ex. 30, *Mar. 1, 2017, email chain and attached Mar. 1, 2017, letter*, USEPA-0097550-55. |
| 55. The March 1, 2017, letter from Attorneys General and Governors asked EPA to "consider an immediate suspension of the Information Collection Request pending internal review by the EPA concerning whether it should withdraw the Request" in light of their "hope that the burdensome Obama climate rules never see the light of day." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 30, *Mar. 1, 2017, letter*, at USEPA-00975553. |
| 56. On the morning of March 2, 2017, David Schnare directed the Office of General Counsel to draft a | • **Ex. 9** (30(b)(6) Dep.), at Ex. 33, *Mar. 2, 2017, email*, USEPA-2028163 ("The Administrator wants this turned into a Notice for Federal |

| Undisputed Fact | Supporting Evidence |
|---|---|
| Federal Register notice to withdraw the ICR, explaining that "[i]t can literally be three sentences long." | Register publication and he wants it over there today for publication tomorrow."); <br> • *Id.* at 179:2-182:14. |
| 57. On March 2, 2017, Administrator Pruitt formally withdrew the ICR. | • **Ex. 9** (30(b)(6) Dep.), at Ex. 9, *Notice Regarding Withdrawal of Obligation to Submit Information* (dated Mar. 2, 2017), 82 Fed. Reg. 12,817 (Mar. 7, 2017). |
| 58. There was no internal decision-making process concerning whether EPA should withdraw the ICR. | • **Ex. 9** (30(b)(6) Dep.), at 80:14-17 (Q "Was there a process, a decision-making process that culminated in the withdrawal of the ICR?" A "No. There's no record of that."); <br> • *See also id.* at 105:1-10 (testifying that there was no consultation with staff), 171:6-9 (Q "So is there an internal review by the EPA concerning whether it should withdraw the request?" A "No."); <br> • **Ex. 10** (Tsirigotis Dep.), at 162:7-11, 162:18-21, 188:7-21; <br> • **Ex. 11** (Dunham Dep.), at 33:14-34:1, 67:19-68:5. |
| 59. Mr. Cozzie testified that for a change in policy of the magnitude here it would be the typical procedure at EPA for staff to prepare analysis to inform decision-makers in advance of a decision being made. | • **Ex. 12** (Cozzie Dep.) at 163:3-13. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 60. In making the decision to withdraw the ICR, Administrator Pruitt did not consult with any career staff, including Sarah Dunham, the career official who then led EPA's air office in an acting capacity. | • **Ex. 9** (30(b)(6) Dep.), at 90:13-19 ("Again, it was a decision made by the Administrator. The career staff weren't involved in making that decision."); <br> • *See also id.* at 91:13-19 ("Again, my understanding is there was no discussion with career staff at the Agency about the decision." Q "So no career staff were involved in the decision of whether to withdraw the ICR?" A "That's correct."); <br> • **Ex. 10** (Tsirigotis Dep.), at 162:7-11, 162:18-21, 188:7-21 (testifying that, before the decision was made to withdraw the ICR, no one in leadership asked him whether the agency should withdraw the ICR, and he does not recall ever being asked whether the information that EPA was collecting in the ICR was, in fact, needed); <br> • **Ex. 11** (Dunham Dep.), at 14:4-16; 67:5-68:5 (testifying that she does not recall EPA political leadership reaching out to any career staff regarding whether responding to the ICR was unduly burdensome or whether the information sought by the ICR was needed); <br> • *See also id.* at 33:14-34:1, 75:1-3 (testifying that she does not recall being part of any decision-making process leading up to, and had no involvement in determining the rationale for, the withdrawal); <br> • **Ex. 13** (Shine Dep.), at 183:10-24 (testifying that, prior to the ICR withdrawal, no one talked to her |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | about assessing the need for the information that was being collected or asked her to reassess the burdens of the ICR). |
| 61. EPA did not undertake any public process before withdrawing the ICR. | • **Ex. 9** (30(b)(6) Dep.), at 95:8-11 (Q "Was there any public process undertaken by the Agency before the decision to withdraw the ICR was made?" A "No."); <br> • **Ex. 13** (Shine Dep), at 184:6-20 (testifying that before ICR withdrawal, she was not directed to reach out to any stakeholders to discuss the withdrawal of the ICR, did not hold any webinars leading up to the withdrawal, and did not talk to anyone to gain input on whether or not the agency should withdraw the ICR). |
| 62. Neither the agency nor its most knowledgeable staff are aware of Administrator Pruitt seeking any analysis or assessment specifically related to the decision to withdraw the ICR, apart from review by staff in EPA's Office of General Counsel of the draft of the Federal Register notice announcing the withdrawal of the ICR. | • **Ex. 9** (30(b)(6) Dep.), at 210:21-211:3 (Q "[T]o your knowledge, did career staff undertake or present to the administrator any analysis or assessment specific to the withdrawal of the ICR prior to its withdrawal?" A "Not to my knowledge, no."); <br> • **Ex. 12** (Cozzie Dep.), at 172:24-173:13; <br> • **Ex. 10** (Tsirigotis Dep.), at 188:7-21; <br> • **Ex. 16** (*Feb. 12, 2020, Email from Heather Gange, DOJ, to Morgan Costello, NY Attorney General's Office*). |
| 63. Senior career staff directly involved in the ICR did not learn EPA's stated basis for the | • **Ex. 7** (EPA's Amended Responses to Plaintiffs' First Set of Interrogatories (Amended Interrog. Resp.) (Apr. 26, 2019)), at No. 6 (EPA current officials "who are most familiar with the |

21

| Undisputed Fact | Supporting Evidence |
|---|---|
| withdrawal until the day it was announced. | circumstances surrounding the ICR withdrawal" only became aware of the basis for the withdrawal on March 2, the day it was signed);<br>• *See also* **Ex. 12** (Cozzie Dep.), at 178:23-179:13. |
| 64. Mr. Cozzie testified that it is "not typical" for senior career staff "not to be aware of the basis for the pending reversal of a significant agency action until a few days before that action is finalized." | • **Ex. 12** (Cozzie Dep.), at 161:16-21, 163:3-13, 164:5-165:18;<br>• *See also id.* at 178:23-179:13. |
| 65. EPA's Federal Register notice withdrawing the ICR stated as the rationale for withdrawing the ICR that: "The withdrawal is occurring because EPA would like to assess the need for the information that the agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need. This also comes after the Agency received a letter on March 1, 2017 from nine state Attorneys General and the Governors of Mississippi and Kentucky, expressing concern with the burdens on businesses imposed by the pending requests." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 9, *Notice Regarding Withdrawal of Obligation to Submit Information* (dated Mar. 2, 2017), 82 Fed. Reg. 12,817 (Mar. 7, 2017). |
| 66. EPA had no plans to "assess the need for the information" at the | • **Ex. 9** (30(b)(6) Dep.), at 111:10-14 (Q "You testified that at the time of the withdrawal, the |

| Undisputed Fact | Supporting Evidence |
|---|---|
| time of or after withdrawing the ICR. | Agency did not have any plans for assessing the need for the information. Is that correct?" A "To my knowledge, that's correct, yes."); 111:20-22 (Q "Was there a plan for assessing the need for the information after the withdrawal?" A "No. There was not."); *see also id.* at 101:14-102:1.<br>• *See also* **Ex. 10** (Tsirigotis Dep.), at 195:3-7. |
| 67. EPA did not consult with staff at any point after the ICR was promulgated and before it was withdrawn regarding whether an assessment of the need for the information sought in the ICR was warranted or their assessment of the need for the information. | • **Ex. 9** (30(b)(6) Dep.), at 105:1-10 (Q "Did the Agency at any point after the ICR was promulgated and before it was withdrawn consult with staff regarding whether assessment of the need for the information was warranted?" A "No" Q "Did the Agency at any point after the ICR was promulgated and before it was withdrawn consult with staff regarding their assessment of the need for the information?" A "No."). |
| 68. Neither the agency nor anyone now at EPA knows what then-Administrator Pruitt meant by wanting to "assess the need" for the information. | • **Ex. 9** (30(b)(6) Dep.), at 97:20-22 (Q "What did the Agency mean by assess the need for the information?" A "I can't speculate. I don't know."); 110:4-12 (Q "Ms. Costello had asked what EPA meant by assess the need for the information to assess the withdrawal, and I believe you testified that you don't know." A "That's correct." Q "Okay. Is there anyone at EPA that would know the answer to that question?" A "Not to my knowledge, no.");<br>• *See also* **Ex. 11** (Dunham Dep.), at 75:6-11. |
| 69. EPA considered the ICR's potential burden on industry | • **Ex. 9** (30(b)(6) Dep.), at 58:4-7;<br>• **Ex. 12** (Cozzie Dep.), at 172:24-173:13. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| during the two rounds of public notice and comment and found that burden was justified in light of the need for the information. | |
| 70. EPA did not conduct any analysis to reevaluate the potential burden on industry of the ICR prior to withdrawing the ICR. | • **Ex. 9** (30(b)(6) Dep.), at 99:16-100:4;<br>• **Ex. 12** (Cozzie Dep.), at 172:24-173:13. |
| 71. EPA senior staff testified that they do not recall the agency considering options other than full withdrawal of the ICR, such as suspension. | • **Ex. 11** (Dunham Dep.), at 34:2-6<br>• *See also* **Ex. 12** (Cozzie Dep.), at 158:1-159:1. |
| 72. As late as October 2017, EPA was still claiming that it was assessing the need for the information, a statement that an Mr. Cozzie testified was not correct. | • **Ex. 12** (Cozzie Dep.), at 186:10-187:17 & Ex. DC-66, *Oct. 3, 2017, email chain,* USEPA-243623-24. |
| 73. Since withdrawal of the ICR, EPA has not taken any actions specifically directed toward developing an Existing Source Rule. | • **Ex. 12** (Cozzie Dep.) at 64:19-22 (Q "Was there any other work that you were responsible for, in addition to the consult on the ICR, to help advance existing source guidelines?" A "No. Not that I recall.");<br>• *See also id.* at 153:15-21 (Q "Were any efforts made to begin using the data submitted in response to the ICR for the purpose of developing existing source guidelines?" A "No, not that I'm aware of."); |

| Undisputed Fact | Supporting Evidence |
|---|---|
| | • **Ex. 13** (Shine Dep.), at 152:6-19 (testifying that she did not look at the ICR responses "other than just … compiling them in boxes for the hard copies" and did not analyze them); *id.* at 188:1-189:9 (website for ICR responses was deactivated immediately). |
| 74. EPA's withdrawal of the ICR delays the time by which the Agency is able to issue an Existing Source Rule. | • **Ex. 9** (30(b)(6) Dep.), at 211:4-7 (Q "So EPA's withdrawal of the ICR delays the time by which the Agency is able to issue existing source guidelines, is that right?" A "Yes"). |
| 75. EPA neither assessed nor identified any scientific, technical, or economic basis for—or assessed any impacts of—reversing its decision to issue an Existing Source Rule. | • **Ex. 9** (30(b)(6) Dep.), at 211:8-213:3;<br>• *See also* **Ex. 6** (Interrog. Resp.), at Nos. 21-22, 28;<br>• *See generally* 84 Fed. Reg. 50,244, 50,246 (Sept. 4, 2019). |
| 76. Technologies are available to reduce methane emissions from existing sources and the agency has made no findings that the cost of these technologies has changed. | • **Ex. 5** (RFA Resp.), at Nos. 20-25, 28;<br>• *See also* **Ex. 12** (Cozzie Dep.), at 79:15-80:2, 87:8-88:7, 250:18-251:2. |
| 77. On March 2, 2017, within hours of EPA's ICR withdrawal announcement, Kathleen Sgamma, emailed David Kreutzer: "From the bottom of my heart, thank you"; and Mr. Kreutzer responded: "Thank you for bringing it to our attention. There was nobody here | • **Ex. 9** (30(b)(6) Dep.), at Ex. 36, *Mar. 2, 2017, email chain*, USEPA-2023037-38;<br>• *Id.* at 185:11-188:13. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| (political or career) who thought the ICR made sense given the changes in the associated policy," and bestowed "Kudos" on the Ms. Sgamma "for being alert!" | |
| 78. On March 28, 2017, President Trump issued Executive Order No. 13,783 (E.O. 13,783) directing agencies to review existing regulations and "appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise to comply with the law." | • **Ex. 9** (30(b)(6) Dep.), at Ex. 43, *Executive Order 13783 of Mar. 28, 2017, Promoting Energy Independence and Economic Growth*, 82 Fed. Reg. 16,093 (Mar. 31, 2017). |
| 79. EPA initiated its review of the New Source Rule in April 2017 (E.O. Review). | • **Ex. 9** (30(b)(6) Dep.), at Ex. 45, *Review of the 2016 Oil and Gas New Source Performance Standards for New, Reconstructed, and Modified Sources*, 82 Fed. Reg. 16,331 (Apr. 4, 2017). |
| 80. In June 2017, without notice or comment, then-Administrator Pruitt attempted to stay the effectiveness of the New Source Rule. | • 82 Fed. Reg. 25,730 (June 5, 2017). |
| 81. On July 3, 2017, the United States Court of Appeals for the District of Columbia Circuit summarily | • *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| vacated EPA's stay of the New Source Rule as "arbitrary, capricious, [and] ... in excess of [its] ... statutory ... authority." | |
| 82. In June 2017, EPA proposed two additional stays of the requirements of the New Source Rule for notice and comment. EPA never finalized these proposed stays. | • 82 Fed. Reg. 27,641 (June 16, 2017);<br>• 82 Fed. Reg. 27,645 (June 16, 2017). |
| 83. Since initiating the E.O. Review, EPA "has not taken any action specifically toward developing or issuing" the Existing Source Guidelines, nor does EPA intend to do so before completing the E.O. Review. | • **Ex. 6** (Interrog. Resp.), at No. 1 (stating that "[b]ecause the E.O. Review could result in the suspension, revision, or rescission of the methane standards in the 2016 NSPS," it could "potentially affect[] the substance of potential future guidelines for existing oil and natural gas sources, and/or eliminat[e] or curtail[] EPA's authority to issue such guidelines");<br>• **Ex. 17** (Tsirigotis Decl.), at ¶ 11. |
| 84. On September 24, 2019, EPA published a proposed rule to rescind methane standards for new and modified sources of methane emissions in the oil and natural gas sector (New Source Rescission Rule) on the ground that "methane requirements are entirely redundant with" requirements for another pollutant, VOCs. | • 84 Fed. Reg. 50,244, 50,246 (Sept. 24, 2019). |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 85. EPA's proposal New Source Rescission Rule states that "because the methane control options are redundant with VOC control options, there are no expected cost or emissions impacts from rescinding the methane requirement." | • 84 Fed. Reg. at 50,281 (projecting $0 in cost savings to industry from EPA's methane rescission proposal). |
| 86. EPA asserts in the New Source Rescission Rule that rescinding methane regulation for new oil and gas sources will "obviate the need for the development of emission guidelines under CAA section 111(d) . . . to address methane emissions from existing sources." | • 84 Fed. Reg. at 50,254; <br> • *See also* **Ex. 17** (Tsirigotis Decl.), at ¶ 12. |
| 87. Mr. Cozzie testified that proposed New Source Rescission Rule would not relieve any burden on regulated sources. | • **Ex. 12** (Cozzie Dep.), at 36:23-41:2, 86:24-87:3; <br> • *See also id.* at 30:2-13, 31:15-34:11, 35:15-20. |
| 88. EPA declined to analyze the emissions impact of foregoing existing source regulation for the vast majority of oil and gas sources because it views impacts on existing source emissions "as out of scope" of the proposed New Source Rescission Rule. | • **Ex. 9** (30(b)(6) Dep.), at 260:7-11, 261:6-21. |

| Undisputed Fact | Supporting Evidence |
| --- | --- |
| 89. Some companies within the oil and gas industry, including major producers such as BP, Shell, and ExxonMobil, have called on EPA to move forward with an Existing Source Rule, with some suggesting that operators are prejudiced by EPA's failure to regulate methane from existing sources. | • Comments of Joe Ellis, Vice President, Head of U.S. Government Affairs, BP America, Inc. (Nov. 25, 2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0757-1837; <br> • Comments of Krista Johnson, Head, US Government Relations, Shell Oil Company (Nov. 25, 2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0757-1417; <br> • Comments of Staale Gjervik, Senior Vice President, ExxonMobil (Nov. 25, 2019), *available at* https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0757-1421. |
| 90. When plaintiffs and plaintiff-intervenor filed their respective complaints, more than 180 days had passed since plaintiffs and plaintiff-intervenor sent notice of intent to sue letters to EPA. | • EPA Answer (ECF No. 29), at Answer to Initial Compl. ¶ 5 & Answer to Intervenor's Compl. ¶ 3. <br> • *Letter from Peter Zalzal, Envtl. Def. Fund, et al., to E. Scott Pruitt, Adm'r, EPA (Aug. 28, 2017)*, Appendix to Memorandum in Support of Environmental Defense Fund's Motion to Intervene (ECF No. 18-2, Attach. 13). |
| 91. To date, EPA has not issued an Existing Source Rule for methane emissions from existing sources in the oil and gas sector. | • **Ex. 5** (RFA Resp.), at No. 18. |
| 92. EPA does not claim that its delay in promulgating existing source regulations is attributable to a lack | • **Ex. 6** (Interrog. Resp.) at No. 14 (United States "does not now, and will not in the future, argue that any alleged delay in issuing guidelines for |

| Undisputed Fact | Supporting Evidence |
|---|---|
| of time or resources or higher or competing priorities. | existing oil and natural gas sources is attributable to a lack of time or other resources.");<br><br>• *Id.* at No. 15 (EPA "does not now, and will not in the future, argue that the E.O. Review and other actions described in the amended Fed. R. Civ. P. 26(a) disclosures are higher or competing priorities in the sense that they are or were competing for time and other resources that otherwise could be devoted to developing the guidelines at issue");<br><br>• *Id.* at No. 17 (EPA "does not intend to claim that other agency priorities are a basis for not issuing the guidelines at issue."). |