# Exhibit 9

30(b)(6) Deposition of Paul Gunning (Feb. 11, 2020)
(excerpts and selected exhibits)

Plaintiffs' Motion For Summary Judgment

STATE OF NEW YORK, *et al.*, and ENVIRONMENTAL DEFENSE FUND
v.
ANDREW WHEELER, *et al.*
Civil Action No. 18-cv-0773 (RBW)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

+ + + + +

_____
                                  :
IN THE MATTER OF:                 :
                                  :
STATE OF NEW YORK, et al.,        :
                                  :
          Plaintiffs,             :
                                  :
     v.                           : No.
                                  : 18-cv-0773
U.S. ENVIRONMENTAL PROTECTION     :
AGENCY, et al.,                   :
          Defendants.             :
                                  :
_____:

                    Tuesday,
                    February 11, 2020

               Washington, DC


30(b)(6)DEPOSITION OF:

                    PAUL GUNNING

called for examination by Counsel for the

Plaintiff, pursuant to Notice of Deposition, in

the Office of the Attorney General for the

District of Columbia, located at 441 4th Street,

NW, Washington, DC 20001, when were present on

behalf of the respective parties:

**APPEARANCES:**

On Behalf of the Plaintiffs:

MORGAN COSTELLO, ESQ.
CHRISTOPHER GORE, ESQ.
Office of the Attorney General
Environmental Protection Bureau
The Capitol
Albany, New York 12224
518-776-2392
morgan.costello@ag.ny.gov

KAVITA P. LESSER, ESQ.
Deputy Attorney General
California Department of Justice
Environment Section
300 South Spring Street
Los Angeles, California 90013
213-269-6605
kavita.lesser@doj.ca.gov

DAVID S. HOFFMANN, ESQ.

SARAH KOGEL-SMUCKER, ESQ.

Assistant Attorney General

One Judiciary Square

441 4th Street, NW

Washington, DC 20001

202-442-9889

david.hoffmann@dc.gov

On Behalf of the Defendants:


HEATHER E. GANGE, ESQ.

United States Department of Justice

Environmental & Natural Resources Division

Environmental Defense Section

P.O. Box 7611

Washington, DC 20044

heather.gange@usdoj.gov


AMY BRANNING, ESQ.

Office of General Counsel

United States Environmental Protection Agency

1200 Pennsylvania Ave

Washington, DC 20460

202-564-1744

1      plan to issue the ICR.  Is that correct?

2              A      Yes.

3              Q      How was that announcement made?

4              A      I recall it was made by maybe an

5      administrator, acting administrator, assistant

6      administrator at the time Janet McCabe.

7              Q      And what form did that announcement

8      take?

9              A      I don't recall.  I speculate it might

10     have been a press release or something to that

11     effect, but I don't know for sure.

12                     (Whereupon, the above-referred to

13     document was marked as Exhibit No. 3 for

14     identification.)

15                     MS. COSTELLO:  Okay.  I'm going to

16     hand what's been marked for purposes of

17     identification as Exhibit 3, EPA taking steps to

18     cut methane emissions for existing oil and as

19     sources.

20                     BY MS. COSTELLO:

21             Q      Do you recognize this?

22             A      I do.

1      Q      Is this how EPA announced its

2   intention to go forward with existing source

3   guidelines?

4      A      It's my understanding of that, yes.

5      Q      And if you can just take a minute and

6   review it.

7      A      Sure.

8      Q      So who made the announcement?

9      A      The administrator, Gina McCarthy.

10     Q      And what did the EPA announce that it

11  was going to do with respect to existing sources?

12     A      I'll read from the press release as

13  stated.  And today, President Obama committed to

14  doing just that.  EPA will begin developing

15  regulations for methane emissions from existing

16  oil and gas sources.

17          We will start this work immediately to

18  address methane from existing sources.  We intend

19  to work swiftly and will involve stakeholders in

20  meaningful ways as we have been doing all along.

21     Q      Thank you.  And what did the Agency

22  say about why it was going to begin developing

1    existing source guidelines?

2         A     The Agency indicated at the time that

3    there was new data showing that emissions are

4    higher than previously understood.  And so it was

5    believed to take time for us to take a close look

6    at regulating sources.

7         Q     Was the decision in the form of

8    existing source regulations at the time in 2016

9    based on any analysis that had been done by the

10   Agency?

11            MS. GANGE:  I'm going to object to

12   that as being outside the scope of the topics

13   that were designated for his preparation.

14            MS. COSTELLO:  You can go ahead and

15   answer.

16            MS. GANGE:  I'm actually going to

17   instruct the witness not to answer that because

18   he's representing the Agency, and this scope of

19   preparation is delimited by the topics.  And he's

20   not been prepared to speak to things outside the

21   topics that are enumerated there.

22            MS. COSTELLO:  It's well within the

1    objection.

2              MS. GANGE:  If you'd like to go off,

3    that's fine.

4              MS. LESSER:  I think it would be a

5    perfect time to go off the record.

6              (Whereupon, the above-entitled matter

7    went off the record at 9:33 a.m. and resumed at

8    9:36 a.m.)

9              BY MS. COSTELLO:

10      Q    So, please describe the analysis that

11   the Agency undertook in deciding the move forward

12   with existing source guidelines.

13      A    What timeframe are you referring to?

14      Q    At the time of this announcement in

15   March of 2016.

16      A    There was -- so I'll answer your

17   question this way.  When the Agency was

18   developing and finalized in August of 2015 the

19   new source standards, we knew that there was an

20   obligation to then look at existing source

21   standards.

22              The Agency, as I think is highlighted

1    trying to better characterize the nature of the

2    equipment that's out there in the existing

3    source, how old is it, what's the turnover of

4    that equipment, so fairly important and detailed

5    level of information that while we did have

6    available information, we felt at the time and

7    the decision was made to get additional

8    information to support the rule.

9        Q     The Agency had issued some

10   whitepapers.  Is that correct?

11       A     What timeframe?

12       Q     I believe those were in 20 --

13       A     Oh, yes.  Yes.

14       Q     '14?

15       A     I remember.  It was as we were

16   developing the 111(b) standards and then part of

17   that process.

18       Q     Did those whitepapers provide any

19   useful information for purposes of developing

20   existing source guidelines?

21       A     I'm not certain.  There may have been

22   information in there.  And the Agency, when it

1    2016 announcement of its intent to begin

2    developing regulations for methane emissions from

3    existing oil and as sources, what did it do next

4    with respect to the development of guidelines?

5         A    As I said before, we -- you said after

6    March 10th?

7         Q    Yes.

8         A    So we issued -- we went through a

9    process to develop and then issue the ICR working

10   closely with OMB.  And as I mentioned before, we

11   also pursued a voluntary request for information

12   which was just an internal process that we did,

13   opening up a docket to collect information for a

14   period of time from interested stakeholders in

15   public.

16        Q    I'll ask you about that voluntary

17   information request in just a minute.  First, I'm

18   going to hand you what's been marked for

19   identification purposes as Exhibit 4.

20             (Whereupon, the above-referred to

21   document was marked as Exhibit No. 4 for

22   identification.)

1      BY MS. COSTELLO:

2          Q      Do you recognize that document?

3          A      Do I recognize this?  Yes.

4          Q      What is it?

5          A      This is the proposed information

6      collection request.  This is our request for

7      comment that was issued by EPA.  This was

8      published in the Federal Register on June 3,

9      2016.  This was the first draft of the ICR that

10     was commented.  Brenda Shine, I recognize that

11     name.

12         Q      Oh, yes.

13         A      I talked to Brenda, so you can add

14     that to your list.

15         Q      Okay.  Thank you.

16         A      I promise I will recall all these

17     individuals.  Yes, I recognize this.

18         Q      So under what authority did EPA

19     propose to issue the ICR?

20         A      This was under the authority of

21     Section 114 of the Clean Air Act.

22         Q      And what does the Agency need to do to

1   million to respond to the operator survey and $24

2   million to respond to the more detailed facility

3   survey.

4        Q    And in issuing the final ICR, the

5   Agency believes -- determined those costs were

6   justified?

7        A    Yes.

8        Q    How did the collection process proceed

9   after the final ICR was issued?

10       A    So the implementation of the process

11  so to speak was led by our Office of Air Quality

12  and Planning Standards out of RTP in North

13  Carolina.  They worked closely with the team in

14  D.C. from the Office of Atmospheric Programs in

15  the climate change division.

16            The first step was identifying the

17  individuals who would proceed those initial

18  15,000 requests for the first part.  Those were

19  mailed out, I believe, to all of those

20  individuals.

21            So there was a mailing that was done.

22  We were also developing -- spent time developing

1          A      Can you rephrase that?

2          Q      Did EPA receive any of the responses

3      to the ICR before it withdrew it?

4          A      Yes, we did.

5          Q      Approximately how many Part 1

6      responses?

7          A      My understanding is that we got about,

8      of the 15,000, we got about approximately, I

9      think it was in the range of 4,500.  For Part 2,

10      it was a handful, less than 10.

11          Q      Has the Agency reviewed those surveys,

12      responses?

13          A      We have not.

14          Q      Why not?

15          A      Because we've moved forward with the

16      withdrawal.

17          Q      But even though the Agency withdrew,

18      the Agency has not looked at the information?

19          A      We have not looked at that

20      information, no.

21          Q      So you don't know whether they've

22      provided useful information for purposes of

1      developing existing source guidelines?

2           A      Do not know.  We would have to assess

3      that.

4           Q      So your timeline, Exhibit 2, indicates

5      the next entry, January new administration

6      arrives. Before the new administration arrived,

7      in 2016 into 2017 in preparation for the change

8      of administration, were there any transition

9      activities at the Agency?

10          A      Yes.  I think as is customary with any

11     change in administration, there was a transition

12     team that was mobilized to begin to learn about

13     the activities ongoing at the Agency.

14          Q      Who was that transition team?

15          A      I don't have the specific names.

16     There were multiple folks that were involved in

17     that.

18          Q      Was the ICR a topic of conversation at

19     any of these transition activities?

20          A      Yes.

21          Q      Please describe those.

22          A      While we were in the process of

1       purposes of identification.

2                   (Whereupon, the above-referred to

3       document was marked as Exhibit No. 6 for

4       identification.)

5                   BY MS. COSTELLO:

6       Q      Do you recognize this document?

7       A      I do.

8       Q      What is it?

9       A      This is a document that was put

10      together in preparation for this to identify the

11      resources that were spent by EPA on developing

12      and issuing the 2016 information collection

13      request.

14      Q      Did you prepare this document?

15      A      I did not.

16      Q      Who prepared it?

17      A      The folks involved in the process of

18      implementation and coordination with OGC.

19      Q      What are their names?

20      A      Brenda Shine who I mentioned before,

21      Penny Lassiter and Julius Banks.

22      Q      Is that everyone?

1    the operators and making that all happen.

2         Q    You said it's four, full-time

3    employees.  Who are those?

4         A    I don't know the specific individuals.

5    I do know of a couple of folks that were involved

6    in that who I mentioned already.  Brenda Shine

7    was a key player in running that process.

8              Jonathan Witt is another individual

9    that was involved.  The overall manager of that

10   operation, I believe, was Penny Lassiter.

11        Q    Is she included in the four, full-time

12   FTE?

13        A    She's -- her work is probably of that.

14   It's just an estimate, so --

15        Q    Right, right.  Okay.  And what is the

16   estimated cost associated with four, full-time

17   employees for I guess this is the calendar year

18   2016?

19        A    I don't have that level of detail in

20   terms of the -- depends on a lot of things there.

21        Q    I think.

22        A    It's just an estimate.

1      Q     Do you recall anything concerning the

2 actions EPA has taken towards developing and

3 issuing existing source guidelines before and

4 following promulgation of the 2016 new source

5 rule other than what we've already spoken about

6 today?

7      A     No.

8      Q     Do you recall anything concerning the

9 resources provided by the Agency on developing

10 existing source guidelines other than what we

11 have discussed today?

12      A     No.

13      Q     You have indicated that you did not

14 know whether EPA had granted extension requests

15 for the ICR survey responses.  Who in the Agency

16 would know that?

17      A     Either Brenda Shine or Penny Lassiter

18 would know.

19      Q     Is that the same four --

20      A     Yes, they were the ones that were

21 running and managing the ICR process.

22      Q     So they would also know if any

1    may reflect the dates of these meetings between

2    Sarah Dunham and the transition team?

3         A    Anything that exists has been

4    provided.  If there is something that exists, I'm

5    not aware of it.

6         Q    Those are all my questions.  Thank you

7    very much.

8         A    Okay.  Thank you.

9         Q    Regarding this topic, I should say.

10              BY MS. COSTELLO:

11         Q    I'm going to turn to cover questions

12    related to Topics 4 through 8, with respect to

13    the withdrawal of that ATI.

14              I'm going to hand you what's been

15    marked as Exhibit 9 for purposes of

16    identification.  Do you recognize that document?

17              (Whereupon, the above-referred to

18    document was marked as Exhibit No. 9 for

19    identification.)

20         A    Yes.

21         Q    What is it?

22         A    This is the FR notice that announced

1    the withdrawal of the obligation to state

2    information for the ICR.

3         Q    When did EPA withdraw the ICR?

4         A    On --- this notice was on Tuesday,

5    March 7, 2017.

6         Q    You said, I'm sorry, the notice --

7         A    This was the actual publication in the

8    FR.  The actual notice of withdrawal was on March

9    2nd, 2017.  The date on the document you provided

10   is March 7th.

11        Q    Who was involved in the process that

12   led to the withdrawal?

13        A    Can you be more specific?

14        Q    Was there a process, a decision-making

15   process that culminated in the withdrawal of the

16   ICR?

17        A    No.  There's no record of that.

18        Q    Was there a process by which a

19   decision was made in the Agency to withdraw the

20   ICR?

21        A    Not that I'm aware of.

22        Q    How did the decision to withdraw the

1      it's unclear and unknown as to whether or not he

2      spoke with the Administrator.

3           Q     Who is David Schnare?

4           A     He was a part of the transition team,

5      and I think he -- there was a portion of the

6      transition team that comes in after the election,

7      post-inauguration of the new Administration.

8                 They have a beachhead team that comes

9      that can be the same or similar people or new

10     people.  It's uncertain as to whether or not

11     David Schnare was involved in both phases or just

12     the second phase, the beachhead phase, once --

13     post-election.  But he was at the Agency at that

14     time is my understanding.

15          Q     So I understand the terminology,

16     beachhead team is a portion of the transition

17     team that is post-election.  Is that right?

18          A     Right.  It's the first wave of

19     political folks that come over to begin to run

20     the Agency after the election.  It depends, the

21     makeup of that team could be similar or

22     dissimilar from the transition team.

1          Q      So this would be prior to the

2     inauguration of the new Administration, the new

3     President, in January?

4          A      Any correspondence that you would see

5     that would have occurred prior to the

6     inauguration but post election would be someone

7     in that transition team capacity who's beginning

8     to learn about the issues before the new team

9     takes over post-election, post-inauguration.

10         Q      So the beachhead team is the post-

11    election, pre-inauguration team?

12              (Laughter.)

13         A      Post-election, post-inauguration team.

14    So think of it this way, the transition team is:

15    the new President has been elected in November,

16    but they're not going to be sworn and the

17    Administration is not going to officially start

18    until January.

19              So that transition team is charged

20    with making that transition between the

21    Administrations and beginning to understand the

22    Agency and start to make decisions, so that post-

1    inauguration when there's officially a new

2    President in place, the politicals can begin to

3    start staffing out the Agency to run the Agency.

4    That's what I'm referring to when I say beachhead

5    team.  Terms of art in Washington, I don't know.

6           Q    Is there a term for the team, not the

7    beachhead team, but the team that is post-

8    election, pre-inauguration?

9           A    That's the transition team.  And

10   again, the individuals who are on those teams,

11   some people can stay on and be part of that

12   beachhead team; some people disappear and move

13   on.  So the makeup of those teams differs, but

14   there can be some similarities.

15          Q    And David Kreutzer, was he a member of

16   the transition team?

17          A    I'm uncertain.  There were a lot of

18   individuals that were here.  Again, if there is

19   email traffic with David that occurred prior to

20   inauguration, then he would have been part of the

21   transition team.

22          Q    But he was part of the beachhead team?

1          A     If he was here post-inauguration, he

2     would have been part of the beachhead team, yes.

3          Q     Do you know when he left the Agency?

4          A     I do not.

5          Q     And then David Schnare, I think you

6     've testified it's unclear whether he was part of

7     the transition team?

8          A     But he certainly was here post-

9     inauguration and was dealing a lot with OAR at

10    the time.

11         Q     Okay.  And is he still with the

12    Agency?

13         A     He is not.

14         Q     When did he leave?

15         A     I do not know.

16         Q     How about George --- and I don't know

17    how to say his last name.  Sugiyama?

18         A     Sugiyama.  George Sugiyama, yeah.

19    Again, he is one of those individuals that was

20    around during that time period.  Whether he was

21    part of both the transition and beachhead team,

22    I'm uncertain, but he was either in one of those

1       A       Like a liaison type, precisely.

2       Q       How about Don Benton, was he a member

3    of the transition team?

4       A       I'm uncertain.  Again, he's one of

5    these individuals I think who's either part of

6    one or the other.

7       Q       Is he still with the Agency?

8       A       No.

9       Q       Were there other political folks that

10   were involved in the decision-making process that

11   led to the withdrawal of the ICR?

12      A       Not that I'm aware of.

13      Q       How about career staff?  Who were the

14   career staff who were involved in the

15   decision-making process that led to the

16   withdrawal of the ICR?

17      A       Again, it was a decision made by the

18   Administrator.  The career staff weren't involved

19   in making that decision.

20      Q       How about the conversations and

21   discussion that led up to the withdrawal of the

22   ICR?

1              MS. GANGE:  Can you be a little bit

2    more precise about what you mean by withdrawal of

3    the ICR?

4              BY MS. COSTELLO:

5         Q    The decision to withdraw, so not the

6    decision itself.  I understand you testified that

7    was made by the Administrator, but who were the

8    career employees who were involved in the

9    discussions that led up to that decision?

10             MS. GANGE:  Do you mean the mechanism

11   by which to withdraw the ICR?

12             BY MS. COSTELLO:

13        Q    Whether to withdraw the ICR.

14        A    Again, my understanding is there was

15   no discussion with career staff at the Agency

16   about the decision.

17        Q    So no career staff were involved in

18   the decision of whether to withdraw the ICR?

19        A    That's correct.

20             Were there career staff involved in

21   the technical discussions about how to accomplish

22   that withdrawal?

1   withdrawal on the 2nd of March.  I don't know the

2   discussions beyond that.  All I know is what I've

3   said.

4        Q     And was there any consideration by the

5   Agency as to extending the response date of the

6   ICR?

7        A     I have no information on that.

8        Q     Was there any public process

9   undertaken by the Agency before the decision to

10  withdraw the ICR was made?

11       A     No.

12       Q     Was there a record created in support

13  of that decision?

14       A     No.

15       Q     Has the Agency ever withdrawn an

16  information collection request before?

17       A     I don't know.

18       Q     How was the decision to withdraw the

19  ICR implemented?

20       A     Say it again?

21       Q     How was the decision to withdraw the

22  ICR implemented?

1    instance, for the Agency's ---

2        A    Not beyond what I mentioned.  The FR

3    notice and the press release were the two methods

4    for disseminating the decision.

5        Q    Was there anything posted on the

6    Agency's website about it?

7        A    I believe the press release was posted

8    on the website, which is common practice.

9        Q    And what was the basis for EPA's

10   withdrawal of the ICR?

11       A    The basis for withdrawal, as

12   articulated by the Administrator, was included in

13   the FR notice.

14            I'll state it directly, the withdrawal

15   is occurring because EPA would like to assess the

16   need for the information that the Agency was

17   collecting through these requests and reduce

18   burdens on businesses while the Agency assesses

19   such need.

20       Q    What did the Agency mean by assess the

21   need for the information?

22       A    I can't speculate.  I don't know.

1    changed would be informed by the actual

2    implementation of the ICR.  So I believe there

3    were some -- I don't know, I'm not sure, but

4    there could have been a change.

5         Q    So had the Agency conducted any

6    analysis to determine whether or not the original

7    estimate of the burden had somehow changed and

8    was not accurate?

9              MS. GANGE:  In what timeframe?

10              THE WITNESS:  Yes, what timeframe?

11              BY MS. COSTELLO:

12         Q    After it issued the ICR?

13              (Simultaneous speaking.)

14         A    Did we sort of look at the burden

15    again post-withdrawal?

16         Q    Yes.  No, prior to the withdrawal.

17    After issuance of the ICR and prior to

18    withdrawal, during that period of time, did the

19    Agency look at any changes in its estimate?

20         A    Did we do a re-analysis of the burden

21    estimate --

22         Q    Yes.

1          A      -- between the time the ICR was issued

2    and between the time the ICR was withdrawn?

3          Q      Correct.

4          A      No.

5          Q      At the time it decided to withdraw the

6    ICR, did EPA have any reason to believe that it

7    would no longer need the information that it was

8    seeking to collect?

9          A      Say that again.

10         Q      Did the Agency have reason to believe

11   it would no longer need that information?  Was

12   that part of what it needed to assess?

13         A      It's unclear.  I think the decision

14   made to withdraw was based on the burden that was

15   being incurred at the time.

16         Q      And that burden had, to your

17   knowledge, not changed in the instance when the

18   Agency decided to issue the withdrawal --- I mean

19   to issue the ICR?

20         A      Yeah.  It's unclear.

21         Q      What was the Agency planning to do in

22   terms of assessing the need for the information

1   before it withdrew the ICR?

2        A    Before withdrawal we were still in the

3   information collection phase, and there was no

4   discussions of anything beyond executing

5   implementation of the ICR.

6        Q    At the time that it withdrew the ICR,

7   what was the Agency's plan for assessing the need

8   of the information to be collected through the

9   ICR?

10       A    At that time, again, there was no

11  plan.  We were still in the process, in the

12  middle of the information collection -- or the

13  beginning, in some cases, of the process.

14       Q    My question is: after the Agency

15  withdrew the ICR on the basis of needing to

16  assess the need for the information, what was the

17  Agency's plan at that time, when it withdrew the

18  ICR, to assess its need for the information?

19       A    At that time the Agency had not yet

20  articulated a plan for that.

21       Q    Did the Agency have a plan?

22       A    At the time of the withdrawal, there

1    was no plan at that time.

2         Q      So we had gone over the fact that

3    before getting approval from OMB to proceed with

4    the ICR under the Public Paperwork Reduction Act,

5    EPA was required to show certain things, correct?

6         A      What do you mean?  To show --

7         Q      Required to undertake a public notice

8    and comment process?

9         A      Yes, we were.

10        Q      And as part of that process they were

11   required to evaluate whether the proposed

12   information collection request was necessary for

13   the proper performance of the functions of the

14   Agency.  Is that right?

15        A      Yes.

16        Q      And at that point, the Agency had

17   determined that it was necessary for the proper

18   performance of the functions of the Agency to go

19   forward with this information collection request.

20   Is that right?

21        A      Yes.

22        Q      Did the Agency's position on the

1      Q      Did the Agency at any point after the

2  ICR was promulgated and before it was withdrawn

3  consult with staff regarding whether assessment

4  of the need for the information was warranted?

5      A      No.

6      Q      Did the Agency at any point after the

7  ICR was promulgated and before it was withdrawn

8  consult with staff regarding their assessment of

9  the need for the information?

10     A      No.

11     Q      You may have already answered this,

12 but just to be clear: at the time of the

13 withdrawal or thereafter, did the Agency discuss

14 its plans for assessing the need for the

15 information?

16     A      Not that I'm aware of.

17     Q      And I believe you testified no but

18 prior to withdrawing the ICR, did the Agency

19 consider suspending it instead?

20     A      I think I made it clear that I was not

21 certain as to whether or not they considered it.

22 The only thing I'm aware of is the decision to

```
1           A     No.

2                 MS. LESSER:  Can I ask --- sorry, you

3     moved onto another topic.  Just to follow-up

4     again, Ms. Costello had asked what EPA meant by

5     assess the need for the information to assess the

6     withdrawal, and I believe you testified that you

7     don't know.

8                 THE WITNESS:  That's correct.

9                 BY MS. LESSER:

10          Q     Okay.  Is there anyone at EPA that

11    would know the answer to that question?

12          A     Not to my knowledge, no.

13          Q     I can't recall if this was asked, but

14    when was the decision made to withdraw the ICR?

15          A     The Federal Register --- the

16    announcement was made on March 2nd, 2017.

17          Q     And is it EPA's testimony that that is

18    when the decision was made to withdraw?

19          A     That's when the decision appeared in

20    the FR.  When it was made, it could have been

21    made prior but that's the date of record.

22          Q     Do you know if the decision was made
```

111

1    prior to the date that's published in the Federal

2    Register?

3         A    Again, we don't have any information

4    as to when the Administrator made the decision

5    other than when we executed that decision.

6         Q    I understand.  Is there anyone at EPA

7    except for the Administrator that would know when

8    that decision was made?

9         A    No.

10        Q    You testified that at the time of the

11   withdrawal, the Agency did not have any plans for

12   assessing the need for the information.  Is that

13   correct?

14        A    To my knowledge, that's correct, yes.

15        Q    Is there anyone at the Agency who

16   would know whether there was a plan for assessing

17   the need for the information at the time of

18   withdrawal?

19        A    No.

20        Q    Was there a plan for assessing the

21   need for the information after the withdrawal?

22        A    No.  There was not.

1      Q     I don't have any further questions.

2  Thank you.

3            MS. COSTELLO:  I think if we go about

4  another 20 minutes, does that work?  And then

5  we'll break for lunch.

6            (Whereupon, the above-referred to

7  document was marked as Exhibit No. 10 for

8  identification.)

9            BY MS. COSTELLO:

10     Q     I'm handing you what's been marked as

11 Exhibit 10 for purposes of identification.  Do

12 you recognize that document?

13     A     Yes.  I do.

14     Q     Is this one of the documents you

15 reviewed in preparation for your testimony today?

16     A     Yes.  It is.

17     Q     Can you describe this document,

18 please?

19     A     Yes.  There is some email traffic and

20 then an attachment.  There's an initial email

21 from a Matt Kellog, with the House of

22 Representatives to a Howard Benjamin, who is in

1    White House liaison?

2         A     That's correct.  That's my

3    understanding.

4         Q     What did he do with this email?

5         A     I have no idea.  There's no other

6    record of him forwarding this.

7         Q     And you didn't speak to him about that

8    for purposes of your preparation here today?

9         A     I did, I asked him about his role in

10   this matter, and he categorized his role as

11   simply traffic cop for any correspondence with

12   the White House, and he had no specific

13   recollection of these matters.

14              As he had described it to me, you

15   know, he was doing this on all sorts of issues

16   across the Agency and just being a conduit.  He

17   did not recollect what happened after that.

18        Q     He doesn't recollect whether he

19   forwarded this onto anybody else at the Agency?

20        A     No.

21        Q     Did he recollect whether he spoke to

22   anybody at the Agency about this?

115

1          A     No.

2          Q     Are you aware of whether anybody at

3     the Agency responded to the House Majority

4     Leader's office to this email?

5          A     I am not.

6          Q     Or responded to the House Majority

7     Leader's office on this topic of the ICR?

8          A     I don't recall seeing that in the

9     email traffic.

10          Q     And is this accurate, the statement in

11     here that the companies are subject to  potential

12     fines of up to $90,000 a day?

13          A     I don't know if that specific figure

14     is right.  This was an action under Section 114

15     under the Clean Air Act, so any kind of penalty

16     for non-compliance that's provided in the Clean

17     Air Act would be applicable, I can say that.

18     Whether this is the exact figure, I don't know.

19          Q     Has the Agency sought such a penalty

20     for non-compliance with an ICR?

21          A     I don't know.  Not that I'm aware of.

22          Q     It says here that the goal here would

1    Q    I'm handing you what's been marked for

2  purposes of identification as Exhibit 11.  Do you

3  recognize that document?

4         (Whereupon, the above-referred to

5  document was marked as Exhibit No. 11 for

6  identification.)

7    A    Yes.  It's one of the emails that I

8  reviewed in preparation.

9    Q    Can you describe this email please?

10   A    It's an email correspondence from a

11 Ms. Kathleen -- I'm going to butcher the

12 pronunciation -- Sgamma from the President of the

13 Western Energy Alliance to David Kreutzer, who

14 wanted to talk about the ICR that was in effect

15 at the time.  That's it.

16   Q    And this correspondence, her initial

17 email, was sent to David Kreutzer on February

18 1st, 2017.  Is that right?

19   A    Yes.  That's correct.  This was what

20 that shows.

21   Q    And was there an acting Administrator

22 for EPA at the time?  This is before the

1    Administrator --

2                    (Simultaneous speaking.)

3         A    Administrator Pruitt was confirmed on

4    February 17th, 2017, so this is before that.

5         Q    Who was in charge of the Agency at the

6    time?

7         A    Catherine McCabe was the acting

8    Administrator.

9         Q    So she indicates here in her initial

10   email that there's confusion about the deadlines

11   for submitting data.  Are you aware of

12   stakeholders being confused about deadlines?

13        A    Not specifically, no.

14        Q    Was that an issue that was raised, for

15   instance, in the hotline?

16        A    It could have been, yes.

17        Q    The final ICR notice specifically set

18   a 16-digit --

19                    (Simultaneous speaking.)

20        A    Yes.  And it's not uncommon for people

21   to request extensions on that kind of thing.

22                    (Simultaneous speaking.)

1   we'll do one more, and then we'll take a break.

2       A    Okay.  This is a good time.  Yeah,

3   let's just do this one.  I'll try to sustain the

4   energy.

5       Q    I'm handing you what's been marked as

6   Exhibit 16.  Do you recognize that document?

7           (Whereupon, the above-referred to

8   document was marked as Exhibit No. 16 for

9   identification.)

10      A    Yes.  This is again one of the email

11  chains that I was provided in preparation for

12  this today.

13      Q    And what is this email about?

14      A    It looks like George Sugiyama is

15  replying to David Kreutzer's question/interest in

16  suspending enforcement of the ICR, and George is

17  suggesting that Peter Tsirigotis, misspelling

18  noted of his name, would be the appropriate

19  person to talk to about this issue.

20      Q    And the date on this is what?

21      A    February 10, 2017.

22      Q    So it looks like it is a direction to

1      call Peter Tsirigotis?

2           A     To tell him to email recipients of the

3      ICR, not to respond.

4                 Did George Sugiyama have the authority

5      to make that request?

6           A     No.  He did not.

7           Q     Was anything done in response to this

8      email?

9           A     Not that I'm aware of, no.

10          Q     Did anyone call Peter Tsirigotis and

11     direct him to tell the recipients of the ICR not

12     to respond?

13          A     He did not do that.  And I spoke to

14     Peter.

15          Q     Peter did not email the recipients of

16     the ICR?

17          A     That's correct.

18          Q     Did he receive a request to make that

19     email?

20          A     I don't know if Peter was called about

21     that, but I do know that he did not take action.

22          Q     He didn't indicate whether or not

1    you going to be closing out these documents, or

2    are you going to be coming back to them?

3              MS. LESSER:  Possibly.

4              MS. COSTELLO:  Okay.  Then I'll break

5    here.

6              (Whereupon, the above-entitled matter

7    went off the record at 12:05 p.m. and resumed at

8    1:05 p.m.)

9              BY MS. COSTELLO:

10       Q    I'm handing you what's been marked as

11   Exhibit 17.  Do you recognize this document?

12             (Whereupon, the above-referred to

13   document was marked as Exhibit No. 17 for

14   identification.)

15       A    Yes, I do, this was provided to me as

16   preparation for today.

17       Q    What is it?

18       A    It's a document, it's an email, from

19   Kathleen again from the Western Energy Alliance

20   to David Kreutzer dated February 10, 2017 about

21   providing information on the ICR.

22       Q    So, this says here it's providing

131

1       several key rationales for either eliminating the

2       ICR or at least extending the response date.

3                   Are you aware of whether that was an

4       alternative that was considered by the Agency?

5            A     I am not, as I said before.  I'm not

6       aware of any deliberation on that matter.

7            Q     And she also says she would think the

8       new EPA would want to carefully discuss this

9       issue.  Are you aware of any discussions on this

10      issue?

11           A     Not beyond what I've gone over

12      already.

13           Q     I'm handing you what's been marked as

14      Exhibit 18.  Do you recognize this document?

15                  (Whereupon, the above-referred to

16      document was marked as Exhibit No. 18 for

17      identification.)

18           A     Yes, I do.  This was provided to me in

19      advance as well.

20           Q     And what is this document?

21           A     This is another email which is a

22      follow-on to an email that was sent from

1          Q      I'm handing you what's been marked as

2     Exhibit 19.  Do you recognize this document?

3               (Whereupon, the above-referred to

4     document was marked as Exhibit No. 19 for

5     identification.)

6          A     I do, this was also provided to me in

7     advance for this preparation.

8          Q     What is this document?

9          A     This document is an email transmitted

10    from David Kreutzer to Sarah Dunham on February

11    10, 2017 at 2:24 p.m. regarding the ICR.

12               David in the email states to Sarah,

13    subject matter quashing the ICR, could you draft

14    whatever request you would need from Catherine

15    and send it to her, Schnare, and me?  Thanks,

16    David.

17         Q     Is this a reference to Catherine

18    McCabe?

19         A     I believe so.

20         Q     Was anything done in response to this

21    email?

22         A     This is February 10th, my conversation

1         A        She viewed her role, appropriately so,

2     in her acting capacity as assistant administrator

3     of OAR.

4                  There was a lot of new people coming

5     in, but until there was a confirmed administrator

6     that was making decisions, the decision-making

7     authority was embodied in Catherine McCabe.

8                  And so Sarah felt strongly that we

9     adhere to that and would not want to take actions

10    without her approval and direction.

11        Q        Did Sarah express concerns about

12    taking direction related to this particular

13    topic, this ICR topic?

14        A        My conversation with Sarah, Sarah

15    stressed that this is the way that she handled

16    that role, about this and perhaps other matters.

17                 But she was very steadfast in only

18    taking actual items that came from the proper

19    authority, which was Catherine McCabe.

20        Q        I'm handing you what's been marked as

21    Exhibit 20.  Are you familiar with that document?

22                 (Whereupon, the above-referred to

1    document was marked as Exhibit No. 20 for

2    identification.)

3         A     Yes, this is also part of my

4    preparation.

5         Q     Can you describe this document,

6    please?

7         A     David Schnare sent an email to Andrew

8    Bremberg, who was at the Executive Office of the

9    President on February 22, 2017.  The subject

10   matter was energy executive orders.

11         David asked Andrew, and I'll read the

12   email, I know Don Benton left a message with you

13   this morning seeking insight on when the EOs are

14   coming out.

15         Ryan Jackson begged me to use whatever

16   influence I had to get the same information.  So,

17   he was trying to get information on those EOs.

18         He goes on to say Administrator Pruitt

19   wants to make a fast start, and we're developing

20   Federal Register notices to the guard to the CAFE

21   standard, the clean power-plant, Clean Air Act

22   111B NSPS Rule, and the methane information

1    a decision and its rationale is made.  Is that

2    right?

3            A    That's correct.

4            Q    So, at this point, a decision had not

5    been made, and a rationale had not been

6    apparently shared with Sarah Dunham, is that

7    right?

8            A    Apparently, yes.

9            Q    When was the rationale for the

10   decision made?

11           A    By the administrator?  We do not know.

12   Some time prior to -- clearly between this email

13   and March 2nd.

14           Q    Is there anybody at the Agency that

15   would know that?

16           A    I asked that question to Ryan Jackson,

17   I asked that question to Sarah Dunham, and I

18   don't have the information.

19           Q    I'm handing you what's been marked as

20   Exhibit 22.  Do you recognize that document?

21               (Whereupon, the above-referred to

22   document was marked as Exhibit No. 22 for

1    identification.)

2         A    Yes, this was one of the materials

3    that was brought to me in terms of my

4    preparation.

5         Q    Please describe it.

6         A    This was an email from Ryan Jackson to

7    David Schnare, dated February 27th at

8    approximately 10:29 p.m.  Ryan Jackson, the Chief

9    of Staff, comments, I've been meaning to ask this

10   all day, do we have time tomorrow morning?

11        What can be done on the ICR presently?

12        Q    Did you speak with Mr. Jackson about

13   this email?

14        A    He had seen this email.  I had spoken

15   to him about it every recollection he had

16   relative to this, and he didn't provide much.

17        Q    Did he recall what prompted him to

18   send this email?

19        A    He did not.

20        Q    What happened in the intervening

21   period between the 22nd, when the request was

22   made at the briefing with respect to the ICR, and

1    or anyone else about it.

2              I did not give him specific emails to

3    ask him to respond to.  He tried to provide all

4    of his recollections to me.

5         Q    Did he indicate who was the impetus

6    behind wanting to withdraw the ICR?

7         A    No, he did not.

8         Q    I'm handing you what's been marked for

9    identification as Exhibit 24.  Do you recognize

10   this document?

11             (Whereupon, the above-referred to

12   document was marked as Exhibit No. 24 for

13   identification.)

14        A    Yes.

15        Q    What is it?

16        A    This email is from David Schnare to

17   Ryan Jackson and John Konkus and Byron Brown

18   dated February 28, 2017, where David Schnare is

19   noting that he has provided some direction to

20   Sarah Dunham and Nancy Grantham to prepare a

21   presser for the trade press that announced that

22   we are pulling the Clean Air Act 114 ICR and that

1        A     He was a political at the Agency.  I'm

2    not sure what his role was.  And I mentioned John

3    Konkos was a political as well.

4        Q     Is Byron Brown with the Agency still?

5        A     No.

6        Q     Was he employed by EPA on February 28,

7    2017?

8        A     I do not know.

9        Q     Do you know why this email was being

10    sent to him at a G-mail address?

11        A     I do not know.

12              MS. GANGE:  And Ms. Costello, EPA is

13    representing that Mr. Brown was still with EPA at

14    the time this email was sent.

15        Q     I'm presenting you with Exhibit 25.

16    What is that document?  First of all, do you

17    recognize the document?

18              (Whereupon, the above-referred to

19    document was marked as Exhibit No. 25 for

20    identification.)

21        A     Yes, yes, I do.  This was provided to

22    me in terms of the preparation.  This is an email

1          Exhibit 29.  Do you recognize that

2          document?

3          (Whereupon, the above-referred to

4    document was marked as Exhibit No. 29 for

5    identification.)

6          A     Yes, I do recognize this.  This was an

7    email provided to me for preparation.

8          Q     And what is it?

9          A     It's an email --- it's some email

10   traffic, first from Sarah Rees to Robin Kime

11   about the request for the notice and an update,

12   referring to the ICR.

13          Sarah notes that she's confirmed a

14   decision has been made and OAR is working on the

15   withdrawal.  They have some comments, materials,

16   and appointee of the notice.

17          We've asked to see the materials in

18   advance.  I will send to Samantha Dravis a

19   request for more information.  This email was

20   then sent -- forwarded.

21          It looks like there's some sort of

22   communication with Samantha and Robin.

1    Q     So this email is dated March 1st, the

2  first communication, 10:24 a.m., correct?

3    A     That's Correct.

4    Q     It indicates that the decision has

5  been made to withdraw the ICR?

6    A     That's correct.

7    Q     I'm handing you what's been marked as

8  Exhibit 30.  Do you recognize this document?

9          (Whereupon, the above-referred to

10  document was marked as Exhibit No. 30 for

11  identification.)

12    A     Yes, I do.  This was also provided to

13  me in preparation.

14    Q     Can you describe it, please?

15    A     It was an email sent from --

16  forwarding some story that was in POLITICO Pro

17  and in Whiteboard on March 1, 2017.

18          This press information was forwarded

19  from Rebecca, who is the -- I'm not going to try

20  to pronounce her name --- Wondenhagen (Phonetic)

21  ---

22    Q     That's good.

1          Yes, again, I think we talked about

2   this before and you've asked this question.  I'm

3   not aware of any specific deliberation around

4   this matter or consideration of this.

5          BY MS. COSTELLO:

6          Q    So is there an internal review by the

7   EPA concerning whether it should withdraw the

8   request?

9          A    No.

10         Q    So you can turn back to Exhibit Number

11   9, please.

12         A    Yes.

13         Q    And this March 1st letter is

14   referenced in the administrator's notice of

15   withdrawal, is that right?

16         A    That's correct.

17         Q    In the actual letter from the

18   letterhead of Kim Kasten, the Attorney General of

19   Texas, but it's signed by several other attorneys

20   general, and a couple governors, there's a

21   statement about the requests are unnecessary and

22   onerous burden on oil and gas producers.

1     when the time was going to be.

2          Q     Okay.  I'm handing you what's been

3     marked as Exhibit Number 33.  Do you recognize

4     that document?

5               (Whereupon, the above-referred to

6     document referred to was marked as Exhibit 33 for

7     identification.)

8          A     Yes, I do.  This was also provided to

9     me as part of my preparation.  I'm looking at an

10    email from David Schnare sent to Kevin Minoli,

11    Shannon Kenny, Sarah Rees, and Sarah Dunham, on

12    the 2nd of March 2017, in the morning.

13              Subject matter, direction from the

14    administrator.  Attached was the latest oil and

15    gas information request, new brief draft.

16              David notes in his correspondence,

17    attached the new file draft with the press

18    release that's going out today on the Clean Air

19    Act 114 Methane Issue.

20              Quote is being added that Schnare

21    wants this turned into a federal register

22    publication and he wants it over there today for

1    publication tomorrow.

2         Q     So this appears to be the direction

3    from the administrator that was requested from

4    Kevin Minoli the day before, is that right?

5         A     It could be, yes.

6         Q     And this is from David Schnare to

7    Kevin Minoli.

8         A     And Sarah Dunham.

9         Q     And Sarah Dunham.  Had a notice for

10   federal register been drafted yet at this point?

11        A     Apparently, according to this email,

12   it looks like he was requesting for it to be

13   drafted, asking, turned into a notice of federal

14   register, but I'm not certain.

15        Q     And he also indicates that OGC drafts.

16   Is that typical?

17        A     Yes, it's usually a joint effort with

18   the program office and OGC.

19        Q     And was that the case here for the ICR

20   withdrawal notice?  Who drafted that?

21        A     I suspect OGC, but I'm not certain.

22        Q     Is it typical for a federal register

1    notice to be drafted in one day?

2        A     I mean, it depends on the length of

3    the notice.  I mean, an FR notice for a rule can

4    take obviously a long time.  If it's short, it

5    could be a lower bar.  Less of a lift.

6        Q     It also indicates that the

7    administrator wants it over there today for

8    publication tomorrow.  What is that in reference

9    to?

10       A     Again, speculation.  He might be

11   referring to over there being the Office of

12   Federal Register, because there's actual, as you

13   know it wasn't actually put in the FR until the

14   7th of March.

15             So there's a process with that that is

16   outside the Agency's control, run by OFR.  So

17   that's probably what he was referring to.

18       Q     But he indicates that he wanted it to

19   be published the next day.  That didn't happen?

20       A     No.

21       Q     Is that a realistic request?

22       A     Might I speculate that David probably

1    wasn't aware of the practicalities of

2    implementation completely, so it was a little bit

3    of an unrealistic request.

4        Q    And this indicates literally it would

5    be, yes, three sentences long.

6        A    Which wouldn't take more than a day to

7    draft.

8        Q    Was there any reason why it needed to

9    be three sentences long?

10       A    I don't know what he was thinking.  As

11   you see in the final FR, the rationale provided

12   by the administrator was fairly to the point, in

13   respect to the burden and the desire to reassess

14   that.  So maybe that's what he was thinking.

15       Q    I'm handing you what's been marked as

16   Exhibit Number 34.  Do you recognize this

17   document?

18            (Whereupon, the above-referred to

19   document referred to was marked as Exhibit 34 for

20   identification.)

21       A    Yes, this is part of the materials for

22   preparation.  This is two emails, the first of

1        Q    So between Exhibit 33 email of 8:57

2   a.m. directing the press release being turned

3   into a federal register notice, it looks like it

4   took just a couple hours to draft that federal

5   register notice, is that right?

6        A    It's possible.  I mean, again, it's

7   possible.  I don't know for certain.

8        Q    I'm handing you what's been marked as

9   Exhibit Number 36.  Do you recognize that

10  document?

11             (Whereupon, the above-referred to

12  document referred to was marked as Exhibit 36 for

13  identification.)

14        A    Yes, I do.  This was provided as part

15  of my preparation.  This is email traffic again

16  between David Kreutzer and Kathleen Sgamma from

17  the West Energy Alliance.

18             The first part of the correspondence

19  was from Kathleen to David on Wednesday, February

20  1st, 2017.  Hello, David, I know you're

21  underwater right now but do you have time to talk

22  about the ICR that is ongoing?

1          Oil and gas companies, there's

2    confusion about the deadlines for submitting

3    data.  Thank you.  David responds, on February

4    1st at 1:23, trying to find time to meet with

5    her.  My meeting's still 5:30. Call me.  She

6    thanks David.

7          David responds at 5:11 in the evening.

8    Thank you for bringing it to our attention.

9    There was nobody here political or career who

10   thought the ICR made sense given the changes in

11   the associated policy.

12          However, with all the commotion of the

13   transition, the very sensible proposal to cancel

14   the ICR fell through the cracks.  David.

15        Q    So he responded to an earlier email

16   chain after the ICR withdrawal notice came out on

17   March 2nd, thanking David Kreutzer, is that

18   right?

19        A    Can you provide that?  Just perhaps,

20   can you give specific emails that have been

21   submitted as an exhibit?

22        Q    We did have it as an exhibit earlier,

1    but it's the email chain that is the original

2    email that came in from February 1st.  She's just

3    replying to that email chain later on March 2nd

4    here.

5              It says, March 2nd at 4:55 p.m.  From

6    the bottom of my heart, thank you.  That email

7    came in after the withdrawal had occurred, the

8    ICR withdrawal, is that right?

9        A     Okay.  The ICR withdrawal in terms of

10    its public availability on March 2nd?  The exact

11    timing of that, I don't know.  And I don't know

12    what she was referring to.

13        Q     Well, the announcement.  There had

14    been an announcement that came out about the ICR

15    withdrawal on the 2nd, is that right?

16        A     Yes, there was a press release.  Yes.

17        Q     And when was that press release

18    issued?

19        A     What time?  I don't know.  I can

20    provide it to you, but I don't off the top of my

21    head of what the exact timing of that was.

22        Q     This appears to be her thanking David

1   Kreutzer for the withdrawal of the ICR, is

2   that --

3                MS. GANGE:  Could you please pose a

4   question to the Witness?

5                MS. COSTELLO:  I am.

6                THE WITNESS:  She's not specific about

7   what she's thanking him for, at least in the

8   email traffic that I'm reviewing.  It could be,

9   but how do you know that for certain?

10               BY MS. COSTELLO:

11       Q     This correspondence all relates to the

12   ICR, is that correct?

13       A     It appears to be, yes.

14       Q     What does it mean by nobody here,

15   political or career, thought the ICR made sense

16   given the changes in the associated policy?

17       A     I don't know what David was thinking.

18   That's his speculation.  I would appear,

19   speculation on my behalf, I did not talk to him.

20   I don't know what or who, political or career, in

21   particular, who he's referring to.

22       Q     Had there been a chance in policy

1        A      No.

2        Q      That it was withdrawing --

3        A      No, the admission for the withdrawal

4    was in the burden, and that was the rationale.

5    But I was just commenting on what you had asked

6    about what this might be referring to, associated

7    policy, but again, I don't know for sure what

8    David's referring to.

9        Q      So there had been, at this point in

10   time of March 2nd, 2017, no changes in EPA's

11   policy as it related to methane emissions from

12   the oil and gas sector?

13       A      That's correct.

14       Q      I'm handing you what's been marked as

15   Exhibit Number 37.  Do you recognize this

16   document?  There is an attachment as well.

17              (Whereupon, the above-referred to

18   document referred to was marked as Exhibit 37 for

19   identification.)

20       A      Yes, I recognize this.  This was

21   provided as part of my preparation.  This was an

22   email from Ryan Jackson to David Schnare, John

1    counsel is asking for --

2              MS. COSTELLO:   Okay.  Yes.

3              (Whereupon, the above-entitled matter

4    went off the record at 3:28 p.m. and resumed at

5    3:29 p.m.)

6              MS. GANGE:   So we're happy to speak

7    between counsel for the parties after the

8    deposition, but after discussing with Agency

9    counsel, I'm satisfied that we still stand behind

10   the answer to the response to the request for

11   admission, and it does not fall within the scope

12   of the topics that were articulated.

13             MS. COSTELLO:   Okay.

14             MS. GANGE:   And so the witness wasn't

15   prepared on that, so he can't speak to it.   But

16   EPA and DOJ counsel are happy to explain more

17   after.

18             MS. COSTELLO:   Okay.  Well, I'll look

19   forward to that explanation.

20             BY MS. COSTELLO:

21      Q      But to your knowledge, did career

22   staff undertake or present to the administrator

1      any analysis or assessment specific to the

2      withdrawal of the ICR prior to its withdrawal?

3            A     Not to my knowledge, no.

4            Q     So EPA's withdrawal of the ICR delays

5      the time by which the Agency is able to issue

6      existing source guidelines, is that right?

7            A     Yes.

8            Q     Did EPA estimate the emissions that

9      would continue to occur at existing sources

10     during the period of any delay?

11           A     No.

12           Q     Did EPA estimate the amount of methane

13     emissions that could be prevented if EPA

14     proceeded to get the information necessary to

15     promulgate the existing source guidelines?

16           A     Can you be more specific, please?

17           Q     Did EPA do any sort of estimate on

18     methane emissions that could be prevented if the

19     Agency were to promulgate existing source

20     guidelines?

21                 MS. GANGE:  In what timeframe?

22                 THE WITNESS:  Yes, what --

1          MS. COSTELLO:  Before it withdrew the

2     ICR.

3          THE WITNESS:  The only assessment,

4     which I mentioned before in the beginning of the

5     day, was just looking at, as we were doing the

6     2016 rule, the universe of available emissions

7     that were out there based on the inventory and

8     other materials the Agency had at our disposal to

9     understand sort of the scope of the existing

10    source universe that would be potentially

11    affected depending on the design of the 111(d)

12    guidelines.

13        Q     But specific to the withdrawal of the

14    ICR and that decision --

15        A     No.

16        Q     -- was any analysis undertaken?

17        A     No.

18        Q     Okay. Did EPA look at the climate

19    impact of methane emissions that could be

20    prevented if the EPA promulgated existing source

21    guidelines rather than withdrawing the ICR?

22        A     At what time period?

1        Q     Before withdrawal of the ICR, before

2    making a decision.

3        A     No, no.

4        Q     I'm going to turn to Topic 10.  Since

5    withdrawing the ICR, has EPA taken any action

6    with respect to establishing existing source

7    guidelines?

8             MS. GANGE:  I'm sorry, could you

9    repeat the question?

10            THE WITNESS:  Yes, say that again?

11            MS. COSTELLO:  Since withdrawing the

12    ICR, has EPA taken any action with respect to

13    establishing existing source guidelines?

14            MS. GANGE:  Can you clarify --

15            THE WITNESS:  I think -- is this --

16            MS. GANGE:  Can you clarify what you

17    mean by with respect to?

18            THE WITNESS: Yes --

19            MS. COSTELLO: Concerning --

20            THE WITNESS:  This is noted in Item

21    Number 11.  Is that what you're referring to,

22    with respect to establishing -- denial to the

1    produced in litigation?

2              MS. GANGE:  If you know.

3              THE WITNESS:  I don't know.

4              MS. LESSER:  Okay.  All right.  That's

5    it.

6              BY MS. COSTELLO:

7         Q    I'm handing you what's been marked as

8    Exhibit 43.  Do you recognize this document?

9              (Whereupon, the above-referred to

10   document was marked as Exhibit 43

11   identification.)

12        A    Yes, this is Federal Register

13   notification on Friday, March 31st, 2017.  The

14   text of the executive order on promoting energy

15   independence and economic growth, executive order

16   13783.  Dated March 28th, 2017.

17        Q    Did you review this document in

18   preparation for your testimony today?

19        A    Yes.  I've seen this one.

20        Q    What does this executive order say

21   with respect to the 2016 new source performance

22   standards for oil and gas?

1    document?

2           (Whereupon, the above-referred to

3    document was marked as Exhibit 45 for

4    identification.)

5        A    Yes, I do.  This was provided to me in

6    preparation.  This is a federal register notice

7    that was published on April 4th, 2017.

8           Summary, just quickly, US EPA

9    announces its reviewing of 2016 Oil and Gas New

10   Sources and if appropriate will initiate

11   reconsideration proceedings to suspend, revise,

12   or rescind this rule.  Dated April 4th, 2017.

13       Q    So this is federal register notice

14   announcing the review pursuant to executive order

15   13783?

16       A    Yes, that's my understanding.

17       Q    What actions has EPA undertaken

18   pursuant to its executive order review?

19       A    The Agency has, at this point in time,

20   initiated two proposals.  One -- the first of

21   which was September.  They actually did -- let me

22   just step back for a second.

1    document?

2              (Whereupon, the above-referred to

3    document was marked as Exhibit 49 for

4    identification.)

5         A    Yes, I do.

6         Q    What is it?

7         A    This was an estimate that we prepared

8    for the time needed to promulgate emission

9    guidelines.  This particular timeline is done

10   without doing another ICR.

11        Q    So this is an estimate of the time

12   that the Agency would need to promulgate existing

13   source guidelines assuming that they did not need

14   to do another ICR?

15        A    That's correct.

16        Q    Can you just walk us through --

17        A    Of course.

18        Q    -- this please?

19             MS. GANGE:  And I'm going to object to

20   that.  You need to propound better questions --

21             THE WITNESS:  Be more specific.

22   There's a lot here.

1      rule, the notes for my own purposes, to show you

2      which asterisk corresponds to which executive

3      order and which action in terms of what's driving

4      that requirement.

5              Q      Okay.

6              A      And they're the same for both.

7                     MS. GANGE:  Has that been marked as

8      Exhibit 50?

9                     MS. COSTELLO:  Yes.

10                    (Whereupon, the above-referred to

11     document was marked as Exhibit 50 for

12     identification.)

13                    BY MS. COSTELLO:

14             A      So I see here that a requirement such

15     as, it looks like an OMB requirement for OMB

16     review, allows for a period of review, the Agency

17     has assumed the full amount of time for those,

18     for instance in step six and step 11?

19             A      That's correct.

20                    MS. GANGE:  And are you referring to

21     steps six and 11 in Exhibit 50 or Exhibit 49?

22                    THE WITNESS:  Yes, that's good.  You

1    answer that.  Yeah, thank you very much.

2              Okay, so, was there a specific --

3    there was some discussion.  What's the specific

4    question again, please?

5         Q    In the regulatory impact analysis --

6         A    Yes.

7         Q    -- did the Agency look at the impacts

8    of the proposal on the lack of regulation of

9    existing sources that would be triggered by a

10   recision of the --

11        A    No, it was viewed as out of scope.

12        Q    And why is that?

13        A    So, reading from the RIA, and this is

14   referring to page 1-3, "Proposed impacts of the

15   proposed action being analyzed in this RIA

16   pertain specifically to the potential new

17   reconstructed modified sources under mod OA.

18             "The EPA recognizes that by rescinding

19   the applicability of the NSPS issued under the

20   Clean Air Act Section 111(b) to methane

21   emissions, existing sources of the same type in

22   the source category will not be subject to

1    regulation under Clean Air Act Section 111(d).

2                "Analysis of potential impacts of

3    removing the requirement to regulate under 111(d)

4    is outside of the scope of this RIA and would be

5    speculative."

6         Q    Okay, so even though the effect of

7    this proposal is that there will be no regulation

8    of existing sources, that the Agency believed it

9    was out of scope of its proposal?

10        A    To do the analysis, that's correct.

11        Q    So, the Agency did not look at the

12   scale of emissions that would be left unregulated

13   by EPA from existing sources as a result of this

14   proposed recision rule?

15        A    No, we did not do that analysis.

16        Q    And did EPA look at the climate impact

17   of the methane emissions that could be prevented

18   if EPA promulgated existing source guidelines?

19        A    No, we viewed this policy package,

20   again, as I said, as that being out of scope of

21   this action for the proposal.

22                MS. COSTELLO:  Okay, I think we are



# The EPA Blog



EXHIBIT

Exhibit 3

Posted on **March 10, 2016**

# EPA Taking Steps to Cut Methane Emissions from Existing Oil and Gas Sources

By Gina McCarthy, EPA Administrator

Today, as part of the Obama Administration's ongoing commitment to act on climate, President Barack Obama and Canadian Prime Minister Justin Trudeau committed to new actions to reduce methane pollution from the oil and natural gas sector, the world's largest industrial source of methane. These actions build on the historic agreement that nearly 200 nations made in Paris last December to combat climate change and ensure a more stable environment for future generations.

Methane is upwards of 25 times more potent than carbon dioxide in warming the planet and is a key constituent of natural gas. By tackling methane emissions, we can unlock an amazing opportunity to spur U.S. action to protect our environment, but also unleash opportunities to think creatively and lead the world in developing a clean energy economy.

That's why the Administration has been moving quickly and working hard to reduce emissions of this potent greenhouse gas. In 2012, we set emissions standards that cut pollution, including methane, emitted by fractured and re-fractured natural gas wells. This past summer, we proposed standards to directly address methane from new and modified sources in the oil and gas sector. Each of these steps moves the United States toward our goal of cutting methane emissions from the oil and gas sector by 40 to 45 percent below 2012 levels by 2025.

But as science advances and new data emerge, we need to make sure we're continuing to address the biggest climate challenges in the best ways possible. Over the past year, EPA's Greenhouse Gas Reporting Program, along with studies from groups like the Environmental Defense Fund and industry and researchers at Colorado State University, Carnegie Mellon, the University of Texas, Washington State University, and others have provided significant new data on methane emitted by existing operations in the oil and gas sector.

The new data show that methane emissions are substantially higher than we previously understood. So, it's time to take a closer look at regulating existing sources of methane emissions.

And, today, President Obama committed to doing just that. EPA will begin developing regulations for methane emissions from existing oil and gas sources. We will start this work immediately to address methane from existing sources. We intend to work swiftly, and will involve stakeholders in meaningful ways, as we have been doing all along.

We will begin with a formal process to require companies operating existing oil and gas sources to provide information to assist in the development of comprehensive regulations to reduce methane emissions. An Information Collection Request (ICR) will allow us to gather information on existing sources of methane emissions, technologies to reduce those emissions and the costs of those technologies in the production, gathering, processing, and transmission and storage segments of the oil and gas sector.

This is a routine step to assist in the development process for regulations to reduce air pollution. It helps EPA identify the most significant sources of emissions, the kinds of technologies that work best to reduce them, and how those technologies can be applied effectively.

There are hundreds of thousands of existing oil and gas sources across our country; some emit small amounts of methane, while others emit a lot. The Information Collection Request will help EPA identify, among other things, which existing sources are big emitters and how they can be effectively controlled. EPA will begin preliminary outreach to states, industry, environmental groups, communities and other organizations in the coming weeks and will launch the formal information collection process in April. This engagement will give us the opportunity to hear feedback from the public on our plans.

Throughout the process we will continue to expand opportunities for industry to voluntarily step up now to cut emissions from existing sources through EPA's Methane Challenge program. Voluntary action to reduce methane emissions will put leading companies ahead of the game in meeting future standards.

I am pleased and proud to fulfill President Obama's commitment to reduce methane emissions and join our Canadian colleagues in the continued fight against climate change.

Additional information:

- Basic information about ICRs: http://www.epa.gov/icr/icr-basics
- Read the Obama Administration's Climate Action Plan: Strategy to Reduce Methane Emissions .
- Read about EPA's steps to cut methane emissions from the oil and gas sector.

*Editor's Note:* The views expressed here are intended to explain EPA policy. They do not change anyone's rights or obligations. You may share this post. However, please do not change the title or the content, or remove EPA's identity as the author. If you do make substantive changes, please do not attribute the edited title or content to EPA or the author.

EPA's official web site is www.epa.gov. Some links on this page may redirect users from the EPA website to specific content on a non-EPA, third-party site. In doing so, EPA is directing you only to the specific content referenced at the time of publication, not to any other content that may appear on the same webpage or elsewhere on the third-party site, or be added at a later date.

EPA is providing this link for informational purposes only. EPA cannot attest to the accuracy of non-EPA information provided by any third-party sites or any other linked site. EPA does not endorse any non-government websites, companies, internet applications or any policies or information expressed therein.

This entry was posted in **EPA Connect**. Bookmark the **permalink [https://blog.epa.gov/2016/03/10/epa-taking-steps-to-cut-methane-emissions-from-existing-oil-and-gas-sources/]** .



the Clean Water Act, certain research and development projects, development and issuance of regulations, EPA actions involving renovations or new construction of facilities, and certain grants awarded for projects authorized by Congress through the Agency's annual Appropriations Act. EPA is collecting information from certain applicants as part of the process of complying with either NEPA or Executive Order 12114 ("Environmental Effects Abroad of Major Federal Actions"). EPA's NEPA regulations apply to the actions of EPA that are subject to NEPA in order to ensure that environmental information is available to the Agency's decision-makers and the public before decisions are made and before actions are taken. When EPA conducts an environmental assessment pursuant to its Executive Order 12114 procedures, the Agency generally follows its NEPA procedures. Compliance with the procedures is the responsibility of EPA's Responsible Officials, and for applicant proposed actions applicants may be required to provide environmental information to EPA as part of the environmental review process. For this Information Collection Request (ICR), applicant-proposed projects subject to either NEPA or Executive Order 12114 (and that are not addressed in other EPA programs' ICRs) are addressed through the NEPA process.

*Form Numbers:* None.

*Respondents/affected entities:* Entities potentially affected by this action are certain grant or permit applicants who must submit environmental information documentation to EPA for their projects to comply with NEPA or Executive Order 12114, including Wastewater Treatment Construction Grants Program facilities, State and Tribal Assistance Grant recipients and new source National Pollutant Discharge Elimination System permittees.

*Respondent's obligation to respond:* Voluntary.

*Estimated number of respondents:* 312 (total).

*Frequency of response:* On occasion.

*Total estimated burden:* 37,525 hours (per year). Burden is defined at 5 CFR 1320.03(b).

*Total estimated cost:* $3,607,085 (per year), includes $8,452 annualized capital or operation & maintenance costs.

*Changes in Estimates:* The above estimates are based on information and data available through the current ICR supporting documentation. However, it is anticipated that there will be slight decrease in hours in the total estimated respondent burden compared with the

ICR currently approved by OMB. This slight decrease is due to changes in the number of respondents and their associated EPA actions eligible for categorical exclusions which results in a reduction in total hours and burden.

Dated: Tuesday, May 31, 2016.

**Karin Leff,**

*Acting Director, NEPA Compliance Division, Office of Federal Activities.*

[FR Doc. 2016–13153 Filed 6–2–16; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OAR–2016–0204; FRL–9946–70–OAR]**

**Proposed Information Collection Request; Comment Request; Information Collection Effort for Oil and Gas Facilities**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) is planning to submit an information collection request (ICR), "Information Collection Effort for Oil and Gas Facilities" (EPA ICR No. 2548.01, OMB Control No. 2060–NEW) to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act (PRA) (44 U.S.C. 3501 *et seq.*). Before doing so, the EPA is soliciting public comments on specific aspects of the proposed information collection as described below. This is a request for approval of a new collection of information. An Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**DATES:** Comments must be submitted on or before August 2, 2016.

**ADDRESSES:** Submit your comments, referencing Docket ID No. EPA–HQ–OAR–2016–0204, online using *http://www.regulations.gov* (our preferred method), or by mail to: EPA Docket Center (EPA/DC), Environmental Protection Agency, Mail Code 28221T, 1200 Pennsylvania Ave. NW., Washington, DC 20460.

EPA's policy is that all comments received will be included in the public docket without change including any personal information provided, unless the comment includes profanity, threats, information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** Ms. Brenda Shine, Sector Policies and Programs Division, Refining and Chemicals Group (E143–01), Office of Air Quality Planning and Standards, Environmental Protection Agency, Research Triangle Park, NC 27711; telephone number: (919) 541–3608; fax number: (919) 541–0246; email address: *shine.brenda@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Supporting documents which explain in detail the information that the EPA will be collecting are available in the public docket for this notice. The docket can be viewed online at *http://www.regulations.gov* or in person at the EPA Docket Center (EPA/DC, EPA WJC West Building, Room 3334, 1301 Constitution Ave. NW., Washington, DC. The telephone number for the Docket Center is 202–566–1742. The telephone number for the public reading room is 202–566–1744. For additional information about EPA's public docket, visit *http://www.epa.gov/dockets.*

Pursuant to section 3506(c)(2)(A) of the PRA, the EPA is soliciting comments and information to enable it to: (i) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the Agency, including whether the information will have practical utility; (ii) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (iii) enhance the quality, utility, and clarity of the information to be collected; and (iv) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses. The EPA will consider the comments received and may amend the ICR as appropriate. The final ICR package will then be submitted to OMB for review and approval. At that time, the EPA will issue another **Federal Register** notice to announce the submission of the ICR to OMB and the opportunity to submit additional comments to OMB.

*Abstract:* Collectively, oil and gas facilities are the largest industrial emitters of methane in the U.S. In January 2015, as part of the Obama Administration's commitment to addressing climate change, the EPA outlined a number of steps it plans to take to address methane and smog-forming volatile organic compound

**EXHIBIT**

(VOC) emissions from the oil and gas industry. Concurrently with this action, the EPA has promulgated new source performance standards (NSPS) for the oil and gas industry to achieve both methane reductions and additional reductions in VOCs (40 CFR part 60, subpart OOOOa). The EPA has also committed to require standards of performance for existing oil and gas sources. Section 111(d) of the Clean Air Act (CAA), as amended, provides a cooperative federalism approach to establishing standards of performance for existing sources. Under this approach, the EPA establishes guidelines that identify the emission performance states must require their sources to achieve, and states then submit plans for EPA review and approval, which establish standards of performance that achieve that emissions performance.

While a great deal of information is available on the oil and gas industry and has to date provided a strong technical foundation to support the Agency's recent actions, the EPA is now seeking more specific information that would be of critical use in addressing CAA section 111(d). Taking into account the large number of sources that a national regulation development effort would need to consider, and the potential for taking a different approach to addressing co-located existing sources than was taken with new and modified sources, the EPA requires information that will enable the development of effective standards for this entire industry under CAA section 111(d). For new sources, the CAA requires that standards apply to each new affected facility upon startup. Conversely, without information allowing for development of a pathway for phasing in standards, existing source standards will likely apply to all regulated units at approximately the same time. Currently there are hundreds of thousands of pieces of equipment across the country in all kinds of different situations and configurations. To determine how to efficiently and effectively address emissions from this volume of sources in a timely, but administrable manner, we need more comprehensive information that will improve our understanding of what emission controls are being used (and perhaps shared) in the field, how those are configured, the difficulty of replacing or upgrading controls, how much time will be needed to retrofit, what the likely costs of retrofitting are, whether electricity or generating capacity is available, and how often sites are staffed or visited. Such

information will, for example, allow us to ascertain if there are effective ways for affected facilities at well sites, or other co-located facilities, to share emission controls, how to balance the level of emission reductions with administering a program of this size, and potential phase in opportunities. Additional information will also support the Agency's effort to explore proposing standards for new and modified units not currently covered by NSPS OOOOa. Specifically, before proposing standards the EPA must assure that it has adequate information to determine "the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirement) the Administrator determines has been adequately demonstrated," (BSER) as well as the "degree of emission limitation achievable through the application of" such system. Currently, the EPA collects information on the greenhouse gas (GHG) emissions from oil and gas facilities under 40 CFR part 98, subpart W, of the Greenhouse Gas Reporting Program (GHGRP). However, the GHGRP does not collect information on design, performance, and costs of emission controls. Such information is necessary to evaluate the scope, design, and potential impact of future standards of performance for existing oil and gas facility sources. There are also differences in the definition of "facility" in the GHGRP for oil and gas production facilities as compared to the way we have defined facility under our regulations. As previously stated, "the EPA's definition of 'facility' for purposes of 40 CFR part 98 in no way impacts the 'facility' definition for similar sources under existing CAA programs." 80 FR 64262, 64271. Additionally, certain states have moved forward with their own rules and have developed information needed for their own purposes, but this information is not sufficient for a national rulemaking. Thus, it is necessary to collect specific information from oil and gas production facilities both for existing sources and sources not covered by the standards of performance for new and modified sources to understand the number of affected facilities and to estimate the facility-level impacts of potentially implementing existing source standards of various designs.

There will be two parts to the information collection. Part 1, referred to as the operator survey, is specifically designed to obtain information from onshore oil and gas production facilities

to better understand the number and types of equipment at production facilities. Part 1 seeks to collect facility-level information (e.g., facility name, location, contact information, and number of wells, tanks, and compressors) using the definition of facility commonly employed when permitting new and existing sources (i.e., all buildings, equipment, structures, and other stationary equipment that are located on one or more contiguous or adjacent properties and that are under common ownership or control). Part 1 will be sent to all known operators of oil and gas production wells and will allow the Agency to obtain the information necessary to identify and categorize all potentially affected oil and gas production facilities. The operators will complete the Part 1 survey, including providing equipment counts for all production facilities that they operate with the exception of facilities selected to complete Part 2. Part 1 is not expected to contain any CBI. This operator survey may be submitted either electronically or through hard copy responses. The submission requires the owner or operator to certify that the information being provided is accurate and complete.

Part 2, referred to as the detailed facility survey, will be sent to selected oil and gas facilities across the different industry segments. Specifically, these industry segments include onshore production, gathering and boosting, processing, compression/transmission, pipeline, natural gas storage, and liquefied natural gas (LNG) storage and import/export facilities. This ICR will not collect information from offshore production facilities or from local natural gas distribution facilities. Due to the large number of potentially affected facilities, Part 2 uses a statistical sampling method considering each industry segment (and groupings of facilities in the production segment) to be separate sampling populations. Thus, a statistically significant number of facilities within each industry segment (or "population") will be required to complete the Part 2 detailed facility survey.

Developing an appropriate sampling size for the onshore production industry is complicated by the number of factors that could impact the types of processes or equipment present at the site and the magnitude of emissions from these sources. Therefore, the Agency considered further stratification of the production industry segment into separate populations based on differences in the type of well (oil or natural gas, vertical or horizontal

drilling, or further distinctions based on gas-to-oil ratio), the type of formation, and the production basin. At this time, the Agency has limited information on means to characterize individual facilities or wells by formation type or well drilling type (vertical versus horizontal wells). However, the Agency does have estimates of the number of wells in a given basin and has estimates of the gas-to-oil ratio (GOR), from which we designate well type for nearly all wells. Therefore, the Agency considered two options for establishing different populations within the production segment: Option 1, which is based on the well type using GOR ranges, and Option 2, which is based on regional groupings of basins.

Option 1, which considers populations based on well types, defines the following five populations based on GOR:

1. Heavy Oil (GOR ≤ 300 standard cubic feet per barrel, scf/bbl)
2. Light Oil (300 < GOR ≤ 100,000 scf/bbl)
3. Wet Gas (100,000 < GOR ≤ 1,000,000 scf/bbl)
4. Dry Gas (GOR > 1,000,000 scf/bbl)
5. Coal Bed Methane

Most of these well type categories have historical significance, such as the GOR of 300 scf/bbl included in the applicability of the Oil and Gas NSPS requirements for well completions (40 CFR part 60, subpart OOOOa) and the GOR of 100,000 scf/bbl delineation between oil and gas wells used in the U.S. Emissions Inventory for GHG Sources and Sinks. The delineation between "wet" and "dry" gas wells was developed for this ICR to gain information on "wet" gas wells because these gas wells have been found to have higher VOC content and, as such, are of particular interest in this information collection effort.

Option 2, which considers regional groupings of basins, defines the following five populations based on basins (geological provinces) defined by the American Association of Petroleum Geologists:

1. East: Basins 100 to 190
2. South: Basins 200 to 290 and Basin 400
3. Midwest: Basins 300 to 395
4. West Texas: Basins 405 to 440
5. West: Basins 445 to 895

Option 1 (populations based on well type) will ensure that a statistically significant number of each well type is sampled. This is important because there are fewer wet gas wells and coal bed methane gas wells than heavy oil, light oil, or dry gas wells. However, because of the differences in the number

of wells within each population, analyses using the data must use these classifications (or weighting factors) to develop nationwide assessments. The regional populations are more similar to each other in terms of the number of wells in each region, but weighting factors would still be required to perform nationwide assessments separate from these defined regions.

Based on a desire to have no more than a 10-percent error (i.e., +/−10 percent) in the estimate of an average value at a 95-percent confidence interval and 90-percent power to differentiate an effect size of 0.2, the target number of samples required for large populations was determined to be 385 (additional detail regarding the determination of the target sample size using the statistical sampling approach is provided in Part B of the Supporting Statement for this ICR, which is included in Docket ID No. EPA–HQ–OAR–2016–0204 at http://www.regulations.gov). Consequently, because the number of production facilities in each population is relatively large compared to the target sample size, the overall costs of the two survey options for production facilities are nearly identical. We are specifically requesting comment on these two options for developing population categories within the production industry. We recognize that other alternatives may be viable, such as defining the entire production industry as one population and developing sampling requirements based on the accuracy and precision needed to characterize any subcategory of the production population that represents, for example, 20 percent of the total production wells. In this example, 1,925 (5 × 385) samples from the production population would be required. All respondents would have equal weight, so analyses could be conducted without having to consider weighting factors, but analyses for categories of wells with less than 20 percent of the population would have less accuracy and precision. As there are many potential factors to consider for the production population, we also request comment on other potential methods to define populations of production wells in order to adequately characterize the various potentially important differences in production facilities.

Part 2 will collect detailed unit-specific information on emission sources at the facility and any emission control devices or management practices used to reduce emissions. Most of the information requested under Part 2 is expected to be available from company records and would not require

additional measurements to be performed. However, selected data elements must be completed based on actual component equipment counts (specifically, pneumatic device counts and equipment leak component counts) or measurement data (specifically, separator/storage vessel flash analyses). If this information is not directly available for a facility, the respondent will be required to collect and report this information (count equipment components and/or sample and analyze tank feed streams) as part of this information collection. Part 2 is expected to include information that oil and gas facilities consider to be confidential and the survey must be completed and submitted electronically via the EPA's Electronic Greenhouse Gas Reporting Tool (e-GGRT).

The data collected throughout this process will be used to determine the number of potentially affected emission sources and the types and prevalence of emission controls or emission reduction measures used for these sources at existing oil and gas facilities, among other purposes. This information may also be used to fill data gaps, to evaluate the emission and cost impacts of various regulatory options, and to establish appropriate standards of performance for oil and gas facilities.

If OMB approves this ICR, respondents will be required to respond under the authority of section 114 of the CAA. The EPA anticipates issuing the CAA section 114 letters by October 30, 2016. These letters would require the owner/operator of an oil and gas facility to complete the Part 1 survey within 30 days of receipt of the survey, and would require facilities to complete the Part 2 survey with 120 days of receipt.

The Agency has reviewed the draft surveys applying the confidentiality determination methods established for data reporting under the GHGRP as a model, as well as the policy notice entitled "Disclosure of Emission Data Claimed as Confidential Under Sections 110 and 114(c) of the Clean Air Act (56 FR 7042, February 21, 1991.) The EPA has developed proposed determinations of the data elements in the surveys that may be considered CBI. These proposed determinations are included in the information being supplied for public review and comment in Docket ID No. EPA–HQ–OAR–2016–0204 at http://www.regulations.gov. Confidentiality designations will be made according to the provisions set forth in title 40, Code of Regulations part 2, subpart B—Confidentiality of Business Information. Any information subsequently determined to constitute a trade secret will be protected under 18 U.S.C. 1905.

*Form Numbers:* Production Operator Survey (Part 1); Detailed Facility Survey (Part 2).

*Respondents/affected entities:* Respondents affected by this action are owners/operators of oil and natural gas facilities. Part 1 of this ICR is specifically requesting information for facilities in the onshore petroleum and natural gas production industry segment. Part 2 of this ICR is specifically requesting information for facilities in the following industry segments: Onshore petroleum and natural gas production, onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, onshore natural gas transmission compression, onshore natural gas transmission pipelines, underground natural gas storage, LNG storage and LNG import and export equipment. The ICR is not requesting information for the offshore petroleum and natural gas production industry segment or from the natural gas (local) distribution industry segment.

*Respondent's obligation to respond:* The information collection in Parts 1 and 2 is being conducted by the EPA's Office of Air and Radiation pursuant to section 114 of the CAA, to assist the Administrator of the EPA in developing emissions standards for oil and natural gas facilities pursuant to the CAA.

*Estimated number of respondents:* The estimated number of respondents for Part 1 is 22,500 operators representing approximately 698,800 facilities (total). The estimated number of respondents for Part 2 is 3,385.

*Frequency of response:* This is a one-time survey.

*Total estimated burden:* The estimated industry burden is 116,438 hours for Part 1 and 111,485 hours for Part 2. Therefore, the cumulative industry burden for all parts of this ICR is estimated to be 227,923 hours. The estimated cumulative Agency burden to administer this ICR (all parts) is 17,947 hours. Burden is defined at 5 CFR 1320.03(b).

*Total estimated cost:* The estimated costs for the oil and natural gas industry is $16,476,182 for Part 1 and $23,673,312 for Part 2. The resulting total industry costs for all parts of this ICR is estimated to be $40,149,494, which includes $11,302,500 in operating and maintenance (O&M) costs to cover mailing hard copies of Part 1 responses and contracting services for storage vessel feed material flashing analyses as part of Part 2 responses. The estimated cumulative Agency costs to administer this ICR (all parts) is $960,793, which includes $144,618 in O&M costs to send certified CAA

section 114 letters to all respondents selected for Part 1 and Part 2 surveys with electronic return receipt.

*Changes in Estimates:* This is a new ICR, so this section does not apply.

Dated: May 12, 2016.

**Peter Tsirigotis,**

*Director, Sector Policies and Programs Division, Office of Air Quality Planning and Standards.*

[FR Doc. 2016–11967 Filed 6–2–16; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OPP–2016–0242; FRL–9946–52]**

## Pesticides; Draft Guidance for Pesticide Registrants on Pesticide Resistance Management Labeling

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability.

**SUMMARY:** The Agency is announcing the availability of and seeking public comment on a draft Pesticide Registration Notice (PR Notice) entitled "Guidance for Pesticide Registrants on Pesticide Resistance Management Labeling." PR Notices are issued by the Office of Pesticide Programs (OPP) to inform pesticide registrants and other interested persons about important policies, procedures, and registration related decisions, and serve to provide guidance to pesticide registrants and OPP personnel. This draft PR Notice provides guidance for registrants to follow when developing resistance management information to include on their pesticide labels. This draft PR Notice would update the guidance in PR Notice 2001–5.

**DATES:** Comments must be received on or before August 2, 2016.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPP–2016–0242, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

• *Mail:* OPP Docket, Environmental Protection Agency Docket Center (EPA/DC), (28221T), 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001.

• *Hand Delivery:* To make special arrangements for hand delivery or delivery of boxed information, please follow the instructions at *http://*

*www.epa.gov/dockets/contacts.html.* Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Nikhil Mallampalli, Biological and Economic Analysis Division (7503P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001; telephone number: (703) 308–1924; email address: *mallampalli.nikhil@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. General Information

*A. Does this action apply to me?*

This action is directed to the public in general. Although this action may be of particular interest to those persons who are required to submit data under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) or are required to register pesticides. Since other entities may also be interested, the Agency has not attempted to describe all the specific entities that may be affected by this action.

*B. What should I consider as I prepare my comments for EPA?*

1. *Submitting CBI.* Do not submit this information to EPA through regulations.gov or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you mail to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

2. *Tips for preparing your comments.* When preparing and submitting your comments, see the commenting tips at *http://www.epa.gov/dockets/comments.html.*

*C. How can I get copies of this document and other related information?*

A copy of the draft PR Notice "Guidance for Pesticide Registrants on Pesticide Resistance Management Labeling" and any related or supporting information are available in the docket

**Resources Spent on Development and Issuance of the 2016 Information Collection Request**

Office of Air Quality Planning and Standards: develop and survey the industry (2016 calendar year); resources also cover phone bank and data collection activities

4 full-time employees
Approximately $ 850,000 - contractor assistance

Climate Change Division: design and code changes to the electronic reporting system (eGGRT)

1 FTE
$460,000 – contract support

| Design and Requirements | $104,000 |
| Coding e-GGRT changes | $263,000 |
| Testing | $81,000 |
| Reporter Help Content Development | $13,000 |
| **TOTAL** | **$461,000** |



*Applicants:* Duke Energy Carolinas, LLC, Duke Energy Florida, LLC, Duke Energy Progress, LLC.

*Description:* § 205(d) Rate Filing: OATT Attachment C–1 and C–3 Amendment to be effective 5/1/2017.

*Filed Date:* 3/1/17.

*Accession Number:* 20170301–5262.

*Comments Due:* 5 p.m. ET 3/22/17.

*Docket Numbers:* ER17–1077–000.

*Applicants:* Wisconsin Public Service Corporation.

*Description:* § 205(d) Rate Filing: Revised Market Based Rate Tariff to be effective 2/25/2016.

*Filed Date:* 3/1/17.

*Accession Number:* 20170301–5267.

*Comments Due:* 5 p.m. ET 3/22/17.

*Docket Numbers:* ER17–1078–000.

*Applicants:* Wisconsin River Power Company.

*Description:* § 205(d) Rate Filing: Revised Market Based Rate Tariff to be effective 2/25/2016.

*Filed Date:* 3/1/17.

*Accession Number:* 20170301–5277.

*Comments Due:* 5 p.m. ET 3/22/17.

*Docket Numbers:* ER17–1079–000.

*Applicants:* Wisconsin Electric Power Company.

*Description:* § 205(d) Rate Filing: Wisconsin Electric Market Based Rate Tariff O819 Filing to be effective 2/25/2016.

*Filed Date:* 3/1/17.

*Accession Number:* 20170301–5280.

*Comments Due:* 5 p.m. ET 3/22/17.

*Docket Numbers:* ER17–1080–000.

*Applicants:* Combined Locks Energy Center, LLC.

*Description:* § 205(d) Rate Filing: Revised Market Based Rate Tariff to be effective 2/25/2016.

*Filed Date:* 3/1/17.

*Accession Number:* 20170301–5281.

*Comments Due:* 5 p.m. ET 3/22/17.

The filings are accessible in the Commission's eLibrary system by clicking on the links or querying the docket number.

Any person desiring to intervene or protest in any of the above proceedings must file in accordance with Rules 211 and 214 of the Commission's Regulations (18 CFR 385.211 and 385.214) on or before 5:00 p.m. Eastern time on the specified comment date. Protests may be considered, but intervention is necessary to become a party to the proceeding.

eFiling is encouraged. More detailed information relating to filing requirements, interventions, protests, service, and qualifying facilities filings can be found at: *http://www.ferc.gov/docs-filing/efiling/filing-req.pdf.* For other information, call (866) 208–3676 (toll free). For TTY, call (202) 502–8659.

Dated: March 1, 2017.

**Nathaniel J. Davis, Sr.,**

*Deputy Secretary.*

[FR Doc. 2017–04410 Filed 3–6–17; 8:45 am]

**BILLING CODE 6717–01–P**

---

## DEPARTMENT OF ENERGY

### Federal Energy Regulatory Commission

**[Project No. 13318–003]**

### Swan Lake North Pumped Storage Project; Notice of Meeting

Commission staff will meet with representatives of the Klamath Tribes (Tribes) regarding the proposed Swan Lake North Pumped Storage Project (Project No. 13318–003). The meeting will be held at the location and time listed below:

Klamath Tribes, Tribal Administration Building, 501 Chiloquin Blvd., Chiloquin, OR 97624, Phone: (541) 783–2219, Thursday, March 30, 2017, 1:00 p.m. PDT

Members of the public, intervenors, agencies, and the applicant, in the referenced proceeding may attend this meeting; however, participation will be limited to only tribal representatives and Commission staff. If the Tribes decide to disclose information about a specific location which could create a risk or harm to an archeological site or Native American cultural resource, the public will be excused for that portion of the meeting.[1] If you plan to attend this meeting, please contact Dr. Frank Winchell at the Federal Energy Regulatory Commission. He can be reached at (202) 502–6104.

Dated: March 1, 2017.

**Kimberly D. Bose,**

*Secretary.*

[FR Doc. 2017–04377 Filed 3–6–17; 8:45 am]

**BILLING CODE 6717–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–9959–96–OAR]**

### Notice Regarding Withdrawal of Obligation To Submit Information

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice that it is withdrawing its requests that owners and operators in the oil and natural gas industry provide information on equipment and emissions at existing oil and gas operations.

**FOR FURTHER INFORMATION CONTACT:** Peter Tsirigotis, Director, Sector Policies & Programs Division, Office of Air Quality Planning & Standards, Office of Air & Radiation, Mail code D205–01, U.S. Environmental Protection Agency, 109 T.W. Alexander Drive, Research Triangle Park, NC 27709; 1–888–372–8696; *icr@epa.gov.*

**SUPPLEMENTARY INFORMATION:** In 2016, EPA sent letters to more than 15,000 owners and operators in the oil and gas industry, requiring them to provide information. The information request comprised two parts: An "operator survey" that asked for basic information on the numbers and types of equipment at onshore oil and gas production facilities in the United States, and a "facility survey" asking for more detailed information on sources of methane emissions and emissions control devices or practices in use by a representative sampling of facilities in several segments of the oil and gas industry. EPA is withdrawing both parts of the information request.

The withdrawal is occurring because EPA would like to assess the need for the information that the agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need. This also comes after the Agency received a letter on March 1, 2017 from nine state Attorneys General and the Governors of Mississippi and Kentucky, expressing concern with the burdens on businesses imposed by the pending requests. EPA takes these concerns seriously and is committed to strengthening its partnership with the states.

The withdrawal was effective upon announcement on March 2, 2017. As such, owners and operators—including those who have received an extension to their due dates for providing the information—are no longer required to respond.

Dated: March 2, 2017.

**E. Scott Pruitt,**

*Administrator.*

[FR Doc. 2017–04458 Filed 3–2–17; 4:15 pm]

**BILLING CODE 6560–50–P**

---

[1] Protection from public disclosure involving this kind of specific information is based upon 18 CFR 4.32(b)(3)(ii) of the Commission's regulations implementing the Federal Power Act.



EXHIBIT

Exhibit 9

| | |
|---|---|
| **From:** | Peacock, Marcus C. EOP/OMB <Marcus.C.Peacock@omb.eop.gov> |
| **To:** | Munoz, Charles |
| **CC:** | Howard, Benjamin; Carr, Kerrie L. EOP/OMB |
| **Sent:** | 1/30/2017 11:45:46 AM |
| **Subject:** | FW: Transmission to EPA |
| **Attachments:** | Requested Suspension of the Oil and Natural Gas Production ICR - 01-2017....docx |

Charles,
See the request below from the House Majority Leader's office.

Benjamin,
Charles is the EPA point of contact for OMB.

Marcus

**From:** Howard, Benjamin [mailto:Benjamin.R.Howard@who.eop.gov]
**Sent:** Monday, January 30, 2017 11:40 AM
**To:** Peacock, Marcus C. EOP/OMB <Marcus.C.Peacock@omb.eop.gov>
**Subject:** FW: Transmission to EPA

Apologies for another email. Do you have a good POC at EPA to send this request to?

**From:** Kellogg, Matt [mailto:Matt.Kellogg@mail.house.gov]
**Sent:** Monday, January 30, 2017 9:20 AM
**To:** Howard, Benjamin <Benjamin.R.Howard@who.eop.gov>
**Subject:** Transmission to EPA

Ben – I know you're slammed.  Can you transmit this to the appropriate folks at EPA?  My assumption is that the EPA team will likely rescind/modify this ICR once it gets up and running.  However, the compliance deadline for companies is approaching quickly.  If the compliance deadline is passed, companies are subject to potential fines of up to $90,000 a day.  Goal here would be to suspend this ICR until the new EPA gets up and running.

Thanks.

-Kellogg

Matthew B. Kellogg
Senior Policy Advisor and Counsel
Office of the Majority Leader
202.225.4000



In June 2016, the Environmental Protection Agency (EPA) finalized New Source Performance Standards (NSPS) for oil and natural gas production facilities (Subpart OOOOa) under the Clean Air Act (CAA). These regulations changed the managed emissions from Volatile Organic Compounds (VOC) to methane. In doing so, EPA opened a CAA pathway to regulate existing facilities – Section 111(d). Environmentalists demanded that EPA immediately use this regulatory option. EPA announced that it would first initiate an Information Collection Request (ICR) under the Paperwork Reduction Act (PRA) to gather information it needed to understand the oil and natural gas production industry.

Subsequently, the PRA process was subjected to political manipulation to shorten development of and consideration of comments demonstrating that the feasibility and cost of completing the ICR was incorrect. The ICR was approved but is still unworkable. For example, Part 1 of the ICR which has been sent to about 10,000 operators requires compliance in 60 days – a target that was picked to compel completion before the end of the Obama Administration. It cannot be met by these operators. However, failure to comply exposes them to huge potential fines under the enforcement authority of the CAA – Section 114.

The Trump Administration should suspend action on the ICR until it has the opportunity to determine whether it is appropriately structured to acquire useful information that complies with the PRA and is cost effective in its approach. This action needs to occur within the first week of the inauguration to prevent the waste of millions of dollars that are being spent to comply with the current ICR.

| | |
|---|---|
| **From:** | Kathleen Sgamma <ksgamma@westernenergyalliance.org> |
| **To:** | Kreutzer, David |
| **Sent:** | 2/2/2017 10:26:57 AM |
| **Subject:** | RE: Question on ICR |

Thank you so much. My afternoon blew up, but I tried calling you this morning but your voicemail's not set up. Please call when you get a chance.

**From:** Kreutzer, David [mailto:kreutzer.david@epa.gov]
**Sent:** Wednesday, February 01, 2017 1:23 PM
**To:** Kathleen Sgamma
**Subject:** RE: Question on ICR

Sure. I have meetings until about 5:30. I'll try calling then. If you don't hear from me by 6 EST, feel free to call me at 202.564.3113 or 202.384.8061 (cell).

**From:** Kathleen Sgamma [mailto:ksgamma@westernenergyalliance.org]
**Sent:** Wednesday, February 1, 2017 2:58 PM
**To:** Kreutzer, David <kreutzer.david@epa.gov>
**Subject:** Question on ICR

Hello David,

I know you're underwater right now, but do you have time to talk about the ICR that is ongoing for O&G companies. There's confusion about the deadlines for submitting data. Thank you.

Kathleen Sgamma
President
Western Energy Alliance
1775 Sherman St., Suite 2700
Denver, CO 80203
(303) 501-1059 direct
(303) 623-0987 main
ksgamma@westernenergyalliance.org
westernenergyalliance.org
@KathleenSgamma

**********************************
This email and any files transmitted with it are confidential and intended solely for the viewing use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.



EXHIBIT
Exhibit 11

| | |
|---|---|
| **From:** | Sugiyama, George </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8DB82515F204FC3BDFA8B4DC81DD149-SUGIYAMA, G> |
| **To:** | Kreutzer, David |
| **Sent:** | 2/10/2017 11:56:12 AM |
| **Subject:** | RE: Oil and Gas ICR |

EXHIBIT

Exhibit 16

CALL peter Zaragotis in OAQPS, Durham , NC he's the division director of the unit that put out the ICR and the rule.  Tell him to e-mail the recipients of the ICR and to not respond.  Will act further depending on CRA;.

**From:** Kreutzer, David
**Sent:** Thursday, February 9, 2017 3:48 PM
**To:** Schnare, David <schnare.david@epa.gov>; Benton, Donald <benton.donald@epa.gov>
**Cc:** Schwab, Justin <schwab.justin@epa.gov>; Bangerter, Layne <bangerter.layne@epa.gov>; Ericksen, Doug <ericksen.doug@epa.gov>; Konkus, John <konkus.john@epa.gov>; Sugiyama, George <sugiyama.george@epa.gov>; Davis, Patrick <davis.patrick@epa.gov>; Greaves, Holly <greaves.holly@epa.gov>
**Subject:** FW: Oil and Gas ICR

Given the pending CRA on the Methane Rule, we should suspend enforcement of this ICR, at least until the CRA is resolved.

David

**From:** Rees, Sarah
**Sent:** Thursday, February 9, 2017 11:29 AM
**To:** Kreutzer, David <kreutzer.david@epa.gov>
**Subject:** Oil and Gas ICR

Hi David – here's some information on the Oil and Gas ICR that was issued this past fall. Please let me know if you have additional questions.

Cheers,
Sarah

15,000 owners/operators of wells were required to complete Part 1 of the ICR by mid-January (60 days following receipt of letter dated November 14). Part 2 is due 180 days after receipt of letter dated November 14, or roughly mid-May. Respondents to Part 2 include gathering and boosting, transmission, storage, import/export facilities as well as production wells. Part 2 is much more detailed than Part 1, includes CBI, and is required of 4,650 respondants.

From the ICR:

Scope:
The oil and gas industry includes a wide range of different types of facilities or industry segments. The oil and gas industry segments considered in the framework of this information collection request include: onshore petroleum and natural gas production; onshore petroleum and natural gas gathering and boosting; onshore natural gas processing; onshore natural gas transmission compression; onshore natural gas transmission pipelines; underground natural gas storage; LNG storage; and LNG import and export equipment. It is estimated that there are almost 1.4 million producing oil and gas wells at approximately 698,800 well sites (onshore production facilities) in the United States (U.S.). There are approximately 5,000 gathering and boosting facilities, 668 processing facilities, 1,400 transmission compression facilities, 939 transmission pipeline facilities, 418 underground natural gas storage facilities, and 111 liquefied natural gas (LNG) storage or import/export facilities.

| | |
|---|---|
| **From:** | Kathleen Sgamma <ksgamma@westernenergyalliance.org> |
| **To:** | Kreutzer, David |
| **Sent:** | 2/10/2017 2:09:04 PM |
| **Subject:** | Information on the ICR |

Hello David,

Thank you for your call today. In case the information is helpful, here's some background from our attorney.

The ICR's were issued in two parts under EPA's section 114 information gathering request authority. The first part (Part 1) applies to every single operator in the country. Part II was a more targeted information request for certain operators, but asks for much more detailed and onerous information. Both parts impose significant burdens on operators in terms of collecting and submitting data. They also both raise significant CBI issues. The ultimate purpose of the ICR under the Obama EPA was to gather necessary information in advance of promulgating section·111(d) air quality standards for *existing* as opposed to *new* oil and gas sources.

EPA's section 114 authority is very broad, and is most often used for single facilities or a single company as a predicate for an enforcement action. So in that sense, this industry-wide information request is a bit unusual, although not without precedent (EPA did these for refineries). Fortunately, there are no statutory deadlines under section 114 for responding and extensions are routinely granted by EPA upon request. In fact, here limited extensions have been granted for many operators required to respond to Part I. In this respect, section 114 is somewhat informal compared with other provisions of the Clean Air Act.

There are several key rationales for either eliminating the ICR or at least extending the response date nationwide for every operator right now. First, it seems unlikely that the new EPA will approach this "existing" source regulation in the same way. If there is any chance that this EPA will not promulgate an existing source regulation under section 111(d), then it does not make sense for every operator in the country to go through this burdensome information request. At a minimum, I would think the new EPA would want to carefully discuss this issue given the significance of an existing source rule that would literally apply to every facility in the country (putting many marginal wells and smaller operators out of business). Second, an existing source regulation under 111(d) may only go forward once there has been a new source performance standard promulgated under section 111(b). EPA has issued two NSPS for oil and gas – Quad O and Quad Oa. However, both rules are being challenged in the courts. Should they be struck down or otherwise pulled back by EPA, it would have no statutory authority to even promulgate an existing source regulation under 111(d). Thus, it seems the ICR process should be put on hold for that reason as well.

Kathleen Sgamma
President
Western Energy Alliance
1775 Sherman St., Suite 2700
Denver, CO 80203
(303) 501-1059 direct
(303) 623-0987 main
ksgamma@westernenergyalliance.org
westernenergyalliance.org
@KathleenSgamma

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email and any files transmitted with it are confidential and intended solely for the viewing use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.



EXHIBIT
Exhibit 17

| From: | Kreutzer, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=52652127F1174690A5223B2A6DF21968-KREUTZER, D> |
|---|---|
| To: | Schnare, David |
| Sent: | 2/10/2017 2:12:41 PM |
| Subject: | FW: Information on the ICR |

Please call.  I just talked with Sarah Dunham. Looks like this will be easier than we thought.

**From:** Kathleen Sgamma [mailto:ksgamma@westernenergyalliance.org]
**Sent:** Friday, February 10, 2017 2:09 PM
**To:** Kreutzer, David <kreutzer.david@epa.gov>
**Subject:** Information on the ICR

Hello David,

Thank you for your call today. In case the information is helpful, here's some background from our attorney.

The ICR's were issued in two parts under EPA's section 114 information gathering request authority. The first part (Part 1) applies to every single operator in the country. Part II was a more targeted information request for certain operators, but asks for much more detailed and onerous information. Both parts impose significant burdens on operators in terms of collecting and submitting data. They also both raise significant CBI issues. The ultimate purpose of the ICR under the Obama EPA was to gather necessary information in advance of promulgating section 111(d) air quality standards for *existing* as opposed to *new* oil and gas sources.

EPA's section 114 authority is very broad, and is most often used for single facilities or a single company as a predicate for an enforcement action. So in that sense, this industry-wide information request is a bit unusual, although not without precedent (EPA did these for refineries). Fortunately, there are no statutory deadlines under section 114 for responding and extensions are routinely granted by EPA upon request. In fact, here limited extensions have been granted for many operators required to respond to Part I. In this respect, section 114 is somewhat informal compared with other provisions of the Clean Air Act.

There are several key rationales for either eliminating the ICR or at least extending the response date nationwide for every operator right now. First, it seems unlikely that the new EPA will approach this "existing" source regulation in the same way. If there is any chance that this EPA will not promulgate an existing source regulation under section 111(d), then it does not make sense for every operator in the country to go through this burdensome information request. At a minimum, I would think the new EPA would want to carefully discuss this issue given the significance of an existing source rule that would literally apply to every facility in the country (putting many marginal wells and smaller operators out of business). Second, an existing source regulation under 111(d) may only go forward once there has been a new source performance standard promulgated under section 111(b). EPA has issued two NSPS for oil and gas – Quad O and Quad Oa. However, both rules are being challenged in the courts. Should they be struck down or otherwise pulled back by EPA, it would have no statutory authority to even promulgate an existing source regulation under 111(d). Thus, it seems the ICR process should be put on hold for that reason as well.

Kathleen Sgamma
President
Western Energy Alliance
1775 Sherman St., Suite 2700
Denver, CO 80203
(303) 501-1059 direct
(303) 623-0987 main
ksgamma@westernenergyalliance.org


EXHIBIT
Exhibit 18

USEPA-202304:

| From: | Kreutzer, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=52652127F1174690A5223B2A6DF21968-KREUTZER, D> |
|---|---|
| To: | Dunham, Sarah |
| Sent: | 2/10/2017 2:24:15 PM |
| Subject: | ICR |

Sarah,

Re: Quashing the ICR

Could you draft whatever request you would need from Catharine and send it to her, Schnare, and me?

Thanks,

David

David W. Kreutzer, Ph.D.
202.564.3113

IMPORTANT: Please note that any correspondence with this account may become a federal record and be subject to Freedom of Information Act (FOIA) requests.



EXHIBIT

Exhibit 19

USEPA-20230

| | |
|---|---|
| **From:** | Catanzaro, Michael J. EOP/WHO <Michael.J.Catanzaro@who.eop.gov> |
| **To:** | Bremberg, Andrew P. EOP/WHO; Schnare, David |
| **CC:** | Salvi, Mary |
| **Sent:** | 2/22/2017 11:11:12 AM |
| **Subject:** | RE: Energy Executive Orders |

That works.

**From:** Bremberg, Andrew P. EOP/WHO
**Sent:** Wednesday, February 22, 2017 11:01 AM
**To:** Schnare, David <schnare.david@epa.gov>
**Cc:** Salvi, Mary <Mary.E.Salvi@who.eop.gov>; Catanzaro, Michael J. EOP/WHO
<Michael.J.Catanzaro@who.eop.gov>
**Subject:** RE: Energy Executive Orders

Can we set up a call for 12:00?

**From:** Schnare, David [mailto:schnare.david@epa.gov]
**Sent:** Wednesday, February 22, 2017 10:42 AM
**To:** Bremberg, Andrew P. EOP/WHO <Andrew.P.Bremberg@who.eop.gov>
**Subject:** Energy Executive Orders

Andrew:

I know that Don Benton left a message with you this morning seeking insight on when the EO's are coming out. Ryan Jackson begged me to use whatever influence I had with you to get the same information.

I don't have any influence with you that I know of , but I can at least repeat the question.

Administrator Pruitt wants to make a fast start and we are developing federal register notices with regard to the CAFÉ standards, the Clean Power Plan, the CAA 111(b) NSPS rule and the methane information collection demand.  Mr. Pruitt wants to launch all these on this Friday.

I've already told them that we will hear from you when we hear from you, and that's just the way it is.

Any help?  Or should I remind them, again, that patience is its own reward.

David Schnare



EXHIBIT
Exhibit 20

| | |
|---|---|
| **From:** | Jackson, Ryan </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=38BC8E18791A47D88A279DB2FEC8BD60-JACKSON, RY> |
| **To:** | Schnare, David |
| **Sent:** | 2/27/2017 10:29:02 PM |
| **Subject:** | |

I've been meaning to ask this all day and we have time tomorrow morning some, but what can be done on the ICR presently?

Ryan Jackson
Chief of Staff
U.S. Environmental Protection Agency
(202) 564-6999



EXHIBIT

Exhibit 22

| | |
|---|---|
| **From:** | Schnare, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=96FC79D4007541A69E8B3CF57F6E13B0-SCHNARE, DA> |
| **To:** | Dunham, Sarah; Grantham, Nancy; Konkus, John |
| **CC:** | Jackson, Ryan |
| **Sent:** | 2/28/2017 7:26:56 AM |
| **Subject:** | CAA 114 Methane information request |

Sarah:

Please work with Nancy to prepare a press release to the appropriate trade press to announce that we are withdrawing our request for information on methane releases that we made under CAA Sec. 114, and that we are preparing letters to the 15,000 persons who originally received that request.  In addition, please prepare a one-pager indicating the schedule with which we can get those letters out.

We need to indicate that we are withdrawing both parts 1 and 2 of the request.

If you have questions, please let me know.

dschnare



USEPA-202816

| | |
|---|---|
| **From:** | Kime, Robin </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7EF7B76087A6475B80FC984AC2DD4497-RKIME> |
| **To:** | Dravis, Samantha |
| **Sent:** | 3/1/2017 10:26:45 AM |
| **Subject:** | Methane ICR - request for notice and update |

Hi
This just in.

**From:** Rees, Sarah
**Sent:** Wednesday, March 01, 2017 10:24 AM
**To:** Kime, Robin <Kime.Robin@epa.gov>
**Cc:** Kenny, Shannon <Kenny.Shannon@epa.gov>
**Subject:** RE: Request for notice and update

Confirmed that this decision has been made and OAR is working on the withdrawal. They have some comms materials and are putting the notice together. We've asked to see the materials in advance and also timeline as to when they will be ready. I will send to Samantha as soon as I have more information.



EXHIBIT
29

| From: | Harvey, Reid </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8EC31CAAD5048DB83F210032847DE32-RHARVE02> |
|---|---|
| To: | Dunham, Sarah |
| Sent: | 3/1/2017 1:38:37 PM |
| Subject: | FW: AGs ask EPA to drop methane information request |
| Attachments: | AGs Letter to EPA on Methane ICR_3.1.17.pdf |

**From:** VonDemHagen, Rebecca
**Sent:** Wednesday, March 01, 2017 1:28 PM
**To:** Harvey, Reid <Harvey.Reid@epa.gov>; Gunning, Paul <Gunning.Paul@epa.gov>; Kocchi, Suzanne <Kocchi.Suzanne@epa.gov>
**Cc:** Krieger, Jackie <Krieger.Jackie@epa.gov>
**Subject:** FW: AGs ask EPA to drop methane information request

FYI – copy of letter attached

**From:** POLITICO Pro Energy Whiteboard [mailto:politicoemail@politicopro.com]
**Sent:** Wednesday, March 01, 2017 12:56 PM
**To:** VonDemHagen, Rebecca <VonDemHagen.Rebecca@epa.gov>
**Subject:** AGs ask EPA to drop methane information request

By Alex Guillén

03/01/2017 12:50 PM EDT

Eleven state attorneys general today asked EPA to halt its ongoing direction for oil and gas companies to answer questions related to Obama-era plans for methane emission regulations.

EPA finalized its Information Collection Request just days after the election. The ICR requires oil and gas companies to answer a litany of technical questions and is the first step toward regulating methane emissions from existing oil and gas operations.

The AGs note EPA itself predicted it would cost companies more than $42 million and 284,000 hours to comply with the request.

"We believe the EPA's requests to be an unnecessary and onerous burden on oil and gas producers that is more harassment than a genuine search for pertinent and appropriate information," the letter says.

EPA's request "comes at a time when the oil and gas industry is recovering from its most significant economic downturn in decades," it adds. "Many of the company can ill-afford the time and expense to comply with yet another empty regulatory burden."

The signatories include EPA Administrator Scott Pruitt's successor as Oklahoma attorney general, Mike Hunter.

*To view online:*
https://www.politicopro.com/energy/whiteboard/2017/03/ags-ask-epa-to-drop-methane-information-request-084305

PLAINTIFF'S EXHIBIT
30

tabbies®

Was this Pro content helpful? Tell us what you think in one click.

| Yes, | Somewhat | Neutral | Not | Not |
|------|----------|---------|-----|-----|
| Yes, very | Somewhat | Neutral | Not really | Not at all |

You received this POLITICO Pro content because your customized settings include: tags: Energy: EPA, Energy: Regulations, Energy: Business. To change your alert settings, please go to https://www.politicopro.com/settings

This email was sent by: **POLITICO, LLC**
1000 Wilson Blvd. Arlington, VA, 22209, USA

USEPA-009755



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

March 1, 2017

Hon. Scott Pruitt, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue, N.W.
Washington D.C. 20460

Re:   Request to Suspend and Withdraw the Environmental Protection Agency's
      Information Collection Request for Existing Oil and Gas Facilities, EPA ICR
      No. 2548.01; from the State of Texas, from the State of Alabama, from the State
      of Arizona, from the State of Kansas, from the State of Kentucky, from the
      State of Louisiana, from the State of Mississippi (by and through the governor),
      from the State of Montana, from the State of Oklahoma, from the State of
      South Carolina, and from the State of West Virginia

Dear Administrator Pruitt:

We write to express our concern with the pending Information Collection
Request (Request) for Oil and Gas Facilities, EPA ICR No. 2548.01, and request that
it be suspended and withdrawn. The information request was issued on November
10, 2016 and requires oil and natural gas companies to provide voluminous
information and survey responses in support of the Obama Administration's
initiatives to impose onerous requirements upon industry to reduce emissions of
greenhouse gasses, such as methane.

As you are aware, 15 States, as well as industry partners, challenged the
Obama Administration's attempts to govern emissions of greenhouse gasses from a
broad spectrum of new facilities within the oil and natural gas sector. *See North
Dakota v. EPA*, Case No. 16-1242 (D.C. Cir.); *State of Texas v. EPA*, Case No. 16-1257
(D.C. Cir.); *State of West Virginia v. EPA*, Case No. 16-1242 (D.C. Cir.).[1]  These
matters were recently consolidated with pending challenges to the Obama
Administration's earlier rules targeting emissions of other compounds from oil and
natural gas facilities. *See Am. Petroleum Inst. v. EPA*, Case No. 13-1108, and
consolidated cases. The litigation in these matters has just begun, but it relates to a
common theme from the Obama Administration—the issuance of onerous regulations

---

[1] The States that are in this pending litigation are: Alabama, Arizona, Kansas,
Kentucky, Louisiana, Michigan, Montana, North Carolina, North Dakota, Ohio,
Oklahoma, South Carolina, Texas, West Virginia, and Wisconsin.

Hon. Scott Pruitt
Page 2

and requirements in support of an overall climate agenda targeting multiple industry sectors that will create an economic drag on our nation's economy with dubious environmental benefit. We also disagree with EPA's assumption that it possesses clear authority to regulate methane under section 111(d) of the Clean Air Act without a specific methane endangerment finding.

This information request furthers the previous administration's climate agenda and supports the next and most onerous phase of the Obama Administration's regulations targeting the oil and gas industry—the imposition of burdensome climate rules on existing sites, the cost and expense of which will be enormous. The burden of the Request is disproportionate to its benefit. We believe the EPA's requests to be an unnecessary and onerous burden on oil and gas producers that is more harassment than a genuine search for pertinent and appropriate information. Among the 114 inquiries of the Request, many state regulatory agencies already have up-to-date records and data available and responsive to many of the EPA requests. And yet the EPA has not adequately attempted to work with state agencies to develop less burdensome avenues to acquire much of the data sought. For other information sought in the Request, oil and gas producers are required to gather data and information that does not provide an environmental benefit.

The EPA's own estimates claim the industry cost of responding to the Request is about $42 million: $18 million to respond to the operator survey and $24 million to respond to the more detailed facility survey, or between $1,100 and $5,800 for each company to respond to and complete the Request. Experience indicates that the true cost and burden is undoubtedly much higher and comes at a time when the oil and gas industry is recovering from its most significant economic downturn in decades. Many of the companies can ill-afford the time and expense to comply with yet another empty regulatory burden.

We hope that the burdensome Obama climate rules never see the light of day, which is why we ask that this Information Collection Request be suspended and withdrawn. At a minimum, we suggest that the EPA: (1) grant a 180-day extension for any required response; (2) take no enforcement against companies that do not respond; (3) allow companies to use "best estimate" data and information; and (4) work with state regulatory agencies to acquire pertinent and appropriate information.

We appreciate that the Administration has many priorities and that this request may require additional deliberation. Please consider an immediate suspension of the Information Collection Request pending internal review by the EPA concerning whether it should withdraw the Request.

We appreciate your prompt consideration to this matter.

Hon. Scott Pruitt
Page 3


Sincerely,


Ken Paxton
Attorney General of Texas

Steven T. Marshall
Attorney General of Alabama


Mark Brnovich
Attorney General of Arizona

Derek Schmidt
Attorney General of Kansas


Matt Bevin
Governor of Kentucky

Jeff Landry
Attorney General of Louisiana


Phil Bryant
Governor of Mississippi

Tim Fox
Attorney General of Montana


Mike Hunter
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina


Patrick Morrisey
Attorney General for West Virginia

Hon. Scott Pruitt
Page 4


cc:     Hon. Jeff Sessions, United States Attorney General

USEPA-009755

| From: | Schnare, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=96FC79D4007541A69E8B3CF57F6E13B0-SCHNARE, DA> |
|---|---|
| To: | Minoli, Kevin; Kenny, Shannon; Rees, Sarah; Dunham, Sarah |
| Sent: | 3/2/2017 8:56:30 AM |
| Subject: | Direction from the Administrator |
| Attachments: | Oil and Gas Info Request New Brief DRAFT v5 CLEAN.docx |

Attached is the near final draft of the press release going out today on the CAA 114 methane issue (a quote is being added).

The Administrator wants this turned into a Notice for Federal Register publication and he wants it over there today for publication tomorrow.  OGC drafts.  It can be literally three sentences long.

Please let me know when this has been sent to OFR.

dschnare



| | |
|---|---|
| **From:** | Kreutzer, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=52652127F1174690A5223B2A6DF21968-KREUTZER, D> |
| **To:** | Kathleen Sgamma |
| **Sent:** | 3/2/2017 5:11:32 PM |
| **Subject:** | Re: Question on ICR |

Thank you for bringing it to our attention. There was nobody here (political or career) who thought the ICR made sense given the changes in the associated policy. However, with the all the commotion of the transition, the very sensible proposal to cancel the ICR fell through the cracks.

Kudos to you for being alert!

David

Sent from my iPhone

On Mar 2, 2017, at 4:55 PM, Kathleen Sgamma <ksgamma@westernenergyalliance.org> wrote:

From the bottom of my heart, thank you.

**From:** Kreutzer, David [mailto:kreutzer.david@epa.gov]
**Sent:** Wednesday, February 01, 2017 1:23 PM
**To:** Kathleen Sgamma
**Subject:** RE: Question on ICR

Sure.  I have meetings until about 5:30. I'll try calling then.  If you don't hear from me by 6 EST, feel free to call me at 202.564.3113 or 202.384.8061 (cell).

**From:** Kathleen Sgamma [mailto:ksgamma@westernenergyalliance.org]
**Sent:** Wednesday, February 1, 2017 2:58 PM
**To:** Kreutzer, David <kreutzer.david@epa.gov>
**Subject:** Question on ICR

Hello David,

I know you're underwater right now, but do you have time to talk about the ICR that is ongoing for O&G companies. There's confusion about the deadlines for submitting data. Thank you.

Kathleen Sgamma
President
Western Energy Alliance
1775 Sherman St., Suite 2700
Denver, CO 80203
(303) 501-1059 direct
(303) 623-0987 main
ksgamma@westernenergyalliance.org
westernenergyalliance.org
@KathleenSgamma



PLAINTIFF'S
EXHIBIT
36

USEPA-202303

**********************************
This email and any files transmitted with it are confidential and intended solely for the viewing use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.



16093

Federal Register

Vol. 82, No. 61

Friday, March 31, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13783 of March 28, 2017

## Promoting Energy Independence and Economic Growth

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Policy.* (a) It is in the national interest to promote clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation. Moreover, the prudent development of these natural resources is essential to ensuring the Nation's geopolitical security.

(b) It is further in the national interest to ensure that the Nation's electricity is affordable, reliable, safe, secure, and clean, and that it can be produced from coal, natural gas, nuclear material, flowing water, and other domestic sources, including renewable sources.

(c) Accordingly, it is the policy of the United States that executive departments and agencies (agencies) immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law.

(d) It further is the policy of the United States that, to the extent permitted by law, all agencies should take appropriate actions to promote clean air and clean water for the American people, while also respecting the proper roles of the Congress and the States concerning these matters in our constitutional republic.

(e) It is also the policy of the United States that necessary and appropriate environmental regulations comply with the law, are of greater benefit than cost, when permissible, achieve environmental improvements for the American people, and are developed through transparent processes that employ the best available peer-reviewed science and economics.

**Sec. 2.** *Immediate Review of All Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources.* (a) The heads of agencies shall review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that potentially burden the development or use of domestically produced energy resources, with particular attention to oil, natural gas, coal, and nuclear energy resources. Such review shall not include agency actions that are mandated by law, necessary for the public interest, and consistent with the policy set forth in section 1 of this order.

(b) For purposes of this order, "burden" means to unnecessarily obstruct, delay, curtail, or otherwise impose significant costs on the siting, permitting, production, utilization, transmission, or delivery of energy resources.

(c) Within 45 days of the date of this order, the head of each agency with agency actions described in subsection (a) of this section shall develop and submit to the Director of the Office of Management and Budget (OMB Director) a plan to carry out the review required by subsection (a) of this section. The plans shall also be sent to the Vice President, the Assistant to the President for Economic Policy, the Assistant to the President for Domestic Policy, and the Chair of the Council on Environmental Quality. The head of any agency who determines that such agency does not have



PLAINTIFF'S
EXHIBIT

43

agency actions described in subsection (a) of this section shall submit to the OMB Director a written statement to that effect and, absent a determination by the OMB Director that such agency does have agency actions described in subsection (a) of this section, shall have no further responsibilities under this section.

(d) Within 120 days of the date of this order, the head of each agency shall submit a draft final report detailing the agency actions described in subsection (a) of this section to the Vice President, the OMB Director, the Assistant to the President for Economic Policy, the Assistant to the President for Domestic Policy, and the Chair of the Council on Environmental Quality. The report shall include specific recommendations that, to the extent permitted by law, could alleviate or eliminate aspects of agency actions that burden domestic energy production.

(e) The report shall be finalized within 180 days of the date of this order, unless the OMB Director, in consultation with the other officials who receive the draft final reports, extends that deadline.

(f) The OMB Director, in consultation with the Assistant to the President for Economic Policy, shall be responsible for coordinating the recommended actions included in the agency final reports within the Executive Office of the President.

(g) With respect to any agency action for which specific recommendations are made in a final report pursuant to subsection (e) of this section, the head of the relevant agency shall, as soon as practicable, suspend, revise, or rescind, or publish for notice and comment proposed rules suspending, revising, or rescinding, those actions, as appropriate and consistent with law. Agencies shall endeavor to coordinate such regulatory reforms with their activities undertaken in compliance with Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs).

**Sec. 3.** *Rescission of Certain Energy and Climate-Related Presidential and Regulatory Actions.* (a) The following Presidential actions are hereby revoked:

(i) Executive Order 13653 of November 1, 2013 (Preparing the United States for the Impacts of Climate Change);

(ii) The Presidential Memorandum of June 25, 2013 (Power Sector Carbon Pollution Standards);

(iii) The Presidential Memorandum of November 3, 2015 (Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment); and

(iv) The Presidential Memorandum of September 21, 2016 (Climate Change and National Security).

(b) The following reports shall be rescinded:

(i) The Report of the Executive Office of the President of June 2013 (The President's Climate Action Plan); and

(ii) The Report of the Executive Office of the President of March 2014 (Climate Action Plan Strategy to Reduce Methane Emissions).

(c) The Council on Environmental Quality shall rescind its final guidance entitled "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews," which is referred to in "Notice of Availability," 81 *Fed. Reg.* 51866 (August 5, 2016).

(d) The heads of all agencies shall identify existing agency actions related to or arising from the Presidential actions listed in subsection (a) of this section, the reports listed in subsection (b) of this section, or the final guidance listed in subsection (c) of this section. Each agency shall, as soon as practicable, suspend, revise, or rescind, or publish for notice and comment proposed rules suspending, revising, or rescinding any such actions, as appropriate and consistent with law and with the policies set forth in section 1 of this order.

**Sec. 4.** *Review of the Environmental Protection Agency's "Clean Power Plan" and Related Rules and Agency Actions.* (a) The Administrator of the Environmental Protection Agency (Administrator) shall immediately take all steps necessary to review the final rules set forth in subsections (b)(i) and (b)(ii) of this section, and any rules and guidance issued pursuant to them, for consistency with the policy set forth in section 1 of this order and, if appropriate, shall, as soon as practicable, suspend, revise, or rescind the guidance, or publish for notice and comment proposed rules suspending, revising, or rescinding those rules. In addition, the Administrator shall immediately take all steps necessary to review the proposed rule set forth in subsection (b)(iii) of this section, and, if appropriate, shall, as soon as practicable, determine whether to revise or withdraw the proposed rule.

(b) This section applies to the following final or proposed rules:

(i) The final rule entitled "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 *Fed. Reg.* 64661 (October 23, 2015) (Clean Power Plan);

(ii) The final rule entitled "Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units," 80 *Fed. Reg.* 64509 (October 23, 2015); and

(iii) The proposed rule entitled "Federal Plan Requirements for Greenhouse Gas Emissions From Electric Utility Generating Units Constructed on or Before January 8, 2014; Model Trading Rules; Amendments to Framework Regulations; Proposed Rule," 80 *Fed. Reg.* 64966 (October 23, 2015).

(c) The Administrator shall review and, if appropriate, as soon as practicable, take lawful action to suspend, revise, or rescind, as appropriate and consistent with law, the "Legal Memorandum Accompanying Clean Power Plan for Certain Issues," which was published in conjunction with the Clean Power Plan.

(d) The Administrator shall promptly notify the Attorney General of any actions taken by the Administrator pursuant to this order related to the rules identified in subsection (b) of this section so that the Attorney General may, as appropriate, provide notice of this order and any such action to any court with jurisdiction over pending litigation related to those rules, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the administrative actions described in subsection (a) of this section.

**Sec. 5.** *Review of Estimates of the Social Cost of Carbon, Nitrous Oxide, and Methane for Regulatory Impact Analysis.* (a) In order to ensure sound regulatory decision making, it is essential that agencies use estimates of costs and benefits in their regulatory analyses that are based on the best available science and economics.

(b) The Interagency Working Group on Social Cost of Greenhouse Gases (IWG), which was convened by the Council of Economic Advisers and the OMB Director, shall be disbanded, and the following documents issued by the IWG shall be withdrawn as no longer representative of governmental policy:

(i) Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (February 2010);

(ii) Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis (May 2013);

(iii) Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis (November 2013);

(iv) Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis (July 2015);

(v) Addendum to the Technical Support Document for Social Cost of Carbon: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (August 2016); and

(vi) Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis (August 2016).

(c) Effective immediately, when monetizing the value of changes in greenhouse gas emissions resulting from regulations, including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A–4 of September 17, 2003 (Regulatory Analysis), which was issued after peer review and public comment and has been widely accepted for more than a decade as embodying the best practices for conducting regulatory cost-benefit analysis.

**Sec. 6.** *Federal Land Coal Leasing Moratorium.* The Secretary of the Interior shall take all steps necessary and appropriate to amend or withdraw Secretary's Order 3338 dated January 15, 2016 (Discretionary Programmatic Environmental Impact Statement (PEIS) to Modernize the Federal Coal Program), and to lift any and all moratoria on Federal land coal leasing activities related to Order 3338. The Secretary shall commence Federal coal leasing activities consistent with all applicable laws and regulations.

**Sec. 7.** *Review of Regulations Related to United States Oil and Gas Development.* (a) The Administrator shall review the final rule entitled ''Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources,'' 81 *Fed. Reg.* 35824 (June 3, 2016), and any rules and guidance issued pursuant to it, for consistency with the policy set forth in section 1 of this order and, if appropriate, shall, as soon as practicable, suspend, revise, or rescind the guidance, or publish for notice and comment proposed rules suspending, revising, or rescinding those rules.

(b) The Secretary of the Interior shall review the following final rules, and any rules and guidance issued pursuant to them, for consistency with the policy set forth in section 1 of this order and, if appropriate, shall, as soon as practicable, suspend, revise, or rescind the guidance, or publish for notice and comment proposed rules suspending, revising, or rescinding those rules:

(i) The final rule entitled ''Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands,'' 80 *Fed. Reg.* 16128 (March 26, 2015);

(ii) The final rule entitled ''General Provisions and Non-Federal Oil and Gas Rights,'' 81 *Fed. Reg.* 77972 (November 4, 2016);

(iii) The final rule entitled ''Management of Non-Federal Oil and Gas Rights,'' 81 *Fed. Reg.* 79948 (November 14, 2016); and

(iv) The final rule entitled ''Waste Prevention, Production Subject to Royalties, and Resource Conservation,'' 81 *Fed. Reg.* 83008 (November 18, 2016).

(c) The Administrator or the Secretary of the Interior, as applicable, shall promptly notify the Attorney General of any actions taken by them related to the rules identified in subsections (a) and (b) of this section so that the Attorney General may, as appropriate, provide notice of this order and any such action to any court with jurisdiction over pending litigation related to those rules, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, until the completion of the administrative actions described in subsections (a) and (b) of this section.

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

Federal Register / Vol. 82, No. 61 / Friday, March 31, 2017 / Presidential Documents     **16097**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 28, 2017.*

[FR Doc. 2017–06576
Filed 3–30–17; 11:15 am]
Billing code 3295–F7–P

Source Rule, EPA for the first time used Section 111(b) to limit carbon dioxide emissions from new power plants.

Due to concerns about EPA's legal authority and record, 24 States and a number of other parties sought judicial review of the New Source Rule in the U.S. Court of Appeals for the District of Columbia. *State of North Dakota* v. *EPA,* No. 15–1381 (and consolidated cases) (D.C. Cir.). The case has been fully briefed, and oral argument in the D.C. Circuit is currently scheduled for April 17, 2017.

## II. Initiation of Review of New Source Rule

On March 28, 2017, President Trump issued an Executive Order establishing a national policy in favor of energy independence, economic growth, and the rule of law. The purpose of that Executive Order is to facilitate the development of U.S. energy resources and to reduce unnecessary regulatory burdens associated with the development of those resources. The President has directed agencies to review existing regulations that potentially burden the development of domestic energy resources, and appropriately suspend, revise, or rescind regulations that unduly burden the development of U.S. energy resources beyond what is necessary to protect the public interest or otherwise comply with the law. The Executive Order also directs agencies to take appropriate actions, to the extent permitted by law, to promote clean air and clean water while also respecting the proper roles of Congress and the States. The Executive Order specifically directs EPA to review and, if appropriate, initiate reconsideration proceedings to suspend, revise or rescind the New Source Rule.

Pursuant to the Executive Order, EPA is initiating its review of the New Source Rule and providing advanced notice of forthcoming rulemaking proceedings consistent with the President's policies. If EPA's review concludes that suspension, revision or rescission of the New Source Rule may be appropriate, EPA's review will be followed by a rulemaking process that will be transparent, follow proper administrative procedures, include appropriate engagement with the public, employ sound science, and be firmly grounded in the law.

EPA's ability to revisit existing regulations is well-grounded in the law. Specifically, the agency has inherent authority to reconsider past decisions and to rescind or revise a decision to the extent permitted by law when supported by a reasoned explanation.

*FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ("*Fox*"); *Motor Vehicle Manufacturers Ass'n of the United States, Inc., et al,* v. *State Farm Mutual Automobile Insurance Co., et al,* 463 U.S. 29, 42 (1983) ("*State Farm*"). Moreover, the Clean Air Act itself authorizes EPA to reconsider its rulemakings. 42 U.S.C. 7607(b)(1), (d)(7)(B). The Clean Air Act complements the EPA's inherent authority to reconsider prior rulemakings by providing the agency with broad authority to prescribe regulations as necessary. 42 U.S.C. 7601(a). The authority to reconsider prior decisions exists in part because EPA's interpretations of statutes it administers "are not carved in stone" but must be evaluated "on a continuing basis," *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 857–58 (1984). This is true when—as is the case here— review is undertaken "in response to . . . a change in administrations." *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services,* 545 U.S. 967, 981 (2005). Importantly, such a revised decision need not be based upon a change of facts or circumstances. Rather, a revised rulemaking based "on a reevaluation of which policy would be better in light of the facts" is "well within an agency's discretion," and "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *National Ass'n of Home Builders* v. *EPA,* 682 F.3d 1032, 1038 & 1043 (D.C. Cir. 2012) (citing *Fox,* 556 U.S. at 514–15; quoting *State Farm,* 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part)).

In conducting this review, EPA will follow each of the principles and policies set forth in the Executive Order, consistent with EPA's statutory authority. The Agency will reevaluate whether this Rule and alternative approaches are appropriately grounded in EPA's statutory authority and consistent with the rule of law. EPA will assess whether this Rule or alternative approaches would appropriately promote cooperative federalism and respect the authority and powers that are reserved to the States. EPA will also examine whether this Rule or alternative approaches effect the Administration's dual goals of protecting public health and welfare while also supporting economic growth and job creation. EPA will review whether this Rule or alternative approaches appropriately maintain the diversity of reliable energy resources

and encourage the production of domestic energy sources to achieve energy independence and security. Additionally, EPA will assess this Rule and alternative approaches to determine whether they will provide benefits that substantially exceed their costs. In taking any actions subsequent to this review, EPA will use its appropriated funds and agency resources wisely by firmly grounding in the statute its actions to protect public health and welfare.

Dated: March 28, 2017.

**E. Scott Pruitt,**

*Administrator.*

[FR Doc. 2017–06519 Filed 4–3–17; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 60

**[FRL–9961–09–OAR]**

### Review of the 2016 Oil and Gas New Source Performance Standards for New, Reconstructed, and Modified Sources

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Announcement of review.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) announces it is reviewing the 2016 Oil and Gas New Source Performance Standards and, if appropriate, will initiate reconsideration proceedings to suspend, revise or rescind this rule.

**DATES:** April 4, 2017.

**FOR FURTHER INFORMATION CONTACT:** Mr. Peter Tsirigotis, Sector Policies and Programs Division (D205–01), U.S. Environmental Protection Agency, Research Triangle Park, NC 27711; telephone number: (888) 627–7764; email address: *airaction@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The EPA announces it is reviewing the 2016 Oil and Gas New Source Performance Standards (Rule) 81 FR 35,824 (June 3, 2016), and, if appropriate, will initiate proceedings to suspend, revise, or rescind it.

### I. Background

Section 111 of the Clean Air Act authorizes the EPA to issue nationally applicable New Source Performance Standards (NSPS) limiting air pollution from "new sources" in source categories that cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. 7411(b)(1). Under this authority,

PLAINTIFF'S
EXHIBIT

the EPA had regulated sulfur dioxide emissions from natural gas processing and volatile organic chemicals (VOCs) from a number of equipment and operations at oil and gas facilities. 40 CFR part 60 subpart OOOO. In 2016, the EPA promulgated this Rule, which expanded the existing NSPS by requiring methane reductions from previously regulated sources and limiting methane and VOCs from other types of new oil and gas facilities never before regulated under Section 111.

Several state and industry petitioners challenged this Rule in the U.S. Court of Appeals for the District of Columbia alleging, *inter alia*, that EPA acted arbitrarily and capriciously, and in excess of statutory authority. *See, e.g., West Virginia* v. *EPA,* 16–1264, State Petitioners' Nonbinding Statement of the Issues to be Raised. These cases have been consolidated and are pending before the court. Many of these parties also submitted petitions for reconsideration of this Rule to EPA. The Agency has not yet acted on these petitions.

## II. Initiation of Review of This Rule

On March 28, 2017, President Trump issued an Executive Order establishing a national policy in favor of energy independence, economic growth, and the rule of law. The purpose of that Executive Order is to facilitate the development of U.S. energy resources—including oil and gas—and to reduce unnecessary regulatory burdens associated with the development of those resources. The President has directed agencies to review existing regulations that potentially burden the development of domestic energy resources, and appropriately suspend, revise, or rescind regulations that unduly burden the development of U.S. energy resources beyond what is necessary to protect the public interest or otherwise comply with the law. The Executive Order also directs agencies to take appropriate actions, to the extent permitted by law, to promote clean air and clean water while also respecting the proper roles of Congress and the States. This Executive Order specifically directs EPA to review and, if appropriate, initiate proceedings to suspend, revise or rescind this Rule.

Pursuant to the Executive Order, EPA is initiating its review of this Rule and providing advanced notice of forthcoming rulemaking proceedings consistent with the President's policies. If EPA's review concludes that suspension, revision or rescission of this Rule may be appropriate, EPA's review will be followed by a rulemaking process that will be transparent, follow

proper administrative procedures, include appropriate engagement with the public, employ sound science, and be firmly grounded in the law.

EPA's ability to revisit existing regulations is well-grounded in the law. Specifically, the agency has inherent authority to reconsider past decisions and to rescind or revise a decision to the extent permitted by law when supported by a reasoned explanation. *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ("*Fox*"); *Motor Vehicle Manufacturers Ass'n of the United States, Inc., et al.,* v. *State Farm Mutual Automobile Insurance Co., et al.,* 463 U.S. 29, 42 (1983) ("*State Farm*"). Moreover, the Clean Air Act itself authorizes EPA to reconsider its rulemakings. 42 U.S.C. 7607(b)(1), (d)(7)(B). The Clean Air Act complements the EPA's inherent authority to reconsider prior rulemakings by providing the agency with broad authority to prescribe regulations as necessary. 42 U.S.C. 7601(a). The authority to reconsider prior decisions exists in part because EPA's interpretations of statutes it administers "are not carved in stone" but must be evaluated "on a continuing basis," *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 857–58 (1984). This is true when—as is the case here— review is undertaken "in response to . . . a change in administrations." *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services,* 545 U.S. 967, 981 (2005). Importantly, such a revised decision need not be based upon a change of facts or circumstances. Rather, a revised rulemaking based "on a reevaluation of which policy would be better in light of the facts" is "well within an agency's discretion," and "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *National Ass'n of Home Builders* v. *EPA,* 682 F.3d 1032, 1038 & 1043 (D.C. Cir. 2012) (citing *Fox,* 556 U.S. at 514–15; quoting *State Farm,* 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part)).

In conducting this review, EPA will follow each of the principles and policies set forth in the Executive Order, consistent with the EPA's statutory authority. The Agency will reevaluate whether this Rule or alternative approaches are appropriately grounded in EPA's statutory authority and consistent with the rule of law. The EPA will assess whether this Rule or alternative approaches would appropriately promote cooperative federalism and respect the authority and

powers that are reserved to the States. EPA will also examine whether this Rule or alternative approaches effect the Administration's dual goals of protecting public health and welfare while also supporting economic growth and job creation. EPA will review whether this Rule or alternative approaches appropriately maintain the diversity of reliable energy resources and encourage the production of domestic energy sources to achieve energy independence and security.

Additionally, EPA will assess this Rule and alternative approaches to determine whether they will provide benefits that substantially exceed their costs. In taking any actions subsequent to this review, EPA will use its appropriated funds and agency resources wisely by firmly grounding in the statute its actions to protect public health and welfare.

Dated: March 28, 2017.

E. Scott Pruitt,

*Administrator.*

[FR Doc. 2017–06658 Filed 4–3–17; 8:45 am]

BILLING CODE 6560–50–P

---

# DEPARTMENT OF VETERANS AFFAIRS

**48 CFR Parts 816, 828 and 852**

**RIN 2900–AP82**

## Revise and Streamline VA Acquisition Regulation To Adhere to Federal Acquisition Regulation Principles (VAAR Case 2014–V002—Parts 816, 828)

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule; correction.

---

**SUMMARY:** The Department of Veterans Affairs (VA) is correcting a proposed rule regarding Federal Acquisition Regulation Principles. This correction addresses minor technical errors in the proposed rule.

**DATES:** April 4, 2017. The comments due date remains May 12, 2017.

**ADDRESSES:** Written comments may be submitted through *www.Regulations.gov;* by mail or hand-delivery to the Director, Regulation Policy and Management (00REG), Department of Veterans Affairs, 810 Vermont Avenue NW., Room 1068, Washington, DC 20420; or by fax to (202) 273–9026. Comments should indicate that they are submitted in response to "RIN 2900–AP82–Revise and Streamline VA Acquisition Regulation to Adhere to Federal Acquisition Regulation Principles." Copies of comments received will be

**Estimate of Time needed to promulgate EG without ICR** (February 3, 2020)

| | **27.5 MONTHS TOTAL** |
|---|---|
| **Step 1:** Identify and evaluate available data and information in order to determine whether to issue an information collection request (ICR)<br>- Identify available data (e.g., internal and external sources)<br>- Procure access to external data sources as needed<br>- Evaluate whether data is usable<br>- Identify and evaluate potential data and knowledge gaps | 3 months |
| ~~ESTIMATE OF TIME NEEDED TO DEVELOP PROPOSED AND FINAL RULE~~ | ~~24.5 MONTHS TO DEVELOP PROPOSED AND FINAL RULE~~ |
| **Step 2:**<br>a. Evaluate information for purposes of developing the proposed guidelines (e.g., establish inventory of potential affected facilities and their baseline emissions, identify available control technologies, their cost, and if technologies are widely available)<br>b. Establish a federal docket[+] and convene an Agency workgroup<br>c. Conduct preliminary evaluation for small business impacts* | 2 months |
| **Step 3:**<br>- Identify technical and policy decisions that must be made by the Administrator (e.g., scope of regulation, technical feasibility, policy approaches, economic impact considerations, legal considerations)<br>- Draft outlines for the preamble, technical support document,[+] regulatory impact analysis,* and ICR (recordkeeping/reporting) supporting statement.*<br>- Begin processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.*<br>- Determine if small businesses will be affected and begin RFA/ SBREFA process including the multi-step screening analysis.* | 2 months |
| **Step 4:**<br>- Identify regulatory and policy options (including preliminary national-level impacts) for the Administrator<br>- In-depth drafting of preamble, regulatory text, technical support document (and other supporting documents as needed),[+] regulatory impact analysis,* and ICR supporting statement*<br>- Continue processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.*<br>- Continue small business review, including the multi-step regulatory flexibility analysis and small entity outreach.* | 3 months |
| **Step 5:**<br>- Submit regulatory package to formal internal Agency review<br>- Prepare package for OMB submittal and routing<br>- Complete processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.* | 1 month |

PLAINTIFF'S EXHIBIT 49

**Estimate of Time needed to promulgate EG without ICR** (February 3, 2020)

| | |
|---|---|
| -   Complete proposal phase of small business review* | |
| **Step 6:** OMB review (EO 12866 allows OMB up to 90 days to review significant rules)* and interagency review+ | 90 days* |
| **Step 7:**<br>-   Administrator signature+<br>-   Docketing+<br>-   Federal Register publication+ | 1 month |
| **Step 8:** Public comment period and public hearing if requested+ | 60 days (at least 30 days for public comment, and docket shall be kept open for another 30 days after a hearing)+ |
| **Step 9:** Summarize comments for purposes of drafting Response to Comments Document;+ begin evaluating comments | 2 months |
| **Step 10:**<br>-   Continue evaluating comments and information received<br>-   Identify technical and policy decisions that must be made by Administrator<br>-   Identify regulatory and policy options for Administrator decision<br>-   Update regulatory impact analysis* and ICR supporting statement*<br>-   Draft preamble and final regulatory text, technical support document, and other supporting documents as needed+<br>-   Complete processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.*<br>-   Complete small business review*<br>-   Submit regulatory package to formal internal Agency review<br>-   Prepare package for OMB submittal and routing<br>-   Draft responses for Response to Comments Document+ | 5 months |
| **Step 11:** OMB review (EO 12866 allows OMB up to 90 days review significant rules)* and interagency review+ | 90 days* |
| **Step 12:**<br>-   Administrator signature+ | 2 weeks |
| **Step 13:**<br>-   Docketing+ and Federal Register publication+ | |

Notes:

+ Action is required by CAA section 307(d).

* Other Statutory requirements and Executive Order reviews include:
- Executive Order 12866: Regulatory Planning and Review
- Executive Order 13563: Improving Regulation and Regulatory Review
- Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs

2

**Estimate of Time needed to promulgate EG without ICR** (February 3, 2020)

- Paperwork Reduction Act
- Regulatory Flexibility Act
- Unfunded Mandates Reform Act
- Executive Order 13132: Federalism
- Executive Order 13175: Consultation and Coordination with Indian Tribal Governments
- Executive Order 13045: Protection of Children from Environmental Health & Safety Risks
- Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use
- National Technology Transfer and Advancement Act
- Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations
- Congressional Review Act

**Estimate of Time needed to promulgate EG with ICR** (February 3, 2020)

*TIER 1's [handwritten]*
*ECON. SIG. /NOVEL [handwritten]*

| | 44.5 MONTHS TOTAL |
|---|---|
| **Step 1:** Identify and evaluate available data and information in order to determine whether to issue an information collection request (ICR)<br>- Identify available data (e.g., internal and external sources)<br>- Procure access to external data sources as needed<br>- Evaluate whether data is usable<br>- Identify and evaluate potential data and knowledge gaps<br>~~EPA doesn't have legal authority~~ | 3 months |
| ~~[redacted]~~ | 41.5 MONTHS TO DEVELOP AND ISSUE CLEAN PROPOSED AND FINAL RULE |
| **Step 2:** Assess information needs, then prepare and publish the first draft of an ICR* | 2 months |
| **Step 3:** Required public comment period* | 60-day comment period* |
| **Step 4:** Review comments received; revise and publish a second draft of an ICR* | 2 months |
| **Step 5:** Required comment period* | 30-day comment period* |
| **Step 6:** Consider the comments received and submit the final ICR to OMB for approval* | 2 months |
| **Step 7:** Assuming OMB approval, mail the OMB approved ICR to owners and operators in the oil and gas sector | 1 month |
| **Step 8:** Timeframe for ICR recipients to submit requested information (assuming no deadline extension for submitting requested information and receipt of all requested information) | 6 months |
| **Step 9:**<br>a. Evaluate information for purposes of developing the proposed guidelines (e.g., establish inventory of potential affected facilities and their baseline emissions, identify available control technologies, their cost, and if technologies are widely available)<br>b. Establish a federal docket+ and convene an Agency workgroup<br>c. Conduct preliminary evaluation for small business impacts* 14 | <u>3 months</u><br>• ↑ data [handwritten]<br>• follow up w/ respondts [handwritten]<br>• analyses [handwritten] |
| **Step 10:**<br>- Identify technical and policy decisions that must be made by the Administrator (e.g., scope of regulation, technical feasibility, policy approaches, economic impact considerations, legal considerations)<br>- Draft outlines for the preamble, technical support document,+ regulatory impact analysis,*1. and ICR (recordkeeping/reporting) supporting statement.*4<br>- Begin processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.*7,12,9,6<br>- Determine if small businesses will be affected and begin RFA/ SBREFA process including the multi-step screening analysis.* 14 | 2 months |

*EARLY GUIDANCE [handwritten, left margin]*

1

PLAINTIFF'S EXHIBIT
50
tabbies

**Estimate of Time needed to promulgate EG with ICR** (February 3, 2020)

| | |
|---|---|
| **Step 11:**<br>- Identify regulatory and policy options (including preliminary national-level impacts) for the Administrator<br>- In-depth drafting of preamble, regulatory text, technical support document (and other supporting documents as needed),[+] regulatory impact analysis,[*1] and ICR supporting statement [*+]<br>- Continue processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc. [*] 7,12,9,6<br>- Continue small business review, including the multi-step regulatory flexibility analysis and small entity outreach. [*] 14 | 3 months |
| **Step 12:**<br>- Submit regulatory package to formal internal Agency review<br>- Prepare package for OMB submittal and routing<br>- Complete processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.[*] 7,12,9,6<br>- Complete proposal phase of small business review [*] 14 | 1 month |
| **Step 13:** OMB review (EO 12866 allows OMB up to 90 days to review significant rules)[*1] and interagency review[+] | 90 days[*1] |
| **Step 14:**<br>- Administrator signature[+]<br>- Docketing[+]<br>- Federal Register publication[+] | 1 month |
| **Step 15:** Public comment period and public hearing if requested[+] | 60 days (at least 30 days for public comment, and docket shall be kept open for another 30 days after a hearing)[+] |
| **Step 16:** Summarize comments for purposes of drafting Response to Comments Document;[+] begin evaluating comments | 2 months |
| **Step 17:**<br>- Continue evaluation of comments and information received<br>- Identify technical and policy decisions that must be made by Administrator<br>- Identify regulatory and policy options for Administrator decision<br>- Update regulatory impact analysis[*1] and ICR supporting statement[*+]<br>- Draft preamble and prepare final regulatory text, technical support document, and other supporting documents as needed[+]<br>- Complete processes for assessing federalism, environmental justice, childrens health, unfunded mandates, etc.[*]<br>- Complete small business review[*]<br>- Submit regulatory package to formal internal Agency review<br>- Prepare package for OMB submittal and routing | 5 months |

**Estimate of Time needed to promulgate EG with ICR** (February 3, 2020)

| | |
|---|---|
| -    Draft responses for Response to Comments Document[+] | |
| **Step 18:** OMB review (EO 12866 allows OMB up to 90 days to review significant rules)* and interagency review[+] | 90 days* |
| **Step 19:**<br>-    Administrator signature[+] | 2 weeks |
| **Step 20:**<br>-    Docketing[+] and Federal Register publication[+] | |

Notes:

[+] Action is required by CAA section 307(d).   +  40 CFR 60.22a

*Other Statutory requirements and Executive Order reviews include:

1. Executive Order 12866: Regulatory Planning and Review
2. Executive Order 13563: Improving Regulation and Regulatory Review
3. Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs
4. Paperwork Reduction Act
5. Regulatory Flexibility Act
6. Unfunded Mandates Reform Act
7. Executive Order 13132: Federalism
8. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments
9. Executive Order 13045: Protection of Children from Environmental Health & Safety Risks
10. Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use
11. National Technology Transfer and Advancement Act
12. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations
13. Congressional Review Act
14. Small Business Regulatory Enforcement and Fairness Act (SBREFA)

## AUTHENTICATION BY SIGNATURE

I, the undersigned, do hereby certify by my signature hereunder that I have read the foregoing deposition of testimony given by me on February 11, 2020, and find said transcription to be a true and accurate record, as corrected.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on MARCH 19, 2020.

Paul Gunning

Sworn to and subscribed before me this _____day

of _____, 20__ __.

_____
Notary Public

My commission expires _____.

| ERRATA | | | ERRATA |
|---|---|---|---|

| DEPOSITION/TESTIMONY OF: | PAUL MATTHEW GUNNING |
|---|---|
| IN THE MATTER OF: | STATE OF NEW YORK, et. al., PLANTIFFS, V. U.S. EPA, et. al. DEFENDANTS |

| DOCKET NO.: | 18-CV-0773 | TAKEN ON: | FEBRUARY 11, 2020 |
|---|---|---|---|

**INSTRUCTIONS:**
1. Review the transcript for any corrections.  Please make NO marks on the transcript itself.
2. On this form only, at places you feel ought to be looked at: List page number, line number, proposed alternative version and reason for change.
3. Sign the signature page before a notary public and have the page notarized.
4. Return the notarized signature page and completed errata sheets to the designated officer.

| PAGE # | LINE # | CHANGE | REASON |
|---|---|---|---|
| 1 | | Full name for depsition should be PAUL MATTHEW GUNNING ~ | Add middle name |
| 24 | 14 | OLES - should be oil and natural gas sector | transcription error |
| 27 | 13 | "I" should be "it" | " " |
| 27 | 20 | "the" should be "that" | " " |
| 33 | 13 | add period after 1993 | " " |
| 38 | 18 | Agency should be Agency's | " " |
| 46 | 1 | "stacks" should be "stages" | " " |
| 58 | 17 | "proceed" should be "resume" | " " |
| 59 | 4 | "EGRIP" should be "e-GGRT" | " " |
| 59 | 6 | "reannounced cash" should be "greenhouse gas" | " " |
| 59 | 12 | should be "we have addressed that | " " |
| | 13 | through that platform allready | |
| 59 | 14 | should be "interest and questions" | " " |
| 65 | 3 | "NOAR" should be "in OAR" | " " |
| 66 | 3 | delete "on" | " " |

| PAGE # | LINE # | CHANGE | REASON |
|---|---|---|---|
| 66 | 20 | delete "as" | transcription errors |
| 71 | 10 | "OEQPS" should be "OAQPS" | " " |
| 71 | 15 | " " " " " | " " |
| 72 | 2 | "ERIC" should be "e-GGRT" | " " |
| 79 | 13 | "ATI" should be "ICR" | " " |
| 80 | 1 | "state" should be "provide" | " " |
| 93 | 15 | Change to "Division DIRECTOR FOR THE Sector Policy and Programs DIVISION IN OAQPS" | " " |
| 92 | 21 | delete "as Administrator" | " " |
| 96 | 12 | "patrol" should be "withdrawal" | " " |
| 96 | 13 | "OAGPS" should be "OAQPS" | " " |
| 96 | 16 | " " " " " | " " |
| 98 | 10 | "FRDs" should be "FRN" | " " |
| 126 | 20 | "interior role" should be "Interior rule" | " " |
| 129 | 12 | "the head acting" should be "the acting head" | " " |
| 137 | 6 | "management" should be "among" | " " |
| 142 | 4 | "identification" should be "independence" | " " |
| 144 | 11 | delete "actually" | " " |
| 167 | 2 | "Kocci" should be "Kocchi" | " " |
| 177 | 1 | "OAG" should be "OGC" | " " |
| 234 | 4 | "SPJ" should be "NSPS" | " " |
| | | | |
| | | | |
| | | | |