# Exhibit 12

Deposition of David Cozzie (Feb. 25, 2020)
(excerpts and selected exhibits)

Plaintiffs' Motion For Summary Judgment

STATE OF NEW YORK, *et al.*, and ENVIRONMENTAL DEFENSE FUND
v.
ANDREW WHEELER, *et al.*
Civil Action No. 18-cv-0773 (RBW)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
No. 18-cv-0773

_____
                                        )
STATE OF NEW YORK, et al.,              )
                                        )
            Plaintiffs,                 )        **COPY**
                                        )
ENVIRONMENTAL DEFENSE FUND,             )
                                        )
            Plaintiff-Intervenor,       )
                                        )
vs.                                     )
                                        )
U.S. ENVIRONMENTAL PROTECTION           )
AGENCY, et al.,                         )
                                        )
            Defendants.                 )
_____)

DEPOSITION

OF

DAVID COZZIE


Taken by Plaintiffs
Raleigh, North Carolina
February 25, 2020
9:05 a.m.



Page 2

                    A P P E A R A N C E S

   On behalf of the Plaintiffs:

          MORGAN A. COSTELLO, ESQ.
          State of New York
          Office of the Attorney General
          The Capitol
          Albany, New York  12224
          (518) 776-2392
          Morgan.costello@ag.ny.gov

          MELISSA A. HOFFER, ESQ.
          MEGAN M. HERZOG, ESQ.
          The Commonwealth of Massachusetts
          Office of the Attorney General
          100 Cambridge Street, 10th Floor
          Boston, Massachusetts  02108
          (617) 963-2674
          Melissa.hoffer@state.ma.us
          Megan.herzog@mass.gov

          DANIEL M. LUCAS, ESQ.
          State of California
          Office of the Attorney General
          300 South Spring Street, Suite 1702
          Los Angeles, California  90013
          (213) 269-6345
          Daniel.lucas@doj.ca.gov

   On behalf of the Plaintiff-Intervenor:

          SUSANNAH LANDES WEAVER, ESQ.
          Donahue, Goldberg & Weaver, LLP
          1008 Pennsylvania Avenue SE
          Washington, DC  20003
          (202) 569-3818
          Susannah@donahuegoldberg.com

Page 3

On behalf of the Defendants:

      HEATHER E. GANGE, ESQ.
      United States Department of Justice
      Post Office Box 7611
      Washington, DC  20044
      (202) 514-4206
      Heather.gange@usdoj.gov


Also present:

      Amy Branning, EPA


      Deposition of DAVID COZZIE, taken by the Plaintiffs, at the North Carolina Department of Justice, 114 West Edenton Street, Raleigh, North Carolina, on the 25th day of February, 2020, at 9:05 a.m., before Joann Bunze, RPR, Stenographic Reporter and Notary Public.

David Cozzie                    2/25/2020                    18-cv-0773

Page 14

1    going to ask you a couple of questions about your

2    current role at EPA.  I'm gonna save a couple for the

3    end of the day today, but I just thought we could get

4    started with a few easy, hopefully routine questions.

5           So to get us started, is your current title

6    still the group leader for the fuels and incineration

7    group?

8           A.    No, it is not.

9           Q.    Okay.  What is your current title?

10          A.    I'm the acting associate director of the

11   sector policies and programs division.

12          Q.    Okay.  And what are your responsibilities in

13   that new role as the sector director?

14          A.    I help the -- assist the division director in

15   carrying out all the activities across the division of

16   the sector -- across the sector policy and programs

17   division, which is a division focused on developing

18   regulations under the Clean Air Act, Sections 112, 111,

19   and 129.

20          Q.    Okay.  So that's been pretty slow lately,

21   huh?

22          Was your prior title group leader for fuels

23   and incineration group?

24          A.    Not immediately prior.

25          Q.    Okay.  What was your immediately prior title?

David Cozzie                    2/25/2020                    18-cv-0773

Page 15

1          A.      I was the acting division director for the

2     sector policy and programs division.

3          Q.      Okay.   During the period when you were

4     working on the 2016 new source performance standard and

5     the associated information collection request, or ICR,

6     what was your title?

7          A.      I was the group leader for the fuels and

8     incineration group.

9          Q.      Okay.   Was that group sort of nested within

10    the office of air quality planning and standards?

11         A.      Yes.

12         Q.      Okay.   And what were your specific

13    responsibilities when you were the group leader for the

14    fuels and incineration group?

15         A.      As the group leader for the fuels and

16    incineration group, I was responsible for a range of

17    regulatory activities related to Sections 111, Sections

18    112, and Sections 129 of the Clean Air Act.

19         Q.      Okay.   Okay.   What are the responsibilities

20    of the office of air quality planning and standards?

21         A.      The office of air quality -- can you repeat

22    that question?

23         Q.      What are the -- what does that office, the

24    office of air quality planning and standards, what is

25    sort of its jurisdiction within EPA; what does it do?

David Cozzie                    2/25/2020                    18-cv-0773

Page 16

1      A.      The office of air quality planning and

2   standards implements several aspects of the Clean Air

3   Act, including Sections 108, 110.  It also includes

4   modeling efforts under other divisions, as well as the

5   various implementations of Sections 111, 112, and 129,

6   as I mentioned earlier.  And there is additional

7   outreach -- an outreach division as well that works

8   with tribes and other stakeholders.

9      Q.      Okay.  So the -- was the fuels and

10  incineration group, when you were leading it, was it

11  the group that was primarily responsible for developing

12  the 2016 new source performance standard for methane?

13     A.      Yes; that is correct.

14     Q.      Okay.  Was the fuels and incineration group

15  also primarily responsible for the 2016 information

16  collection request, which I may at times refer to as

17  capital I, capital C, capital R, IRC?

18     A.      No.

19     Q.      Which group was primarily responsible for the

20  ICR?

21     A.      The refining and chemicals group.

22     Q.      Okay.  And who led the refining and chemicals

23  group?

24     A.      Penny Lassiter.

25     Q.      What was your role with regard to the ICR?

David Cozzie                    2/25/2020                    18-cv-0773

Page 21

1          Is EPA otherwise aware of data, or studies,

2    or research documenting adverse health effects of

3    people living near sources of those air pollutants in

4    any of those three segments?

5               MS. GANGE:  I'll just note here that

6          Mr. Cozzie is appearing as a fact witness.  He's

7          not a 30(b)(6) witness.  I understand you may be

8          asking generally by framing your questions with --

9               MS. HOFFER:  Please don't instruct the

10         witness how to --

11              MS. GANGE:  He can only speak with

12         respect to his own personal knowledge.

13         Q.    You can answer the question.

14         A.    Can you repeat the question, please?

15         Q.    Sure.  Are you or others at EPA aware of

16    instances, independent of comments, when people living

17    in close proximity to oil and gas sources, in either

18    the production, processing, transmission or storage

19    segments, have become ill as a result of exposure to

20    pollutants from those sources?

21              MS. GANGE:  If you know.

22              THE WITNESS:  So yes, through studies.

23    I have seen studies that have suggested that.

24         Q.    And hazardous air pollutants often contain

25    carcinogens; is that right?

David Cozzie                    2/25/2020                    18-cv-0773

Page 22

1       A.      Some hazardous air pollutants are also
2  carcinogens.
3       Q.      And VOCs can form in the presence of
4  sunlight, ozone, which causes respiratory impairments?
5       A.      Yes.
6       Q.      Thank you.
7               Are you or others at EPA aware of instances
8  in which workers working at oil and gas facilities have
9  experienced adverse health effects as a result of
10 exposure to hazardous air pollutants, VOCs, or methane
11 pollution from sources in any of those three segments?
12 So this is for workers, not people living near them.
13      A.      Oh.  Yes, I'm aware of some of those
14 articles.
15      Q.      Could you describe what some of those health
16 effects were that you became aware of from reading
17 those news articles?
18      A.      The one I read about was someone on a storage
19 tank without -- operating without protective equipment
20 fell ill and died.
21      Q.      Have you worked on other Section 111
22 rulemakings during your tenure at EPA?
23      A.      Yes.
24      Q.      Okay.  What were those?
25      A.      Municipal solid waste landfills.

David Cozzie                    2/25/2020                    18-cv-0773

Page 23

1      Q.      Any others?

2      A.      Pardon, did you say worked on?

3      Q.      Yeah.   Other 111(d) rulemakings that you've

4   worked on.

5      A.      No.  Municipal solid waste landfills.

6      Q.      Okay.  Can you recall any circumstance in

7   which the agency has issued a 111(b), as in boy, rule,

8   and then did not issue the existing source guideline,

9   also known as the 111(d), as in dog, rule until a year

10  or more later?

11     A.      No.  No.

12     Q.      It's the -- could you explain what your

13  experience has been before with the issuance of 111(b)

14  and 111(d) rules pursuant to Section 111?  In terms of

15  the -- let me give you an easier question.  That was a

16  terrible question.

17            In terms of the timeline for 111(b), as in

18  boy, and (d), as in dog, are those rules typically

19  issued close in time together?

20     A.      My experience has been, with the landfills

21  where we amended, both the 111(b) and the 111(d)

22  proposed and finalized at the same time; and the oil

23  and gas, which we proposed the 111(b), but did not

24  propose the 111(d) at the same time.

25     Q.      Okay.  So for your experience with landfills,

David Cozzie                    2/25/2020                    18-cv-0773

Page 30

1    that's all.

2         Q.    Is there a difference in the control

3    technology that is used with a reciprocating compressor

4    that reduces methane more than a VOC control would?

5         A.    No.

6         Q.    So what would the direct benefit be of

7    regulating methane emissions from a reciprocating

8    compressor?

9         A.    I don't believe there was -- I don't believe

10   there would be.

11        Q.    Okay.  So upon reflection --

12        A.    Upon reflection, yes, I don't think there is

13   a difference.

14        Q.    Okay.  So I'm gonna ask you just to focus now

15   on two segments.  So just thinking about production and

16   processing, not thinking about transmission and

17   storage.  So these next questions are focused just on

18   production and processing segment, okay?

19             Is it accurate to say that methane and VOCs

20   have identical emissions profiles in the production and

21   processing segment?

22        A.    I need more clarity on that question.

23             (Pause.)

24        Q.    What is an emissions profile, Mr. Cozzie?

25        A.    That is -- emission profile is the rate at

David Cozzie                2/25/2020                18-cv-0773

Page 31

1    which something emits a -- emits whatever you're

2    measuring.

3         Q.    So the rate of emissions for CH4, methane,

4    and for VOC, are those the same when they are coming

5    from sources in the production and processing segments?

6         A.    So the -- I guess I'm looking for clarity on

7    the question as to their total profile or their

8    individual profiles?

9         Q.    Let's take a specific example.  That might be

10   a little easier.

11        A.    Okay.

12        Q.    All right.  Before I -- before I present you

13   with a specific example, I'm gonna ask you another

14   question.

15             Is it true that identical source control

16   technologies are used for VOC and methane emissions

17   from sources in the production and processing segments?

18        A.    Yes.

19        Q.    And is it true that, where VOC controls are

20   in place for production and processing segment sources,

21   direct methane regulation of those sources yields no

22   additional emissions reduction benefit?

23        A.    Yes.

24        Q.    Okay.  So let's take a specific example.

25   Let's assume pneumatic controllers at natural gas

David Cozzie                    2/25/2020                    18-cv-0773

Page 32

1    processing plants, okay?

2             So those are regulated for VOCs in 2012,

3    correct?

4         A.    Yes.

5         Q.    Okay.  When those emit VOCs and methane, do

6    they have the same emission profile?

7         A.    At that site for that -- for that component,

8    to the extent the gas produced at that site is

9    consistent, they would have the same VO -- VOC and

10   methane emission, basically, content across VOCs versus

11   methane.

12        Q.    Okay.  So when EPA announced the rule

13   rescinding methane regulation of sources within the

14   production and processing segment, and it says that the

15   sources within the production and processing segment

16   have identical emissions profiles, EPA is indeed

17   correct about that?

18             MS. GANGE:  Before you answer that, you

19        need to be sure that you agree she's properly

20        characterized that document.  And I would ask that

21        you show him that before you ask him questions

22        about specific terms.  But if you don't recall the

23        specific wording of that, you should be clear.

24             THE WITNESS:  Yeah, I don't recall that.

25        Q.    Okay.  If you don't recall, what we are gonna

David Cozzie                    2/25/2020                    18-cv-0773

Page 33

1    do is we're gonna make a copy of this for you at lunch

2    that you could actually read, because if I put it in

3    front of you, you will strain, as I did last night, to

4    read it.

5                Now, it's true that the 2016 methane new

6    source performance standard didn't impose any

7    additional control measures on pneumatic controllers,

8    right?

9          A.    Correct.

10         Q.    Okay.  And would you agree that, for the oil

11   and gas sources regulated for VOCs, just for VOCs in

12   2012 and 2016, direct methane regulation is entirely

13   redundant?

14         A.    For pneumatic controllers?

15         Q.    No.  I'm talking about all of them in the

16   production and processing segments.  So I will ask the

17   question again so it's clear.

18               Would you agree that for oil and gas sources

19   in the production and processing segments that were

20   regulated for VOCs in 2012 and 2016, direct methane

21   regulation is entirely redundant?

22         A.    Yes.

23         Q.    And the addition of direct methane regulation

24   results in no further emissions reductions, correct,

25   for those sources that were already regulated for VOC

David Cozzie                    2/25/2020                    18-cv-0773

Page 34

1    in 2012 and 2016?

2          A.     Yes.

3          Q.     In your view, does direct methane regulation

4    result in any additional monitoring obligation and what

5    would be in place if it were purely VOC regulation, or

6    what is in place with purely VOC regulation?

7          A.     (No response.)

8          Q.     In other words, do you have to do anything

9    different if you are a regulated source to monitor for

10   methane?

11         A.     I don't think so.

12         Q.     Is there any data gathering that would cease

13   to occur if you're regulating only for VOCs and no

14   longer for methane?

15         A.     Could you be a little more precise in your

16   question?

17         Q.     Sure, is there any data gathering that a

18   source would have to undertake, as part of their

19   monitoring reporting efforts, if they were regulated

20   for methane and VOC that they would not have to

21   undertake if they were regulated only for VOC?

22         A.     (No response.)

23         Q.     In other words, does direct methane

24   regulation impose any additional data gathering

25   obligation on a source?

David Cozzie                    2/25/2020                    18-cv-0773

Page 35

1        A.      I don't know.

2        Q.      Okay.   So no -- I just want to confirm your

3    answer so we are on the same page.

4            The direct methane regulation of oil and gas

5    sources within the production and processing segment

6    imposes no additional monitoring requirement?

7                    MS. GANGE:   Objection.   He just

8        testified he does not know.

9                    THE WITNESS:   I said I don't know.   I

10       said I don't know.

11       Q.      No.   I'm asking about monitoring, not data

12   gathering.

13       A.      Oh, oh.   Can you continue with the question

14   again?

15       Q.      Sure.   So when we were talking about direct

16   methane regulation of oil and gas sources that are in

17   the production and processing segment, is there an

18   independent monitoring obligation that would not be

19   present if only VOC regulation were in place?

20       A.      No.

21       Q.      Okay.   Thank you.   It will get easier going

22   forward.

23           Does direct methane regulation make it any

24   easier to enforce compliance?

25       A.      I don't know.

David Cozzie                    2/25/2020                    18-cv-0773

                                                              Page 36

 1          Q.      Okay.   Does VOC-only regulation slow or
 2   frustrate, in your view, the development of alternative
 3   means of emission limitation?
 4          A.      Could you be a little more precise with that
 5   question?
 6          Q.      Do you know what alternative emission
 7   limitations are?   Sometimes referred to as AMELS,
 8   A-M-E-L-S.
 9          A.      Yes, I do.
10          Q.      Okay.   So if you were just regulating for
11   VOCs and no longer doing direct methane regulation, in
12   your view, would that frustrate the development of
13   AMELS for methane?
14          A.      No.
15          Q.      And why is that?
16          A.      Back that question up with some
17   clarification, because, in the absence of methane,
18   people would be developing AMELS to address the VOC,
19   which would include using methane as a surrogate for
20   that.   So that's why I don't believe it would frustrate
21   it.
22          Q.      Fair enough.
23              If direct methane regulation is completely
24   redundant -- and I think you have established that in
25   your responses -- how might it also impose a further

Page 37

1    burden on regulated industry?

2        A.    I don't know.

3        Q.    Would it?

4        A.    I don't know.

5        Q.    Is there any recordkeeping obligation that --

6    in fact, there would be fewer recordkeeping

7    obligations; is that correct, if you removed direct

8    methane regulation, leave VOC-only regulation in place?

9        A.    I don't recall the recordkeeping

10   requirements.

11       Q.    But sitting here today, can you think of a

12   single possible additional burden on industry with a

13   view that direct methane regulation is entirely

14   redundant of VOC regulation?

15            MS. GANGE:   Could you repeat that

16       question?

17            THE WITNESS:   Yes.

18       Q.    I think you understand the question.

19            MS. GANGE:   I --

20            THE WITNESS:   Please repeat the

21       question.

22       Q.    So you're sitting here today.   Is it true --

23   is it your sworn testimony that, even though you have

24   testified that direct methane regulation is completely

25   redundant of VOC regulation, that it is also a burden

David Cozzie                    2/25/2020                    18-cv-0773

Page 38

1   on industry?

2               MS. GANGE:  I am going to object to that

3       as mischaracterizing former testimony.

4       Q.    If direct methane regulation is entirely

5   redundant of VOC regulation, does direct methane

6   regulation impose a burden on regulated industry?

7               MS. GANGE:  Just make sure when you

8       answer that that you're sure where --

9               MS. HOFFER:  I'm gonna ask you to stop

10      coaching the witness, Heather.  Under the rules,

11      you know that you are not permitted to do that.

12      You are not permitted to instruct the witness.

13      Thank you.

14              THE WITNESS:  I don't know.

15      Q.    So --

16      A.    I don't know the burden -- what additional

17  burden it would be on industry.

18      Q.    If you don't know what the additional burden

19  on industry would be, do you still believe that there

20  would be one, you just don't know what it is?

21      A.    I don't know what it would be.  I don't know

22  what it is -- what that burden is.

23      Q.    Okay.  So you can't think of what a burden on

24  industry would be of entirely redundant direct methane

25  emissions regulations; is that correct?

Page 39

1          MS. GANGE:  Objection, mischaracterizes

2     former testimony.  He has not previously testified

3     that it is entirely --

4          MR. LUCAS:  Counsel, please limit your

5     objections to an appropriate form, which is stating

6     the objection, not coaching the witness.

7          MS. GANGE:  I believe I have properly

8     stated an objection, and if you have an issue with

9     that, that could be easily addressed by simply

10    asking the witness that underlying question so that

11    you can get clarity and move on.

12          MR. LUCAS:  Anything beyond "objection,

13    misstates prior testimony" is more than is needed

14    and more than is permitted under the federal rules.

15          THE WITNESS:  Can we go back to that

16    question?

17    Q.    Yeah.  I was just trying to get at here, with

18    direct methane emissions regulation -- and let's just,

19    for clarity purposes, you have testified -- and let me

20    know if I got this wrong -- that there are no

21    additional emissions reductions benefits associated

22    with direct methane emissions over and above what you

23    would get with just VOC regulation, right?

24    A.    In the rule as constructed today.

25    Q.    In the rule as constructed today what?  Could

David Cozzie                2/25/2020                18-cv-0773

Page 40

1    you just finish your sentence, just so we are really
2    clear?
3         A.    I assume we are talking about the rule.
4         Q.    That's right.
5         A.    Okay.  That's all I wanted -- that's all I
6    was trying to clarify, that we were talking about the
7    rule.
8         Q.    Yeah.
9         A.    Okay.
10        Q.    So the direct methane regulation in the 2016
11   methane NSPS afforded no additional emissions
12   reductions benefits than the 2012 or 2016 VOC emissions
13   controls requirements did, correct?
14        A.    Correct.
15        Q.    Thank you.  Okay.
16              So in that way, those requirements are
17   redundant, right?  You get the same thing with a VOC
18   regulation from 2012 and 2016 that you get from the
19   methane regulation; it doesn't do anything different,
20   same control technologies; is that right?
21        A.    Yes.
22        Q.    Okay.  So my question to you was, if the 2016
23   methane NSPS is redundant of the requirements to reduce
24   emissions that were in place as a result of the 2012
25   and 2016 rules, was there additional burden on industry

David Cozzie                    2/25/2020                    18-cv-0773

Page 41

1    resulting from the direct methane regulation?

2         A.    Not that I'm aware of.

3         Q.    Okay.  So if direct regulation of methane for

4    new, modified, and reconstructed oil and gas sources

5    results in no additional emissions reductions, why did

6    EPA do it?

7         A.    (Pause.)

8               MS. GANGE:  We have been sitting here a

9         long time.  Either you know or you don't.

10              MS. HOFFER:  Heather.

11              THE WITNESS:  I just -- there -- I mean,

12        I don't recall all the reasons for why it was done.

13        There was certainly interest in greenhouse gas

14        regulation at the time among the agency.

15        Q.    But as I understand your testimony, direct

16   regulation of methane from new, modified, and

17   reconstructed sources actually doesn't get you any

18   decreased greenhouse gas emissions reductions than you

19   would have had from the VOC regulation in 2012 and

20   2016, correct?

21        A.    That is correct.

22        Q.    Okay.  So why did EPA pursue direct methane

23   regulation in 2016?

24        A.    And as I had said, there was a myriad of

25   reasons, and I don't recall all of them, but there was

David Cozzie                    2/25/2020                    18-cv-0773

Page 64

1        A.      I would read it to be as quickly as possible,

2     fast.

3        Q.      Was -- I'm sorry.  Go ahead.

4        A.      I just said fast.

5        Q.      Fast.

6                Were you or others in your group instructed

7     to prioritize work on developing existing source

8     guidelines?

9        A.      At that time, we were finishing the new

10    source performance standard in my group.

11       Q.      And the new source performance standard is

12    the first step required to regulate existing sources;

13    is that right?

14       A.      That is correct.

15       Q.      Was anyone -- do you recall anyone at EPA

16    ever instructing you to, you know, put this on a fast

17    track or prioritize it for your group?

18       A.      I don't recall.

19       Q.      Okay.  Was there any other work that you were

20    responsible for, in addition to the consult on the ICR,

21    to help advance existing source guidelines?

22       A.      No.  Not that I recall.

23       Q.      Okay.  All right.  I'm gonna show you the

24    next exhibit.  This is Plaintiff's Exhibit DC-11.

25                      (Plaintiff's Exhibit No. DC-11 marked

David Cozzie                    2/25/2020                    18-cv-0773

Page 79

1          A.      I don't recall on this.  I don't recall on

2     how we did it in this action.

3          Q.      Okay.  How did you determine -- or your

4     group -- you and your team determine that the methane

5     control technologies were readily available?

6          A.      So we had information that we gathered from

7     the white papers you spoke about earlier, as well as we

8     had information from some of our other offices that

9     look at -- they looked at methane, greenhouse gas

10    reporting rule in particular, as information on

11    technologies that people use, and there is also a

12    natural gas star program that talks about technologies

13    that are out there.  And so all those were considered

14    in -- in the types of technologies that could be used.

15         Q.      Okay.  Thank you.  Are those -- the

16    technologies that were identified for the 2016 new

17    source performance standard, are they still

18    cost-effective today?

19         A.      I haven't looked at that information

20    recently, so I --

21         Q.      Are you aware of any information, as you sit

22    here today, that would lead you to believe that they

23    are no longer cost-effective?

24         A.      No.

25         Q.      Are the control technologies still readily

David Cozzie                    2/25/2020                    18-cv-0773

Page 80

1    available?

2         A.    Yes.

3         Q.    Okay.  Do you recall offhand what the

4    estimate of the amount of money that the natural gas

5    industry would save, sort of in the aggregate, as a

6    result of capturing methane that otherwise would have

7    been lost to the atmosphere?

8         A.    I do not recall.

9         Q.    Okay.  But there was some savings that you

10   anticipated industry would --

11        A.    I don't recall if there was a cost savings or

12   if there was a cost.

13        Q.    Are you familiar with the principal of lost

14   and unaccounted for gas?

15        A.    (No response.)

16        Q.    Actually used in utility ratemaking?

17        A.    Yes.  Yes, I am familiar with it.  I looked

18   at some a little bit.

19        Q.    I'm sorry.  I had to look at it too.

20              So, you know, in that process, there is

21   usually, like, a number associated with the cost,

22   because the ratepayers pick that up.

23        A.    Uh-huh.

24        Q.    So I was wondering, could a similar analysis

25   be used to demonstrate, if that was captured and not

David Cozzie                    2/25/2020                    18-cv-0773

Page 86

1    in the bottom right-hand corner, 0835582.   Yeah.   All

2    right.

3              So if you come all the way down, you see

4    there is a subsection titled "other background"?

5        A.    Uh-huh.

6        Q.    And there are two bullet points there.   The

7    first says, "U.S. oil production is at the highest

8    level in nearly 30 years."   And the second one says,

9    "The U.S. is now the largest natural gas producer in

10   the world."

11             Do you see that?

12       A.    Yes, I do.

13       Q.    Okay.   Was that true as of December 2016 as

14   well?   So this document, just to remind you, was

15   prepared December 5th; so was that a true statement at

16   that time?

17       A.    I would have to say yes.

18       Q.    Okay.   So at the time you-all are working on

19   the 2016 new source performance standard that's being

20   developed -- then it takes effect in June of 2016, this

21   is prepared in December of 2016 -- oil and gas industry

22   is still booming, right?

23       A.    Yes.

24       Q.    Okay.   To your knowledge, Mr. Cozzie, did the

25   2016 new source performance standard have any adverse

David Cozzie                    2/25/2020                    18-cv-0773

Page 87

1    effect on the U.S. domestic oil and gas production, and

2    by "effect," I mean economic effect?

3            A.     Not that I'm aware of.

4            Q.     And today the industry is continuing to

5    produce record amounts of domestic oil and gas; is that

6    right?

7            A.     From the newspapers, yes.

8            Q.     Okay.   The 2016 new source rule identified --

9    EPA identified the best system of emission reduction,

10   which I think we may refer to at times as capital B,

11   capital S, capital E, capital R.

12           The BSER for reciprocating compressors was

13   the regular replacement of rod packing; do you remember

14   that?

15           A.     Yes, I do.

16           Q.     Okay.   Could the regular replacement of rod

17   packing also be used to reduce methane emissions from

18   existing reciprocating compressors?

19           A.     Yes.

20           Q.     For fugitive emissions from well sites and

21   compressor stations, EPA identified the BSER as

22   monitoring and leak detection; is that right?

23           A.     Yes.

24           Q.     Would it be possible for monitoring and leak

25   detection to be used to limit fugitive emissions from

Page 88

1    existing well sites and compressor stations?

2         A.    Yes.

3         Q.    Is it true that monitoring and leak detection

4    could be used to limit methane emissions from equipment

5    leaks from existing sources at natural gas processing

6    plants?

7         A.    Yes.

8         Q.    The source category subject to the 2016 new

9    source rule included three segments that we were

10   talking about earlier; there was production,

11   processing, transmission and storage; that's right?

12        A.    Yes.

13        Q.    Okay.  And in the new source rule, EPA found

14   that, of those three segments, the transmission and

15   storage segment was the second largest in terms of

16   total methane emissions; is that true?

17        A.    I don't recall.

18        Q.    Okay.  Is --

19              MR. LUCAS:  Melissa, just for the

20        clarity of the record, since we are talking about

21        three segments.

22              MS. HOFFER:  Yeah.

23              MR. LUCAS:  So just -- I want to

24        identify that segment 1 is production, segment 2 is

25        processing, and segment 3 actually has two

David Cozzie                    2/25/2020                    18-cv-0773

Page  134

1          A.     I don't recall.

2          Q.     We'll come back to some more of that a little

3     bit later.

4               Do you know when EPA began receiving

5     responses to the information collection request?

6          A.     I don't recall the exact date.  I don't

7     recall the date.

8          Q.     Just to the best of your recollection, a

9     general time?

10         A.     A general time frame was mid-December.

11         Q.     Mid-December, okay.

12              Did you perceive that the ICR process ran

13    smoothly from that point when EPA first began receiving

14    responses?

15         A.     No.

16         Q.     No.   How would you characterize problems in

17    the process?

18         A.     We received lots of calls from people

19    confused and unable -- not sure how to respond to the

20    survey request.

21         Q.     Could you be more specific?  What kind of

22    problems did callers raise?

23         A.     People didn't understand what was being asked

24    of them and why they needed to respond to the

25    government.

David Cozzie                    2/25/2020                    18-cv-0773

Page 135

1    Q.    So how would you describe the general level

2    of cooperation by recipients of the ICR?

3    A.    There were a lot of angry people.

4    Q.    And how did EPA respond to these angry people

5    and folks expressing confusion about the ICR process?

6    A.    We set up a hotline to help people respond

7    to -- have people that could answer the phones and

8    respond to their requests, and walk them through the

9    survey, and try to help them understand what they

10   needed to do and the information they needed to

11   provide.

12   Q.    Is it fair to say that EPA worked pretty

13   diligently to respond to requests and help recipients

14   of the ICR through the confusion that they faced?

15   A.    Yes.   That's fair to say.

16   Q.    I am gonna show you a document now marked for

17   identification as DC Exhibit 25.

18                    (Plaintiff's Exhibit No. DC-25 marked

19                    for identification.)

20   Q.    This is a January 11, 2017, email chain

21   copying you, and it relates to questions that EPA

22   received regarding potential financial penalties for

23   failing to respond to the ICR; is that correct?

24   A.    (Witness peruses document.)

25                    MS. GANGE:   Okay.   Before we go any

David Cozzie                          2/25/2020                          18-cv-0773

Page 143

1      incineration group is a group within that division.

2          Q.    Okay.   Did you provide input to this

3      document?

4          A.    I can't recall.

5          Q.    Do you know if this information was ever

6      conveyed to the incoming administration?

7          A.    No, I have no idea.

8          Q.    Did you ever receive any questions about the

9      information from the incoming administration?

10         A.    I don't recall.

11         Q.    Do you recall if anyone on your team received

12     questions from the incoming administration about this

13     information?

14         A.    No, I don't recall.

15         Q.    Do you recall what work was done at EPA to

16     compile the information that went into this document?

17         A.    I'm not even sure what the document is.

18         Q.    That's fair.   Did you expect that the ICR

19     work would continue under the new administration?

20         A.    We expect -- I expected that, at some point,

21     there would not be -- continue to pursue the ICR.

22         Q.    Why did you expect that?

23         A.    Because of the incoming administration's

24     interest in promoting the development of fossil fuels.

25         Q.    And did you think that at this point in time,

David Cozzie                       2/25/2020                       18-cv-0773

Page 146

1   "Approximately 4,500 part 1 responses were received."

2           Does that seem accurate?

3       A.    I would have to go by what's written there,

4   yes.  I would say yes.

5       Q.    Do you have any reason to dispute the numbers

6   here?

7       A.    No.

8       Q.    Okay.  It also says that 4,175 part 2 surveys

9   were sent?

10      A.    Again, I have no reason to dispute the

11  numbers.

12      Q.    Okay.  And six responses were received to the

13  part 2 survey; does that seem accurate?

14      A.    Again, I have no basis for refuting or -- I

15  have no other knowledge.

16      Q.    Okay.  Based on the numbers described here in

17  this email, prior to the withdrawal of the ICR, about

18  one third of the total part 1 survey recipients had

19  responded; is that correct?

20      A.    Yes.

21      Q.    Okay.  Showing you a copy now of a document

22  marked for identification as DC Exhibit 30.

23              (Plaintiff's Exhibit No. DC-30 marked

24               for identification.)

25      Q.    This is the draft text of an award

David Cozzie                    2/25/2020                    18-cv-0773

Page 147

1    nomination, and I will give you a moment to look it

2    over, and then I will ask you a few questions on it.

3         A.    (Witness peruses document.)

4              Okay.

5         Q.    Okay.  Draw your attention to the last

6    paragraph on the first page.  This is page number

7    37871.

8         A.    Uh-huh.

9         Q.    And it's discussing the work of the oil and

10   gas customer service team.  It says that:

11              "The team fielded 2,100 calls over four

12              months, issued no-further-action letters for

13              200" -- excuse me, "for over 230 callers, and

14              provided sufficient guidance to 1,400

15              callers, such that granting an extension to

16              respond would be sufficient for them to

17              complete the ICR."

18              Is that correct?

19        A.    Yeah.  That sounds -- that sounds accurate.

20        Q.    Does this seem to you like an accurate

21   summary of the customer service team's work?

22        A.    (Witness peruses document.)

23              I mean, I think that's just -- I'm not sure

24   about your question there.

25        Q.    Just wondering if this description is an

David Cozzie                    2/25/2020                    18-cv-0773

Page 148

1    accurate reflection of the work that the customer

2    service team did?

3         A.    (No response.)

4         Q.    So, in general, fielding many calls, issuing

5    no-action letters, and providing guidance to callers?

6         A.    Oh, yeah, that's the focus.

7         Q.    Okay.  It seems to me like this reflects a

8    lot of work on behalf of the oil and gas customer

9    service team.

10              Does it seem to you like there was a lot of

11   work that went into this effort to respond to callers

12   and help recipients through the ICR process?

13        A.    Yes.

14        Q.    Okay.  Do you know about how many staff

15   served on the customer review team?

16        A.    I don't know the number.  It was probably

17   larger than the number listed on this piece.

18        Q.    More people probably than reflected here?

19        A.    Uh-huh.

20        Q.    Maybe on a scale of dozens of people, more,

21   less?

22        A.    I don't recall.  I don't recall the numbers.

23        Q.    Okay.  Did you review any of the responses to

24   the ICR?

25        A.    No, I did not.

David Cozzie                    2/25/2020                    18-cv-0773

Page 153

1      Q.    Okay.  And what would the next step be after

2  doing that systematic input of the data?

3      A.    Well, look and determine whether there was --

4  well, I don't -- we didn't receive all the data, so

5  it's hard to tell what happened next.  I can't judge

6  that.

7      Q.    Okay.  Was it your expectation that that

8  would be the next step?

9      A.    That what would be the next step?

10     Q.    The systematic evaluation of the responses

11  including inputting the data and then analyzing the

12  content of the data?

13     A.    Yeah.  That's the process we followed in

14  regulatory, collect data.

15     Q.    Were any efforts made to begin using the data

16  submitted in response to the ICR for the purpose of

17  developing existing source guidelines?

18     A.    No, not that I'm aware of.

19     Q.    Okay.  Is EPA currently using the ICR

20  response data for any purpose?

21     A.    Not that I'm aware of.

22     Q.    Do you anticipate that EPA might use the ICR

23  response data for any purpose in the future?

24     A.    I don't know.

25     Q.    Do you have any ideas about types of uses

David Cozzie                    2/25/2020                    18-cv-0773

Page 156

1      A.      No.

2      Q.      Okay.  I'm gonna show you a document now

3   marked for identification as DC Exhibit 32.

4                    (Plaintiff's Exhibit No. DC-32 marked

5                     for identification.)

6      Q.      This is a February 28, 2017, email from

7   Alison Davis to you, and it attaches a draft press

8   release, and I will give you a moment to look that

9   over.

10     A.      (Witness peruses document.)

11             Okay.

12     Q.      Is it fair to say that, as of the time you

13  received this email, that you were aware that EPA

14  intended to withdraw the ICR?

15     A.      Yes.

16     Q.      And I want to draw your attention to the

17  first sentence of the draft press release.  The

18  bracketed language at the beginning says, in brackets,

19  "Placeholder for message language about why canceling";

20  is that correct?

21     A.      That is what it says.

22     Q.      What did you understand that to mean?

23     A.      That that would be -- the language hadn't

24  been drafted.  It's still the language from -- it was a

25  press release, and the press people typically stick in

David Cozzie                    2/25/2020                    18-cv-0773

Page 157

language on those, on the press releases.

Q.    In your experience, is it typical for a draft press release to have a placeholder for the rationale for EPA's action?

A.    Typically, no.

Q.    At this point in time, as of the time that you received this draft press release, did you know why EPA was canceling the ICR?

A.    I don't recall.  I don't recall.

Q.    Okay.  Do you recall when you learned EPA's reasons for canceling the ICR?

A.    No, I don't.

Q.    Is it correct that, by this date in February of 2017, that EPA had decided to withdraw the ICR but had not yet determined what the basis for that action was?

A.    I don't know.

Q.    Okay.  Was there any point in time when EPA had decided to withdraw the ICR but had not yet determined what the basis for the action was?

A.    I don't know.

Q.    Okay.  Generally speaking, what options are available to EPA should it determine not to go through with an ICR that is already underway?

A.    Could you repeat that question?

David Cozzie                    2/25/2020                    18-cv-0773

Page 158

1      Q.      Sure.   What options are available to EPA

2  should it determine not to proceed with an ICR that is

3  already underway?

4      A.      I don't know all the options.   Certainly one

5  could withdraw the ICR.

6      Q.      Are there any other options you're aware of?

7      A.      No.

8      Q.      Could an ICR be suspended but not withdrawn?

9      A.      Yes, it could.

10     Q.      Okay.   Could compliance dates be extended?

11     A.      What do you mean by "compliance dates"?

12     Q.      Compliance dates for responding to the ICR.

13     A.      Well, I'm not a lawyer, so I don't know what

14  the Paperwork Reduction Act law allows or doesn't

15  allow.

16     Q.      Understood.   But we had already discussed how

17  EPA had been extending some of the deadlines for the

18  responses to the ICR; is that correct?

19     A.      Yes.

20     Q.      Fair to say that EPA could extend the

21  deadlines for other recipients of the ICR?

22     A.      Yes.

23     Q.      Okay.   Did EPA consider any of these options

24  in early 2017, options other than withdrawal of the

25  ICR?

David Cozzie                         2/25/2020                      18-cv-0773

Page 159

1       A.      I don't recall.

2       Q.      Okay.  I'm gonna show you a document marked

3    for identification as DC Exhibit 34.

4                       (Plaintiff's Exhibit No. DC-34 marked

5                       for identification.)

6       Q.      This is a February 22, 2017, email from

7    Alison Davis copying you.

8       A.      (Witness peruses document.)

9               Okay.

10       Q.      Ms. Davis's email refers to a variety of

11    options related to the ICR; is that correct?

12       A.      It says one possibility among a variety.

13       Q.      Correct.  And in a prior email in that chain,

14    Ms. Davis references continued thinking about a variety

15    of options related to the ICR, correct?

16       A.      Yes, it does.

17       Q.      Okay.  What does "a variety of options

18    related to the ICR" mean to you?

19       A.      It means there is various options one could

20    look at.

21       Q.      As of this date, February 22, 2017, was EPA

22    considering a variety of options?

23       A.      I don't recall.

24       Q.      Do you recall what the attached document was?

25       A.      I do not.

David Cozzie                    2/25/2020                    18-cv-0773

                                                          Page 161

1              2016 ICR on March 2, 2017."

2              Is that a true statement?

3       A.     I can't -- I can't.

4              MS. HOFFER:   To the best of his

5       knowledge.

6       Q.     Do you have any reason to contest that

7       statement here?

8       A.     That's what they recall.  I can't -- no.

9       Q.     Okay.  That's fine.

10             Do you know Ms. Dunham?

11      A.     Yes.

12      Q.     Do you know Mr. Tsirigotis?

13      A.     Yes.

14      Q.     And do you know Mr. Gunning?

15      A.     Yes.

16      Q.     In your experience at EPA, is it normal for

17      EPA staff, like Ms. Dunham, Mr. Tsirigotis, and

18      Mr. Gunning, not to be aware of the basis for the

19      pending reversal of a significant agency action until a

20      few days before that action is finalized?

21      A.     That's not typical.

22      Q.     Not typical.  What would be a more typical

23      timeline, in your experience?

24      A.     It depends on -- it's dependent on the

25      process and when things are occurring.

David Cozzie                     2/25/2020                     18-cv-0773

Page 163

1     other types of actions in the past?

2         A.     This is correct.

3         Q.     Okay.  So for a change in policy of this

4     magnitude here, would it be the typical procedure at

5     EPA for staff to prepare analysis to inform

6     decision-makers in advance of a decision being made?

7         A.     Could you repeat that question?

8         Q.     Sure.

9                 MS. HERZOG:  Would you mind reading the

10            question back, please?

11                    (At this time, the requested portion was

12                    read back by the reporter.)

13            THE WITNESS:  Yes.

14        Q.     Okay.

15                MS. GANGE:  We have been at it for a

16            little over an hour now.

17                THE WITNESS:  Yeah.  I could take a

18            break.

19                MS. HOFFER:  You want to take a short

20            break?  That would be fine.

21                    (At this time, a recess was taken from

22                    2:51 p.m. to 2:58 p.m.)

23        Q.     So before we took a break, I was asking you

24     questions about whether staff like Ms. Dunham,

25     Mr. Tsirigotis, and Mr. Gunning would normally be aware

David Cozzie                2/25/2020                18-cv-0773

Page 164

1    in advance of the basis for the pending reversal of an

2    agency action.   So I just wanted to follow up on that a

3    little bit, okay?

4         A.    Okay.

5         Q.    So at the time that the ICR withdrawal was

6    announced in March 2017, Ms. Dunham was the acting

7    assistant administrator of the office of air and

8    radiation.

9              In your experience, would it be typical of

10   someone in that position to know of a change in policy

11   and the basis for that change in policy in advance of

12   the announcement of the policy?

13        A.    Yes.

14        Q.    Would it be normal for someone in that

15   position to be consulted about the change in policy?

16        A.    Yes.

17        Q.    Okay.   And at this time, March 2017,

18   Mr. Gunning was director of the climate change division

19   within the office of atmospheric programs.

20             Would it be normal for someone in that

21   position to be aware of the basis for the pending

22   reversal of an agency action before it is announced?

23        A.    Yes.

24        Q.    Would it be typical for someone in that

25   position to be consulted regarding the change in policy

David Cozzie                    2/25/2020                    18-cv-0773

Page 165

1    in advance?

2         A.    As it relates to ICR, may or may not be.

3         Q.    Okay.  And as of this time, March 2017,

4    Mr. Tsirigotis appears to have had your job, director

5    of SPPD.

6         A.    No.  I'm the associate director.

7         Q.    Excuse me.  Excuse me.

8              MS. HOFFER:  We promoted you.

9              THE WITNESS:  Please don't.

10        Q.    So, in your experience, would someone who has

11   the position of director of SPPD know of the basis for

12   the pending agency action in advance of it being

13   announced?

14        A.    Yes.

15        Q.    And would someone in that position typically

16   be consulted regarding the rationale for an agency

17   action?

18        A.    Yes.

19        Q.    Okay.  I'm gonna show you now a copy of a

20   document marked for identification as DC Exhibit 36.

21              (Plaintiff's Exhibit No. DC-36 marked

22              for identification.)

23              THE WITNESS:  (Witness peruses

24   document.)

25        Q.    This is a February 1, 2017, email from

David Cozzie                    2/25/2020                    18-cv-0773

Page 172

1    information that the agency was collecting?

2         A.    It was -- could you repeat that question?

3         Q.    Sure.  I'm just wondering --

4         A.    I don't have an opinion on his -- what his

5    need is.

6         Q.    Do you see a need for the agency to assess

7    the need for the information that it was collecting

8    through the ICR?

9              MS. GANGE:  What time frame are you

10        referring to in your question?

11             MS. HERZOG:  I'm referring to present

12        time frame.  Thank you for clarifying.

13             THE WITNESS:  So could you repeat that

14        now with the context of the present time frame?

15        Q.    In the context of the present time frame,

16   your current opinion about the need for the agency to

17   assess the need for the information that it was

18   collecting through the ICR.

19        A.    (No response.)

20        Q.    I apologize.  I think I'm phrasing this in a

21   way that's confusing to you, so I'm gonna suggest a

22   different answer.

23        A.    Yes, please, because that's a very --

24        Q.    Do you see a valid need for the agency to

25   assess the need for the information it was collecting

David Cozzie                    2/25/2020                    18-cv-0773

Page 173

1    through the ICR?

2         A.    No.

3         Q.    Can you explain why?

4         A.    Well, we did an assessment for that need for

5    the information when we started the ICR process.  That

6    was part of the initializing the ICR process.

7         Q.    Okay.  So you weren't aware of any change or

8    new information that came to light that would cause the

9    agency to need to reassess its need for the

10   information?

11        A.    As it states here in the second sentence, I

12   believe there is a letter received by the agency from

13   several states.

14        Q.    Were you aware of this letter that the agency

15   received from several states as referenced in this

16   press release?

17        A.    At what point?

18        Q.    At any point prior to March 2, 2017.

19        A.    No.

20        Q.    Did you understand, upon reading this press

21   release, that the letter factored into the agency's

22   decision to reconsider the ICR?

23        A.    Could you repeat that?  Could you repeat that

24   question?

25        Q.    Sure.  Upon reading this press release on

David Cozzie                       2/25/2020                    18-cv-0773

Page 178

1    Q.    Okay.  And he suggests that the ICR
2    withdrawal is something that his team would have liked
3    to have known to avoid embarrassing situations and stay
4    in good communication; is that right?
5    A.    That's what he says, yes.
6    Q.    Do you agree that the ICR withdrawal impacted
7    Mr. Houyoux's work?
8    A.    That's not -- I don't know.
9    Q.    Okay.  What is EPA's typical line of
10   communications among staff regarding major policy
11   decisions?
12   A.    Among staff?  There is -- so, generally, the
13   way communications occur is through the chains of the
14   people that would be involved.  Mark's group, at that
15   point, was not directly involved in the ICR, so -- that
16   I was aware of.
17   Q.    So to clarify, you are saying it would not be
18   typical for someone like Mr. Houyoux to know of this
19   kind of policy decision until the decision is announced
20   publicly?
21   A.    Yes.  Depend -- it depends on the policy and
22   who is affected by it, yes.
23   Q.    Okay.  If EPA staff is to be affected by a
24   significant change in policy, would it be typical for
25   those staff to know of that change in policy in advance

David Cozzie                    2/25/2020                    18-cv-0773

Page 179

1      of it being publicly announced?

2           A.    Yes.

3           Q.    Okay.  In general, what was the manner in

4      which the decision to withdraw the ICR was communicated

5      to EPA staff?

6           A.    I think -- I don't recall, but I think most

7      of it came through the public announcement.

8           Q.    Through the public announcement.

9                 In your experience, is that consistent with

10     EPA's typical practice and routine procedures?

11          A.    No.

12          Q.    This was atypical?

13          A.    Yes.

14          Q.    Okay.  Were you instructed not to discuss the

15     planned ICR withdrawal with Mr. Houyoux?

16          A.    I don't recall.

17          Q.    Do you recall if you were instructed not to

18     discuss the planned ICR withdrawal with any staff?

19          A.    I don't recall.

20          Q.    Are you aware if anyone at EPA was instructed

21     not to discuss the pending ICR withdrawal with other

22     EPA staff?

23          A.    I'm not aware of.

24          Q.    Okay.  Are you familiar with a Federal

25     Register notice withdrawing the ICR?

David Cozzie                    2/25/2020                    18-cv-0773

Page 186

1    was involved in that process?

2         A.    I don't recall being involved in any process.

3         Q.    And you're not aware of the existence of any

4    such process ongoing at EPA?

5         A.    Yes.

6         Q.    Okay.  Yes, you're not aware?

7         A.    Yes, I'm not aware.

8         Q.    I'm sorry.  That was my fault.

9         A.    Yes.

10        Q.    Okay.  I'd like to show you the copy of a

11   document marked as DC Exhibit 66.

12                    (Plaintiff's Exhibit No. DC-66 marked

13                    for identification.)

14        Q.    This is an October 13, 2017, email from

15   Amy Hambrick to you and others.  I will give you a

16   moment to look it over.

17        A.    (Witness peruses document.)

18              Okay.

19        Q.    This email exchange relates to a media

20   inquiry regarding the status of the NSPS and the ICR;

21   is that correct?

22        A.    Yes.

23        Q.    And I'm looking at the very last sentence of

24   Cathy Mills' email in this chain.  It says, "EPA is

25   assessing the need for the information that the agency

David Cozzie                    2/25/2020                    18-cv-0773

Page 187

1    was collecting."

2               Do you see that?

3        A.    Yes.

4        Q.    Okay.  And the date of this email is

5    October 2017, so months after the ICR was withdrawn on

6    March 2017, correct?

7        A.    Yes.

8        Q.    Are you aware of any action that EPA was

9    taking at that time to assess the need for the

10   information the agency was collecting?

11       A.    No.

12       Q.    Is this an accurate statement?

13       A.    For that time or --

14       Q.    For that time, October 2017.

15       A.    No.

16       Q.    Is it accurate today?

17       A.    No.

18       Q.    Okay.  Are you aware that EPA, through

19   counsel in this case, has stated that it did not take

20   the step of assessing the need for the ICR because

21   executive order 13783 was issued, directing EPA to

22   review and potentially rescind the 2016 new source

23   rule?

24       A.    Could you repeat that?

25       Q.    Sure.  I can show you a document that might

David Cozzie                    2/25/2020                    18-cv-0773

Page 231

1       Q.      Correct.

2       A.      -- there is less data and such that we expect

3   in that package.   So there is probably less analytical

4   pieces in that -- there is less analytical pieces in

5   that process that have to be done and through that

6   process.   And there is certain things, like the

7   regulatory flexibility -- the small business piece is

8   not affected by that package.   So I think the -- and I

9   don't recall offhand how many comments we got, but

10  there were significantly fewer comments than we

11  expected for this package.

12      Q.      We had previously discussed earlier today

13  that the responses to the part 2 surveys associated

14  with the ICR were due in May 2017; is that right?

15      A.      I don't recall the date they were due.

16      Q.      Roughly summer 2017?

17      A.      Yes.

18      Q.      So based on both of the timelines that I just

19  showed you, the one that estimates it would take 44 and

20  a half months to promulgate existing source guidelines

21  with an ICR and the timeline that estimated that it

22  would take 27 and a half months to promulgate existing

23  source guidelines without an ICR, is it fair to say

24  that, if the ICR hadn't been withdrawn and EPA had

25  continued to work on existing source guidelines, that

David Cozzie                    2/25/2020                    18-cv-0773

Page 232

1    it would have been able to issue those existing source

2    guidelines by now?

3         A.    I don't know that.  I mean, that would follow

4    that timeline, but I don't know what other things would

5    have occurred in that process, so.

6         Q.    Understood.  I was asking you a hypothetical,

7    but applying these hypothetical timelines based on what

8    we know about the status of the ICR, that's a

9    reasonable projection?

10                   MS. GANGE:  Asked and answered.

11                   THE WITNESS:  Yes.

12        Q.    Has EPA continued to enforce the 2016 new

13    source rule?

14        A.    Yes.

15        Q.    How so?

16        A.    That's not -- that's not in my -- I mean,

17    people are obligated to comply with the standard.  As

18    far as the enforcement of that goes, that would fall

19    into our office of enforcement compliance.

20        Q.    Okay.  Are there records documenting the

21    enforcement that the EPA would have as a matter of

22    course?

23        A.    I don't know.

24        Q.    Do you know who would know?

25        A.    The office of enforcement and compliance or

David Cozzie                    2/25/2020                    18-cv-0773

Page 250

1    methane emissions?

2        A.    I'm aware of the estimates of the U.S.

3    emissions that we actually go through that, yes.

4        Q.    And the relationship between that and global

5    methane emissions?

6        A.    To some degree.  Not that -- not that I can

7    recall right now exactly what it is.

8        Q.    Okay.  I'm looking back at page 1 of the

9    article, the second paragraph, it states that the

10   fossil fuel industry routinely leaks or intentionally

11   releases methane into the air.

12              Do you see that?

13       A.    I do see that.

14       Q.    The ICR data was going to help you understand

15   those emissions; is that correct?

16       A.    Yes.  That would be one area of the ICR --

17   ICR data would help.

18       Q.    And existing source guidelines would have

19   gone a long way towards monitoring and controlling

20   those emissions from existing sources, would you agree?

21       A.    I can't say that, because I don't know what

22   the rule would have looked like.

23       Q.    In general, would regulation of methane

24   emissions from existing sources contribute to resolving

25   this problem?

David Cozzie                         2/25/2020                         18-cv-0773

Page 251

1      A.     Yes, if you are mitigating -- mitigating

2   emissions would reduce the emissions, yes.

3      Q.     Thank you.

4             MS. HOFFER:   No further questions from

5   Massachusetts.

6             MS. COSTELLO:   None from me.

7             MR. LUCAS:   I just have a very few

8   questions.

9                        EXAMINATION

10  BY MR. LUCAS:

11     Q.     And I appreciate your patience.  I know it's

12  been a long day for you.

13            So during your entire tenure at EPA, part of

14  your job involved preparing a variety of different

15  documents; is that correct?

16     A.     Yes.

17     Q.     Could be emails, could be reports, could be

18  letters, could be white papers, just as examples; is

19  that correct?

20     A.     Yes.

21     Q.     Some of those documents that you prepare

22  personally may have your name on them and some may not;

23  is that correct?

24     A.     Yes.

25     Q.     So, for example, an email, your name would



**Exemplary Customer Service Award Nomination**
**Oil and Gas Customer Service Team**

The Oil and Gas Customer Service Team (the Team) is nominated for the Exemplary Customer Service Award for their outstanding leadership, skill and creativity in developing and implementing a customer service phone bank to assist over 15,000 entities responding to an information collection request (ICR) for the oil and gas industry. The team's efforts were critical in providing the oil and gas industry timely assistance in understanding the scope and obligations for the ICR and technical guidance in developing their responses to the request.

The Team demonstrated outstanding leadership and creativity in a very limited time in establishing the customer service team and implementing the customer service phone bank. The Team was formed when a technical lead on the Oil and Gas ICR team started receiving numerous daily calls requesting assistance on the completing the ICR. The Team worked quickly with facilities management to establish a central phone bank and to reprogram phone lines to route these calls to a central phone bank. While establishing the phone bank, the Team undertook several tasks to ensure the phone bank would be successfully implemented. Specifically, the Team developed a protocol for tracking entities that called the phone bank and ensuring that each caller was responded to appropriately, developed a script for EPA staff working on the phone bank to ensure callers' concerns were appropriately addressed, and trained staff on how to work with entities calling the phone bank. In addition, the Team established a protocol for ensuring entities calling the phone bank received written confirmation of issues discussed on phone calls, when appropriate.

As the team and trained staff began to field calls from the respondents to the ICR, the Team sought to continuously improve the quality and efficiency of the effort. For example, the Team leadership held~~p~~ regular morning meetings to identify key issues raised in phone calls, monitor the number of phone calls received, and track written responses to entities that called the phone bank. As a result of this continuous management ~~by the Team~~, the Team developed outreach materials and held webinars to address many of the issues raised in phone calls to the broader group of respondents to the ICR.

As a result of these efforts, the Team staffed~~manned~~ the phone bank from 8 a.m. to 6 p.m. each business day for nearly 4 months and fielded over 2,100 calls. In the course of these calls, the Team was able to adequately address the ICR questions. ~~for the caller and~~ issue a "No Further Action" letter for over 230 callers, and provide sufficient guidance to over 1,400 callers such that granting an extension to respond would be sufficient for the entitiesy to complete the ICR.

**Citation:** For outstanding leadership, skill, and creativity in developing and implementing an exemplary customer service protocol for responding to inquiries from respondents to the Oil and Gas Information Collection Request.

**Team members:** Brenda Shine, Jonathan Witt, Angela Carey, Virginia Hunt, Aimee St. Claire, Voronina McKinney, Jodi Howard, Janice Godfrey, Matt Witosky, Alison Davis, Wanda Pemberton, Tonisha Dawson, John Ashley, John Schaefer, KB Mills, Kevin McGinn, Marguerite McLamb, Michael Benson, and Tegan Lavoie.

**EXHIBIT**

DC **32**

2/25/20 Cozzie

| | |
|---|---|
| **From:** | Davis, Alison </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1C309F42D5D44D18A52B027BD01?ADAVIS06> |
| **To:** | Tsirigotis, Peter; Cozzie, David; Lassiter, Penny; Noonan, Jenny |
| **CC:** | Koerber, Mike |
| **Sent:** | 2/28/2017 11:09:16 AM |
| **Subject:** | Please review by NOON |
| **Importance:** | High |
| **Attachments:** | Oil and Gas Info Request.New Brief.DRAFT.docx |

All -- please review and comment by noon. I also am sending to Derek and Elliott.

USEPA-0055400

INTERNAL DRAFT – PLEASE REVIEW AND COMMENT BY NOON
EPA Withdraws Information Request for the Oil and Gas Industry

03/DATE/2017

Contact Information:
U.S. EPA Media Relations (press@epa.gov)

WASHINGTON – [Placeholder for message language about why cancelling], the Environmental Protection Agency (EPA) is withdrawing a request that thousands of owners and operators in the oil and natural gas industry provide information on existing oil and gas wells and other equipment. The cancellation is effective immediately, relieving thousands of owners and operators of the burden of responding.

The information request, issued under section 114 of the Clean Air Act, is not a regulation and does not require a notice of proposed rulemaking to withdraw.

Under the previous administration, EPA had sent letters to nearly 20,000 owners and operators in the oil and gas industry, requiring them to provide information. Nearly 15,000 of the letters consisted of "operator surveys" asking for basic information on the numbers and types of equipment at onshore oil and gas production facilities in the United States; approximately 4,650 were more detailed "facility surveys" that asked for detailed information on sources of methane emissions and emissions control devices or practices in use by a sampling of oil and natural gas facilities.

EPA is withdrawing both parts of the request. Owners and operators – including those who have received an extension to their due dates for providing the information – are no longer required to respond.

EXHIBIT
66
2/25/20 Louie

| | |
|---|---|
| **From:** | Hambrick, Amy </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=787B0A3376944FCABAED4F01843 AHAMBRIC> |
| **To:** | Mills, Kathy; Cozzie, David; Thompson, Lisa |
| **Sent:** | 10/3/2017 10:57:55 AM |
| **Subject:** | RE: O&G media inquiry |

Looks good, I have no comments.

Amy Hambrick
U.S. Environmental Protection Agency
(919)541-0964

**From:** Mills, Kathy
**Sent:** Tuesday, October 03, 2017 10:55 AM
**To:** Cozzie, David <Cozzie.David@epa.gov>; Thompson, Lisa <Thompson.Lisa@epa.gov>; Hambrick, Amy <Hambrick.Amy@epa.gov>
**Subject:** O&G media inquiry

Reporter: Maya Weber
Oulet: S&P Global Platts
DDL: 11 a.m. today
 I am covering a conference where EPA's methane regulations on the oil and gas sector were discussed. I wanted to check in to be sure I am up to date on what you are doing on the rule affecting new oil and gas sources, as well as the data collection that (under the Obama administration) was laying the groundwork for regulation existing sources of methane in the oil and gas sector.
 It has been a while since I have written about it so I wanted to be sure I was up to date on the latest actions by EPA.

How is this response? (thanks Lisa for your input)

## NSPS
On April 4, 2017, the EPA published an announcement in the Federal Register of its review of the 2016 Oil and Natural Gas NSPS for New, Reconstructed, and Modified Sources. The EPA was directed to review this regulation to ensure the rule promotes clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation.

In an April 18, 2017, letter, the EPA committed to reconsidering several provisions of the 2016 final rule, including fugitive emissions, pneumatic pumps and professional engineer certification requirements from the 2016 rule. On June 16, 2016, the EPA proposed to stay these requirements for 2 years. The agency is currently reviewing the public comments received on these proposals.

## ICR
On March 2, 2017, the EPA withdrew its request that owners and operators in the oil and natural gas industry provide information on equipment and emissions at existing oil and gas operations. The withdrawal was effective immediately, meaning owners and operators are no longer required to respond. EPA is assessing the need for the information that the agency was collecting.

For more information about the EPA's Oil and Gas program, please visit https://www.epa.gov/controlling-

air-pollution-oil-and-natural-gas-industry.

Kathy "KB" Mills
SPPD
U.S. EPA, Office of Air Quality Planning & Standards
919-541-1599

USEPA-0243624

Page 257

1                    S I G N A T U R E

2

3          I, DAVID COZZIE, do hereby state under

4     oath that I have read the above and

5     foregoing deposition in its entirety and

6     that the same is a full, true and correct

7     transcript of my testimony, subject to the

8     attached list of corrections, if any.

9     *Pursuant to 28 USC § 1746, I declare under penalty*

10    *of perjury that the foregoing is true and correct.*

      *Executed March 20, 2020*

11                                          _____

12                              DAVID COZZIE

13

14

15    STATE OF_____

16    COUNTY OF_____

17

18              Sworn to and subscribed before me

19    this_____day of_____, 20_____.

20

21                              _____

22                              Notary Public

23

24    My commission expires:_____

25

David Cozzie                              2/25/2020                              18-cv-0773

Page 258

```
 1              E R R A T A   S H E E T

 2    _____

 3    PAGE          LINE              CORRECTION

 4    137           10        "it somewhat" should be "someone"

 5    142           20        Delete "the" at end of line

 6    143           21        Should be "they would not continue

 7                              to pursue the ICR"

 8    150           18        Should be "Refining and Chemicals"

 9    153           14        "regulatory, collect data" should be

10                            "regulatory work after we collect data"

11    168           4         "Conglomorative" should be

12                            "conglomerate"

13    179           21        "Depend" should be

14                            "Depends"

15    194           15        "and that point" should be

16                            "and at that point"

17    194           17        "there is" should be "there are"

18    197           7         "are gonna" should be "were going to"

19    219           24        delete "done"   moved to
                                              next page  DAC

20

21         I, _DAVID A. COZZIE_, after having

22    read the foregoing transcript of my deposition, wish to

23    make the above corrections.

24         SIGNATURE _____

25    JB        DATE_3/21/2020_____
```