# Exhibit 13

Deposition of Brenda Shine (Feb. 27, 2020)
(excerpts and selected exhibits)

Plaintiffs' Motion For Summary Judgment

STATE OF NEW YORK, *et al.*, and ENVIRONMENTAL DEFENSE FUND
v.
ANDREW WHEELER, *et al.*
Civil Action No. 18-cv-0773 (RBW)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
No. 18-cv-0773

_____
                                  )
STATE OF NEW YORK, et al.,        )
                                  )
          Plaintiffs,             )
                                  )
ENVIRONMENTAL DEFENSE FUND,       )
                                  )        **COPY**
          Plaintiff-Intervenor,   )
                                  )
vs.                               )
                                  )
U.S. ENVIRONMENTAL PROTECTION     )
AGENCY, et al.,                   )
                                  )
          Defendants.             )
_____)


DEPOSITION

OF

BRENDA SHINE


Taken by Plaintiffs
Raleigh, North Carolina
February 27, 2020
8:58 a.m.



Page 2

A P P E A R A N C E S

On behalf of the Plaintiffs:

        MORGAN A. COSTELLO, ESQ.
        State of New York
        Office of the Attorney General
        The Capitol
        Albany, New York  12224
        (518) 776-2392
        Morgan.costello@ag.ny.gov

        DANIEL M. LUCAS, ESQ.
        State of California
        Office of the Attorney General
        300 South Spring Street, Suite 1702
        Los Angeles, California  90013
        (213) 269-6345
        Daniel.lucas@doj.ca.gov


On behalf of the Plaintiff-Intervenor:

        SUSANNAH LANDES WEAVER, ESQ.
        Donahue, Goldberg & Weaver, LLP
        1008 Pennsylvania Avenue SE
        Washington, DC  20003
        (202) 569-3818
        Susannah@donahuegoldberg.com


On behalf of the Defendants:

        HEATHER E. GANGE, ESQ.
        United States Department of Justice
        Post Office Box 7611
        Washington, DC  20044
        (202) 514-4206
        Heather.gange@usdoj.gov


Also present:

        Amy Branning, EPA

Page 3

Deposition of BRENDA SHINE, taken by

the Plaintiffs, at the North Carolina Department of

Justice, 114 West Edenton Street, Raleigh,

North Carolina, on the 27th day of February, 2020, at

8:58 a.m., before Joann Bunze, RPR, Stenographic

Reporter and Notary Public.

Brenda Shine                2/27/2020                18-cv-0773

                                                      Page 20

1     A.     I know what I was doing, but I don't remember

2     too much what everyone else was doing.

3     Q.     Sure.   That's okay.

4            What were you -- what were you primarily

5     working on in the 2016 time frame?

6     A.     So, in the 2016 time frame, I had just -- I

7     had just finished up the petroleum refinery MACT RTR,

8     the risk and technology review, in December of 2015.

9     So, in 2016, I became the lead on developing the oil

10    and gas information collection request.

11    Q.     Great.   And I'm gonna have a lot of questions

12    for you about that in a bit.

13           Was that the first time you worked on oil and

14    gas -- issues related to oil and gas?

15    A.     Yes.

16    Q.     Okay.   And what did you do to get up to speed

17    or learn about the oil and gas industry in 2016?

18    A.     Well, certainly did some literature review.

19    I looked at our national emission inventories.   I

20    looked at the greenhouse gas inventory.   I read what I

21    could that was available about the industry.   Just

22    general, publicly available-type information and

23    datasets that we had available, I reviewed.

24    Q.     Great.   And did you ever visit any oil and

25    gas sites?

Page 30

1    comprehensive information on the oil and gas sector?

2         A.    Well, there were a number of actions going on

3    in that time frame.  There was an NSPS, and I think

4    there was reconsideration on NSPS.  There was this

5    111(d) effort.  And so there were a number of actions

6    going on, and I think the idea was to just collect as

7    comprehensive a dataset as we could from the oil and

8    gas industry, and we thought we might could use that

9    data in a number of ways.  We also -- I believe there

10   was some oil and gas MACT standards that were out as

11   well.  So we were collecting information to address a

12   number of things.

13        Q.    Great.  And would you characterize yourself

14   as sort of the lead on developing the ICR?

15        A.    Yes.

16        Q.    And so what did that -- what did that entail?

17        A.    So I had a project team that I worked with at

18   EPA and also subcontractors that did a lot of the

19   preparation of the ICR, and I provided technical

20   direction to the project team and also the contractors,

21   and it was -- I briefed -- I briefed information up.  I

22   did briefings for upper management on what we're gonna

23   do.  I participated in meetings about the information

24   we were going to collect.  And, you know, just tried to

25   develop this comprehensive survey.

Brenda Shine                2/27/2020                18-cv-0773

Page 31

1    Q.    So you said you had a team.

2          Were those -- was that team composed of

3    people from your group, the refineries and chemicals

4    division?  Or group, sorry.

5    A.    Yeah.  There was one person that was in my

6    group and another person that was not, and they were --

7    they were part of my project team.

8    Q.    So who were the members of your project team?

9    A.    So Eric Goehl was working in our group at the

10   time, and he assisted me.  And I also had Jonathan

11   Witt, who worked in another group, but he had

12   availability, so he got to help.

13   Q.    What group did he work in, Jonathan Witt?

14   A.    He was in the fuels and incineration group.

15   Q.    Okay.

16   A.    And we also had a little bit of help from

17   Angie Carrie, who was actually in the refining and

18   chemicals group as well.  So we had about three people

19   on that team.

20   Q.    You plus three people on that team.

21         And would you say that the four of you spent

22   the bulk of your time in -- you know, from when you

23   started developing it until it went out, working on the

24   ICR?

25   A.    So Jonathan Witt and I did, but Eric kind of

Page 32

1    moved off the team fairly early on, and Angie was more

2    part-time.  But -- so Jonathan and I worked full-time

3    on that for most of the -- most of the year.

4        Q.    And you also mentioned you had contractor

5    help.

6              Can you tell me a little bit about that?

7        A.    Yeah.  We have contractor assistance from

8    Research Triangle Institute, RTI, and so we had a lead

9    at RTI, and he also had a couple of people working with

10   him on the contractor side, so.

11       Q.    And what kinds of functions did the

12   contractors play in the development?

13       A.    So the contractors did a lot of the

14   programming, did some of the writing of the documents.

15   They -- you know, we provide the technical direction,

16   but they pretty much draft the materials, and then we

17   review them, we, you know, approve them.  So -- so they

18   did most of the -- once it was decided sort of the

19   information we were going to collect, they helped us

20   design a survey to collect it.

21       Q.    Okay.  And would you say that they were

22   also -- that your lead there and his -- the people

23   working with him working on this pretty full-time or --

24       A.    Yes.

25       Q.    Okay.

Brenda Shine                     2/27/2020                     18-cv-0773

Page 53

1    head of that group?

2         A.    David Cozzie.

3         Q.    Okay.  Great.  And, in addition to datasets,

4    did you reach out to people out -- and talking to

5    David Cozzie's group -- did you reach out to people

6    outside of the agency to help inform, you know, the

7    development of that first draft of the instrument?

8         A.    Yeah.  We reached out to -- well, there

9    was -- so we reached out to CARB.  We -- because they

10   had a -- we thought they had a good method for

11   sampling.  And we were looking for some methods for the

12   second part of the survey.  We also -- we always talked

13   to the trade associations, you know, just to make sure

14   that, you know, we're -- we understand, you know,

15   what -- you know, we understand, you know, what

16   information they might have.  So we talked with them.

17   We also talked to our regional offices, like our Region

18   8, which is in Colorado.  You know, there was a lot of

19   information.  They had a lot of -- they were doing a

20   lot of work at the time there, so we would have

21   meetings with them, talk about what they thought was

22   important to collect.

23        Q.    And just to be clear, when you say CARB, you

24   mean the California Air Resources Board; is that right?

25        A.    Yes.

Page 54

1    Q.    And did you talk to regulators or people from

2    other states than California?

3    A.    Yeah.  We talked to Pennsylvania.  We talked

4    to states that, you know, had oil and gas activities.

5    Tried to find out what kind of information they had.

6    We -- you know, we -- so Pennsylvania, Ohio, Texas

7    Railroad Commission.  We talked to a lot of people.

8    Q.    Would you say the outreach was pretty

9    extensive?

10   A.    Yeah.  Yeah.

11   Q.    And when you -- you said you talked to the

12   trade groups.

13         Do you recall which trade groups you talked

14   to?

15   A.    I think we talked to the Gas Processors

16   Association, and we -- we definitely talked to the

17   association that was over the oil and gas production,

18   but I can't remember what their -- what the name of

19   their organization was, but we talked to them.

20   Q.    Do you recall meetings with the American

21   Petroleum Institute?

22   A.    I don't recall API.

23   Q.    Okay.

24   A.    Although, I've got to believe that we did

25   talk to API for their upstream.  I'm used to talking to

Brenda Shine                  2/27/2020                  18-cv-0773

Page 55

1    API for the refineries, but I'm sure we talked to them.

2         Q.    And I don't know if you were just

3    referring -- was it the Independent Petroleum

4    Association of America?

5         A.    That's who we talked to.

6         Q.    Okay.

7         A.    IPAA.   Yeah, we talked to them.   We also

8    talked to individual companies too.

9         Q.    Do you remember any of the individual

10   companies that you talked to?

11        A.    No.   I mean, I remember there were some, but

12   I can't tell you who and what the names of the

13   companies were right now.

14        Q.    Okay.   And what was the goal or the hope for

15   doing this extensive outreach?

16        A.    Well, we wanted to make sure that, you know,

17   we were collecting the right information, and that

18   that -- that what we were collecting made sense, was

19   reasonable.

20        Q.    I am going to mark as Exhibit BS-4.

21              (Plaintiff's Exhibit No. BS-4 marked for

22              identification.)

23              THE WITNESS:   Ah, Region 8.

24              (Witness peruses document.)

25              Okay.

Page 66

1    list of invitees?

2         A.    This would have been, looks like trade

3    associations, and individual companies that were

4    stakeholders, and also their counsel.

5         Q.    And it says -- you know, it says:

6               "We will -- we will discuss why we're

7               conducting the ICR, what type of information

8               we will collect from the oil and gas

9               industry, the steps of the ICR process, and

10              the schedule."

11              Is that the information you think would --

12   you would have been conveying in, sort of, this time

13   frame to stakeholders?

14        A.    Yes.

15        Q.    Okay.  And how did you -- when you were

16   putting together the ICR, how did you go about figuring

17   out where to mail it to?

18        A.    So we accessed a commercially available

19   database that pulled -- that tried to pull data from a

20   number of different places.  It was a commercial

21   product, it was called Drillinginfo, and they had a

22   mailing list.  So we started with that mailing list.

23        Q.    And that's where you got the 15,000 or so

24   addresses?

25        A.    Yes.

Page 67

1    Q.    Okay.  Do you -- in general, that commercial

2    database, I guess it had mailing addresses.

3          What other kinds of information could you get

4    from it?

5    A.    There was some information on wells.  I

6    recall there were, you know, wells.  There may have

7    been a description of what type of wells, oil or gas, a

8    little bit of both.  Maybe some location information.

9    I don't -- I don't recall the rest, but I think that's

10   what it was.  And owners and operators.

11   Q.    Like the names -- names of owners and

12   operators?

13   A.    That's right.

14   Q.    Okay.  And you had said it was Drillinginfo;

15   is that correct?

16   A.    Yes.

17   Q.    And did you use that Drillinginfo data for

18   anything beyond the mailing addresses in the ICR

19   process?

20   A.    We may have used it to get a sense of how

21   many -- how many wells there were and how many people

22   we might have had to mail this to, yeah.

23   Q.    Okay.  So you testified that there were two

24   rounds of what I guess I will call notice and comment

25   on the ICR.

Brenda Shine                    2/27/2020                    18-cv-0773

Page 68

1          Do you recall how many comments were coming

2    in on each version?

3        A.     No.

4        Q.     Do you have any sense of whether it was,

5    like, 50, or 500, or 5,000, any --

6        A.     Would have been closer to 50, but a lot of

7    times the comments are submit- -- you know, one comment

8    letter might have a lot of comments in it, but it might

9    be sent by one company, for example.  Individual

10   comments, I couldn't tell you, but probably closer to

11   50, you know, substantive comment letters than 500.

12       Q.     Okay.  And were you involved in reviewing

13   those comments?

14       A.     Yes.

15       Q.     What -- what was your -- your and your team's

16   procedure for reviewing comments?

17       A.     So the first thing you have to do is really

18   you have to -- because they are written sort of in a

19   narrative a lot of times, you have to kind of pull,

20   excerpt the exact -- what was the actual comment in

21   between all the other words on the page.  So you try to

22   identify each comment, each substantive comment about

23   the ICR, and we would typically tabulate that, and we

24   would organize it according to, you know, what bin that

25   comment might be.  One might be about, you know, you

Page 69

1    shouldn't ask for information on this piece of

2    equipment.  One might be about component counts that we

3    were looking at.  So we try to organize those comments

4    to see how many were common.  We could just kind of

5    summarize.  And we would basically go down the list and

6    talk about each one, and talk about, you know, whether

7    it made sense, and whether we should try to address it,

8    whether we thought we had a better -- whether we

9    thought our response might be different, and so we

10   would try to, sort of, you know, see what we thought

11   about those comments.  And then we would then probably,

12   you know, kind of summarize what we heard, and then lay

13   out some options for how we would decide whether we

14   were going to revise the instrument based on that.

15   Typically bring that up to your management say, "Here's

16   what we heard, and, you know, here's what we think

17   about what we heard, and here's what we think we ought

18   to do."  There might be a couple of options.  We would

19   say, "We could do one, two, or three.  What do you want

20   to do?"  That's typically how we would respond to the

21   comments.

22        Q.    And this was you and the, sort of, two or

23   three team members that you had talked about earlier

24   who would be reviewing these comments?

25        A.    Primarily, but if it was a comment that we

Brenda Shine                    2/27/2020                    18-cv-0773

Page 70

```
1    really needed some help with, we might reach out to
2    somebody that could explain it or could shed some light
3    on it.  So it was mostly us, but where we needed to,
4    you know, seek additional information, we did.
5         Q.    And do you remember who you sought additional
6    information from?
7         A.    Well, for example, we might ask Cindy Beeler,
8    "Hey, is this really true?  Does this really make
9    sense," for example, but I don't recall.  I don't
10   recall, you know, distinct conversations.
11        Q.    And did the contractor you had referred to,
12   RTI, assist with the comment review?
13        A.    Yes.  They might have helped actually excerpt
14   and tabulate the comments, yes.
15        Q.    Were there any -- were there any -- was there
16   anything that surprised you from the comments?
17        A.    I don't recall.
18        Q.    Yeah.  And as you reviewed the comments and
19   talked to stakeholders, how did the ICR change from the
20   first draft?
21        A.    I don't remember --
22        Q.    All right.
23        A.    -- really.
24        Q.    I think I have another exhibit later that
25   might help with that as well.
```

Page 81

1    Q.    And was that the only testing mandated by the

2    ICR, or was there other testing?

3    A.    I can't remember, but I know that was

4    testing, but I can't remember what other testing we

5    might have required.

6    Q.    Okay.  And, essentially, is the goal of that

7    testing to understand, like, how much is getting

8    released into the air; how much gas, how much methane?

9    A.    Yeah.  I mean, it could be released into the

10   air, or it could be captured, but yeah.

11   Q.    Okay.  Okay.  So I think this is gonna be

12   very consistent with what you said, in terms of data

13   gaps.  Mr. Gunning had -- had mentioned that some of

14   the things that the agency was looking to understand

15   were the potential sources that could be affected by

16   the rule, how many of them there were, their location,

17   mitigation technologies and practices and costs, and a

18   better characterization of the nature of the equipment,

19   like the age and the turnover.

20         Is that, kind of, consistent with your

21   understanding of what some of the data gaps that the

22   agency was looking to fill?

23   A.    Yeah.  I think those are some of them.

24   Q.    Okay.  Not necessarily all?

25   A.    Right.

Page 82

1    Q.    Yeah.  So can you explain why the existing

2    sources, like the Drillinginfo that you mentioned, the

3    greenhouse gas inventory, weren't sufficient to

4    identify the number and location of sources?

5    A.    Well, I mean, it was a starting point to

6    identify the number of sources and the locations.

7    Q.    Uh-huh.

8    A.    So it might have been okay for the number --

9    Q.    Uh-huh.

10   A.    -- but, I mean, it was a database that was

11   cobbled from other databases, and the time frame was

12   not the same.  When we take a survey, we want to take a

13   snapshot, connect the dots at the same time frame.  So

14   there could have been more wells, there could have been

15   less wells, some could have been abandoned.

16   Q.    Is this an industry where that could change a

17   lot over time, you think, the number and location of

18   sources?

19   A.    I think -- I think the wells, themselves,

20   change over time.

21   Q.    Uh-huh.

22   A.    I recall that the wells can stop producing as

23   much over time.

24   Q.    Uh-huh.  So, as of 2016, do you think the

25   agency had a decent handle on, sort of, the number of

Brenda Shine                    2/27/2020                    18-cv-0773

Page 83

1    sources out there, or not so good of a handle?

2        A.    Well, maybe not the emission sources.   Maybe

3    there was -- you know, we definitely had a listing of

4    wells, but we didn't have any information on anything

5    else.

6        Q.    Okay.

7        A.    No tank information.   Those are emission

8    sources, right?   No compressors, things like that.   How

9    many tanks would you have at a well site, for example.

10   We had no information on that.

11       Q.    Okay.   So just to make sure I'm

12   understanding, you said we had a list of wells, so some

13   sense of how many wells, but with respect to the

14   individual sources, like tanks, the agency didn't have

15   a good handle on how many of those there were or where

16   they were located; is that fair?

17       A.    Well, right.   It was -- so equipment

18   associated with those wells --

19       Q.    Yeah.

20       A.    -- we didn't have.

21       Q.    Okay.

22       A.    Yeah.

23       Q.    And do you know if the agency's information

24   on that has gotten any better since 2016?

25       A.    I don't know.

Brenda Shine                    2/27/2020                    18-cv-0773

Page 84

1      Q.      Okay.   Do you have any reason to think that
2   it either has or has not?
3      A.      I really don't know.
4      Q.      Okay.   Do you think that, if the agency was
5   trying to get a better handle on those questions, that
6   you would be somebody who would be consulted?
7      A.      I might be consulted about doing another ICR.
8      Q.      Uh-huh.
9      A.      But I don't know about, you know -- no, I
10  don't know about -- I don't know that I would be
11  consulted about, sort of, what I know about the
12  industry.
13     Q.      Sure.
14     A.      Yeah.
15     Q.      Okay.   Do you think that, at the agency, you
16  are one of the people most knowledgeable about kind of
17  the sources and equipment and kind of the data on that
18  question?
19     A.      I do not think I am.
20     Q.      No?
21     A.      No.
22     Q.      Okay.   Who do you think is likely sort of
23  more knowledgeable on those questions?
24     A.      I would think people in our office of
25  atmospheric programs office, you know, that manage the

Brenda Shine                    2/27/2020                    18-cv-0773

Page 85

1    greenhouse gas inventory and reporting rule, and I

2    think probably people that are working on the standards

3    probably knew more about -- know more about it than I

4    do.

5         Q.    Okay.  And just going to that first category,

6    the office of atmospheric programs, do you think that

7    they would likely have knowledge -- we looked at things

8    earlier that said that most of these sources are below

9    the reporting threshold.

10             Do you know if they are looking at sources

11   below the reporting threshold?

12        A.    I don't know.

13        Q.    Okay.  Another thing Mr. Gunning had

14   mentioned was the age and turnover.

15             Are those things that you were looking at

16   through the ICR?

17        A.    Yeah.  Age, definitely.  I'm not sure what he

18   meant by turnover, but.

19        Q.    Okay.

20        A.    Yeah, age of the wells --

21        Q.    Okay.

22        A.    -- is important.

23        Q.    What is your best estimate of what "turnover"

24   means?

25        A.    I don't -- I don't know.

Page 86

1      Q.    Okay.  All right.  So I guess one -- one

2   thing, were you -- in the ICR, were you looking to

3   understand kind of how quickly sources either go out of

4   commission or modify and thus become new sources?

5      A.    I don't think I understand your question.

6      Q.    Okay.  Well, let me try that again.

7      A.    Sorry.

8      Q.    So at least my understanding, which is

9   imperfect, is that you have -- you have your new source

10  performance standards, and then you have your existing

11  source guidelines, and the new sources -- and I think

12  we will have some exhibits on this later -- the new

13  sources start with a date, and kind of any source

14  that's new after that or modifies, and the existing

15  sources is everything else.

16     A.    Uh-huh.

17     Q.    So I guess one question is, were you looking

18  at -- was the ICR looking to see how often -- what --

19  an existing source modified, and so it would be covered

20  by a new source standard?

21     A.    I don't know.  I don't remember that.

22     Q.    Okay.  Or how -- or how often a source would

23  just, you know, sort of shut down and therefore not be

24  a source anymore; were you looking at that?

25     A.    We were looking at -- we were asking

Brenda Shine                     2/27/2020                     18-cv-0773

Page 87

1   questions about age of wells, because there was -- we

2   understood there to be a correlation between the age of

3   a well and the production of a well.

4       Q.    And what was that general correlation?

5       A.    So there is a term called a stripper well,

6   and that's what the industry used to describe a well

7   that didn't produce a whole lot.  And, typically, those

8   were wells that have been around for a long time.

9       Q.    Uh-huh.

10      A.    Or that, you know, after a while stopped

11  producing as much gas.  Kind of didn't produce as much.

12  So we were trying to understand if -- that correlation.

13  So we were collecting enough -- hopefully collecting

14  enough information to look at the production and the

15  age of those wells.

16      Q.    And would you also have looked at how that

17  affected the emissions?

18      A.    Well, it was inherent, you know, if you

19  produce less, you have less to lose, but at the same

20  time, some of these wells that were producing not very

21  much, they probably didn't have a whole lot of

22  controls, you know.  There is no incentive to really

23  take good care of those wells, I don't think.

24      Q.    So am I understanding, you know, there is

25  something of a correlation, if you are producing less,

Brenda Shine                    2/27/2020                    18-cv-0773

                                                            Page 88

1    you are going to be emitting less, but that could be

2    disturbed by just not keeping up the equipment?

3         A.    Yeah.  I don't know.  Yeah.

4         Q.    Okay.  Was that something that the ICR was

5    looking to get a better understanding of?

6         A.    The maintenance of the wells?

7         Q.    Or just the correlation between a well that's

8    producing less and its emissions.

9         A.    I think we wanted to understand that, yeah.

10        Q.    Okay.  And, you know, in the 2016 time frame,

11   the agency finalized the new source performance

12   standards.

13              Were you aware of any conversations about

14   whether those standards could be applied to existing

15   sources?

16        A.    Not specific conversations, no.

17        Q.    Okay.  Did you -- did you then or now have

18   any reason to think that the new source standards could

19   be applied to existing sources?

20        A.    I'm not that familiar with the new source

21   standards.

22        Q.    Okay.

23        A.    So, yeah.  I don't -- I don't have a great

24   answer on that.

25        Q.    Okay.

Page 98

1  enable us to accurately assess the impacts of proposed

2  and final requirements," I believe you said that, when

3  we are talking about impacts, we are talking about,

4  like, emissions reductions and cost; is that right?  It

5  could be more than that, but those are two of the

6  things?

7       A.   Yes.

8       Q.   And that the ICR would have helped the agency

9  assess the potential emissions reductions and the

10 potential costs from existing source guidelines?

11      A.   Yes.

12      Q.   And if we zero in, in particular, on the

13 emissions reductions part of that, what -- what parts

14 of the ICR would have helped the agency to understand

15 the emissions impacts?

16      A.   Having the ICR would have given us an

17 understanding of the baseline emissions in the

18 industry.

19      Q.   Uh-huh.

20      A.   And, therefore, any requirement that we would

21 apply we could understand what potential reductions

22 could occur from that.

23      Q.   Okay.  So if we had one example, like, say, a

24 storage tank or something, can you explain how the ICR

25 might have helped you establish that baseline?

Brenda Shine                2/27/2020                18-cv-0773

Page 100

1    processing facilities for well sites, distance to

2    gathering lines, pipelines, availability of electricity

3    or generating capacity, information on whether the

4    facilities are manned and how often visited,

5    availability of controls and monitoring equipment.

6              Are those all things that the ICR was geared

7    to collect?

8         A.   Yes.

9         Q.   Okay.  And how might this information have

10   assisted the agency in developing existing source

11   guidelines?

12        A.   Well, so we talked about the first one, the

13   number and type of equipment and activities to help you

14   understand the emissions potential.  Distances and

15   availability of -- or information on whether facilities

16   are manned and how often visited speaks to the

17   feasibility of requirements and the cost of

18   requirements.  Availability of electricity is important

19   because some of the emission sources rely on pneumatic

20   controls instead of electricity, and therefore, those

21   are emission-type sources, so that was important.

22   Availability of controls is pretty obvious.  Are there

23   already existing controls that someone could use to

24   further, you know, make reductions.  And monitoring

25   equipment is important in terms of just really

Page 101

1   assessing if those things are really happening, those

2   controls are really working.

3       Q.    Great.  And so would this information also

4   have helped the agency assess the costs of an existing

5   source guideline?

6       A.    Yes.

7       Q.    And would it also have helped the agency

8   assess the emissions reduction from an existing source

9   guideline?

10      A.    Yes.

11      Q.    And was this information available from any

12  other source at the time?

13      A.    I don't think so.  Not comprehensively.

14      Q.    Okay.  I will go to the next exhibit, which

15  is, unfortunately, kind of long.  I'm only using it for

16  a small thing.

17                  MS. WEAVER:  What number are we at?

18                  COURT REPORTER:  8.

19                  MS. WEAVER:  8.

20                  (Plaintiff's Exhibit No. BS-8 marked for

21                  identification.)

22      Q.    Take your time and look over it.

23      A.    (Witness peruses document.)

24                  MS. GANGE:  Quick question with this

25  exhibit.  I don't see a date on it or a Bates

Page 131

1    standards were playing in reducing emissions?

2        A.      No.

3        Q.      And did you do an assessment of what roles

4    voluntary -- voluntary actions were playing in reducing

5    emissions?

6        A.      No.

7        Q.      Okay.  Let's move on to implementation of the

8    ICR.

9        A.      Okay.

10       Q.      So after it's been sent to the recipients,

11   how would you characterize how things were going up

12   until March 2017?

13       A.      So I would say that it was a big work effort.

14   After we sent the ICR out, we had -- of course we sent

15   out a lot of them.  There is a big number, and we had

16   to basically respond to a lot of questions about it,

17   and we set up a call center, because we were getting so

18   many calls, and we manned it every day.  We had people

19   in there answering the phones.  And we were trying to

20   get the data, you know, so we -- that was a big effort,

21   really just answering the phones and answering

22   questions, and a lot of times people would -- they

23   didn't want to fill out the form, for example.

24   Sometimes it was some person that was maybe just the

25   owner of a well and, you know, they didn't know what to

Brenda Shine                    2/27/2020                    18-cv-0773

Page 132

1    do.   And so we would try to get the information from

2    them just over the phone.   We could fill out the -- you

3    know, so there was a lot of work just in answering

4    questions, and transcribing the information that we

5    would get, sending out letters saying, "We got this

6    from you, and is this right?"   I think people were

7    asking for extensions at the time.   We would have to,

8    sort of, write down their names and say, "Yeah, you can

9    have an extension until X day."   And, you know, just

10   really trying to facilitate the collection at that

11   point.

12        Q.   Were you surprised by that?   When you sent

13   out the letters, were you expecting to get a lot of

14   calls or did it take you by surprise?

15        A.   Well, so I thought it would be a lot of

16   people.   I thought we would get a lot of calls, and I

17   was -- I was right, and I was a little worried about

18   it.   And then it -- it -- it became clear that we did

19   actually have to set up a hotline, and we did have to

20   man, you know, a conference room, you know, for two to

21   three months to get it.   We didn't plan on doing that,

22   but when -- you know, when this thing went out, we

23   realized we had to, because I couldn't answer the phone

24   all day long.

25        Q.   And was that different from the prior ICR

Page 136

1      Q.     Okay.  So you described setting up a phone

2  bank in response.  This memo also discusses

3  establishing a separate -- on the back, sorry --

4  establishing a separate email account, a confirmation,

5  a recorded webinar.

6             Do you remember those things happening?

7      A.     Yes.

8      Q.     And did you feel that, with all of these

9  responses, you were able to -- the agency was able to

10  respond to questions usefully and give the necessary

11  assistance to callers?

12      A.     Yes.

13      Q.     How many -- well, how many EPA staff were

14  working on this phone bank?

15      A.     I would estimate anywhere from three to eight

16  people every day.

17      Q.     Okay.  And were they the same people or kind

18  of a rotation?

19      A.     There was a rotation.

20      Q.     Okay.  So how many total people do you think,

21  approximately, worked on the phone bank?

22      A.     I'm gonna say 15.

23      Q.     Okay.  And did you direct them or train them?

24      A.     Yes.

25      Q.     Okay.  This memo also says at the bottom of

Page 139

1      Q.     Okay.  And who is Jodi Howard?

2      A.     Jodi Howard is an engineer that works in SPPD

3   in our division, and she -- she was one of the main

4   people that ran the phone bank.

5      Q.     Okay.  And so this is a quick summary of the

6   phone bank calls from the week of February 6, 2017.

7                "We responded to 188 phone calls, 15

8                volunteers manned the phone lines, we sent

9                out 200 letters granting extensions, a total

10               of 285 no-further-action letters."  And it

11               says that, "As of February 10th, the phone

12               bank, they had received 1,965" -- not the

13               phone bank, sorry -- "EPA had received 1,965

14               responses, and the phone bank had fielded

15               1,879 calls and received 1,113 extension

16               letters."

17               Does that sound approximately right to you?

18     A.     Yes.

19     Q.     So characterize that as a pretty major

20   effort?

21     A.     Yes.

22     Q.     And do you know, were -- was Jodi Howard kind

23   of reporting the numbers every week up to senior

24   management?

25     A.     Yes.

Page 152

1      A.      Approximately 4,000.

2      Q.      Uh-huh.   And those are part one and part two,

3   or all part one?

4      A.      All part one.   I think we received maybe four

5   of part two.

6      Q.      Okay.   Did you look at any of the responses

7   at any time?

8      A.      Other than just, you know, compiling them in

9   boxes for the hard copies, no.

10     Q.      So did you -- did you ever look at the

11  substance of any of the responses?

12     A.      So here, later we have gotten FOIA

13  response -- FOIA request for them, so we had to -- so I

14  have been involved in, you know, looking at those.

15     Q.      Uh-huh.

16     A.      And handing them over.

17     Q.      And when you did that, did you look at --

18  sort of look at the substance of the responses?

19     A.      Not to analyze or anything.

20     Q.      Did anything ever jump out at you or surprise

21  you from, you know, the time you spent with them in

22  responding to FOIA request?

23     A.      No.

24     Q.      So I'm gonna -- did you conduct any initial

25  analysis of the data?

Brenda Shine                  2/27/2020                  18-cv-0773

Page 154

1      A.      And I haven't gotten any questions.

2      Q.      Okay.  And can you think of any ways that the

3  data might be useful now?

4      A.      No.

5      Q.      And do you think it's pretty -- do you think

6  that it's pretty stale -- is that because you think

7  it's pretty stale at this point, or just the agency is

8  not doing anything where it would be relevant?

9      A.      Well, I don't really know what they would

10  want to do -- they could -- it is stale.  And just not

11  getting the second part of it, that would have really

12  helped, right.  That was really the -- that was really

13  sort of the drilling down.  So you could have -- I

14  mean, you could -- you could take the part-one

15  responses and look at, you know, how many wells you

16  had, you know.  But it wouldn't be everybody, so I

17  don't know.  You know, I don't know what they would do

18  with it.

19      Q.      So you really -- is it fair to say that you

20  really needed both components to truly understand

21  things like the emissions and costs associated with

22  regulating?

23      A.      Yeah.  The cost is really part two.  They

24  were really -- you know, those were the questions that

25  we really -- would have helped us with cost, would have

Page 155

1    been part two.

2           Q.     And how about emissions?

3           A.     Part two as well.

4           Q.     To your knowledge, has EPA ever assessed the

5    human health and welfare impacts of regulating or not

6    regulating existing sources of oil and gas?

7           A.     I don't know.

8           Q.     Okay.  You haven't worked on any kind of

9    analysis of the emissions -- the emissions impacts of

10   regulating or not regulating?

11          A.     No.

12          Q.     And the data the ICR was gonna gather would

13   have enabled the agency -- would it have enabled the

14   agency to do that kind of evaluation?

15          A.     I think so.

16          Q.     Let me be just a little clear.  Evaluation

17   of, you know, the emissions reductions you could get

18   from regulation.

19          A.     That was the intent of getting it, yeah.

20          Q.     Okay.  And is that true for just methane or

21   also for volatile organic compounds and hazardous air

22   pollutants?

23          A.     It's true for VOCs and hazardous air

24   pollutants as well, because that's where we were asking

25   information again, in part two.

Brenda Shine                    2/27/2020                    18-cv-0773

                                                            Page 156

1        Q.    So part two would have gotten to all three of

2    those pollutants, not just methane?

3        A.    It certainly would have gone a long way.

4        Q.    Okay.

5        A.    It was really focused on methane, but we did

6    manage to ask about composition, which means you are

7    asking about all the constituents.

8        Q.    Uh-huh.   Going back to that PowerPoint

9    presentation -- do you still have that?  It should be

10   the fattest thing in your pile.

11              MS. COSTELLO:  It's the third exhibit.

12              THE WITNESS:  There it is.  Thank you.

13       Q.    So if you could just look at page 4.  I

14   apologize again for how small it is.

15       A.    (Witness peruses document.)

16             Okay.

17       Q.    In the first sub-bullet here it says:

18             "Emissions are significantly higher than

19             previously understood."

20             Do you know what that means?

21       A.    No.

22       Q.    Do you know whether, in the 2016 time frame,

23   was the agency working to assess the -- or to better

24   understand the emissions from oil and gas sources?

25       A.    Yes.

Brenda Shine                    2/27/2020                    18-cv-0773

                                                        Page 165

1      A.    Yes.

2      Q.    On the second page -- sorry, the second page

3  of what I gave you, the first page of the paper, the

4  third bullet point.  At the very end it says that the

5  ICR would have collected:

6            "Monitoring data important to help EPA

7            understand emissions, their causes, and

8            options for mitigating them."

9            Do you agree with that?

10     A.    Where are you?

11     Q.    Sorry.  It's in the -- at the end of the

12  sub-bullet that starts with "examples of information

13  collection."

14     A.    Am I on the wrong page?

15     Q.    Sorry.  The Bates stamp is 0075287.

16     A.    Okay.  I'm in the right place.

17     Q.    Okay.  And so the third large -- I'm sorry,

18  the third black bullet down.

19     A.    Okay.

20     Q.    And then it has a sub light bullet.

21     A.    Okay.

22     Q.    And the end of that says that one of the

23  things the ICR would have collected was:

24            "Monitoring data important to help EPA

25            understand emissions, their causes, and

Page 166

1          options for mitigating them."

2          Do you agree with that?

3     A.    Yeah.

4     Q.    Okay.  And right above that it says that it

5     would have collected information about:

6          "The cost of control technologies and/or

7          process and operational changes."

8          Do you agree with that?

9     A.    I'm not sure about the process and

10    operational changes, but definitely the cost of

11    controls, I think, yeah.

12    Q.    Okay.  And if you go to the next page, which

13    is on the back of this one, it says -- the second black

14    bullet on this page says:

15         "The final ICR provides 180 days to respond;

16         i.e., May 2017.  Data submitted

17         electronically through the greenhouse gas

18         reporting tool."

19         Does that sound right to you?

20    A.    Yes.

21    Q.    Okay.  And then the same page, I guess the

22    third black bullet down it says, "We made a number of

23    changes through the comment process," and it lists a

24    bunch of things.

25         So it says it provided -- EPA provided

Page 174

1      A.     I was okay with it.

2      Q.     Yeah.  Yeah.  Prior to March of 2017, did you

3    hear any rumors or anything to suggest that the ICR was

4    going to be withdrawn?

5      A.     No, not really.  I mean, we heard about

6    administration wanting to reduce burden and things like

7    that, the new administration, but I don't remember any

8    specific discussion of it.

9      Q.     Okay.  So up until March 1st or 2nd, up until

10    then, you were just doing what you would have been

11    doing to implement the ICR?

12      A.     Yeah.

13      Q.     Okay.  This will be BS-21.

14             (Plaintiff's Exhibit No. BS-21 marked

15             for identification.)

16      Q.     Sorry.  Actually, I just don't have any

17    questions about it, but you can read it.

18      A.     That's okay.

19      Q.     We don't need to unstick that.  BS-22.

20             (Plaintiff's Exhibit No. BS-22 marked

21             for identification.)

22             THE WITNESS:   (Witness peruses

23    document.)

24             Yeah.

25      Q.     All right.  Do you -- this is a meeting

Page 180

1    asked to provide any information, do any briefing

2    papers, anything like that?

3        A.    No.  I don't recall doing that.

4        Q.    Okay.

5        A.    No.

6        Q.    Was that typical for a decision like this

7    that's directly related to the work you are doing, for

8    you not to be asked to provide any input, whether that

9    be data analysis or a briefing paper?

10       A.    I mean, they had a lot of information

11   already, it looks like.  They had all these papers and

12   stuff.  I don't know what else they would have wanted

13   from me.  So is it typical?  It's typical -- it's

14   typical to provide information to make a decision, but

15   if they have all the information, then, you know, no

16   need for me.

17       Q.    Were you ever asked about any sort of

18   options, like whether to suspend it or withdraw it, to

19   provide information for -- to present the

20   decision-makers with any options here?

21       A.    No.

22       Q.    Was it typical for you to hear about a final

23   agency action related directly to the work that you do

24   on sort of the day of or the day before it's finalized?

25       A.    No.

Brenda Shine                    2/27/2020                    18-cv-0773

Page  183

1    the facts that would go into the assessment?

2         A.    That's correct.

3         Q.    Okay.  And based on the implementation so

4    far, did anything come up that would have made you

5    think maybe we don't need this data after all?

6         A.    No.

7         Q.    Did you have any reason to believe at the

8    time that the information might no longer be needed?

9         A.    No.

10        Q.    And after the issuance of the ICR but prior

11   to the -- its withdrawal, did anybody talk to you about

12   assessing the need for the information that was being

13   collected?

14        A.    No.

15        Q.    And during that time frame, did anyone ask

16   you for an assessment of the burdens of the ICR?

17        A.    A new assessment of the burden?

18        Q.    So --

19        A.    I'm not sure.

20        Q.    -- between -- let me make it clear.

21             Between when it was finalized and when it was

22   withdrawn in March, did anyone ask you to do, yeah, a

23   new assessment of the burdens of the ICR?

24        A.    No.

25        Q.    And did anybody ask you just for your -- not

Brenda Shine                    2/27/2020                    18-cv-0773

Page 184

1    necessarily to conduct a new one, but for your

2    assessment of what the burdens were?

3         A.    For the same time frame?

4         Q.    Yeah.

5         A.    I don't recall that, no.

6         Q.    Okay.  Okay.  During that time frame, same

7    time frame between the finalization and the withdrawal,

8    were you directed to reach out to any stakeholders to

9    discuss the withdrawal of the ICR?

10        A.    No.

11        Q.    Did you hold any webinars leading up to the

12   withdrawal?

13        A.    No.

14        Q.    Okay.  Did you talk to anyone about -- to

15   gain input on whether or not the agency should withdraw

16   the ICR?

17        A.    No.

18        Q.    And are you aware of whether any of your

19   colleagues did any of those things?

20        A.    No.

21        Q.    Okay.  Looking back at the Federal Register

22   notice, it also notes that March 1st letter you

23   mentioned from nine attorneys general and the governors

24   of Mississippi and Kentucky expressing concern with the

25   burdens on businesses.

Brenda Shine                    2/27/2020                    18-cv-0773

Page 188

1    Q.    Okay.   The last page of this, talking points,

2    at the top it says:

3              "EPA will preserve the data it has received

4              as required by the Federal Records Act."

5              Did EPA do that?

6    A.    Yes.

7    Q.    And that's what we were talking about, the

8    boxes and the --

9    A.    Yes.

10   Q.    Okay.   And then the very end there is a Q and

11   A:

12             "I've already filled out my survey.   Can I

13             still submit it?"

14             And the response is:

15             "EPA has withdrawn the information request,

16             and you are no longer required to submit

17             data.   The contractor websites where you

18             would have submitted the data will be

19             deactivated."

20             Is that's correct?

21   A.    Yes.

22   Q.    Okay.   And do you know how quickly they were

23   deactivated?

24   A.    I think immediately.

25   Q.    Okay.

Brenda Shine                    2/27/2020                    18-cv-0773

Page 189

1      A.      Yeah.

2      Q.      Yeah.   And do you know -- were you aware of

3   any reason to -- that the agency didn't want to receive

4   any more data?

5      A.      Well, we just -- we were told to stop, and we

6   stopped.

7      Q.      Okay.   So that decision would have been made

8   more at your level, like just deactivate it?

9      A.      Sure.

10     Q.      This is gonna be BS-26.

11             (Plaintiff's Exhibit No. BS-26 marked

12             for identification.)

13             THE WITNESS:   (Witness peruses

14   document.)

15             Okay, yeah.

16     Q.      This is an invitation to a March 3rd, 2017,

17   meeting from you to Kong Chiu.   The stamp is 0412462.

18             Who is Kong Chiu?

19     A.      I don't know.

20     Q.      Okay.   And so do you recall this meeting?

21     A.      No.

22     Q.      No.   Do you have any estimate of what you

23   might have -- the subject is "Oil and gas ICR

24   discontinuation" -- what you might have been talking

25   about on March 3rd?

Brenda Shine                    2/27/2020                    18-cv-0773

Page 233

1              S I G N A T U R E

2

3          I, BRENDA SHINE, do hereby state under

4      oath that I have read the above and

5      foregoing deposition in its entirety and

6      that the same is a full, true and correct

7      transcript of my testimony, subject to the

8      attached list of corrections, if any.

9

10

11      _____

12              BRENDA SHINE

13

14

15      STATE OF North Carolina

16      COUNTY OF Durham

17

18              Sworn to and subscribed before me

19      this 19 day of March , 20 20 .

20

21

22                      Notary Public

23

24      My commission expires: 5 Aug 2022

25