# Exhibit 14

Final Report on Review of Agency Actions that
Potentially Burden the Safe, Efficient Development of
Domestic Energy Resources Under Executive Order
13783 (Oct. 25, 2017) (USEPA-0088206-21)

Plaintiffs' Motion For Summary Judgment

STATE OF NEW YORK, *et al.*, and ENVIRONMENTAL DEFENSE FUND
v.
ANDREW WHEELER, *et al.*
Civil Action No. 18-cv-0773 (RBW)

# U.S. Environmental Protection Agency

Final Report on Review of Agency Actions that Potentially Burden
the Safe, Efficient Development of Domestic Energy Resources
Under Executive Order 13783



*October 25, 2017*

USEPA-0088206

Environmental Protection Agency
# Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783

## Executive Summary

On March 28, 2017, President Trump signed Executive Order 13783, Promoting Energy Independence and Economic Growth. The Executive Order establishes a national policy to promote the clean and safe development of domestic energy resources while avoiding unnecessary regulatory burdens. It directs federal agencies to "review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, "agency actions") that potentially burden the development or use of domestically produced energy resources[.]"[1] The Executive Order also orders the U.S. Environmental Protection Agency (EPA) to review specific rules. As part of E.O. 13783, agencies are to develop a report detailing this review that includes recommendations for reducing unnecessary regulatory burdens.

Through implementation of environmental statutes such as the Clean Air Act and Clean Water Act, EPA promulgates regulations that may affect domestic energy use and resources. Under Administrator E. Scott Pruitt's leadership, EPA is working to fulfill its critical mission while ensuring regulations are consistent with underlying laws and policies. Implementation of E.O. 13783 and other presidential directives related to regulatory reform plays an important role in this effort.

In order to identify priority areas and specific regulations for potential repeal, replacement, or modification pursuant to E.O. 13783, EPA has coordinated its review with other Administration initiatives, such as the Presidential Memorandum on Streamlining Permitting and Reducing Regulatory Burdens for Domestic Manufacturing,[2] and E.O. 13777 on Enforcing the Regulatory Reform Agenda.[3] Notably, Administrator Pruitt established a Regulatory Reform Task Force (RRTF) pursuant to E.O. 13777, which has also served to lead implementation of the Section 2 review required under E.O. 13783.[4]

EPA issued a request for public comments to inform the RRTF on April 11, 2017.[5] As a result of this outreach, EPA received over 460,000 public comments, including a record-breaking number of 63,346 individual responses. Additionally, EPA program offices conducted nearly a dozen public

---

[1] 82 Fed. Reg. 16093 (Mar. 28, 2017).
[2] 82 Fed. Reg. 8667 (Jan. 30, 2017).
[3] 82 Fed. Reg. 12285 (Mar. 1, 2017).
[4] Memorandum from E. Scott Pruitt, Adm'r, U.S. Envtl Protection Agency, to Acting Deputy Adm'r, U.S. Envtl Protection Agency (Apr. 19, 2017) available at https://epa.gov/laws-regulations/epa-implementation-executive-order-13783-promoting-energy-independence-and-economic
[5] EPA-HQ-OA-2017-0190 available at https://www.regulations.gov/document?D=EPA-HQ-OA-2017-0190-0001.

USEPA-0088207

meetings in April and May to hear directly from stakeholders on EPA regulations and opportunities for reform.[6]

Many of the public comments centered on specific rulemakings and/or specific provisions of rulemakings that may unduly burden domestic energy production and use. Through this robust public feedback, the RRTF identified recurrent themes regarding EPA's energy-related regulations. These general themes included a need for streamlining complex permitting programs, restoring EPA's co-regulatory relationship with the states, increasing transparency pertaining to the economic impact of agency actions, and enhancing EPA's understanding of the entities it regulates.

In an effort to meet the requirements of E.O. 13783, EPA identified four key initiatives that it believes will further the goal of reducing unnecessary burdens on the development and use of domestic energy resources. These initiatives include: (1) comprehensive New Source Review reform, (2) National Ambient Air Quality Standards (NAAQS) reform, (3) robust evaluations of the employment effects of EPA regulations, and (4) a sector-based outreach program. Furthermore, the appendix of this report includes summaries of actions that EPA has already taken on rules identified for review, either specifically or generally, in E.O. 13783. Together, these efforts will help advance the Administrator's vision for EPA while fulfilling the President's goal of promoting domestic energy production and use.

## I.   New Source Review Reform

The Clean Air Act (CAA) establishes a number of permitting programs designed to reduce air pollution, primarily through the use of pollution control technology. New Source Review (NSR) is a preconstruction permitting program intended to ensure that new and modified stationary sources of air pollution do not significantly degrade air quality. NSR permits are legal documents that establish site-specific requirements that facility owners/operators must observe. The permit specifies what construction is allowed, what emission limits must be met, and often how the emissions source may be operated. There are three types of NSR permits: (1) Prevention of Significant Deterioration (PSD) permits (CAA Title I, Part C), which are required for new major sources or a major source making a major modification in an area that is in attainment with NAAQS air-quality standards; (2) Nonattainment NSR (NNSR) permits (CAA Title I, Part D), which are required for new major sources or major sources making a major modification in a nonattainment area; and (3) Minor source permits (CAA § 110(a)(2)(C)).

The potential costs, complexity, and delays that may arise from the NSR permitting process can slow the construction of domestic energy exploration, production, or transmission facilities that must undergo review. In some circumstances, the NSR process discourages the construction of new

---

[6] *See* https://www.epa.gov/laws-regulations/regulatory-reform#Public.

USEPA-0088208

facilities or modifications of existing ones that could result in greater environmental improvements. Such reactions to the NSR process slows the growth of domestic energy resources and raise energy costs, among other impacts.

Numerous public comments in response to the request for comments on E.O. 13777, and the Presidential Memorandum on Streamlining Permitting, raised concerns with the NSR program's impact on domestic energy resources. Commenters noted that the NSR permitting process is unduly lengthy and complex. Commenters further stated that the NSR application and construction costs are exceedingly high, to the point of discouraging industry from modernizing facilities for fear of triggering NSR obligations.

Several commenters suggested that EPA should defer to state decisions on the applicability of NSR requirements and other source-specific permitting decisions. Commenters also raised concerns about the availability and cost of emissions offsets in nonattainment areas, and about whether costs will increase as various NAAQS are revised.

Commenters recommended reforms to allow the purchase of offsets from outside a nonattainment area, and inter-pollutant trading. Commenters also urged EPA to better promote and facilitate use of Plant-wide Applicability Limitations, which generally can allow domestic energy production facilities to modify equipment and operations without concerns of triggering NSR requirements. Finally, recommendations included reviewing the debottlenecking rule and re-proposing it to address NSR requirements for modifying sources.

The above comments represent just some of the issues raised in public comments related to NSR. Accordingly, EPA believes opportunities exist to simplify the NSR application and permit process; to review ways to reduce the length of the permitting process; to review burdens created by the current emissions offsets structure; to improve relationships with the states; and to review the "once in, always in" policy to clarify the means by which a facility currently classified as a major source can become an area source.

To address these important areas and achieve meaningful NSR reform, Administrator Pruitt intends to convene an NSR Reform Task Force, details of which will be announced in a forthcoming agency memorandum.

## II.      National Ambient Air Quality Standards (NAAQS) Reform

Pursuant to the CAA, EPA sets NAAQS for six criteria pollutants: ozone, nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), particulate matter ($PM_{10}$ and $PM_{2.5}$), carbon monoxide (CO), and lead.   In setting the NAAQS, EPA establishes primary standards to protect public health and secondary

USEPA-0088209

standards to protect public welfare.  EPA must review and, if appropriate, revise each NAAQS every five years.

After EPA sets a new NAAQS or revises an existing standard for each criteria air pollutant, the CAA requires EPA to determine if areas meet the new standard.  Based on monitoring data or modeling, states and tribes submit recommendations to EPA on whether an area meets NAAQS for a criteria pollutant.  After reviewing the recommendations and the available information, EPA "designates" an area as attainment or nonattainment (or unclassifiable) for the standard.   States develop State Implementation Plans (SIPs) demonstrating that the state has the basic required elements of an air quality program (so-called "infrastructure SIPs" or "i-SIPs") and identifying emissions control requirements the state will rely upon to attain and/or maintain the primary and secondary NAAQS ("attainment" and "maintenance" SIPs).

NAAQS requirements, and revision of the NAAQS standards, have the potential to impact all facilities that emit a NAAQS pollutant or its precursor substances, including those facilities that generate energy from, oil, and natural gas.  These facilities can be impacted whether they are in attainment areas or nonattainment areas.  As a result, facilities face burdens including higher costs, greater uncertainties in making future plans, and a potential facility closure that not only impacts employment, but also affects communities that rely on the facility.

In response to EPA's request for comments on E.O. 13777, commenters raised concerns with the stringency of some NAAQS, as well as the short review time between revisions.  Each new or revised NAAQS requires a host of rules, guidance, and technical support documents for use by state, local, and tribal regulators, as well as industry.  The increased frequency of NAAQS revisions results in overlapping requirements that must be implemented in short time spans.  Planned and permitted facilities are subject to significant uncertainty, making it difficult to anticipate future air quality improvement requirements and restricting economic growth.  Frequent NAAQS revisions may further require that states modify their SIPs before previous standards can be fully implemented, and can also result in permitting delays for new facilities as new air quality assessments are conducted.

Other comments focused on NAAQS implementation issues.  Commenters requested that EPA develop implementation guidance that corresponds with NAAQS rulemaking in a timely manner.  They recommended that implementation guidance and the various other regulatory and analytic tools be available and final at the time the new or revised NAAQS are promulgated, and not years later, as has repeatedly occurred in recent years.  Moreover, uncertainty and delays in guidance and implementation requirements may needlessly obstruct energy expansion and modernization of existing facilities.

Concerns were further expressed regarding the unnecessary burden arising from the development and revision of SIPs, and the chronic backlog of federal SIP approvals.  At the end of fiscal year 2016,

USEPA-0088210

EPA had a backlog of 322 SIPs.[7]  Commenters noted that many state SIP submittals remain without EPA action for years, and that the process for developing, submitting and approving SIPs is inefficient and outdated.  Commenters also noted that EPA will second-guess state permitting decisions, affecting state control of the process and introducing delays and financial risks for companies seeking permits.  Comments further recommended EPA defer to state authorities for source-specific decisions and, therefore, readjust its focus to overarching guidance and policy.

Commenters additionally questioned specific NAAQS – particularly the 2015 ozone standard – which approach background concentrations in some regions.  Other commenters articulated concerns regarding monitoring and modeling issues, international and long-range ozone transport, stratospheric ozone intrusions, and exceptional events.

EPA received recommendations to revise the exceptional events rule and associated guidance to allow for greater state flexibility in flagging and excluding exceptional events in the data set used to determine compliance with NAAQS.  Exceptional events are unusual or naturally occurring actions that can affect air quality, but are not reasonably controllable using techniques that may be implemented to attain and maintain NAAQS.  Exceptional events include wildfires, stratospheric ozone intrusions, and volcanic and seismic activities.

To review the issues related to the ozone NAAQS, the Administrator formed the Ozone Cooperative Compliance Task Force.  Among its priorities, the Task Force is reviewing administrative options to enable states to enter into cooperative agreements with EPA to provide regulatory relief and meaningfully improve ozone air quality.  Moreover, EPA plans to work to streamline SIP approvals through a nationally consistent process that includes setting performance targets, and better monitoring progress on SIP reviews. EPA further plans to work to eliminate the SIP backlog.

## III.    Employment Evaluations

Regulatory costs impose tremendous burdens on American businesses, employees, and consumers – particularly within the energy sector.  In its *2015 Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act*, the Office of Management and Budget estimated that the total annual cost of EPA regulations from October 1, 2004 through September 30, 2014 stood between $37.6 and $45.4 billion (2010$).[8]  These costs may impact business development and expansion, as well as capital investment and employment patterns.

---

[7] *Fiscal Year 2018 Justification of Appropriation Estimates for the Committee on Appropriations*, U.S. ENVTL PROTECTION AGENCY, EPA-190-K-17-002 (May 2017) available at https://www.epa.gov/sites/production/files/2017-06/documents/fy18-cj-14-program-performance.pdf

[8] OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, *2015 Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act* (2015), available at https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/2015_cb/2015-cost-benefit-report.pdf.

USEPA-0088211

In the CAA,[9] the Clean Water Act,[10] the Toxic Substance and Control Act,[11] Solid Waste Disposal Act,[12] and the Comprehensive Environmental Response, Compensation, and Liability Act,[13] Congress expressed its intent that EPA conduct continuing evaluations of potential losses or shifts of employment that may result from implementation of these statutes.[14] However, the Agency historically has not conducted these assessments. EPA acknowledges the importance of considering the cumulative effects of its regulations on the American public. Accordingly, EPA intends to conduct these evaluations consistent with the statutes.

## IV.    Smart Sectors

To accomplish the goals of E.O. 13783, EPA acknowledges that it must work to develop better relationships with the regulated community to close information gaps through informal means. Engaging these stakeholders in a collaborative manner to understand technological advancements or to coordinate on regulatory developments could reduce conflicts that complicate the rulemaking process.

Accordingly, EPA recently announced its *Smart Sectors* program to re-examine how it engages with industry to reduce unnecessary regulatory burdens, improve regulatory forecasting and predictability, and improve the ability of both EPA and industry to conduct long-term regulatory planning while also improving the environment and public health.[15] EPA initially identified thirteen sectors to work with, including ones directly related to oil and gas, utilities, mining, power generation, and the automotive industry.

The *Smart Sectors* program designates staff-level points of contact who are highly knowledgeable about specific industries. These individuals will act as liaisons among industry trade associations and companies, EPA program and regional offices, state and local governments, and other stakeholder groups. The sector liaisons will focus their attention on three main areas: building relationships and improving customer service to sectors; developing additional expertise in each industry's operations and environmental performance; and informing the planning of future policy, regulations, and Agency processes.

EPA anticipates that participating industries will benefit from coordinated, cooperative, and constructive problem-solving with government. The Agency will invite participating industries to

---

[9] 42 U.S.C. §7621.
[10] 33 U.S.C. §1367.
[11] 15 U.S.C. §2622.
[12] 42 U.S.C. §7001(e).
[13] 42 U.S.C. §9610.
[14] 42 U.S.C. §7621(a); 33 USC §1367(e); 42 U.S.C. §700142 U.S.C. §9610(e).
[15] *See* https://www.epa.gov/smartsectors.

USEPA-0088212

engage in active dialogue and offer their own innovative ideas to reduce environmental impacts. Beginning in January 2018, EPA plans to release monthly updates on its *Smart Sectors* website with data and other information.

**Conclusion**

Multiple ways exist for EPA to protect the environment and public health while supporting the President's policy to promote economic growth and energy independence.  The four key initiatives identified herein will advance the goal of reducing unnecessary regulatory burdens on the development and use of domestic energy resources in accordance with E.O. 13783.  These initiatives also illustrate meaningful progress towards fulfilling Administrator Pruitt's efforts to satisfy EPA's core mission through increased transparency, public participation, and cooperative federalism.

USEPA-0088213

APPENDIX

This appendix includes summaries of the actions that EPA has taken on (1) rules that were identified specifically for review in E.O. 13783; and (2) other energy-related rules identified for review by EPA pursuant to E.O. 13783.

## I.      Rules Identified Specifically in E.O. 13783

### A.      Clean Power Plan and Related Rules

E.O. 13783 Section 4 addresses the Clean Power Plan and related rules that affect the electric utility sector, particularly utilities' fossil fuel-fired power plants – i.e., primarily coal and natural gas.  EPA initiated a review of the two identified final rules and withdrew a proposed rule.

#### 1. Carbon Emission Guidelines for Existing Stationary Sources (Clean Power Plan)

On October 23, 2015, EPA issued a final rule, "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units" (Clean Power Plan or CPP).[16]  This rule established the first-ever standards for states to follow in developing plans to reduce greenhouse gas (GHG) emissions from existing fossil fuel-fired electric generating units (EGUs).  Affected domestic energy resources include oil, natural gas, and coal.

On February 9, 2016, the U.S. Supreme Court issued an unprecedented stay of the CPP implementation pending judicial review.[17]  Following a full briefing on the merits, oral argument was held before the D.C. Circuit, sitting *en banc*, on September 27, 2016.  The case is currently pending in the D.C. Circuit.

Pursuant to E.O. 13783, on March 28, 2017, Administrator Pruitt signed a notice to review this final rule.[18]  On March 28, 2017, the Department of Justice requested that the D.C. Circuit hold in abeyance the litigation regarding the CPP.  On April 28, 2017, the D.C. Circuit ordered the litigation regarding the CPP be held in abeyance for 60 days.[19]  On May 15, 2017, the Department of Justice submitted a supplemental brief to the Court urging the Court to continue to hold the cases in abeyance while EPA conducts its review of the CPP.[20]  On June 6, 2017, EPA submitted a CPP proposal to OMB.[21]  On August 8, 2017, the D.C. Circuit ordered litigation be held in abeyance for an additional

---

[16] 80 Fed. Reg. 64661 (Oct. 23, 2015).
[17] *West Virginia v. EPA*, U.S., No. 15A773 (Feb. 9, 2016).
[18] 82 Fed. Reg. 16329 (Apr. 4, 2017).
[19] *West Virginia v. EPA*, D.C. Cir. *en banc*, No. 1673071 (Apr. 28, 2017).
[20] *West Virginia v. EPA*, D.C. Cir. *en banc*, No, 1675243 (May 15, 2017).
[21] https://www.reginfo.gov/

USEPA-0088214

60 days.[22]  On October 10, 2017, Administrator Pruitt signed a Notice of Proposed Rulemaking proposing to repeal the CPP.[23]  The public comment period closes on December 15, 2017. On October 10, 2017, EPA also submitted an advanced notice of proposed rulemaking, State Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units, to OMB.[24]

### 2.  Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources

On October 23, 2015, EPA issued a final rule, "Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units."[25]  This rule established standards for emissions of carbon dioxide ($CO_2$) for newly constructed, modified, and reconstructed affected fossil fuel-fired EGUs.  Affected domestic energy resources include oil, natural gas, and coal.

Pursuant to E.O. 13783, on March 28, 2017, Administrator Pruitt signed a notice to review the final rule.[26]  On March 28, 2017, the Department of Justice requested that the D.C. Circuit hold in abeyance the litigation regarding the rule, including the scheduled April 17, 2017, oral arguments.[27] On March 30, 2017, the D.C. Circuit granted the request to hold the litigation in abeyance.[28]

### 3.  Federal Plan/Model Trading/Framework Rule

On October 23, 2015, in connection with the CPP, EPA published a proposed rule, "Federal Plan Requirements for Greenhouse Gas Emissions From Electric Utility Generating Units Constructed on or Before January 8, 2014; Model Trading Rules; Amendments to Framework Regulations; Proposed Rule."[29] This rule proposed (1) a Federal plan to implement the CPP emission guidelines, (2) model trading rules to aid implementation of the guidelines, and (3) amendments to the existing framework regulations implementing CAA §111(d).  Affected domestic energy resources include oil, natural gas, and coal.

Pursuant to E.O. 13783, on March 28, 2017, Administrator Pruitt signed a notice withdrawing these proposed rules.[30]  The notice also included the withdrawal of the proposed design details of the Clean Energy Incentive Program (CEIP) under the CPP.[31]

---

[22] *West Virginia v. EPA*, D.C. Cir. *en banc*, No. 1687838 (Aug. 8, 2017).
[23] 80 Fed. Reg. 48035 (Oct. 16, 2017).
[24] https://www.reginfo.gov/
[25] 80 Fed. Reg. 64509 (Oct. 23, 2015).
[26] 82 Fed. Reg. 16330 (Apr. 4, 2017).
[27] *North Dakota v. EPA*, D.C. Cir., No. 1668276 (Mar. 28, 2017).
[28] *North Dakota v. EPA*, D.C. Cir., No. 1668612 (Mar. 30, 2017).
[29] 80 Fed. Reg. 64966 (Oct. 23, 2015).
[30] 82 Fed. Reg. 16141 (April 3, 2017).
[31] 81 Fed. Reg. 42940 (June 30, 2016).

USEPA-0088215

B.    **Methane Emissions Standards for Oil and Natural Gas Sector**

On June 3, 2016, EPA issued a final rule, "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources."[32]  This rule included amendments to the existing standards for the oil and natural gas source category (subpart OOOO) and set first-time standards for both GHGs (specifically methane) and volatile organic compounds (VOC) (subpart OOOOa).

Pursuant to E.O. 13783, on March 28, 2017, Administrator Pruitt signed a notice to review the final rule.[33]  On April 7, 2017, the Department of Justice requested that the D.C. Circuit hold in abeyance the litigation regarding the oil and gas methane rule, including the scheduled oral arguments.[34]  On May 18, 2017, the D.C. Circuit granted the request to hold the litigation in abeyance until EPA has completed its review and reconsideration of the 2016 rule.[35]

On April 18, 2017, Administrator Pruitt signed a letter that announced EPA's intent to convene a proceeding for reconsideration of the following objections relative to the fugitive emissions requirements: (1) the applicability of the fugitive emissions requirements to low production well sites, and (2) the process and criteria for requesting and receiving approval for the use of an alternative means of emission limitations (AMEL) for purposes of compliance with the fugitive emissions requirements in the 2016 rule.[36]  On May 26, 2017, Administrator Pruitt signed a notice of reconsideration related to (1) the requirements for certification of closed vent system by a professional engineer, and (2) the well site pneumatic pump standards, and a partial stay of the rule requirements pending reconsideration.[37]

On June 12, 2017, Administrator Pruitt signed a proposed rulemaking for a three-month stay[38] and a separate notice proposing a two-year stay.[39]  EPA currently has supplemental notices to these proposals under OMB interagency review.[40, 41]

II.    **Other Energy-Related Rules Identified by EPA**

---

[32] 81 Fed. Reg. 35824 (June 3, 2016).
[33] 82 Fed. Reg. 16331 (Apr. 4, 2017).
[34] *API v. EPA*, No. 13-1108 (and consolidated cases), D.C. Cir., No. 1670157 (Apr. 7, 2017).
[35] *API v. EPA*, No. 13-1108 (and consolidated cases), D.C. Cir., No. 1675813 (May 18, 2017).
[36] EPA Administrator E. Scott Pruitt, letter to API et al. (Apr. 18, 2017).
[37] 82 Fed. Reg. 25734 (June 5, 2017).  Note that the D.C. Circuit vacated the 90 day stay on July 3, 2017.  The court also emphasized that nothing in its opinion limits EPA's authority to reconsider the oil and gas standards and to proceed with its June 16, 2017 proposed two-year stays of certain requirements in the rule.
[38] 82 Fed. Reg. 27641 (June 16, 2017).
[39] 82 Fed. Reg. 27645 (June 16, 2017).
[40] https://www.reginfo.gov/
[41] https://www.reginfo.gov/

USEPA-0088216

As noted previously, the Administration has initiated several regulatory reform efforts, allowing EPA to leverage the ideas and information collected from those efforts to support and focus its activities to alleviate unnecessary burdens on the domestic energy sector. Public input has been received in response to both the Department of Commerce's request for information (RFI) regarding the Presidential Memorandum Streamlining Permitting and Reducing Regulatory Burdens for Domestic Manufacturing,[42] and EPA's request for comment pursuant to E.O. 13777 in order to identify regulations that may be appropriate for repeal, replacement, or modification. EPA has screened each docket for comments with substantive, specific suggestions to remove regulatory burdens on the development or use of domestic energy resources. As part of this effort, the RRTF has identified the following additional energy-related actions EPA has taken:

### A.   Oil and Gas Information Collection Request

On November 10, 2016, EPA sent an information collection request (ICR) to more than 15,000 owners and operators in the oil and gas industry, requiring them to provide information on equipment inventories and methane emissions. This ICR conducted pursuant to CAA §114 was to assist the Agency in developing emissions standards for existing oil and gas facilities pursuant to CAA §111(d).[43]

On March 2, 2017, Administrator Pruitt withdrew the ICR.[44] The withdrawal will allow EPA to assess the need for the information that the Agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need. EPA estimated the burden of the information collection to be 284,751 hours, costing $42,453,050. Due to some facilities submitting responses to the ICR prior to the withdrawal, EPA estimated that the withdrawal saved approximately $37 million in reporting burden. Affected domestic energy resources include oil and natural gas.

### B.   Mid-Term Evaluation for Light-Duty Vehicle Greenhouse Gas Emissions Standards

In 2012, EPA and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) set GHG emissions and Corporate Average Fuel Economy (CAFE) standards for model year (MY) 2017 and beyond for light-duty vehicles.[45] The 2012 joint rulemaking included a regulatory requirement for EPA to conduct a Mid-Term Evaluation (MTE) of the GHG standards established for MY 2022-2025 to assess whether the standards were appropriate no later

---

[42] The RFI resulted in 170 comments. Most EPA-relevant comments focused on air permitting programs (e.g. NSR, Title V, SSM, etc.).
[43] EPA ICR No. 2548.01.
[44] 82 Fed. Reg. 12817 (Mar. 7, 2017).
[45] 77 Fed. Reg. 62624 (Oct. 15, 2012).

USEPA-0088217

than April 1, 2018. On January 12, 2017, EPA issued, "Final Determination on the Appropriateness of the Model Year 2022-2025 Light-duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation."[46] This action determined that the GHG emission standards for MY 2022-2025 light-duty vehicles were appropriate.

On March 15, 2017, Administrator Pruitt and Department of Transportation Secretary Elaine Chao announced that they intended to reconsider the final determination in order to allow for additional consultation and coordination, to ensure that the record is based on the best available data, and consistent with the schedule prescribed by the 2012 regulation. A formal notice of reconsideration was published in the Federal Register on March 22, 2017.[47] On August 21, 2017, EPA and DOT issued a request for public comment on its reconsideration of the Final Determination and invited stakeholders to provide any relevant comments, data, and information to inform the reconsideration.[48]

In accordance with the schedule set forth in EPA's regulations, the Agency intends to make a new Final Determination regarding the appropriateness of the MY 2022-2025 Light-duty Vehicle GHG Emissions Standards no later than April 1, 2018.

### C. Steam Electric Effluent Limitations Guidelines

On November 3, 2015, EPA issued a final rule "Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category."[49] This rule contained limitations and standards on various wastestreams at steam electric power plants: fly ash transport water, bottom ash transport water, flue gas mercury control wastewater, flue gas desulfurization (FGD) wastewater, gasification wastewater, and combustion residual leachate. This action affects domestic coal resources.

EPA received seven petitions for review of the 2015 Steam Electric ELG rule. On December 8, 2015, the United States Judicial Panel on Multi-District Litigation issued an order consolidating all of the petitions in the U.S. Court of Appeals for the Fifth Circuit.[50]

On April 11, 2017, the Administrator sent a letter to each state governor notifying them of the Agency's intent to consider postponing compliance dates as well as petitions for reconsideration of the final rule.[51] On April 12, 2017, the Administrator announced EPA's decision to reconsider the

[46] 81 Fed. Reg. 87927 (Jan. 12, 2017).
[47] 82 Fed. Reg. 14671 (Mar. 22, 2017).
[48] 82 Fed. Reg. 39551 (Aug. 21, 2017).
[49] 80 Fed. Reg. 67838 (Nov. 3, 2015).
[50] *Southwestern Electric Power Co., et al. v. EPA*, 5th Citr. (Dec. 8, 2015).
[51] EPA Administrator E. Scott Pruitt, letter to Virginia Governor Terry McAuliffe (Apr. 11, 2017).

USEPA-0008218

final rule and, using authority under the Administrative Procedure Act §705, to postpone compliance dates that have not yet passed pending judicial review.[52]  On September 18, 2017, EPA issued a final rule postponing compliance deadlines relating to FGD wastewater and bottom ash transport water from November 1, 2018, to November 1, 2020, while the Agency reconsiders those wastestreams in the 2015 rule.[53]

### D.   Coal Combustion Residuals

On April 17, 2015, EPA issued a final rule, "Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals From Electric Utilities; Final Rule."[54]  This rule establishes minimum national criteria under subtitle D of the Resource Conservation and Recovery Act (RCRA) for Coal Combustion Residuals (CCR) landfills and surface impoundments at active coal-fired power plants.  This action affects domestic coal resources.

Subsequent to the promulgation of the 2015 CCR rule, various environmental and industry groups submitted to the D.C. Circuit seven separate petitions for review, which have been consolidated into a single action.  On June 14, 2016, the D.C. Circuit remanded with vacatur to EPA specific provisions of the rule for further consideration.[55]   EPA is planning to issue a proposal to address those rule provisions by the end of 2017.[56]

On December 16, 2016, the President signed the Water Infrastructure Improvements for the Nation (WIIN) Act,[57] which included language giving state agencies the authority to implement and enforce coal ash regulations under the 2015 CCR Final rule through EPA-approved state permit programs.  The WIIN Act also gives EPA the authority to regulate coal ash in states that choose not to implement state permitting programs and in states whose permitting programs are determined to be inadequate by EPA.  EPA has direct implementing authority in Indian country.

On April 28, 2017, Administrator E. Scott Pruitt sent letters informing states that EPA was working on guidance for implementing state permitting programs under WIIN that allow flexibility in individual permits to manage the safe disposal of CCR.  On August 15, 2017, EPA issued Interim Final Guidance for State CCR Permit Programs.[58]  On September 14, 2017, EPA announced its intent

---

[52] 82 Fed. Reg. 19005 (Apr. 25, 2017).
[53] 82 Fed. Reg. 43494 (Sept. 18, 2017).
[54] 80 Fed. Reg. 21302 (Apr. 17, 2015).
[55] *Utility Solid Waste Activities Group v. EPA*, D.C. Cir. (June 14, 2016).
[56] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201704&RIN=2050-AG88.
[57] P.L. 114-322.
[58] 82 Fed. Reg. 38685 (Aug. 15, 2017).

USEPA-0088219

to reconsider several substantive provisions of the rule, as part of its rulemaking pursuant to the D.C. Circuit remand.[59]

**E.    Waters of the United States**

On June 29, 2015, EPA issued a final rule, "Clean Water Rule: Definition of 'Waters of the United States'" (WOTUS).[60]  The WOTUS rule is a definitional rule that affects the scope of the "waters of the United States;" it does not establish any regulatory requirements or directly mandate actions on its own.  However, by changing the definition of the "waters of the United States," the rule changes the waters where other regulatory requirements that affect regulated entities come into play (i.e., the locations where regulated entities would be required to obtain certain types of permits).  As a result, this action would have had wide-ranging effects on domestic energy production and use, including the permitting of oil, gas, coal, and renewable development sites, and the transmission and distribution of electricity.

Due to concerns about the potential for regulatory uncertainty, as well as the scope and legal authority of the 2015 WOTUS rule, 31 states and a number of other parties sought judicial review in multiple actions.  On October 9, 2015, the U.S. Court of Appeals for the Sixth Circuit stayed the 2015 WOTUS rule nationwide pending further action of the court.[61]

On February 28, 2017, President Trump signed E.O. 13778 – Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule, which directed EPA and the U.S. Army Corp of Engineers to review the 2015 WOTUS rule.[62]

On June 27, 2017, EPA and the Army Corps signed a proposed rulemaking to repeal the 2015 WOTUS rule.[63]  As indicated in the proposed withdrawal, the agencies are implementing E.O. 13778 in two steps to provide as much certainty as possible as quickly as possible to the regulated community and the public during the development of the ultimate replacement rule.  In Step 1, the agencies are taking action to establish the legal status quo in the Code of Federal Regulations, by re-codifying the regulation that was in place prior to issuance of the 2015 rule.  In Step 2, the agencies plan to propose a new definition that would replace the approach in the 2015 rule.

EPA has initiated programmatic staff workgroups to recodify the regulation that was in place prior to the 2015 WOTUS rule and consider a new definition that would replace the approach in the

---

[59] EPA Press Release, "EPA to Reconsider Certain Coal Ash Rule Provisions" (Sept. 14, 2017).
[60] 80 Fed. Reg. 37054 (June 29, 2015).
[61] *Ohio v. U.S. Army Corps of Eng'rs.*, 6th Cir. (Oct. 9, 2015).
[62] 82 Fed. Reg. 12497 (Mar. 3, 2017).
[63] 82 Fed. Reg. 34899 (July 27, 2017) (NPRM).

USEPA-0088220

WOTUS rule with one that reflects the principles that Justice Scalia outlines in the *Rapanos* plurality opinion.

USEPA-0088221